**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DON TEDFORD,　　　　　　　　　)
　　　　　Petitioner,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　)　　　CIVIL ACTION NO. 09-409
JEFFREY BEARD, et al.,　　　　　　)
　　　　　Respondents.　　　　　　)

## MEMORANDUM OPINION

Before the Court is *Petitioner's Motion For Leave To Conduct Discovery*. [ECF No. 143].

The Respondents (hereinafter "the Commonwealth") oppose Petitioner's motion, which is his

third motion for discovery, for the reasons set forth in its *Brief In Opposition to Petitioner's*

*Motion Seeking Leave To Re-Open Discovery Phase Of Litigation*. [ECF No. 185]. The Court

agrees with the Commonwealth that Petitioner is not entitled to reconsideration of the Court's

two previous decisions that denied additional discovery in this case. Therefore, the Court will

deny Petitioner's motion in all respects.

## I.　Relevant Background[1]

### A.　The state court proceedings

On February 6, 1987, a jury in the Court of Common Pleas of Butler County convicted

Petitioner of murdering and raping Jeanine Revak more than a year earlier, in January 1986.

_____

[1]　　Respondents have submitted the state court record ("SCR") from the Court of Common
Pleas of Butler County, which includes documents filed with that court and transcripts of all
relevant proceedings. The documents contained in the SCR are numbered 1 through 226 and
shall be cited to as "SCR No. ___ ."

Following a separate sentencing trial, the jury sentenced him to death on the first-degree murder conviction. Petitioner's defense counsel was his privately-retained attorney, Charles A. Schwartz, Esq.

The trial court subsequently appointed Peter Shaffer, Esq., with the Butler County Public Defender's Office, to represent Petitioner as he litigated his post-trial motions. (SCR Nos. 58, 63 and 95). In those motions, Petitioner raised claims of trial court error, prosecutorial misconduct, and over 80 claims that his trial attorney, Schwartz, provided him with ineffective assistance of counsel. In February 1988, the trial court presided over a three-day evidentiary hearing on Petitioner's post-trial motions. A number of witnesses testified at the hearing, including Schwartz, Petitioner, and Robert Sintz, a UPS delivery man. Petitioner also introduced many exhibits at the hearing.

On April 29, 1988, the trial court issued a Memorandum Opinion and Order which denied Petitioner's post-trial motions. (SCR No. 98, Commonwealth v. Tedford, C.A. No. 241 of 1986, slip op. (C.P. Butler, April, 29, 1988)). Petitioner appealed and on December 13, 1989, the Supreme Court of Pennsylvania affirmed his judgment of sentence. Commonwealth v. Tedford, 567 A.2d 610 (Pa. 1989).

In July 1995, Petitioner filed a *pro se* motion for post-conviction relief ("PCRA"). Eventually, Matthew C. Lawry, Esq., among others, came to represent him. Petitioner, through counsel, filed an amended PCRA petition raising, *inter alia*, claims of prosecutorial misconduct

2

and claims of ineffective assistance of trial counsel (Schwartz) and post-trial and direct appeal counsel (Shaffer). (SCR Nos. 119 and 168).

As is the case in a federal habeas proceeding, no discovery is permitted in a capital PCRA proceeding except upon leave of court after a showing of good cause; bald assertions and conclusory allegations do not support discovery; and, speculative discovery requests will be denied. Pa.R.Crim.P. 902(E)(2). See, e.g., Commonwealth v. Williams, 86 A.3d 771, 789 (Pa. 2014) ("this Court has viewed overly broad discovery requests under Rule 902(E)(2) with suspicion. A general claim of necessity is insufficient. Instead, discovery requests in the PCRA setting must be accompanied by an explanation why the exculpatory information was unavailable to prior counsel and must identify specific documents or items that were not disclosed pre-trial or during the trial proceedings."); Commonwealth v. Bryant, 855 A.2d 726, 749-50 (Pa. 2004) ("A showing of good cause requires more than just a generic demand for potentially exculpatory evidence.") (quoting Commonwealth v. Carson, 913 A.2d 220, 261 (Pa. 2006)); Commonwealth v. Collins, 957 A.2d 237 (Pa. 2008) (PCRA court did not err in denying petitioner's discovery requests, which were premised on the mere speculation that possible trial court errors or potential exculpatory evidence could be discovered).

In the motion for discovery Petitioner filed with the PCRA court, he requested:

    a.    Any and all photographs taken during the investigation of this case, including but not limited to, any and all photographs and contact sheets of film exposed i) at the scene where the victim's body was found, ii) of the victim's body, iii) inside or in the vicinity of the Finishing Touch, iv) of the victim's automobile or

3

the site where said automobile was found, or v) of clothing belonging to or seized from the defendant;

b.     Any and all scene drawings of i) the scene where the victim's body was found, ii) the inside of or the vicinity of the Finishing Touch, or iii) the site where the victim's automobile was found;

c.     Any and all audiotapes of witness interviews, including but not limited to i) the interviews of James Revak [the victim's husband] conducted by the Pennsylvania State Police and the Cranberry Township police, ii) any audiotapes of telephone calls made by Mr. Tedford, and iii) any audiotapes of interviews of Elizabeth Manuel;

d.     Any logs or copies of logs obtained by law enforcement agencies from UPS, reflecting deliveries to the Finishing Touch;

e.     Any and all crime lab reports, including i) all drawings made by the laboratories or by criminalists, ii) any and all fiber analysis, and iii) any reports concerning an analysis of striation patterns that was conducted in an attempt to match the purported murder weapon with twine seized from the Finishing Touch. If no report was prepared, Petitioner requests a copy of all materials used to make the comparison and any results from the comparison;

f.     Any fingerprints taken and the results of any fingerprint comparisons that were performed;

g.     Any and all polygraph examination results; and

h.     All property seized from the [Petitioner].

(SCR No. 160 at ¶ 13).

On February 26, 2002, the PCRA court heard argument on Petitioner's motion for

discovery. On June 12, 2002, it issued a Memorandum Opinion and Order which denied it. (SCR

No. 163, Commonwealth v. Tedford, C.A. No. 241 of 1986, slip op. (C.P. Butler, June 12,

4

2002)). The court reviewed each request Petitioner made and concluded that with respect to each request that he failed to show that good cause existed to justify a grant of discovery. (Id. at 3-16).

On March 5, 2004, by Memorandum Opinion and Order the PCRA court dismissed all of Petitioner's post-conviction claims except for the claim that his post-trial and appellate counsel (Shaffer) had labored under a conflict of interest. (SCR No. 193). The PCRA court held an evidentiary hearing limited to that remaining claim on May 18, 2004. On July 16, 2004, the PCRA court issued a Memorandum Opinion and Order which denied that claim. (SCR No. 208).

Petitioner appealed to the Supreme Court of Pennsylvania. On November 18, 2008, it affirmed the orders of the PCRA court. Commonwealth v. Tedford, 960 A.2d 1 (Pa. 2008). It expressly held that "the PCRA court did not err in dismissing all but one of Petitioner's claims without discovery or a hearing." Id. at 55.

### B. Rules governing discovery in a § 2254 action

On November 18, 2009, Petitioner, through his court-appointed attorneys Lawry and Amy Donnella, Esq. ("first habeas counsel") filed with this Court Petitioner's pending Petition For a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. [ECF No. 23]. Petitioner presents 17 claims for relief. He argues that he is entitled to a new trial or, at a minimum, a new sentencing hearing.[2]

---

[2]     Petitioner originally raised 18 claims for relief. On September 6, 2013, he notified the Court that he was withdrawing one of his sentencing-phase claims (Claim 16). Accordingly, Petitioner now has a total of 17 claims for relief pending before the Court.

"A habeas petitioner, unlike the usual civil litigant in federal court, **is not entitled to discovery as a matter of ordinary course**." Bracy v. Gramley, 520 U.S. 899, 904 (1997) (emphasis added). See also Harris v. Nelson, 394 U.S. 286, 300 (1969) ("broad-ranging preliminary inquiry is neither necessary nor appropriate in the context of a habeas corpus proceeding."). In a federal habeas action, discovery is authorized in Rule 6 of the Rules Governing Section 2254 Cases in the United States District Court only by leave of court upon a showing by the petitioner of "good cause," which may be made "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief[.]" Harris, 394 U.S. at 300; see Bracy, 520 U.S. at 908-09.

At least four important factors must be considered by a federal district court when evaluating a petitioner's request for discovery in a § 2254 action. First, the "burden rests upon the petitioner to demonstrate that the sought-after information is pertinent and that there is good cause for its production." Williams v. Beard, 637 F.3d 195, 209 (3d Cir. 2011). Second, "bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the state to respond to discovery or to require an evidentiary hearing." Zettlemoyer v. Fulcomer, 923 F.2d 284, 301 (3d Cir. 1991). Mayberry v. Petsock, 821 F.2d 179, 185 (3d Cir. 1987). In order to demonstrate good cause for discovery, a habeas petitioner must set forth "specific factual allegations which, if fully developed, would entitled him or her to the writ" on a claim that he is raising in his petition. See, e.g., Lee v. Glunt, 667 F.3d 397, 404 (3d Cir. 2012). Third, Rule 6

6

does not authorize what is commonly referred to as "fishing expeditions." This is related to the requirement that a petitioner's request for discovery be based upon specific factual allegations regarding a claim before the court. It is not enough for a petitioner to speculate that the discovery he seeks might yield information that would support one of his claims or that it would give support to a new claim. See, e.g., Deputy v. Taylor, 19 F.3d 1485, 1493 (3d Cir. 1994) (quoting with approval Munoz v. Keane, 777 F.Supp. 282, 287 (S.D.N.Y. 1991), which explained: "petitioners are not entitled to go on a fishing expedition through the government's files in hopes of finding some damaging evidence"); Williams, 637 F.3d at 210-11 (the petitioner's discovery request "amounts to an entreaty to engage in a fishing expedition. The law is clear, however, that such speculative discovery requests should be rejected."); Arthur v. Allen, 459 F.3d 1310, 1311 (11th Cir. 2006) ("good cause for discovery cannot arise from mere speculation" and "discovery cannot be ordered on the basis of pure hypothesis."); Rich v. Calderon, 187 F.3d 1064, 1067-68 (9th Cir. 1999) (noting that in habeas proceedings discovery is not "meant to be a fishing expedition for habeas petitioners to explore their case in search of its existence.") (internal quotation marks omitted).

The fourth point a district court must consider relates to the "exhaustion" requirement in federal habeas actions filed by state prisoners. A federal habeas court generally may not grant a state prisoner's petition for a writ of habeas corpus unless he first presented his federal constitutional claims to the state court. 28 U.S.C. § 2254(b)(1)(A). This "exhaustion" requirement is "grounded in principles of comity; in a federal system, the States should have the

7

first opportunity to address and correct alleged violations of state prisoner's federal rights."

Coleman v. Thompson, 501 U.S. 722, 731 (1991). See also O'Sullivan v. Boerckel, 526 U.S.

838, 842-49 (1999).

> [It is] principally designed to protect the state courts' role in the enforcement of
> federal law and prevent disruption of state judicial proceedings. See Braden v.
> 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 490-491, 93 S.Ct. 1123,
> 1127, 35 L.Ed.2d 443 (1973). Under our federal system, the federal and state
> "courts [are] equally bound to guard and protect rights secured by the
> Constitution." Ex parte Royall, 117 U.S. [241, 251, 6 S.Ct. 734, 740 (1886)].
> Because "it would be unseemly in our dual system of government for a federal
> district court to upset a state court conviction without an opportunity to the state
> courts to correct a constitutional violation," federal courts apply the doctrine of
> comity, which "teaches that one court should defer action on causes properly
> within its jurisdiction until the courts of another sovereignty with concurrent
> powers, and already cognizant of the litigation, have had an opportunity to pass
> upon the matter." Darr v. Burford, 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed.
> 761 (1950). See Duckworth v. Serrano, 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70
> L.Ed.2d 1 (1981) (per curiam) (noting that the exhaustion requirement "serves to
> minimize friction between our federal and state systems of justice by allowing the
> State an initial opportunity to pass upon and correct alleged violations of
> prisoners' federal rights").

Rose v. Lundy, 455 U.S. 509, 517 (1982) (footnote omitted), limited on other grounds by Rhines

v. Weber, 544 U.S. 269 (2005). Because a petitioner in a § 2254 case must first exhaust any

claim in state court before he brings it in federal court, a federal court must, in considering a state

prisoner's motion for discovery, take into account any lack of diligence on the petitioner's part in

developing the record in state court. See, e.g., Hooks v. Workman, 606 F.3d 715, 730-31 n.14

(10th Cir. 2010); Moore-El v. Luebbers, 446 F.3d 890, 900-01 (8th Cir. 2006); Crawford v.

Head, 311 F.3d 1288, 1329 (11th Cir. 2002); Isaacs v. Head, 300 F.3d 1232, 1248-50 (11th Cir.

2002); Maynard v. Dixon, 943 F.2d 407, 412 (4th Cir. 1991); Byrd v. Armontrout, 880 F.2d 1, 7

(8th Cir. 1989). Although federal habeas courts always had to inquire into the efforts the petitioner in a § 2254 case made in developing the record in state court, the inquiry has become all the more important since the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA, as codified at 28 U.S.C. § 2254(e)(2), prohibits a federal district court from granting a petitioner an evidentiary hearing if he was not reasonably diligent in trying to develop the record in state court. See, e.g., Williams v. Taylor, 529 U.S. 420 (2000); Palmer v. Hendricks, 592 F.3d 386, 392 (3d Cir. 2010) (§ 2254(e)(2) bars a federal habeas court from holding an evidentiary hearing "unless the petitioner was diligent in his attempt to develop a factual basis for his claim in the state court proceedings[.]"); Lewis v. Horn, 581 F.3d 92, 104-05 (3d Cir. 2009) (the purpose of § 2254(e)(2) is "to ensure the prisoner undertakes his own diligent search for evidence"); Taylor v. Horn, 504 F.3d 416, 437 (3d Cir. 2007) ("Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings."); Isaacs, 300 F.3d at 1248-49 ("[i]n passing AEDPA ... Congress modified the discretion afforded to the district court and erected additional barriers limiting a habeas petitioner's right to discovery or an evidentiary hearing."). AEDPA also enacted a deferential standard of review, which is codified at 28 U.S.C. § 2254(d). When a federal court is analyzing a claim under the standard set forth in § 2254(d), its review is limited to the record that was before the state court when it adjudicated the claim. As the Supreme Court recently reiterated:

> Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing

9

so. Provisions like §§ 2254(d)(1) and (e)(2) ensure that "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." [Williams, 529 U.S. at 437; Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 787 (2011)] ("Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions"); Wainwright v. Sykes, 433 U.S. 72, 90, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) ("[T]he state trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing").

Cullen v. Pinholster, —U.S. — ,131 S.Ct. 1388, 1401-03 (2011).

## B. Petitioner's first motion for discovery

Because Petitioner indicated in the Petition that he wanted discovery in this federal habeas case, the Court issued an Order dated December 3, 2009, in which it directed him to file a motion for discovery and memorandum in support in which he was required to:

specifically set forth each claim on which discovery is sought and explain why, with respect to each claim, prior state proceedings in the case did not adequately develop the information sought.

[ECF No. 24].

On January 29, 2009, Petitioner filed his first motion for discovery. [ECF No. 32]. He notified the Court that he sought discovery on Claim II, in which he alleges that "trial counsel was ineffective for failing to investigate, discover and present to the jury evidence that would have demonstrated that [he] is actually innocent, or at least raised a reasonable doubt as to his guilt, and for failing to adequately cross examine key state witnesses"; Claim IV, in which he alleges that his constitutional rights "were violated because of prosecutorial suppression and

10

manipulation of evidence and presentation of inaccurate evidence and testimony"; and, Claim V,

in which he alleges the Commonwealth "withheld material, exculpatory evidence regarding deals

with Commonwealth witnesses White and Ferry, and knowingly allowed them to testify

untruthfully." [ECF No. 23 at i-iii].

The discovery that Petitioner sought in his first motion for discovery was extensive. He

requested:

7.  . . . .
a.      Any and all photographs taken during the investigation of this case, including but
not limited to, any and all photographs and/or contact sheets of film exposed: i) at the scene
where the decedent's body was found; ii) of the decedent's body; iii) inside or in the vicinity of
the Finishing Touch; iv) of the decedent's automobile or the site where said automobile was
found; v) of clothing belonging to or seized from the defendant; vi) inside or in the vicinity of the
decedent's residence; vii) inside of any automobile used or controlled by Petitioner; viii) inside
of anyone else's automobile; and ix) of any other evidence or location connected with this case.

b.      Any and all scene drawings made during the investigation of this case, including
but not limited to, drawings of: i) the scene where the decedent's body was found; ii) the inside
of or the vicinity of the Finishing Touch; iii) the site where the decedent's automobile was found;
and iv) the inside or vicinity of the decedent's residence.

c.      Any and all transcripts, notes, audiotapes or videotapes of interviews conducted
as part of the investigation of this case by federal, state, or local law enforcement personnel, or
conversations with any and all witnesses, including but not limited to: i) James Revak;
ii) Don Tedford; iii) Elizabeth Manuel; iv) interviews with anyone who served as a witness in the
trial of this case; v) any person considered a person of interest during the investigation of this
case; and vi) any person who supplied information to law enforcement personnel regarding this
case.

d.      Any logs or copies of logs obtained by law enforcement agencies from UPS,
reflecting deliveries to the Finishing Touch.

e.      Any and all crime lab reports, in whatever format maintained, including: i) all
drawings made by the laboratories or by criminalists; ii) any and all fiber analysis; iii) any and
all hair analysis; iv) any and all reports concerning an analysis of striation patterns that was

11

conducted in an attempt to match the purported murder weapon with twine seized from the Finishing Touch; and v) any and all reports of analysis of suspected biological exemplars (whether fluid or solid) or other fluids performed in conjunction with the investigation of the rape or murder of Jeanine Revak. For each such report, we request production of any and all documents reflecting or recording the scientific or other literature upon which the person preparing the report based his/her opinions. For each such report, we also request production of any and all documents reflecting or recording reviews, quality control documents, and method validation records prepared in conjunction with the report.

f. Any and all documents recording, reflecting or containing communications sent to, or otherwise provided to, any laboratory that received any of the evidence collected in the course of the investigation of this case, regarding such evidence or the investigation into Jeanine Revak's death.

g. Any and all documents concerning or describing fibers, and the handling Jeanine Revak, without regard to whether those fibers were ultimately deemed to be of value to the investigation, including records reflecting or recording the location from which they were collected, the manner in which they were collected, the containers in which they were stored at any point from the moment of collection until the present, the names of all those persons who touched, analyzed, or otherwise handled those fibers from the time the investigation of this crime began, all locations at which these fibers were stored prior to trial and have been stored since trial, and the current location of these fibers.

h. Any and all documents, including bench notes, reflecting or recording information about the manner in which fibers collected in conjunction with the investigation of the rape or murder of Jeanine Revak were analyzed, including, but not limited to, for each such fiber: the date on which the fiber was analyzed; any chemical reagents with which the fiber was treated as part of the analysis; any equipment or machinery/instruments used during the analysis; the date and time at which such equipment or machinery/instruments was calibrated immediately prior to the analysis of that fiber; the date on which such equipment or machinery/instruments had been tested for performance and accuracy immediately prior to the analysis; records of any repair service performed on such equipment or machinery/instruments in the year prior to, and the year subsequent to, the analysis; the name, training and credentials, including certifications, of any person involved in the analysis and that person's function in performing the analysis; any manuals or other documents reflecting the protocols in use regarding such analysis at the time such analysis was being performed; any manuals or other documents reflecting the protocols adopted subsequent to the time such analysis was being performed; any logs or bench notes reflecting the actual steps employed in the process of the analysis of each such fiber; any notes reflecting or recording the decision, and/or the basis therefor, for deciding not to analyze a fiber collected in conjunction with the investigation of the rape or murder of Jeanine Revak. We also

12

request production of any photographs taken of this evidence or taken during the course of analysis of this evidence.

i.      Any and all documents concerning or describing hairs, whether human or animal, and the handling and storage thereof, collected in conjunction with the investigation of the rape or murder of Jeanine Revak, without regard to whether those hairs were ultimately deemed to be of value to the investigation, including records reflecting or recording the location from which they were collected, the manner in which they were collected, the containers in which they were stored at any point from the moment of collection until the present, the names of all those persons who touched, analyzed, or otherwise handled those hairs from the time the investigation of this crime began, all locations at which these hairs were stored prior to trial and have been stored since trial, and the current location(s) of these hairs.

j.      Any and all documents, including bench notes, reflecting or recording information about the manner in which hairs collected in conjunction with the investigation of the rape or murder of Jeanine Revak were analyzed, including, but not limited to, for each such hair: the date on which the hair was analyzed; any chemical reagents with which the hair was treated as part of the analysis; any equipment or machinery/instruments used during the analysis; the date and time at which such equipment or machinery/instruments was calibrated immediately prior to the analysis of that hair; the date on which such equipment or machinery/instruments had been tested for performance and accuracy immediately prior to the analysis; records of any repair service performed on such equipment or machinery/instruments in the year prior to, and the year subsequent to, the analysis; the name, training and credentials, including certifications, of any person involved in the analysis and that person's function in performing the analysis; any manuals or other documents reflecting the protocols in use regarding such analysis at the time such analysis was being performed; any manuals or other documents reflecting the protocols adopted subsequent to the time such analysis was being performed; any logs or bench notes reflecting the actual steps employed in the process of the analysis of each such hair; any notes reflecting or recording the decision, and/or the basis therefor, for deciding not to analyze a hair collected in conjunction with the investigation of the rape or murder of Jeanine Revak. We also request production of any photographs taken of this evidence or taken during the course of analysis of this evidence.

k.      Any and all documents concerning or describing suspected biological exemplars (including but not limited to blood, semen, ejaculate, saliva, skin, fingernail scrapings) and the handling and storage thereof, collected in conjunction with the investigation of the rape or murder of Jeanine Revak, without regard to whether those suspected biological exemplars were ultimately deemed to be either biological or of value to the investigation, including but not limited to: records reflecting or recording the location from which they were collected or the manner in which they were collected; the containers in which they were stored at any point from

13

the moment of collection until the present; the names of all those persons who touched, analyzed, or otherwise handled those exemplars from the time the investigation of this crime began; all locations at which these exemplars were stored prior to trial and have been stored since trial; and the current location of these exemplars.

l. Any and all documents, including bench notes, reflecting or recording information about the manner in which suspected biological exemplars (including but not limited to blood, semen, ejaculate, saliva, skin, fingernail scrapings) collected in conjunction with the investigation of the rape or murder of Jeanine Revak were analyzed, including, but not limited to, for each such exemplar: the date on which it was analyzed; any chemical reagents with which it was treated as part of the analysis; any equipment or machinery/instruments used during the analysis; the date and time at which such equipment or machinery/instruments was calibrated immediately prior to the analysis of that exemplar; the date on which such equipment or machinery/instruments had been tested for performance and accuracy immediately prior to the analysis; records of any repair service performed on such equipment or machinery/instruments in the year prior to, and the year subsequent to, the analysis; the name, training and credentials, including certifications, of any person involved in the analysis and that person's function in performing the analysis; any manuals or other documents reflecting the protocols in use regarding such analysis at the time such analysis was being performed; any manuals or other documents reflecting the protocols adopted subsequent to the time such analysis was being performed; any logs or bench notes reflecting the actual steps employed in the process of the analysis of each such exemplar; any notes reflecting or recording the decision, and/or the basis therefor, for deciding not to analyze a suspected body fluid exemplar collected in conjunction with the investigation of the rape or murder of Jeanine Revak. We also request production of any photographs taken of this evidence or taken during the course of analysis of this evidence.

m. Any and all latent prints collected in conjunction with the investigations of the rape or murder of Jeanine Revak; and, for each such latent print, any and all documents, including bench notes, reflecting the location from which the print was taken, the steps taken in analyzing the print, the names of any persons' known prints against which the latent print was compared; the results of any such comparisons; the name, training, and credentials of any such person who performed any part of the comparison or analysis, or rendered a judgment thereon; any manuals or other documents reflecting the protocols in use regarding such comparisons or analysis at the time such comparison or analysis was being performed; any manuals or other documents reflecting the protocols adopted subsequent to the time such comparison or analysis was being performed; any logs or bench notes reflecting the actual steps employed in the process of the comparison or analysis of each such latent print; any notes reflecting or recording the decision, and/or the basis therefor, for deciding not to analyze a latent print collected in conjunction with the investigation of the rape or murder of Jeanine Revak; any notes reflecting or recording the decision, and/or the basis therefor, for deciding not to compare a latent print

14

collected in conjunction with the investigation of the rape or murder of Jeanine Revak against the known print of Donald Tedford, James Revak, or any other suspect or person of interest in this investigation; and any notes reflecting or recording the decision, and/or the basis therefor, for deciding not to run any such latent print through a statewide or national fingerprint database.

n.    Any and all documents that reflect any audits, certification or recertification procedures done on the laboratory or laboratories in which any forensic analyses were performed, and/or that record the results of any such audits, certification or re-certifications procedures, from January, 1984 through the present.

o.    Any and all documents reflecting or recording the chain of custody of each piece of evidence collected during the investigation of the rape and murder of Jeanine Revak.

p.    Any and all polygraph examination results, and all documents relating to the testing process and containing or reflecting statements made by the examinees.

q.    Any and all documents, including notes and photographs, reflecting or recording information about, or observations made during, the autopsy conducted on Jeanine Revak and any evidence collected in the process thereof (including but not limited to hair, fibers, blood, semen, ejaculate, saliva, skin, fingernail scrapings), including the name, training and credentials, including certifications, of any person involved in or present at the autopsy, and that person's function in performing the autopsy or attending the autopsy; any manuals or other documents reflecting the protocols in use regarding such autopsy on the date it was being performed; any manuals or other documents reflecting the protocols adopted subsequent to the date such autopsy was being performed; and any logs or bench notes reflecting the actual steps employed in the process of the autopsy.

r.    Any and all documents reflecting, discussing, or recording any contamination studies undertaken at any laboratory or facility at which any evidence connected with the investigation of the rape or murder of Jeanine Revak was collected, held, stored, or analyzed, or of any vehicle in which it was transported, during the period running from January 1, 1986 through the present.

s.    Any and all documents reflecting, discussing or recording any contamination control directives in effect at any laboratory or facility at which any evidence connected with the investigation of the rape or murder of Jeanine Revak was collected, held, stored, or analyzed, or of any vehicle in which it was transported, during the period running from January 1, 1986 through the present.

15

t. Any and all documents reflecting, discussing or recording the use of Luminol, or any other chemical or instrument, at any site to determine the presence of blood traces or residue remaining as the result of the rape and murder of Jeanine Revak including but not limited to the office, showroom, closets, bathroom, and immediate exterior of the Finishing Touch; any vehicle operated or controlled by Donald Tedford; Jeanine Revak's residence; Jeanine Revak's vehicle; and James Revak's vehicle, and what the use of Luminol revealed or demonstrated, if anything.

u. Any and all organizational charts or other documents that reflect the staffing and/or hierarchy of staff at any laboratory or other facility at which evidence collected in the investigation into the rape or murder of Jeanine Revak was stored or analyzed at the time such evidence was stored or analyzed there.

v. Any and all documents that reflect conversations, information received from, or deals entered into or discussed, with Michael Ferry and/or Christopher White, prior to, during or after Petitioner's trial.

w. Any and all documents concerning, or interviews conducted with, people who were questioned about the whereabouts or activities of James Revak on the day before, and the day that, he reported Jeanine Revak missing, and in the time between her death and the time of trial.

x. Any previously undisclosed police reports, including but not limited to the report of "further investigation" referenced in the affidavit of probable cause, see Petition, ¶ 101, and the report of the police officer who observed the decedent's car in the early morning of January 11, 1986, see Petition, ¶¶ 109-110.

y. Any and all documents generated or otherwise compiled by the Commonwealth, or its representatives or agents, at any time during which Petitioner has been incarcerated in Pennsylvania, that reflect, record or diagnose any element of Petitioner's mental or emotional state or health; and

z. All property seized from the Petitioner.

8. Petitioner requests an Order from this Court, directing the Respondent to allow him to inspect and photograph all physical evidence collected in the course of the investigation of the rape and murder of Jeanine Revak.

[ECF No. 32 at 2-12].

16

Respondents opposed all but one of Petitioner's discovery requests. [ECF No. 39]. On September 28, 2010, the Court issued a Memorandum Opinion and Order [ECF No. 40] in which it granted Petitioner's motion with respect to his request in ¶ 7(x) for any previously undisclosed police reports regarding the "further investigation" referenced in the affidavit of probable cause, which was signed by Pennsylvania State Police Trooper Edward S. Peters on February 21, 1986. The Court carefully and individually reviewed each of Petitioner's other requests and denied each request because Petitioner failed to establish the required "good cause" necessary to receive authorization to conduct discovery in federal habeas and/or because he was not diligent in developing the record in state court, which provided him with the opportunity on both direct appeal and during the PCRA proceeding to litigate his ineffective assistance and prosecutorial misconduct claims.

The Commonwealth agreed to produce any documents requested in ¶ 7(x) of the first motion to discovery to the extent such documents existed. The Court ordered it to do so by October 19, 2010. The Commonwealth received two extensions in which to comply with the discovery order. On December 15, 2010, counsel for the Commonwealth sent a letter to Petitioner's first habeas counsel in which he wrote: "following a thorough review of the Commonwealth's files ... the Commonwealth has determined that it does not have within its possession, custody, or control any previously-undisclosed police report regarding the 'further investigation' referenced in page two of the Affidavit of Probable Cause[.]" [ECF No. 48, Ex. A at 1].

17

At that point, the Commonwealth had fully complied with the Court's discovery order and that should have been the end of the discovery phase of this case.

## C.     Petitioner's second motion for discovery

In February 2011, Petitioner filed a motion in which he sought leave to file a second motion for discovery. [ECF No. 47]. At a March 28, 2011 status conference, Petitioner's first habeas counsel explained that in January 2011, they had submitted on Petitioner's behalf a request to the Pennsylvania State Police under the Pennsylvania Right to Know Law ("RTKL"), 65 Pa. Stat. § 67.101, *et seq.*, to produce 16 categories of information. In effect, Petitioner requested that the State Police produce all documents in its possession related to the investigation of the rape and murder of Jeanine Revak. In response, the State Police sent to Petitioner's first habeas counsel a six-page response, explaining in detail why it was denying Petitioner's request. The State Police determined that the requested disclosures were prohibited under the RTKL and also Pennsylvania's Criminal History Record Information Act, 18 Pa. Cons. Stat. § 9101, *et seq.* The State Police did provide an 18-page index listing, for each record in its possession regarding the rape and murder of Jeanine Revak, the record type and record subject, and the statutory provision that barred the record's disclosure. The State Police expressly informed Petitioner's first habeas counsel that they had a right to appeal its response within 15 days to the Executive Director, Office of Open Records.

Petitioner's first habeas counsel opted not to appeal the State Police's decision. When the Court asked them at the status conference why they did not, counsel indicated that they knew

that an appeal would be unsuccessful because the State Police's decision was in accordance with state law. (3/28/11 Tr. at 40 "The reason we didn't appeal it was that we believed that the exemption that was cited [by the State Police] was a legitimate exemption; that these documents were considered part of the investigative file, the exemption was specifically that investigative files are not permitted to be turned over.")

On April 12, 2011, Petitioner filed his second motion for discovery. [ECF No. 54]. He requested that the Court compel the State Police to produce all of the documents listed in the 18-page index it had provided– in other words, to produce all of the records the State Police possessed regarding the investigation of the rape and murder of Jeanine Revak. He also sought an order from the Court permitting his counsel to: (1) depose Trooper Peters; and, (2) require him by a subpoena duces tecum to bring to the deposition all documents of which he is aware that support the statements he wrote in the 1986 affidavit of probable cause.

The Commonwealth objected to the discovery Petitioner sought. [ECF No. 64; see also ECF No. 48]. On June 30, 2011, the Court issued a Memorandum Opinion and Order in which it denied Petitioner's second motion for discovery. [ECF No. 54]. The Court observed that "it has already considered and disposed of the voluminous requests for discovery which Petitioner made in his first motion. The pending motion is basically seeking an order that would require the [State Police] to produce much of that which was requested in Petitioner's first discovery motion plus much more. As such, it is in actuality an improper attempt to end run around this Court's

19

September 28, 2010, Memorandum Opinion, which thoroughly addressed and conclusively

disposed of the first discovery motion." [ECF No. 54 at 9].

In specifically denying Petitioner's request that the Court compel the State Police to

produce its files, the Court held:

> Petitioner contends that he is entitled to review the entire [State Police]
> file because the index it provided indicates that its file contains more documents
> than were allegedly provided to his defense in pretrial discovery. Therefore, he
> argues, the prosecution may have suppressed material information in violation of
> its obligation under Brady v. Maryland, 373 U.S. 83 (1963), and he should be
> permitted to review the entire [State Police] file to see if anything in it would
> support an as-yet-unknown claim. His request is a textbook example of the type of
> "fishing expedition" that is impermissible in federal habeas. Williams, 637 F.3d at
> 210-11 ("Ultimately, Williams' request amounts to an entreaty to engage in a
> fishing expedition. The law is clear, however, that such speculative discovery
> requests should be rejected."); Deputy v. Taylor, 19 F.3d 1485, 1493 (3d Cir.
> 1994) ("petitioners are not entitled to go on a fishing expedition through the
> government's files in hopes of finding some damaging evidence). [Petitioner's first
> habeas counsel] admitted as much at the status conference:
>
>> So basically with respect to [the State Police's] file ... we believe
>> that this entire file should be provided to us and the Court could
>> order that. If there's nothing helpful to the defense in this
>> investigative file, then so be it, nobody will have been harmed by
>> the disclosure. If there is Brady or other material that's valuable to
>> the defense in these files, we don't see that anybody gains by not
>> disclosing it.
>
> (3/28/11 Tr. at [7]). As counsel well knows, such a bald and general allegation
> that a possibility exists that the [State Police's] files might contain something of
> benefit to Petitioner, without more, is insufficient to justify discovery in federal
> habeas.
> The Commonwealth also persuasively argues that Petitioner's request is
> misplaced because it rests upon the faulty premise that his defense was entitled to
> the [State Police's] entire file prior to his trial. It points out that a criminal
> defendant has no legal entitlement to review the prosecution's entire investigative
> file, either before, during, or after trial. See, e.g., Pennsylvania v. Ritchie, 480

U.S. 39 (1987); United States v. Bagley, 473 U.S. 667 (1985); Weatherford v. Bursey, 429 U.S. 545 (1977); United States v. Agurs, 427 U.S. 97 (1976). As explained in Ritchie:

> A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files. See United States v. Bagley, *supra*, 473 U.S., at 675; United States v. Agurs, *supra*, 427 U.S., at 111. Although the eye of an advocate may be helpful to a defendant in ferreting out information, Dennis v. United States, 384 U.S. 855, 875 (1966), this Court has never held– even in the absence of a statute restricting disclosure– that a defendant alone may make the determination as to the materiality of the information. Settled practice is to the contrary. In the typical case where a defendant makes only a general request for exculpatory material under Brady v. Maryland, 373 U.S. 83 (1963), it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance. See Weatherford v. Bursey, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and Brady did not create one").

480 U.S. at 59-60 (parallel citations omitted). Thus, that the [State Police] file allegedly contains more records than were made available to Petitioner's defense does not support the inference that the prosecution improperly suppressed information.

[ECF No. 67 at 9-11]. The Court further held that this discovery request "will also be denied for

the separate reason that [Petitioner] was not diligent in attempting to conduct this same discovery

in the state system. There is no indication that Petitioner asked the state court to compel the

[State Police] to produce is entire file to him during any proceedings before it, and his counsel

21

did not appeal the [State Police's] recent denial of their request to produce it." [ECF No. 67 at 12].

In denying Petitioner's request to depose Trooper Peters, the Court held that the record before the Court provided "a rational and reasonable explanation" regarding the matter he sought to explore with Trooper Peter. The Court also held: "Petitioner has known for more than two decades what Trooper Peters wrote in the affidavit of probable cause. If Petitioner wanted to ask him questions about his statements, he should have sought to depose him in a timely manner and while his case was proceeding before the state court." [ECF No. 67 at 12].

### D. Petitioner is appointed new counsel

Throughout the litigation of this case, Petitioner expressed his displeasure with his first habeas counsel because they insisted on litigating sentencing-phase claims that he did not want to litigate. Following an *ex parte* hearing addressing the existence of irreconcilable differences between Petitioner and first habeas counsel, the Court entered an Order dated September 11, 2012 in which it granted Petitioner's request for replacement counsel. The Court appointed Petitioner's current counsel ("second habeas counsel") and directed Petitioner, through his new counsel, to notify the Court by December 6, 2012 "if he wishes to proceed with some or all of his sentencing-phase claims, or if he is waiving some or all of them." [ECF No. 108].

Second habeas counsel understandably required significant time to review and analyze the vast record in this case and to meet with and advise Petitioner. In order to give them sufficient time to do so, the Court granted Petitioner several extensions of time in which to notify

22

the Court whether he intended to proceed with some or all of his sentencing-phase claims. On September 6, 2013, Petitioner notified the Court which sentencing-phase claims he was withdrawing from the Petition. [ECF No. 138].

Several weeks later, Petitioner filed the pending Motion For Leave To Conduct Discovery. [ECF Nos. 143, 145]. In this third motion for discovery, Petitioner identifies 20 items or categories of items that he contends should be produced to him. The Commonwealth opposes Petitioner's motion and argues that it should be denied in its entirety. [ECF No. 185].

## II.   Discussion

All of the items or categories of items that Petitioner is seeking in his third motion for discovery were encompassed within the requests he made in his first and/or second motions for discovery. The issue before the Court is whether there is any basis to reconsider its September 28, 2010 or June 30, 2011 Memorandum Opinions and Orders in which it denied Petitioner's first and second motions for discovery.

The Court has the inherent power to reconsider interlocutory orders such as discovery orders. See, e.g., Deeters v. Phelan Hallinan & Schmieg, LLP, C.A. No. 3:11-252, 2013 WL 6524625, * 2 (W.D. Pa. Dec. 12, 2013). See also 18B Charles A. Wright, et al. Federal Practice and Procedure: Jurisdiction § 4478 (2d ed. updated April 2014) ("Although courts are eager to avoid reconsideration of questions once decided in the same proceeding, it is clear that all federal courts retain power to reconsider if they wish. Law-of-the-case principles in this aspect are a matter of practice that rests on good sense and the desire to protect both court and parties against

23

the burdens of repeated reargument by indefatigable diehards.") Because courts have a strong interest in the finality of decisions rendered and the promotion of judicial economy and jurisprudential integrity, "courts generally ... refuse to reopen what has been decided." Williams v. Runyon, 130 F.3d 568, 573 (3d Cir. 1997) (quoting Messenger v. Anderson , 225 U.S. 436, 444 (1912)). Federal Practice and Procedure: Jurisdiction § 4478 ("The standards announced for departing from the law of the case commonly demand strong justification.") Accordingly, courts grant motions for reconsideration sparingly. "[A] motion for reconsideration is not to be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant. Finally, such a motion cannot be used to raise new arguments or present evidence that could have been raised" when the matter was previously before the court. Deeters, C.A. No. 3:11-252, 2013 WL 6524625 at * 2 (internal citations and quotations omitted). As has been stated by many courts, motions for reconsideration do not provide litigants with "a second bite at the apple."

Petitioner is entitled to reconsideration of the Court's previous two decisions on discovery only if he can establish one of the following three familiar grounds justifying such relief: (1) an intervening change in the controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or prevent manifest injustice. [*Pet's Brief*, ECF No. 144 at 4]. See, e.g., Deeters, C.A. No. 3:11-252, 2013 WL 6524625 at * 2 (citing A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc., C.A. No. 94-7408, 2001 WL 881718, *1 (E.D. Pa. May 1, 2001) ("[c]ourts tend to grant motions for reconsideration sparingly and only upon the grounds

24

traditionally available under Fed.R.Civ.P. 59(e)."). See also Federal Practice and Procedure: Jurisdiction § 4478. Petitioner has not demonstrated the existence of any of the grounds justifying reconsideration.[3]

## A. No intervening change in the controlling law

There has been no intervening change in the controlling law regarding the standard for obtaining discovery under Rule 6 of the Rules Governing Section 2254 Cases. Petitioner cites to recent cases in which a court held that a petitioner was entitled to discovery and contends that they support his position that he should receive additional discovery in this case. None of the cases he cites demonstrate in any way that the controlling law has changed since the Court issued its earlier decisions and, therefore, they do not warrant reevaluation by the Court of its previous decisions to deny additional discovery in this proceeding. The only case cited by Petitioner that represents an actual change in the law is Martinez v. Ryan, — U.S. — , 132 S.Ct. 1309 (2012), but that case represents a change in the law regarding procedurally defaulted claims of trial counsel, not the standard for evaluating discovery requests in a federal habeas case. Martinez does not speak to or govern the standard for obtaining discovery under Rule 6. It does not justify the Court departing from its previous rulings on discovery at this time.

---

[3]     Neither the fact that Petitioner is represented by new counsel nor that this case was reassigned to a new judge in February 2012 is relevant to the inquiry of whether Petitioner is entitled to reconsideration of the Court's earlier decisions.

## B. No new evidence

Petitioner attaches to his third motion for discovery numerous exhibits that have long been part of the record. The only "new" documents he presents are two declarations given by a private investigator, Barry Fox, in 2013, and a 2013 letter authored by Karl Williams, M.D., the Medical Examiner of Allegheny County. None of these items qualify as the type of new evidence that would justify reconsideration of the Court's previous decisions.[4]

In one of the declarations (Exhibit L to the third motion for discovery), Fox explains that in 2013 he interviewed prosecution witness Christopher White, learned that he is being treated for mental illness, and left the interview with the impression that White's "mental health problems are substantial and quite severe." Petitioner has not shown that information regarding White's mental health is new or could not have been gathered earlier. In fact, in an affidavit by David Geibel dated September 26, 1997, which was obtained by Petitioner's first habeas counsel and has been part of the record since the PCRA proceeding, Geibel stated: "Everyone knew that White was crazy. He never knew what was going on around him and only worried about his own

---

[4] The PCRA provides a mechanism for petitioners to file a second or subsequent PCRA petition based upon new facts that "were unknown to the petitioner and could not have been ascertained by the exercise of due diligence[.]" 42 Pa. Cons. Stat. § 9545(b)(1)(ii). When a petitioner discovers this type of new evidence, a district court can stay a federal habeas proceeding while the petitioner files a timely action in state court in order to exhaust his state court remedies with respect to that new evidence. See, e.g., Simmons v. Beard, 356 F.Supp.2d 548, 555-56 (W.D. Pa. 2005) (during the litigation of the federal habeas proceeding a newspaper article was published in which the key prosecution witness recanted her trial testimony; the federal habeas court stayed the proceeding because the petitioner was required to exhaust any claim based upon the recantation with state court).

problems. We all thought it was stupid for the prosecution to even listen to a nut like White and we couldn't believe they actually would put him on the stand."

In his second declaration (Exhibit D to the third motion for discovery), Fox explains that in 2013 he interviewed David Lijewski, one of the hunters who discovered the body of Jeanine Revak in 1986. Fox recounts how Lijewski described to him the placement of the body. Lijewski testified at Petitioner's 1986 trial regarding the location and placement of Revak's body and other testimony and exhibits were offered on that point. Petitioner has not identified anything contained in the brief summarization Fox provides of Lijewski's recent statements that could fairly be described as new. To the extent that anything in Lijewski's statements to Fox is not already part of the record (and Petitioner does not show that there is), there is no justification for that information not being gathered earlier.

Petitioner also directs the Court to Dr. Williams' 2013 letter to his current counsel (*Supplement*, ECF No. 145). In it, Dr. Williams stated that he "informally reviewed" the autopsy, lab reports, and photographs of the victim that Petitioner's second habeas counsel sent to him. Dr. Williams indicated that he had "serious concerns regarding whether the twine in question caused the ligature wounds to the decedent's neck and whether the necklace around the decedent's neck could have caused the ligature observed in the photographs" and "whether the blunt force trauma may have been the cause of death." Dr. Williams explained that in order to address any matter further he would need "the complete medical examiner's file including a complete set of the autopsy photographs and the photographs of the rape kit, the samples taken

27

during the autopsy including the microscopic slides"– in other words, information that Petitioner

sought and was denied production of when the Court ruled on his two previous discovery

motions. That Petitioner, more than 25 years after his trial, obtained a letter from a medical

examiner stating he would need information to evaluate the forensic evidence in this case does

not warrant reconsideration of the Court's earlier decisions. Petitioner always has insisted that

Jeanine Revak did not die in the manner advanced by the Commonwealth[5] and he has not shown

why he could not have obtained a letter similar to Dr. Williams' 2013 letter when he was

litigating his claims before the state court, let alone when he filed his first and second motions

---

[5]     In Petitioner's 1987 post-trial motions, he contended that his trial counsel, Schwartz, was
ineffective for failing to have Dr. Williams' predecessor, Dr. Cyril Wecht, address the same
issues Dr. Williams expressed "concern" about in his 2013 letter. (SCR Nos. 58, 63).
Specifically, Petitioner argued that Schwartz should have "presented evidence and testimony
from a defense expert, Dr. C[y]ril Wecht, which evidence and testimony would have rebutted the
Commonwealth's medical expert and crime lab reports as to establishment of a more precise time
of death, instrumentality causing the death, place of death, lividity, analysis of various clothing
fibers, vegetable fibers, rope or twine fibers, hair samples, blood samples and types, carpet
padding fibers, car and office sweepings and finger prints[.]" [SCR Nos. 58, 63 at ¶ 4]. Petitioner
testified at the post-trial hearing about what he thought Schwartz should have done regarding
having evidence examined by a forensic expert, acknowledged that Schwartz in fact had retained
Dr. Wecht, but questioned why Schwartz ultimately decided not to call him as an expert witness
for the defense. (Feb. 1, 1988 Hr'g Tr. at 82. Id. at 112-124; Feb. 2-3, 1988 Hr'g Tr. at 190-91).
Petitioner also submitted as exhibits at that hearing letters he wrote to Schwartz in January 1987
claiming that the defense "can prove the 'murder weapon' could not have been the 'murder
weapon.'" Def's Ex. 17 from the Feb.1988 Hr'g, contained in the SCR at No. 88-A. See also Def's
Ex. 18 from that same hearing). When Schwartz testified, he discussed why he took the approach
he did regarding challenging certain forensic evidence introduced by the Commonwealth and
why he did not call Dr. Wecht as a defense witness. (Feb. 2-3, 1988 Hr'g Tr. at 217-19, 231-36).
After Petitioner's claims were rejected on post-trial motions and on direct appeal, he once again
raised issues regarding the forensic evidence in the PCRA proceeding. He specifically claimed
that Schwartz was ineffective for failing to challenge the Commonwealth's forensic evidence,
including "the twine murder weapon theory."

before this Court. As was the case with the two 2013 declarations discussed above, Petitioner has not established that Dr. Williams' letter qualifies as the type of new evidence that would justify reconsideration of the Court's previous decisions on discovery.

## C.   No clear error or manifest injustice

Finally, Petitioner has not established the need to correct a clear error of law or prevent manifest injustice. The parties and the Court have already gone through two rounds of counseled discovery requests by Petitioner that have consumed vast amounts of time, thought, and energy on the part of all involved in this litigation. Petitioner had ample opportunity when the Court was considering those motions to show that he was entitled to additional discovery. He failed to do so. The Commonwealth is correct that in the third motion for discovery, Petitioner has just re-presented his same discovery requests with adjustments made to attempt to satisfactorily address the deficiencies identified by the Court in its previous two discovery decisions. That is not a valid basis for the Court to reconsider its prior decisions. As explained above, a movant who fails in his first attempt to persuade a court to adopt his position may not use a subsequent motion for reconsideration to repackage arguments already made and rejected, or to raise new arguments that he did not advance when the matter was being decided in the first instance.

The Commonwealth also accurately characterizes much if not all of Petitioner's third motion as an improper attempt to allow him discovery well outside the scope of what is permitted in federal habeas so that he can re-litigate his state criminal trial in this proceeding. The very way in which Petitioner structures his third motion for discovery evidences the

29

improper nature of his requests. He does not specifically focus upon which of his 17 claims he requires discovery. Instead, he sets forth the "tenets" of the case the Commonwealth presented at his 1987 trial and argues why the discovery he seeks would go towards refuting that case. His arguments do not support discovery in a federal habeas action. As the Supreme Court has observed:

> it must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... **The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.**

Barefoot v. Estelle, 463 U.S. 880, 887 (1983) (emphasis added). See, e.g., Bell v. Cone, 535 U.S. 685, 693 (2002) (AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law.") In addition, federal habeas corpus litigation is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington, 131 S.Ct. at 786 (quoting Jackson v. Virginia, 443 U.S. 307, 332, n. (1979) (Stevens, J., concurring in judgment)).

Petitioner also argues that the Court's prior discovery decisions worked a manifest injustice because application of the well-established rule that discovery in a federal habeas proceedings will not be permitted when a petitioner was not diligent in developing the record in state court ignores the "fact" that seeking discovery in a PCRA proceeding is "an exercise in futility" and "the Pennsylvania rules and practices foreclosed him" from obtaining discovery. [*Pet's Brief*, ECF No. 144 at 7-9]. The Court is not persuaded by this argument. It is not

30

supported by evidence. It also is not relevant to Petitioner's specific case, in which he had a

three-day evidentiary hearing on the many claims that he raised in his post-trail motions,

including numerous claims of ineffective assistance of trial counsel. Also, as the Commonwealth

persuasively argues, Petitioner's argument conflates two separate and distinct things: (1) the

PCRA rules that permit discovery upon a showing of good cause; and (2) his inability to

demonstrate good cause to obtain discovery in the PCRA proceeding. The latter does not negate

the existence of the former.

Considerations of fairness, of respecting the finality of the Court's previous decisions,

and of not unnecessarily wasting additional resources or extending this already protracted

litigation any further all support the denial of Petitioner's third motion for discovery. The Court

also is mindful that the issue in this federal habeas proceeding is not whether the case the

Commonwealth presented against Petitioner in 1987 had weakness, whether the jury's

determinations were against the weight of the evidence (which is not even a claim that is

cognizable in a federal habeas proceeding, see, e.g., Young v. Kemp, 760 F.2d 1097, 1105 (11th

Cir. 1985)), whether Petitioner's former attorneys could have done their jobs differently, or

whether the state court proceedings were imperfect. The actual issue before the Court is whether

any of the 17 claims that Petitioner raises in the Petition entitles him to federal habeas relief

under 28 U.S.C. § 2254, as amended by AEDPA. The question of whether Petitioner was entitled

to additional discovery on any of those claims was decided by the Court long ago. It is now time

to move the case forward, for Petitioner to file a brief in support of the claims he brings in the

Petition, and for the Commonwealth to file its answer to those claims.

An appropriate Order follows.

BY THE COURT:

Kim R. Gibson
United States District Court Judge

Date: September 29, 2014

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DON TEDFORD,          )
      Petitioner,        )
                      )
     v.               )      CIVIL ACTION NO. 09-409
JEFFREY BEARD, et al.,    )

## <u>ORDER</u>

AND NOW, this 29th day of **September, 2014**, it is hereby ORDERED that:

(1)    Petitioner's Motion For Leave To Conduct Discovery [ECF No. 143] is **DENIED**;

(2)    Petitioner shall file a memorandum of law in support of the Petition For a Writ of Habeas Corpus by **January 30, 2015**. It may not exceed 150 pages unless prior leave of Court is obtained. Each claim should be identified by the same claim number by which it is identified in the Petition and the claims should be discussed in the same order as they are listed in the Petition. The memorandum must include the following information:

    a)    citations to the specific provision(s) of the United States Constitution upon which Petitioner relies as a basis for relief;

    b)    a discussion of whether the claim has been exhausted in the state courts, with specific citation to the state court record each time the claim or any subpart of it was raised in a filing before the state courts;

    c)    a discussion of whether the state court adjudicated the claim, or any subpart of it, on the merits, such that federal review of the claim, or any subpart of it, is governed by the standard of review in 28 U.S.C. § 2254(d);

    d)    If Petitioner is seeking an evidentiary hearing on any claim, he must explain, when discussing that specific claim in the

1

memorandum, why a hearing is not prohibited under 28 U.S.C.
§ 2254(d) and (e)(2). He should not file a separate motion for an
evidentiary hearing.

BY THE COURT:

Kim R. Gibson
United States District Court Judge