IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DON TEDFORD,                    )

                          )

        PLAINTIFF,         )

                          )

        VS.               ) **CIVIL NO.:** 09-409

                          )

JEFFREY BEARD, ET. AL.,      )

                          )

        RESPONDENTS.   )

  )

  )

  )

  )

  )

) **TYPE OF PLEADING:**

)

) AMENDED PETITION FOR A
) WRIT OF HABEAS CORPUS
) AND ACCOMPANYING MEMORANDUM
) OF LAW

)

)

)

) **FILED ON BEHALF OF:**

)

) DON TEDFORD

)

) PETITIONER

)

)

) **ATTORNEY OF RECORD:**

)

) ADAM B. COGAN, ESQUIRE
) PA I.D. NO.: 75654

)

) 218 WEST MAIN STREET
) SUITE A
) LIGONIER, PA 15658

)

) [724] 995-8579

)

)

)

## TABLE OF CONTENTS

I.     OVERVIEW    1

II.    THE PARTIES TO THIS LAWSUIT    6

III.   THE PROCEDURAL HISTORY OF THIS CASE    6

    A.  Initial State Court Proceedings    6
    B.  Initial Federal Proceedings    7
    C.  Tedford's Return to State Court    9
    D.  New Evidence    12

IV.   REASONS FOR GRANTING THE WRIT OF HABEAS CORPUS    15

V.    GROUNDS FOR RELIEF: Grounds Respectfully Withdrawn    16
        SUPPLEMENTAL GOURNDS HEREIN ADVANCED    17
    A.  Grounds Regarding Ineffectiveness of Prior Counsel    17
    B.  Grounds Regarding Prosecutorial Misconduct & Brady Violations    18
    C.  Systemic Errors by the State Courts    18
    D.  Errors Regarding the Jury    19
    E.  Summary Errors    19

VI.   FACTUAL BACKGROUND SUPPORTING GROUNDS FOR RELEIEF
        AND SHOWING NEED FOR DISCOVERY    19
    A.  Anomalies presented in Materials revealed – 1986 -March 4, 2011    19
    B.  Tedford's Counsel made No Effort to Obtain Discovery before Trial    26
    C.  Tedford's 1st PCRA: Denials by the Commonwealth of the Existence of
        Additional Discovery    30
    D.  March 4, 2011: More Discovery Exists    33
    E.  Tedford's Renewed Efforts to Obtain Discovery Through a 2nd PCRA   35
    F.  Discredited Expert Testimony Based on 2015 FBI Report: Additional
        Discovery Needed    36
    G.  Critical New Evidence    38
        1.  The "Unknown Location" Where Revak Died    39
        2.  Forensic Discordance and What "Saved the Case"    44
        3.  Jury Infiltration    48
        4.  Christopher White    49

VII.  MOTION FOR DISCOVERY    50
    A.  Supplemental Discovery Requests    51
    B.  Requests for Interrogatories    52
    C.  Evolving Caselaw Demonstrates the Need for Discovery    53

**VIII.  MEMORANDUM OF LAW IN SUPPORT OF TEDFORD'S HABEAS CORPUS CLAIMS**                                                              **75**

**Ground V(A)(1) Trial Counsel IAC Failure to Investigate, Etc.**          **76**

**Ground V(A)(2) The Failure to Challenge the Forensic Evidence**          **96**

**Ground V(A)(3) Conflict of Interest by Prior Counsel**                   **110**

**Ground V(A)(4) Trial Counsel IAC: Failure to Challenge Lack of**

**Evidence, Etc.**                                                         **117**

**Ground V(B)(1) Suppression and Withholding of Critical Evidence**        **121**

**Ground V(B)(2) Manipulation and Inaccuracy of Evidence**                 **130**

**Ground V(B)(3) Prosecutorial Improper Injection of Opinion, Etc.**       **135**

**Ground V(B)(4) Improper Victim Impact Evidence**                         **143**

**Ground V(B)(5) Jury Instructed to Consider Work Release in**

**Judgement of Credibility**                                               **147**

**Ground V(C)(1) Appellate Counsel IAC Alterations of Transcripts, Etc.**  **151**

**Ground V(C)(2) The Failure to Consider Claims of Second PCRA**           **174**

**Ground V(D)(1) Violation of the Right to a Fair and Impartial Jury**     **199**

**Ground V(D)(2) The Jurors Relied upon a Bible, Violating Tedford's**

**First, Sixth and Fourteenth Amendment Rights**                          **227**

**Ground V(E)(1) Relief Based on Accumulation of Errors**                  **231**

**Ground V(E)(2) Actual Innocence**                                        **234**


**IX.    Tedford's Claims Have Been Exhausted and are Not Procedurally Barred**                                                              **244**

**X.     Request for An Evidentiary Hearing**                              **252**

**XI.    Certificate of Appealability**                                    **256**

**XII.   Conclusion**                                                      **257**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DON TEDFORD, | ) | **Final** |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) **CIVIL NO.:** 09-409 | |
| | ) | |
| JEFFREY BEARD, ET. AL., | ) | |
| | ) | |
| RESPONDENTS. | ) | |
| | ) | |

## AMENDED PETITION FOR A WRIT OF HABEAS CORPUS AND ACCOMPANYING MEMORANDUM OF LAW

AND NOW, comes the Petitioner, DON TEDFORD, by counsel, ADAM B. COGAN, ESQUIRE, and BRUCE A. ANTKOWIAK, ESQUIRE, respectfully petitions this Court for a Writ of Habeas Corpus pursuant to Title 28, U.S.C. § 2254.  In support, the following is averred:

## I.     OVERVIEW.

The presentation Tedford will make herein will lead this Honorable Court to one of two conclusions: first, that no reasonable person could now be confident in the conclusion that Tedford is guilty of the murder for which he awaits execution, requiring the grant of a new trial or outright dismissal; or, second, at a minimum, that in light of compelling new evidence of his innocence and the significant evolution in the understanding of the law of discovery and the demands of the Brady doctrine, a manifest injustice will continue to occur if the Court does not reconsider Its prior Order and directs the Commonwealth to disclose the great volume of evidence in the possession of the PSP, the State Crime Lab and/or the prosecuting officers, heretofore never revealed to Tedford.

1

This evidence Tedford has uncovered repudiates the core of the Commonwealth's case.

Neither side disputed nor could have disputed that Tedford spent the bulk of day on which Jeanine Revak died in The Finishing Touch. From at least 9:00 a.m. through late that day, phone records and other evidence conclusively established that he was there. Tedford claimed that he was there all day leaving only later to go visit his friend, Dr. Tim McCormick. He told the jury that Ms. Revak drove to The Finishing Touch where they engaged in consensual sex before she left. He had no idea how why her car was left at a parking lot miles away where it was found the next day.

The Commonwealth claimed that Tedford left the store twice that day, first during a 44-minute period at mid-morning when phone records showed no calls to/from the store. The Commonwealth theorized that during this short window, Tedford left the store, met Revak at the Pines Plaza Mall, and drove her back to The Finishing Touch where he allegedly raped and killed her. The Commonwealth further theorized that he kept her body there until after midnight when he transported it 50 miles in his own car to the remote location in Washington County where she was found. In its opening and closing statements and throughout the trial, the Commonwealth continually asserted that **the murder happened in The Finishing Touch**. TT 11-18; 24-25; 675-677; 683; 688; 690; 704-705; 710-711; 717.The Pennsylvania Supreme Court consistently accepted this version of the events in affirming the sufficiency of the evidence.[1]

---

[1] That Court accepted this recitation on direct appeal. Commonwealth v. Tedford, 567 A. 2d 610, 617 (Pa. 1989), and in both subsequent opinions regarding PCRA dismissals. In dismissing Tedford's claim that the UPS receipt would show he was in the store at mid-morning, the Court observed that while this might disrupt the Commonwealth's timeline to a degree, "it would not call into question the Commonwealth's overall theory of the case," that is, that the murder occurred in the store. Commonwealth v. Tedford, 960 A.2d 1, 598 Pa.639, 682 (2008). And in its 2020 denial of relief, the Court explicitly stated that "the

But in proving its case that Ms. Revak was murdered in The Finishing Touch, the Commonwealth needed to explain two anomalies. First, why was Ms. Revak's car found miles away in the Pine Plaza Mall? For this, it relied on the testimony of Michael Ferry, the jailhouse informant who later recanted, that Tedford allegedly admitted to him picking up Ms. Revak there before returning to the store where he raped and killed her by "wring[ing] her neck."  The Commonwealth bolstered this testimony by Trooper Bernard Stanek, the lead investigator, about whom the prosecutor made the following critical claim in closing:

> Trooper Stanek got on the stand. He said one thing about Ferry's testimony that he gave us we hadn't figured out yet why the victim's car was down at this Pine Plaza Mall. The physical evidence in the case, she must have been murdered and raped at the Finishing Touch. . . Ferry answered that question. . . Tedford met the victim at the Mall, made an excuse to get her back to the Finishing Touch.

TT 706-707.

Again, the Pennsylvania Supreme Court accepted this critical piece of allegedly corroborating evidence, noting it specifically on direct appeal, Tedford, 567 A. 2d at 617, and finding it both relevant and compelling on later appeal as "evidence intended to demonstrate that Ferry possessed information known only to the murderer." Tedford. 960 A.2d at 692.

The Commonwealth's assertion that Tedford was the killer was thus inextricably intertwined with the assertion that the murder happened in The Finishing Touch. The converse, however, is equally indisputable: **if Jeanine Revak did not die at The Finishing Touch, Tedford did not kill her.**

---

Commonwealth contended that Tedford lured Revak to meet him, took her to The Finishing Touch" and raped and killed her there. Commonwealth v. Tedford, 228 A.3d 891, 894 (Pa. 2020).

But Tedford now has compelling evidence that Ms. Revak was not killed in that store. The evidence comes from the same lead investigator who bolstered Ferry's later-recanted testimony in a book he recently published and in an affidavit he supplied to Tedford. Tpr. Stanek concluded, based on his investigation, that the murder **did not occur at The Finishing Touch**. See, <u>Exhibit A</u> and <u>Exhibit B</u>.

His critically exculpatory conclusion **was never revealed to Tedford previously**. Nor were any other scientific or other reports disclosed to Tedford that supported Stanek's conclusion, a conclusion irreconcilable with the central thesis of the Commonwealth's case. The critical corroboration given to the testimony by the jailhouse informant who later recanted was thus manufactured by the prosecutor by calling the lead investigator as his corroborative witness and give testimony to support a theory he knew his investigation did not support.

Neither Stanek's opinion nor any reports and documents he relied upon to conclude that the murder happened at some place other than The Finishing Touch was ever provided to Tedford. The conclusion that The Finishing Touch was not the site of a bloody rape/murder could only have been drawn after extensive efforts to process that scene and meticulously search for any trace evidence which, evidently, was never found. Documentation about those efforts certainly exists in the vast repository of materials in the files of the PSP and Crime Lab which the Commonwealth has strenuously guarded from public view for over three decades.

The second anomaly is intrinsically related to the first. Perhaps Stanek reached his conclusion because he recognized that the 2.5 cm "gaping laceration" on the victim's head, likely produced by a "heavy blow" inducing "profuse bleeding" and "a very great deal of

hemorrhage" followed by a ligature strangulation which cut into the neck, **could not possibly have left no trace evidence in either the store or Tedford's car**. See <u>Exhibit</u> C at 4 (the autopsy report); testimony of the pathologist, TT 38-42; 65-68, and noted by the Supreme Court on direct appeal. 567 A.2d at 615. Tedford has now secured reports from two experts, a Doctor of Emergency Medicine and a professor of forensic science, which attest to the fact that extensive bleeding here almost certainly left trace evidence if the store was the scene.[2] But a review of the reports Tedford received from the PSP and Crime lab would indicate that only a cursory attempt was made to find that evidence, allowing the prosecutor to misrepresent it by asserting in his closing that it was "just drops of blood." TT 713. This misrepresentation was not objected to by defense counsel. Counsel also made no effort to affirmatively present to the jury the compelling fact that the type of injuries sustained by Ms. Revak would most certainly produce trace evidence and that its absence was proof that as Ms. Revak did not die at The Finishing Touch, as the Commonwealth concluded, Tedford is innocent.

The Commonwealth, however, was aware how critical finding such evidence was to its case and must have engaged in extensive efforts to find it. Indeed, Trooper Stanek's conclusion that the murder did not happen at The Finishing Touch is undoubtedly a function of the failed efforts by the investigators and the Crime Lab to find any proof that the critical tenet of their theory was plausible. But the records produced to date show no such efforts being made and how those efforts came up empty.

---

[2] See, <u>Exhibit D</u> and <u>Exhibit E</u>.

This presentation, and other serious errors Tedford will document herein, provide the most compelling basis for the grant of a comprehensive discovery order and the grant of a new trial.

## II.    THE PARTIES TO THIS LAWSUIT.

Tedford respectfully incorporates paragraphs 1 through 5 of his original Petition for a Writ of Habeas Corpus (ECF No. 23) identifying the parties to this case. Personnel within the DOC have changed over time, however, and Tedford thus identifies the following additional Respondents:

Respondent Jamie Sorber is the current Superintendent of SCI Phoenix who in that capacity has the actual present custody of the Petitioner.

Respondent George Little, is the current Secretary of the Pennsylvania Department of Corrections who in that capacity is responsible for carrying out an execution warrant.

Respondent Bobbi Jo Salmon is the Superintendent of SCI Rockview, the location of Pennsylvania's execution chamber.  In that capacity she is in charge of any scheduled execution.

## III.    THE PROCEDURAL HISTORY OF THIS CASE.

### A.  Initial State Court Proceedings

Tedford was convicted by a jury of rape and first-degree murder in the Court of Common Pleas of Butler County on February 6, 1987. Charles Schwartz was his counsel. The Pennsylvania Supreme Court affirmed on December 13, 1989. Commonwealth v. Tedford, 567 A.2d 610 (Pa. 1989).  Tedford was represented by the Butler County Public Defender's Office in post sentence motions and on direct appeal.

On July 12, 1995, Tedford filed a pro se petition for post-conviction relief (first PCRA petition). It was dismissed without prejudice and an amended petition was then filed. On January 28, 2000, the PCRA court dismissed the petition as untimely.  Tedford was

represented by counsel from the Capital Habeas Corpus Unit from the Defender Association of Philadelphia as well as appointed counsel from Butler County for a time in connection with the PCRA litigation. The Pennsylvania Supreme Court reversed, finding that the petition was a timely first PCRA petition. Commonwealth v. Tedford, 781 A.2d 1167 (Pa. 2001).

Following remand, on March 5, 2004, the PCRA court denied all of Tedford's claims except for his claim that appellate counsel had a conflict of interest. A hearing was held on this claim on May 18, 2004. A final order denying relief was then entered on July 6, 2004 and this order was affirmed by the Pennsylvania Supreme Court. Commonwealth v. Tedford, 960 A.2d 1 (Pa. 2008).

### B. Initial Federal Proceedings

On April 8, 2009, Tedford brought the instant action seeking appointed counsel, IFP status, and a stay of execution. A formal petition for a writ of habeas corpus was then filed on Tedford's behalf (ECF No. 23) on November 18, 2009.

On January 29, 2010, Tedford's prior counsel sought discovery through a broadly worded, generic application under Rule 6 of the Rules Governing §2254 Cases (ECF No. 32). On September 28, 2010, the Honorable Terrence F. McVerry denied virtually all discovery requests because they were not raised in the PCRA or because there was no reason to believe any additional discovery materials existed.[3]

But hundreds of pages of such materials did exist as established by a letter from the Pennsylvania State Police (PSP) dated March 4, 2011, pursuant to a Right To Know Law

---

[3] The Pennsylvania Supreme Court had previously noted that Tedford could not prove the existence of additional documents, although the Commonwealth did not address the issue of whether they existed. 966 A. 2d at 685 n. 18 and 689. That Court also ratified a Commonwealth argument that the defense had been given all of the police records, Id. at 694, an argument now shown to be demonstrably false.

(RTKL) request filed with the Pennsylvania State Police (PSP), that detailed numerous categories of evidence gathered during this investigation. The letter contradicted multiple prior representations made by the Commonwealth that all discovery material were provided prior to trial.  See, Exhibit F.  In truth, over half of the reports and other evidence gathered by the PSP has never been disclosed to Tedford.  Despite this showing, the District Court again denied discovery on June 30, 2011 (ECF No. 67).

The case was then reassigned to the Honorable Kim R. Gibson after Judge McVerry recused himself, Judge McVerry having played a role in prosecuting Tedford on a prior case that formed the basis of one of the aggravating circumstances supporting the imposition of Tedford's death sentence (ECF No. 94).  Insurmountable differences then arose between Tedford and his prior counsel when they failed to maintain Tedford's focus solely upon proving his innocence of the murder of Jeanine Revak.  On September 11, 2012, undersigned counsel was then appointed.

Confronted with prior counsel's failed attempts to *secure that which should never have been at issue*, the production of all of the evidence in the Commonwealth's possession relating to the crimes Tedford allegedly committed and for which the Commonwealth seeks to put him to death, counsel endeavored to correct the error of prior counsel by filing focused and specific discovery requests to obtain access to the hundreds of critical but undisclosed materials identified in the RTKL letter.

On September 29, 2014, this Court denied Tedford's renewed discovery application, holding in part that the Court was powerless to grant discovery because Tedford had not properly sought discovery in the state PCRA proceedings (ECF No. 197).

8

The federal habeas corpus proceedings were then stayed to allow Tedford to return to state court to properly seek discovery (ECF No. 214).

C.       Tedford's Return to State Court

Tedford then filed a pro-se PCRA Petition in the Court of Common Pleas of Butler County on or about December 2, 2014.  Undersigned counsel was appointed to represent Tedford there and moved for discovery, see, Exhibit G, and other relief, see Exhibit H, based upon disclosure by the FBI on April 19, 2015 of a report that concluded that nearly every examiner strained by the FBI in hair analysis techniques gave flawed testimony in almost all trials in which they offered evidence.

On February 11, 2019 an Order without an Opinion was entered in the Court of Common Pleas of Butler County which concluded that the court lacked jurisdiction to entertain Tedford's second PCRA claims.  In addition, the Court denied Tedford discovery and an evidentiary hearing with respect to the after discovered evidence claim regarding hair and fiber evidence based upon the disclosure of the 2015 FBI Report, the court summarily concluding that it was without merit.  A copy of this Order is included in Tedford's Supplemental Appendix as Exhibit I.

Tedford appealed, see, Exhibit J, and the Supreme Court of Pennsylvania affirmed on April 22, 2020. See, Exhibit K; Commonwealth v. Tedford, 228 A3d 891, 905 (Pa. 2020) Tedford then sought a writ of certiorari from the United States Supreme Court which was denied on March 29, 2021. Tedford thereafter moved this Court to lift the stay of this case and the Court entered a series of Orders directing the filing of this Amended Habeas Corpus Petition and Memorandum of Law.

When Tedford returned to state court eight years ago, he did so in good faith, believing the Pennsylvania courts would right the wrong that has permeated this case since its inception. He did so also armed with the critical information that while his lawyer foolishly accepted the representations of the Butler County District Attorney prior to trial that all discovery had been properly disclosed (and never pressed the issue in any way by way of motion nor sought to discover any evidence by way of independent investigation), what was disclosed prior to trial was but a small percentage of the evidence pertaining to this case in the Commonwealth's possession. Most specifically, nothing was disclosed indicating that the lead investigator concluded that the murder did not occur at The Finishing Touch.

The RTKL letter of March 4, 2011, proved conclusively that hundreds of pages of material, generated explicitly in connection with the murder of Jeanine Revak, was held in secret by the Commonwealth. This critical fact was unknown during the first PCRA proceeding, where his discovery requests were deemed boilerplate and were dismissed in significant part because the Commonwealth solemnly assured the Court that there was nothing else to discover.  See, e.g. the February 26, 2002 PCRA hearing transcript at pages 15-27.

And when that denial was appealed, the Pennsylvania Supreme Court accepted that assurance, disparaging Tedford's position because he "never states the basis for his belief that these particular items that he has never seen even exist." Commonwealth v. Tedford 598 Pa. 639, 687, 960 A.2d 1 (2008).  His claim, the Court declared, "is comprised entirely of conjecture." Id. at 689.

But now, Tedford could prove that the solemn assurances of the Commonwealth were false and that his assertion that more discovery existed was anything but conjecture. He could establish that the denials of discovery by the state and federal courts were based upon the fundamentally specious premise that nothing was left to discover. Tedford was confident that basic due process principles, particularly in a case where the last chapter of the matter will be a man's execution, would compel courts and prosecutors to correct prior, unfounded judgments and grant him access to material which should have been given to him under the rules of discovery or under the expanding definition of <u>Brady</u> material.

His confidence was misplaced. Tedford's return to the Pennsylvania courts was an odyssey of hypocrisy instead of a search for truth. In no sense was it even a minimal exercise of due process.

The Commonwealth confidently continued to assert that Tedford's execution can proceed without any further disclosure of evidence, despite the March 4th RTKL letter which demonstrated that Its prior representations about the existence of other discovery material were fatally misleading.

And the Courts of Pennsylvania stymied Tedford's efforts to access this critical information by unconstitutionally applying the PCRA statute of limitations bar to his claims, a bar that has not been consistently applied but which was arbitrarily invoked against Tedford. Moreover, despite knowing of the March 4th RTKL letter, the highest court of Pennsylvania continued to assert that Tedford's discovery requests were "comprised entirely of conjecture" <u>Commonwealth v. Tedford</u>, 228 A.3d 891, 907 (2020) and that his conviction was supported by "significant circumstantial evidence" <u>Id</u>. at 895 (referencing seminal deposits that were of no compelling evidentiary value since Tedford

conceded at trial that he had an ongoing sexual relationship with Ms. Revak and referencing the testimony of two jailhouse informants, one of whom recanted and the other of whom suffered from serious mental illness his entire adult life; this evidence, however, was never disclosed to the jury at trial).

### D.    New Evidence

Now, Tedford returns to this habeas corpus court, clinging to the belief that this Court will realize that the courts of Pennsylvania have erected an unconstitutional procedural barrier to the finding of the truth that lies within that undiscovered material. Reinforcing this belief, moreover, is critical new evidence which provides **massive support** for his discovery requests, **independent evidence** of <u>Brady</u> violations which have occurred, and **proof of his actual innocence**:

1.  Trooper Stanek, the PSP investigator in charge of this investigation, concluded that Revak **was not killed at The Finishing Touch**, but that the exact location of Revak's death was "unknown." He surmised that her death occurred in Tedford's car, although no forensic evidence was ever disclosed to indicate that the victim was ever in Tedford's car. Critically, Stanek's testimony at trial was used to bolster the now recanted testimony of Michael Ferry in support of the theory that the murder occurred at The Finishing Touch.  Neither his contrary conclusion nor the full extent of the efforts to determine the location of her murder were ever disclosed to Tedford prior to trial or at any time thereafter.  That evidence exists either within the mass of undisclosed documents in the possession of the PSP, the Crime Lab, or the Butler County District Attorney's office.  The failure to disclose the conclusion and attendant materials constitutes multiple Constitutional violations:

    a.  It represents a <u>Brady</u> violation of the first order, as it completely contradicts the key pillar of the Commonwealth's case that the store **was** the location of the murder. To convict Tedford, the Commonwealth had to prove that the store was the location the murder; if it did not happen at The Finishing Touch, Tedford **did not do it.** The conclusion of the lead investigator, and the evidence he relied upon to reach it, irreconcilably conflicted with the central premise upon which the entire Commonwealth's case depended.

    b.  That the same investigator who gave testimony that bolstered the later recanted testimony of Ferry and the false narrative of the prosecutors was testimony contrary to his own belief.  No impeachment was

possible because it was never revealed that he had concluded that the version of the story he was bolstering was not true. See, Kyles v. Whitley, 514 U.S. 419 (1995) (Brady material includes evidence undermining the integrity of the investigation, evidence suggesting shoddy, inadequate or biased police work or evidence undermining the reliability of a particular police officer involved in an investigation).

   c.   It was critical Brady material to impeach Michael Ferry.[4]

   d.   The prosecution theory was constructed contrary to evidence known to it, providing a basis for a claim of a bad faith effort to convict an innocent man.

2.   Two expert witnesses have provided reports concluding that the kind of injuries the victim suffered, were they actually sustained at the Finishing Tough, would have produced forensic evidence the PSP would have found on a thorough examination. Dr. Mark Persin, D.O., a Board Certified physician in emergency medicine with over thirty years clinical experience, has reported that "[a]s a result" of the injuries reported on the autopsy, "blood would have been present on the victim's body, her clothing, and the environment where the injury occurred."[5] Dr. Lyndsie Ferrara, Ph.D., a professor of forensic science at Duquesne University, has similarly concluded that given the documented findings of the pathologist and criminalist, "it is highly unlikely that no blood would be detected at the crime scene."[6] These opinions support multiple grounds for relief:

   a.   They reinforce the view that the murder did not happen in the store and that Tedford is innocent;

   b.   They demonstrate the ineffectiveness of trial counsel in not developing that evidence at trial

   c.   They show trial counsel's error in failing to object to the prosecutor's mischaracterization of the blood evidence in closing argument;

   d.   They supply corroborative evidence that the PSP conducted far more extensive efforts to find trace evidence in the store than reports released to Tedford to date reveal. Indeed, in his January 26, 1987 Preliminary Hearing testimony at 109-115, Tpr. Peters admitted that Troopers

---

[4] In response to Tedford's renewed application for discovery in light of his receipt of the March 4, 2011 RTKL letter, the District Court (per Judge McVerry) previously relied on the trial testimony of Michael Ferry in denying Tedford's effort to depose Trooper Peters relative to his affidavit of probable cause wherein he related that Tedford never left The Finishing Touch on the alleged day of Jeanine Revak's murder, January 10, 1986. See, ECF No. 67 at 6. The District Court concluded, "However, as Petitioner well knows, on April 16, 1986, the police interviewed a fellow jail inmate, Michael Ferry, and he told them that Petitioner briefly left The Finishing Touch on the day of the murder in order to meet Revak at a nearby shopping plaza, and that he returned with her to The Finishing Touch. As a result of the information Ferry provided, the investigators' understanding of the case changed, and that understanding is what was presented by the prosecution at trial. Thus, when considered in the proper factual context, Trooper Peters' statement and the prosecution's trial theory were not discrepant because the prosecution's theory encompassed additional information not known to Trooper Peters at the time he filed the affidavit of probable cause." In light of Trooper Stanek's confession, however, that Ms. Revak was **not** murdered at The Finishing Touch, this issue must be revisited.

[5] See, Report and Vitae of Dr. Persin, Exhibit D.

[6] See, Report and Vitae of Dr. Ferrara, Exhibit E.

named Rea and Titler also conducted forensic examinations in the store.[7]

3. The son of Christopher White, the other jailhouse informant, has given a statement indicating that he and his father were incarcerated at the same time in the Pennsylvania prison system and that his father spent extensive time in intensive psychiatric treatment while incarcerated. This corroborates the affidavit of the private investigator who previously interviewed White. Records of any psychiatric condition White suffered from have never been revealed.  See, Exhibit L.

4. Trooper Peters married Commonwealth witness and The Finishing Touch employee Lynn Kampers after Tedford's trial. Lynn Kampers was involved in a romantic relationship with Tedford while the two worked at The Finishing Touch during her trial testimony.[8]  If in fact Ms. Kampers and Trooper Peters were involved in a relationship at the time that this case was pending, it would constitute critically important Brady evidence that was never disclosed to Tedford. [9]

5. The chief lab analyst, Scott Ermlick, whose testimony about hair and fiber analysis allegedly "saved the case" for the Commonwealth, TT 717, likely used techniques subsequently repudiated by the FBI in its 2015 Report which concluded that examiners' testimony in at least 90 percent of trial transcripts the Bureau analyzed as part of its Microscopic Hair Comparison Analysis Review contained erroneous statements. The report further detailed that 26 of 28 FBI agent/analysts either provided testimony with erroneous statements or submitted laboratory reports with erroneous statements. The report explained that the government identified approximately 3,000 cases in which FBI examiners may have submitted reports or testified in trials using microscopic hair analysis. In the cases where examiners provided testimony used to inculpate a defendant at trial, erroneous statements were made in 96% of the cases. Defendants in at least 35 of these cases received the death penalty and errors were identified in 33 (94%) of those cases. Nine of these defendants were executed. Tedford raised this issue below. [10]

6. Ermlick also did not reveal critical bench notes of his analytical work on the case because Tedford's defense counsel never requested them. Ermlick has admitted to failing to report exculpatory findings in another case at the request of police investigators, a case which ultimately led to the exoneration of an individual originally charged with capital murder. A thorough review of his files is needed to assure that all relevant scientific reports were disclosed.  The need for this is emphasized by the expert report from Microtrace, LLC, see,

---

[7] In that same hearing, Peters admitted that there were other suspects in the homicide but, while certain currently undisclosed PSP files are marked "Suspect Files," no evidence was ever revealed about who these other suspects were.

[8] A copy of Trooper Peters and Ms. Kampers' marriage certificate is included in Tedford's Supplemental Appendix as Exhibit M.

[9] While trial counsel left the record of the particulars of Ms. Kampers relationship with Tedford somewhat sketchy at trial, TT 371, Ms. Kampers firmly admitted to the police that she was involved in a romantic relationship with Tedford, a copy of this report included in Tedford's Supplemental Appendix as Exhibit N.

[10] A copy of this pleading is included in Tedford's Supplemental Appendix as Exhibit H.

<u>Exhibit O</u>,  a respected independent laboratory which has reviewed Ermlick's reports and the record of the trial. Among their critical conclusions are:

    a.    Ermlick's disclosed reports are so incomplete about the processes he used that unless his bench notes are disclosed, it will be impossible to determine if the techniques he used accorded with proper scientific protocols.

    b.    He testified about numerous matters that are **not** reflected in his official reports, including, the pubic hair form the victim's pants not matching hers or her husband;  what he reviewed at the site of her body, The Finishing Touch, the victim's home or elsewhere; the tear in her jacket; the "linty" nature of her clothing.

    c.    His testimony about acrylic fibers, off white fibers, and carpet fibers is not substantiated by any proper scientific notes or indications of the relevance of the testimony.

    d.    His report reflects that he found a pubic hair from the victim's car that was "non inconsistent with" Tedford's. If this was done properly and this conclusion could be established, it was critically exculpatory since nothing about the Commonwealth's theory ever put Tedford in her car. If a pubic hair of his got there, it was because she carried it there after they had sex that day and she returned, very much alive, to her car to leave.

    e.    An analysis of his notes would confirm that the prosecutor misrepresented or overstated most of what Ermlick testified to, and did so without objection from counsel.

7. Jurors were exposed to improper information about the case long before testimony began, prejudicing a fair trial from the outset.  See, further discussion, <u>infra</u>.


## IV.    REASONS FOR GRANTING THE WRIT OF HABEAS CORPUS

To the extent that the state courts of Pennsylvania actually made decisions adjudicating Tedford's claims, the adjudication of Tedford's claims by the courts of Pennsylvania resulted in decisions that were contrary to, and/or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

In addition, the adjudication of the Tedford claims by the courts of Pennsylvania was based on an unreasonable application of the facts in light of the evidence presented in the state court proceedings. Indeed, no reasonable review of the facts of this case is

presently possible since hundreds of pages on information critical to the case remains hidden in the vault of the PSP.

To the extent that the state courts ignored the merits of Tedford's Constitutional claims, the review must be de novo.

Tedford's continued confinement is unlawful as it has been obtained through gross violation of Tedford's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution for the reasons set forth herein.

## V.    GROUNDS FOR RELIEF

Upon his return to the Pennsylvania courts, Tedford's second PCRA filing thus specifically raised issues which preserve supplemental grounds to the original grounds already of record. Other than those grounds set forth below which were included in his original habeas application but which are now withdrawn, all other grounds were either contained within his original Habeas pleading, were expanded upon/supplemented by his subsequent filings in state court, or are now otherwise properly before this Court:

<u>Grounds Respectfully Withdrawn</u>

As Tedford has steadfastly taken the position that since he did not commit this crime, he would not beg for his life and since he discharged prior counsel because of their failure to adhere to his directions in that regard, Tedford hereby withdraws the following claims made in his original Habeas pleading:

1.    Tedford's trial counsel failed to ask perspective jurors "life qualifying" questions (Claim XII in Tedford's original habeas corpus petition (ECF No. 23)).

2.    Tedford improperly waived his rights to present mitigating evidence (Claim XIII in Tedford's original habeas corpus petition (ECF No. 23)).

3.    Trial counsel was ineffective at sentencing for failing to present mitigating evidence (Claim XIV in Tedford's original habeas corpus petition (ECF No. 23)).

4.  The prosecutor committed misconduct at the sentencing phase in telling the jury that death was the appropriate sentence (Claim XV in Tedford's original habeas corpus petition (ECF No. 23)).

5.  That Tedford was denied the right to reliable mental health assistance in connection with sentencing phase (Claim XVI in Tedford's original habeas corpus petition (ECF No. 23)).

6.  That jury instruction in the penalty phase improperly implied a burden of proof on the Commonwealth (Claim XVII in Tedford's original habeas corpus petition (ECF No. 23)).

<u>Supplemental Grounds Herein Advanced</u>

*A. Grounds Regarding the Ineffectiveness of Prior Counsel*

1.  Trial counsel was ineffective for a gross failure to investigate, discover, and present evidence to support Tedford's claim of actual innocence or at least to raise a reasonable doubt with respect to multiple, specific instances otherwise delineated in the original habeas petition and as supplemented herein; failing to properly invoke the pre-trial discovery process in state court denying Tedford due process of law pursuant to the Fifth and Fourteenth Amendments to the United States Constitution by:  a) failing to request specific discovery from the Commonwealth and thereby not triggering the Commonwealth's obligations under the state discovery rules; and, b) failing to demand <u>Brady</u> material; c) failing to conduct a proper independent investigation to identify the critical areas under which the principle tenets of the Commonwealth's case were founded to demonstrate Tedford's actual innocence and the absence of proof beyond a reasonable doubt of his guilt by, for example, failing to demonstrate that forensic evidence would have been found at the store if the murder were committed there. (Claim II in Tedford's original habeas corpus petition (ECF No. 23)).[11]  To the extent that prior counsel failed to raise the ineffectiveness of trial counsel in prior pleadings, they were also ineffective.  And prior PCRA/Habeas counsel was ineffective for failing to return to state court to preserve issues raised by the RTKL letter.

2.  Trial counsel failed gather contrary evidence to demonstrate the unconstitutionally unreliable and misleading expert testimony upon which Tedford's conviction was substantially based, and to object to serious misstatements made by the prosecutor about the forensic evidence offered by the Crime Lab and pathologist.

---

[11] Contingent with this claim is one which relates to a reference in Crime Lab reports that a pubic hair was found in the victim's car and that Tedford could not be ruled out as the source. If the bench notes of the lab examiner reflect this to have been a valid conclusion, the failure to follow up on this by independent analysis and to present it to the jury would be ineffective.

3.      Tedford's post-verdict motions counsel/appellate counsel labored under a conflict of interest that adversely affected Counsel's performance depriving Tedford of his Sixth Amendment right to the effective assistance of counsel (Claim XI in Tedford's original habeas corpus petition (ECF No. 23)).

4.      Trial counsel was ineffective for failing to challenge the lack of evidence that a rape had occurred and in denying Tedford meaningful appellate review regarding that matter (Claim III in Tedford's original habeas corpus petition (ECF No. 23)).

       *B.      Grounds Regrading Prosecutorial Misconduct & Brady Violations*

1.      The Commonwealth withheld Brady material, which prejudiced Tedford (Claim V in Tedford's original habeas corpus petition (ECF No. 23)).

2.      Tedford's rights were violated because of the prosecutorial suppression and manipulation of evidence and presentation of inaccurate evidence and testimony (Claim IV in Tedford's original habeas corpus petition (ECF No. 23)).

3.      The prosecutor improperly injected his personal opinion, vouched for the jailhouse informant and suggested Tedford had a burden to help the police (Claim VII in Tedford's original habeas corpus petition (ECF No. 23)).

4.      The trial was rendered fundamentally unfair under the Due Process Clause of the Constitution when the Court permitted the Commonwealth to introduce unduly prejudicial victim-impact evidence during his trial (Claim IX in Tedford's original habeas corpus petition (ECF No. 23)).

5.      The conviction must be vacated because the trial court told the jury that it could consider Tedford's status on work release in judging his credibility in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution (Claim X in Tedford's original habeas corpus petition (ECF No. 23)).

       *C.      Systemic Errors by the State Courts*

1.      Tedford was denied his rights to effective assistance of appellate counsel and a meaningful appeal of his conviction as the result of numerous and substantial alterations to and omissions from the transcripts of the preliminary hearing, suppression hearing, juror selection, trial and evidentiary hearing (Claim VI in Tedford's original habeas corpus petition (ECF No. 23)).

2.      Tedford was denied his rights to counsel and due process under the 5th, 6th and 14th Amendments by the failure of the Pennsylvania Courts to consider the claims he made in his second PCRA on the merits by arbitrarily failing to apply their own precedent with respect to such claims, by applying the Statute of Limitations provisions of the PCRA in an arbitrary, capricious and unconstitutional manner, and/or by failing to recognize that his original PCRA counsel was *per se* ineffective

for failing to properly preserve his rights to file a second PCRA under Pennsylvania rules.

### D.      Errors Regarding the Jury

1.      The jurors had access to prejudicial information regarding the case and him in violation of his rights to a fair and impartial jury (Claim I in Tedford's original habeas corpus petition (ECF No. 23).

2.      The jurors at Tedford's trial consulted and relied upon the Bible during their deliberations in violation of his rights under the First, Sixth and Fourteenth Amendments to the United States Constitution (Claim VIII in Tedford's original habeas corpus petition (ECF No. 23).

### E.      Summary errors

1.      Tedford is entitled to relief based upon the accumulation of errors (Claim XVIII in Tedford's original habeas corpus petition (ECF No. 23).

2.      Tedford also specifically raises the claim that he is actually innocent of the crime. He acknowledges the burden placed upon him in such an assertion and he conjoins this assertion with the clear recognition that the discovery he requests will support his position for the reasons that have otherwise been extensively articulated by him throughout the course of these proceedings.

Contemporaneous with this filing, Tedford will file a supplemental appendix which includes additional evidence in support of his claims and that Supplemental Appendix is incorporated herein by reference.

## VI.    FACTUAL BACKGROUND SUPPORTING GROUNDS FOR RELIEF AND SHOWING NEED FOR FULL DISCOVERY

A.      Anomalies Presented in Materials Revealed - 1986 through March 4, 2011.

On January 11, 1986, Ms. Revak's body was discovered on a remote wooded hillside in Washington County by two hunters.  Circling her neck was a deep wound that appeared to have been caused by a handheld ligature of some kind used to strangle a person

to death.  Her clothing was drenched with blood from a severe blow to her head that caused a laceration to her scalp which resulted in profuse bleeding.  TT at 37-38, 41-63, 65-70.

According to the jailhouse informant who later recanted, Michael Ferry, on January 10, 1986, Tedford had developed "hot nuts" for Ms. Revak while working at The Finishing Touch, a medium sized home remodeling store situated in a strip mall in Butler County. TT 380-382. The government's theory at trial was explicitly and unequivocally that Ms. Revak spurned Tedford's sexual advances at The Finishing Touch and that Tedford then raped and strangled her there with twine in common supply at the store.

The Commonwealth further speculated that Ms. Revak's body remained at The Finishing Touch until after midnight when Tedford loaded her body into the hatchback of his sports car and transported it over 50 miles to the location where it was found.  That speculation embraced the notion that Tedford selected a location with which he was totally unfamiliar, as he was from Somerset County and had no affiliation with the remote Washington County hillside where Ms. Revak's body was discovered.  TT 129.

The government's theory was at complete odds with the physical evidence that actually existed in the case.

The Finishing Touch was a fully stocked *home remodeling store* with wall-to-wall carpeting and a drop tile ceiling, and the store was crammed with carpets, lampshades, drapes and a variety of other textile materials that were especially susceptible to soaking up any trace of blood. Given the extreme blow to Ms. Revak that Tedford allegedly delivered, large amounts of blood must have been exuded. TT 144.[12] But no evidence of

---

[12] See also, expert reports Exhibit D and Exhibit E.

blood at the store was produced and the minimal police reports produced at trial suggested only minimal effort was made to find it there.

Investigative tools, however, existed in 1986 that should have established the presence of blood on the floor, on the walls or ceiling if in fact Ms. Revak was murdered at The Finishing Touch. Indeed, PSP Trooper Bernard Stanek, the lead investigator in this case, later wrote a book regarding his investigation of another nearly contemporaneous murder, describing how his investigation there utilized a "luminescent spray" that shows the presence of blood under proper lighting and **"works in the dark no matter how good the area would have been cleaned**." *The Road to Justice*, Bernard W. Stanek*, p. 194, ISBN: 9798649558235 (Copyright 2020) (Made in the USA Monee, IL October 21, 2021). But no reports of this kind that were produced indicated that such techniques were used in this case and in closing argument the District Attorney dismissed the absence of evidence by misrepresenting the testimony of the pathologist and criminalist on the amount of blood likely exuded. No objection was made to those serious misrepresentations.

The Finishing Touch should have literally been a warehouse of forensic trace evidence. Yet it was not.

No trace evidence whatsoever was found at The Finishing Touch to support the theory that Ms. Revak was brutally murdered there. But the reports provided to Tedford so far would indicate only that a cursory attempt was made to find any such evidence there. This is not plausible. The PSP, in conjunction with the Crime Lab, would have made a meticulous study of the alleged crime scene and for Stanek to conclude the murder did not happen there, reports must exist demonstrating that exhaustive efforts to find trace evidence wholly failed.

Nor was any trace of blood or other evidence found in Tedford's car, despite the Commonwealth alleging that Tedford used his hatchback type sports car to transport Ms. Revak's bloody body on the 50 plus mile trip from Butler County to the backwoods of Washington County. At no point did the Commonwealth produce a murder weapon, a speck of blood, a fingerprint or any shed of physical evidence to tie Tedford to the crime or establish that The Finishing Touch was the site of Ms. Revak's demise.

And there was no physical evidence presented to support the finding that Revak was raped. The coroner who first examined Ms. Revak's body concluded there was absolutely no forensic evidence of a sexual assault. Indeed, Revak sustained no physical injury consistent with her being the victim of a forcible rape. TT 71-72.

The exclusive focus on Tedford as the perpetrator of Revak's murder stemmed entirely from one matter which should have been legally irrelevant to this case: at the time of Revak's death, Tedford was on work-release for a prior assault on a female.[13]

Thus, despite the weight of physical evidence refuting the notion that Tedford murdered Jeanine Revak, once Tedford's criminal history status was discovered, the Commonwealth narrowly focused its efforts on proving that Tedford must have been the one who murdered her.

For the last 36 years, Tedford has steadfastly and consistently denied that he raped and killed Ms. Revak. He admitted at trial that he had a sexual relationship with Ms. Revak that began after they met when she applied for a job at The Finishing Touch and persisted

---

[13] In Trooper Stanek's book, it is readily apparent that one of the main investigative tools he used in investigating a homicide was the review of criminal records, *The Road to Justice*, pages 19 and 81, ISBN: 9798649558235 (2020). Trooper Stanek has further conceded in the affidavit he recently authored that shortly after learning: 1) that Tedford was on work release from a state prison sentence, and 2) that Tedford had ties to Ms. Revak, that Tedford became the prime suspect in the investigation. See, Exhibit A.

on several other occasions when she visited him while he worked at the store.  TT 534-535.

This was far from unusual. As trial testimony firmly established, many women were attracted to Tedford during the time that he worked at The Finishing Touch including Lynn Kampers, an employee at the store who later married the affiant on the criminal complaint that was originally filed in this case and that he had numerous sexual trysts at the store with a variety of women, including Ms. Kampers, a customer at The Finishing Touch and a Probation Officer. TT 324, 256-258, 506-508, 364-365, 515-521.

Ms. Revak was married at the time of her death, but evidence showed her relationship with her husband was strained.

On the morning of her death, Ms. Revak lied to her husband about what she was going to do that day, telling him that she was too sick to get out of bed.  However, by mid-morning, and without advising her husband or her employer of her sudden recovery, she was dressed very nicely and out the door to visit Tedford at The Finishing Touch.  The Commonwealth elicited evidence at trial that while in the store, she was purportedly observed there by a deliveryman who reported she was obviously in no distress at the time. According to Tedford, they had normal sexual relations at the store and she left in the early afternoon.  It was the last time he saw her. TT 12, 174-175, 331-333.

Ms. Revak's husband's actions raise deep and troubling concerns about Tedford's guilt. He did not see or speak to his wife the rest of the day; yet, when he returned home to find his purportedly bed ridden ill wife missing, and although she did not call or return throughout the rest of the day or night, he made no call to the police about her disappearance until the next day. He claimed to have gone out looking for her after her

mother asked to speak with her while he was on the phone with her and then allegedly drove right by where her car was parked without noticing his wife's car in what was an otherwise empty parking lot, Ms. Revak's car later found parked very close to the route Mr. Revak purportedly traveled.

When he was called to identify her body the next day, one or more police officers on the scene reported that Ms. Revak's husband made an incriminating statement that could readily be construed as a confession to her murder ("I'm sorry, I couldn't help it" or "I'm sorry, I didn't mean it").  TT at 604-610.

None of this evidence was, however, properly developed by Tedford's trial counsel or effectively presented to the jury.

The Commonwealth's case simply could not have withstood a motion for a judgment of acquittal on all counts had the Commonwealth not presented the testimony of two jailhouse informants, Michael Ferry and Christopher White.

The most extensive testimony of the informants was given by Michael Ferry.  Ferry alleged that Tedford made incriminating statements to him (including the statement about having "hot nuts" upon which the Commonwealth's theory of motive was based) while incarcerated at the Butler County Jail awaiting trial.  TT 380-382.

After the trial, however, Ferry recanted his trial testimony and stated that he testified falsely against Tedford as a result of promises of leniency that were never made known to Tedford's attorney.  See, Exhibit P.

Ferry only came forward with his story after the police went on television and asked for help in explaining why Revak's vehicle was located where it was found and Ferry

admitted at trial to making up Tedford's confession to benefit himself by filling in an otherwise impossible gap in the Commonwealth's timeline of the case.  TT 399-403.

Furthermore, at least two witnesses were available to testify that Ferry concocted his story to falsely implicate Tedford in order to secure leniency from the Commonwealth. See, Exhibit Q and Exhibit R.  Neither of these witnesses, however, were called at trial to impeach Ferry's credibility.

The other Commonwealth informant, Christopher White, was a lifelong thief who testified Tedford simply confessed that he raped and murdered Jeanine Revak without any corroborating details whatsoever, Tedford insisting for some 36 years that White was crazy, yet no evidence offered at trial to support such a claim.  TT 409.

Since Tedford's conviction, however, information has surfaced indicating that White suffered substantial mental health problems which predated his trial testimony and this evidence, if properly disclosed at the time of trial, would have refuted the notion that the White's testimony was at all credible. White revealed to Tedford's private investigator that he suffered serious mental health problems throughout his life, and he was housed in an institution dedicated to treat inmates with severe mental health issues at the time of the private investigator's interview. See, Exhibit S.  White's son has fully corroborated that his father was regularly under psychiatric care while incarcerated. See, Exhibit L. Indeed, at the time of the first private investigator's interview of White, White was serving a 10-25 year sentence for a series of burglaries and terroristic threats, White alleged to threatened a woman, saying: "you can run but you can't hide and I will search all four points of the earth and personally blow your fucking head off" and White pointing a loaded .357 magnum revolver between his juvenile son's eyes and threatening to blow his head off if

25

he informed on his father. See, <u>Exhibit T</u>.  As White was paroled in 2019 at the age of 63, it is likely that his parole decision involved consideration of his psychiatric condition and medications he was likely required to maintain upon his release.

No evidence of Christopher White's mental health problems, however, were disclosed by the Commonwealth and White's testimony went virtually un-impeached at trial.

As a prisoner on work release for an offense that involved an assault against a woman, Tedford became the magnet for police attention to the exclusion of other suspects because of his prior conviction,[14] and the singular determination that Tedford must have been the individual who murdered Revak distorted every aspect of the investigation of the case and the prosecution of Don Tedford.

B.      Tedford's trial counsel made no effort to obtain discovery before trial.

Despite the lack of any meaningful evidence indicating Tedford was the one who murdered Jeanine Revak, what is even more striking is that trial counsel benignly accepted the representations of the Commonwealth that it had given Tedford all the discovery he was entitled to receive, and discovery was never at issue in 1987 when the case was tried. This lack of effort by counsel clearly contradicted professional norms.[15]

Tedford filed an Omnibus Pre-Trial Motion on January 16, 1987 which was initially dismissed by the Trial Court as untimely (except with respect to the giving of an alibi notice). The Trial Court, however, ultimately permitted Tedford to address the Motion to Suppress statements he filed. *But Tedford's Omnibus Motion neither sought discovery nor*

---

[14] See, <u>Exhibit A</u>.
[15] See, <u>Exhibit AA</u>, the expert report and curriculum vitae of Heather Mattes, Esquire.

*made any record note of requests for specific <u>Brady</u> material or other information critical to the defense*.

By the time for filing that motion, counsel had clear evidence that other discovery existed.

On April 3, 1986, a preliminary hearing was held in this matter before District Justice Leon Gant. At that time, the following information was elicited during the testimony of Trooper Peters. Peters testified that leaves and other materials were taken from the scene where the victim's body was found about three weeks after by criminologist Scott Ermlick. See, <u>Exhibit U</u> at 90. Peters was present for this and Ermlick collected "mostly weeds" and other materials. Ermlick was looking for "fibers" and when asked if any fibers were found his answer was "yes, he came up with, it was a weed-type of thing, type of fiber he was looking for." <u>Exhibit U</u> at 91. As of the date of the preliminary hearing, the Trooper had not received any report from Ermlick about these fibers. Page 92. It is unclear if this report was ever produced.

Peters kept a different set of notes from which he then created his reports. He acknowledged that Stanek also took notes as well during their interviews of witnesses and these were different than any official police reports that were ultimately generated. At 97 to 98. Peters described his separate notes as what he took "on the beginning of the investigation and who I interviewed, the time I interviewed them, so on." At 102. He kept a notebook that "we take notes in" in this and other cases. He said those notes would be preserved. <u>Exhibit U</u> at 102 to 103. There is no evidence that they were produced.

Peters indicated that He and Trooper Stanek conducted a search of The Finishing Touch on January 12, 1986 beginning about 4 or 5 p.m. in the presence of the owner of the

store and the district attorney. Exhibit U at 107 He indicated that a blotter was removed and that they did search for blood or fibers, Exhibit U at 109, and said that "we did not have the necessary lighting and normally we will send a records and identification man to go in there and pull fibers and things like that; that was later on done." Id. at 109.   He believed that it was done by "Trooper Cunningham and Trooper Rea." All items were sent to Ermlick, Exhibit U at 109. Peters testified that "we didn't lift any blood from the scene." Exhibit U at 110.   Again, a full report on this search was never produced.

Peters testified that both Tedford's vehicle and the vehicle of the victim were investigated by Troopers Titler and Rea.  Exhibit U at 111.  Everything in Tedford's vehicle was seized from it including clothing, a sweater, a bag, items from The Finishing Touch, paper items, and a blueprint of a solar house.  Exhibit U at 111.  When asked if any of the items found in Tedford's car linked him at all to the victim of the case, Trooper Peters said "no, not that I know of at this time."  Exhibit U at 112.  He said that he had not gotten back all of the reports on those items at that point.   Peters further stated that they swept the rug and the sweepings were given to the criminologist. He identified the sweepings of the rug at The Finishing Touch and in the victim's and Tedford's cars. This was done with a special type of vacuum.  Exhibit U at 112.  He testified that they had no results back on those tests. Exhibit U at 114.   He admitted that there was no evidence of any kind that had been uncovered to date to show that the victim was ever in Tedford's vehicle, or that Tedford was ever in the vehicle of the victim, Exhibit U at 115.

At the hearing on the pre-trial motions held January 26, 1987 before the Honorable John Bridon, Peters testified that when Tedford was interviewed on January 13, 1986, "I believe he was a suspect as well as some other individuals possibly."  Page 49.  The other

individuals the Trooper believed were suspects has never been identified, although the PSP's files contain numerous documents titled "suspect files."

Indeed, counsel had a clear indication that the Commonwealth's case was extremely weak, and that vigorous investigation would likely have been quite fruitful. At the end of the preliminary hearing, which featured the testimony of Peters, the husband of the victim and a delivery man who simply said that he had seen a dark-haired woman with Tedford in The Finishing Touch that day, District Justice Gant made the following ruling:

> "After listening to the testimony, there certainly is, if this were a trial there certainly would be doubt. I didn't hear, certainly didn't hear evidence that would convict the defendant. But it is not at trial. This is a preliminary hearing and my responsibility only is to determine whether or not there is a prima facia case." Exhibit U at 120 to 121.

The case was then held for court.

Thirteen days later, the Commonwealth took the statement of Michael Ferry.

This failure to invoke Court process to obtain discovery occurred not in a simple, readily prepared case, but in a capital murder prosecution that lacked physical evidence of a homicide at the purported crime scene and involved a weak circumstantial attempt to prove guilt based largely through two jailhouse informants who claimed the Commonwealth did not give them any deals or promises.

Adding to his failures in the process of obtaining material from the Commonwealth, defense counsel never sought to investigate the case on his own by hiring a private investigator or independently engaging in any meaningful effort to gather evidence that would challenge the Commonwealth's case.

Given the clear indication that the light of suspicion should have fallen on someone besides Tedford, the failure of counsel to do anything to prepare for trial by way of discovery was profound proof of the ineffectiveness of his representation.

The only justification trial counsel ever offered for his absolute failure to engage in any form of discovery was his uncritical acceptance of the assurance of the Commonwealth that he had all material he was required to receive. At a hearing on February 3, 1988, on Tedford's Post-Verdict Motions which alleged the ineffective assistance of trial counsel, Tedford's trial lawyer was asked by the Commonwealth:

> To the best of your knowledge, did you receive complete copies of all of the police reports, lab reports, property records and related documents?

And to this question, counsel answered:

> I have never, I haven't seen anything from the commencement of trial, thereafter, which was new to me.

February 3rd Hearing at 248-249.[16]

At no time during that hearing did the Commonwealth disabuse the Court of the notion explicitly made at trial at TT 670 ("He had all the evidence"). Similarly, the Commonwealth implicitly suggested at the hearing there were no other materials gathered by the investigating agents in connection with this case which had not been disclosed.

### B.  Tedford's First PCRA:  Denials by the Commonwealth of the Existence of Additional Discovery.

Tedford filed his first PCRA on July 12, 1995.

A motion for discovery was then filed on October 2, 1997 in conjunction with the PCRA, which resulted in various orders entered in the Court of Common Pleas of Butler

---

[16] Even at trial, counsel's statement was belied by the record as during the cross examination of Stanek trial counsel was confronted with documents that he indicated he had never seen before.  TT 210-211.

County in May and December 1998. These orders directed Tedford's trial counsel to turn over his files and records to new counsel, but there is no indication during this phase of the litigation that the Commonwealth made any representation other than that no further discovery was available to Tedford.

Tedford's initial PCRA was dismissed on January 31, 2000, as untimely, but the Pennsylvania Supreme Court reversed and sent the matter back for further proceedings. Commonwealth v. Tedford, 781 A.2d 1167 (Pa. 2001).

On January 11, 2002, Tedford's new lawyers (ones who would represent him until present counsel was appointed) filed another motion for discovery in connection with his pending PCRA.  On February 26, 2002, the PCRA court held a status conference to discuss that motion, at which time the Commonwealth was represented by the Office of the Attorney General.

During that conference, Tedford's lawyers indicated their discovery motion focused on material outside what they had received from trial counsel. The Commonwealth's response was that all discovery been made available to prior counsel. February 26, 2002, Hearing at 7. Repeatedly throughout this conference, the Commonwealth told the Court that it provided all drawings, taped interviews, UPS logs, scientific reports and other relevant matters. February 26th, 2002 Hearing at 7 and 15-27.

At one point in the hearing, the Trial Court directed the Commonwealth to file a verified statement that there was no more information that could have been disclosed. February 26th, 2002 Hearing at 16.  *No such verification was, however, ever filed.*

By Order dated June 12, 2002, the Trial Court denied the motion for discovery based upon two factors.

First, the Trial Court determined that the motion itself was defective in that it was a general boilerplate request insufficiently justifying the need for discovery. Under Rule 902(E) of the Pennsylvania Rules of Criminal Procedure, a capital PCRA defendant has the favorable advantage of being able to seek discovery upon a "showing of good cause," but the motion Tedford filed never demonstrated the basis for the requests or their relationship to the case Tedford was making.

Second, the motion was denied because the PCRA Court accepted the Commonwealth's representations that the various items requested in the motion had already been made available to trial counsel or did not exist.  See, the Trial Court's Order of June 12, 2002 at 2-3, 5, 10, 12 and 14.

The denial of discovery was affirmed by this Court in its general affirmance of the denial of Tedford's PCRA.  <u>Commonwealth v. Tedford</u>, 960 A.2d 1 (Pa 2008).  In Its Opinion, the Pennsylvania Supreme Court chastised Tedford's lawyers for using a "shotgun" approach with respect to both the issues he raised and his discovery requests. The discovery requests were rebuffed because Tedford "never states the basis for his belief that these particular items that he has never seen even exist." <u>Id</u>. at 21. His discovery motion was deemed "broad and improper" <u>Id</u>. and it lacked support, said the Court, because Tedford "has not even proven the existence of some of the evidence" that he was requesting in his otherwise "overbroad, improper, and lacking in good cause" discovery pleading.  <u>Id</u>. at 22.

While Tedford pointed out strong circumstantial reasons to suggest such information *was* in those files and should have been disclosed, the Pennsylvania Supreme Court, like the PCRA Court and trial counsel before, acted upon the assumption

perpetuated by the Commonwealth that there was no other information to be disclosed and that the issues Tedford raised were thus meritless.  <u>Id</u>. at 21. Indeed, the Court's acceptance of the Commonwealth's assurance was, to a degree, a matter of blind faith since, in footnote 18 of the Opinion, the Court noted that "the Commonwealth does not address whether the items exist."

The denial of discovery haunted Tedford when the same lawyers who represented him at his PCRA continued to represent him in his federal habeas corpus proceeding.

In conjunction with his original habeas petition, Tedford's habeas counsel again sought to obtain discovery through a broadly worded, generic application under Rule 6 of the Rules Governing §2254 Cases (ECF No. 32).

On September 28, 2010, the Honorable Terrence F. McVerry entered an Order which systematically denied virtually all of Tedford's discovery requests either because counsel had not raised them in the PCRA or because there was no reason to believe that any materials other than what had been given to trial counsel existed.  As had been the case throughout the proceedings in the Pennsylvania courts, the discovery process was, as of the time of Judge McVerry's Order, governed by the notion that there was essentially nothing left to review that might be discoverable.

D.     March 4, 2011:  More Discovery Exists.

The entire complexion of the discovery, however, turned on March 4, 2011.

Pursuant to a Right To Know Law request Tedford filed, the PSP responded in a letter dated March 4, 2011. See, <u>Exhibit F</u>.  That letter detailed numerous categories of evidence gathered during the investigation and a simple count of the number of such documents gathered revealed a critical truth:  the representations made by the

Commonwealth from and after the time of trial that all discovery material was made available to the defense were false. In fact, about 55 percent of the police reports and other evidence gathered had never been disclosed to Tedford.

Whether any of the prosecutors who made representations about the completeness of discovery knew of this vast discrepancy did so advertently or inadvertently is immaterial. What is critical is that at least half of the discoverable evidence assembled in the case has never been disclosed to Tedford, a fact that renders the underlying premise of the PCRA Court's Order of June 12, 2002, denying discovery at Tedford's first PCRA, and all orders subsequently relying on it, wholly untenable.

While the District Court persisted in denying discovery in light of the March 4, 2011, disclosure by Opinion and Order dated June 30, 2011 (ECF No. 67), Judge McVerry shortly thereafter recused himself after it was revealed he was a prosecutor at Tedford's prior Pennsylvania assault conviction. The case was then reassigned to the Honorable Kim R. Gibson.

Undersigned counsel was then appointed on September 11, 2012, to represent Tedford after insurmountable and irreconcilable differences arose between Tedford and his prior counsel when that counsel sought to focus the case on defeating the death penalty rather than what Tedford wanted, proving his innocence of the rape and murder of Jeanine Revak.  As he did at trial and for 36 years since, Tedford has always maintained that he will not beg for his life for a crime he did not commit.

Undersigned counsel then endeavored to correct the error of prior counsel by filing focused and specific discovery requests aimed at obtaining access to the files that had to date never been disclosed and went to the heart of the judgment at issue.

34

By Opinion and Order dated September 29, 2014 (ECF No. 197), the District Court, however, denied Tedford's renewed discovery application, this Court holding in part that it was powerless to grant the discovery Tedford sought because Tedford was remiss at the PCRA stage of litigation in seeking discovery and the Court was thus foreclosed from obtaining discovery in his federal habeas corpus action.

E.      Tedford's Renewed Efforts to Obtain Discovery through a Second PCRA.

Upon the District Court's denial of Tedford's motion for discovery, the federal habeas corpus proceedings were stayed in order to allow Tedford to return to the Pennsylvania courts to seek discovery (ECF No. 214).

After Tedford filed a pro-se PCRA Petition on or about December 2, 2014, undersigned counsel was appointed to represent Tedford and on or about May 5, 2015, Tedford then filed through counsel his:  Consolidated Pleadings:  Amended Petition Pursuant to the Post Conviction Relief Act, Petition for Reconsideration of June 12, 2002, Order of Court, First PCRA Filing, and Request to Amend that Filing, Petition for Writ of Habeas Corpus Pursuant to Title 42, Pa.C.S. § 6503, Petition for Relief Pursuant to Article I, § 11 of the Constitution of the Commonwealth, and Motion for DNA Testing.  See, Exhibit G.

In this pleading, Tedford specifically alleged: a) that trial counsel was ineffective for failing to invoke the pre-trial discovery process and failing to develop the facts of his defense; b) that PCRA counsel was ineffective for filing a boilerplate discovery request, failing to learn of the March 4, 2011 material sooner, and failing to return immediately to Butler County when they did; c) the likely existence of Brady material in the undisclosed evidence; and, d) that more than good cause existed to direct discovery in light of the

realization that 55% of the discovery generated in this case was never disclosed to Tedford. And in Paragraphs 109-208 of his pleading, Tedford detailed the discovery materials he sought, relating them to the categories of undisclosed discovery reflected in the March 11, letter and the other materials he had gathered since his conviction. This application was anything but boilerplate.

F.       Discredited expert testimony based on the 2015 FBI Report:  Additional Discovery Needed.

Aside from the now discredited testimony of the two jailhouse informants (Michael Ferry and Christopher White), the only evidence the Commonwealth offered linking Tedford to Jeanine Revak's murder came from Scott Ermlick, a PSP Criminalist trained in microscopic hair and fiber analysis by the FBI.  TT 223-256.

Ermlick's testimony was a critically important part of the case, the Commonwealth referencing the significance of Ermlick's testimony three times during closing.  TT 669, 682-683 and 716-717.

Indeed, the Commonwealth's closing reached its crescendo in the assertion that what "saved" the case for the Commonwealth was hair and fiber evidence, this evidence only having meaning as a result of Ermlick's visual comparison testimony as the hairs and fibers were not otherwise shown to the jury for comparison.[17]  TT 717.

At trial, Tedford's trial counsel expended no effort prior to or during the trial to scrutinize the science Ermlick purportedly brought to the courtroom, challenge whether Ermlick's testimony was generally accepted under the Frye standard then (and now) operable in the Pennsylvania courts, or address how Ermlick's testimony aided the jury in

---

[17] The Commonwealth specifically argued:  "What saved this case was the wool clothing and also the apparent fact there were a lot of fibers in The Finishing Touch and she somehow was in contact with them." TT 717.

determining a disputed fact.  Indeed, Ermlick ultimately was qualified at trial, not in any particular scientific discipline, but only as an "expert witness."  TT 226.

After being so qualified, Ermlick expressed his opinions regarding the hair and fiber comparisons he conducted. TT 241-242.[18]

Specifically, Ermlick testified that he found a pubic hair on Revak's underpants that did not match her or her husband but was consistent with Tedford's, based upon his subjective "microscopic analysis." TT 229-230.[19]

Ermlick additionally testified that he compared vegetable fibers found on Revak's clothing with fibers from twine found at The Finishing Touch as well as carpet backing fibers from the store and concluded that they were consistent.  Ermlick elaborated that the vegetable fibers on Revak's clothing absolutely could not have come from where her body was found or from her residence.  TT 233-237, 241-242.

In addition, Ermlick testified that he removed fibers from the decedent's blouse and Tedford's ski sweater and that the fibers had the same "microscopic characteristics" "optical properties" and additional similarities.  TT 231-233.

Ermlick's trial testimony and the analysis he conducted were completely unreliable and lacked scientific support.

Not until April 20, 2015, did the FBI announce the results of a review of cases in which FBI trained analysts testified with respect to hair and fiber analysis.  See, Exhibit H.

---

[18] Microscopic fiber analysis is akin to microscopic hair analysis and is visually analyzed the same way as hairs and with the same limitations. "Strengthening Forensic Science in the United States:  A Path Forward" Committee on Identifying the Needs of the Forensic Sciences Community, National Resource Council (2009) at 155-163.

[19] Ermlick's expert report detailed how a pubic hair retrieved from Revak's vehicle could not be eliminated as having come from Tedford.  See, Exhibit V.

The results of the report were striking.  The April 20, 2015 report concluded that examiners' testimony in at least 90 percent of trial transcripts the Bureau analyzed as part of its Microscopic Hair Comparison Analysis Review contained erroneous statements. Indeed, the report detailed that 26 of 28 FBI agent/analysts either provided testimony with erroneous statements or submitted laboratory reports with erroneous statements.

The report explained that the government identified approximately 3,000 cases in which FBI examiners may have submitted reports or testified in trials using microscopic hair analysis.  In the cases where examiners provided testimony used to inculpate a defendant at trial, erroneous statements were made in 96% of the cases. Defendants in at least 35 of these cases received the death penalty and errors were identified in 33 (94%) of those cases.  Nine of these defendants were executed.

The review encompassed cases where FBI microscopic hair comparison was used to link a defendant to a crime and covered cases in both Federal and State Court systems, the aforementioned review focusing on cases worked prior to 2000.

At Tedford's trial, however, Ermlick's testimony linking Tedford with Revak's death went unchallenged, and, as the Commonwealth claimed, the evidence saved the case for the Commonwealth.

After the report's publication, Tedford filed a timely Supplement to Petition Pursuant to the Post Conviction Relief Act Based on Newly Discovered Evidence on June 9, requesting a new trial, urging that discovery be produced with respect to Ermlick's testimony and requesting that an evidentiary hearing be convened to explore how Tedford was prejudiced by Ermlick's testimony.  See, Exhibit H.

G.    Critical New Evidence.

Tedford now returns to a forum in which he hopes this Court will not disregard the compelling record before it. It is time for the system to recognize that it owes the public an honorable review of Tedford's conviction by requiring that the relevant materials that absolutely exist in the files of the Commonwealth be subject to unbiased and critical review.  The failure to undertake that review can serve nothing but to give weight to the cynical voices who question if our system has any right to call itself just. Before lethal injection occurs, the Court cannot join the Commonwealth Courts and the prosecutors in a posture of callous indifference as to whether that execution is truly justified.

With the resources which have been made available to him, Tedford has never ceased to try to uncover the truth about this case. Those efforts now enable him to present new and critical evidence which profoundly support his decades old assertion that he is innocent of this crime and that his conviction was the result of fundamentally unconstitutional processes including the withholding and manipulation of evidence by the prosecution and the ineffectiveness of his counsel in failing to prepare his case and challenge the Commonwealth's presentation to the standard required of counsel in a death penalty case. That new evidence also compels the Court to reconsider its previous order denying discovery, as it enables Tedford to meet the test for reconsideration, that is, the presence of new evidence, intervening changes in controlling law (discussed, *infra.*), and a circumstance presenting a need to correct clear error or prevent manifest injustice. Nunez v. McCool, No. 21-3321 at *6 (3d Cir. May 3, 2022).

## 1:  The "Unknown Location" Where Revak Died

The case against Tedford was fatally weak even at the point of the preliminary hearing, as noted by the District Justice who presided over it. The Commonwealth

undoubtedly felt that desperation and immediately sought out jailhouse informants to shore up a prosecution devoid of hard evidence to link Tedford to the murder. But one inescapable fact was still deeply problematic: for Tedford to be guilty, the murder had to have occurred in The Finishing Touch. Inescapable facts put him at the store from early morning through the evening, with the only point of contestation being whether he left for a few minutes at mid-morning to meet Revak at a remote location and bring her to the store (the Commonwealth's theory supplied by a witness who later recanted and a State Trooper who did not believe that version called to corroborate the informant), or whether he was in the store the entire time (Tedford's testimony).

The Finishing Touch as the crime scene theory was steadfastly pursued the Commonwealth in its opening, closing, twine theory as the murder weapon, elevation of Ermlick's fiber testimony as a saving element of its case and its deeply troubling use of Trooper Stanek to attempt to corroborate Ferry.  TT 15, 24-25,655-656,677-679, 683-689, 690-691, 706, 710-717.  The appellate Courts of Pennsylvania embraced the Commonwealth's theory and affirmed Tedford's guilt presupposing that this critical element of the case was proven beyond a reasonable doubt. See, footnote 1, *supra*.

Any sensible person, and certainly any veteran police investigator, would have questioned this theory from the beginning. This was a bloody murder. A one-inch gash to the head and a ligature cutting into the throat would indeed produce the profuse bleeding the pathologist and subsequent experts have established. It would have, per the report of Dr. Persin, most certainly left evidence not only on the victim but in the "environment" in which the murder occurred. But no blood or other bodily fluids traceable to the victim were found in The Finishing Touch or in Tedford's vehicle. Did the PSP and Crime Lab not

search as hard as possible to find any? From the records Tedford has received, the effort to do so was minimal.  Did a complete lack of forensic evidence supporting this pillar of the Commonwealth's case bother anyone?

But now the Court knows that at least one key figure in the Commonwealth's case was deeply troubled by something which led him to conclude that the murder did not happen at The Finishing Touch, **although nothing in the discovery disclosed to date reveals the source for those doubts or any efforts made to resolve them.**

In 2020, Trooper Stanek published a book called "*The Road to Justice*."  ISBN: 9798649558235 (2020) ("Book").  The Book recounts his investigation of another homicide in which a body was found in Washington County on January 22, 1988.  Stanek was the chief investigator on that homicide and his investigation led to an arrest and prosecution in Ohio. He is the sole author of the Book.

Stanek's book is an incredibly detailed chronicle of the Ohio investigation. He discusses in meticulous detail the course of the investigation, revealing numerous investigative techniques used there which were also likely used in the investigation of the Revak murder occurring two years earlier, although virtually nothing of those techniques has been revealed to Tedford to date.

For example, Stanek indicated he made a careful examination of the body to determine the degree of lividity. Book at page 16.  Further, upon the initial finding of the body, he met with the entire Crime Unit at the State Police Barracks and asked them to comb their informants and others who might have any possible information to help in the investigation. Book at 29. He worked extensively with the pathologist on the case (the same pathologist as was on the Tedford case, Dr. Abernathy), called in the FBI to assist, carefully

examined phone records, used a trap and trace device to gain further records and worked with the phone company to get other material he needed. Book at 29, 32 to 33, 35, 48, 95 and 117. He tape-recorded interviews of many/most witnesses. 98, 152, 175.

Tedford has consistently requested documentation in all these areas and has received little or nothing so far.

Stanek also relates that during the Ohio investigation, he kept an extensive personal notebook of his observations about the witnesses and the inconsistencies in their testimony. Book at 100. It is impossible to believe that he did not keep one in Tedford's case also, per Trooper Peters' Preliminary Hearing testimony, although it has never been disclosed.

The trial record indicates, however, that such notes likely do exist. On page 210-211 of the trial transcript, as defense counsel cross-examined Stanek about Tedford's statements to him, Stanek referred to some document(s) which Tedford's trial counsel, (who claimed that he had received all that he thought he was entitled to *prior to* trial), stated on the record that he had never seen before. Was this a notebook akin to the one Stanek admittedly generated in the Ohio case? It strongly appears to be so.

There is also clear indication that Stanek understood the critical importance of finding evidence of blood at a crime scene and that forensic substances such as luminal could be used in an intensive review of an area for finding it. He used that technique in the Ohio case, Book at 194-195, see, *supra*, but there is no evidence revealed to Tedford to date that such efforts to discover blood at The Finishing Touch occurred, despite the Commonwealth's need to prove that the murder happened there.

In any event, Stanek concluded that The Finishing Touch was not the crime scene. In writing of help he received in the Ohio case from Trooper Peters, Stanek relates that he also worked with Peters on the Revak investigation.  The full passage of the Book is set forth in the Supplemental Appendix as Exhibit B but the critical part is as follows:

> Shortly after [Trooper Peters] became an investigator, he and Stanek worked a murder case where a young girl had been dumped in an open field in Washington County.  The man who killed her was a state prisoner who was on work release from the State prison in Greensburg, PA. He was hired on work release by a man who ran a decorating business in Cranberry Township, Butler County, PA. The girl who had just gotten married a short time before being killed was looking for a job in that line of work. She was just stopping at these types of businesses checking to see if any positions were open. She stopped at this business that was being managed by the prisoner, and he did an interview. She was a very pretty young girl and he called her and told her to meet him at a certain location because he was going to take her to do a bid on decorating a home to see what she could do. **He, however, took her to an unknown location**, where he raped and killed her.  He then dumped her body in Washington County.  (Emphasis added).

Stanek subsequently gave an affidavit to Tedford (Exhibit A) confirming that he concluded that where her death occurred was **unknown** and adding his speculation that the murder probably happened in Tedford's car, although no forensic evidence of any kind was found there either. But the Commonwealth's theory depended on the victim not being killed at a "unknown" location but at The Finishing Touch. The credibility of Ferry's testimony hinged upon him supposedly supplying critical information that the police were otherwise unable to obtain that supported this theory. But the jury never knew that the investigator called to corroborate Ferry believed the evidence did not support the Commonwealth's lynchpin theory, and Tedford did not know that investigator's conclusion until now.

 If Ms. Revak was not killed at The Finishing Touch, **Ferry was lying** (as he later admitted), Tedford **did not do it,** and there can be absolutely **no confidence** in this verdict.

This revelation powerfully underscores Tedford's claim of actual innocence, and compels the granting of a discovery order.[20] When were Trooper Stanek's doubts first manifested? Were additional scientific tests and examinations by the PSP or other police agencies used to try to account for the lack of forensic evidence and did they also fail? What other leads were pursued to account for the anomaly present at the heart of the Commonwealth's theory? Somewhere within the hundreds of pages of undisclosed documents in the vault of the State Police, Stanek's personal notes about this investigation, the files, bench notes and other records of the Crime Lab of the State Police, or the files of the Butler County District Attorney, some evidence must lie to account for Stanek's conclusion that the site of Revak's death was *unknown.*

### 2:  Forensic Discordance and what "saved the case"

Recent events have shown there is very substantial reason for the Court to doubt the legitimacy and completeness of the testimony criminalist Scott Ermlick gave regarding fiber analysis and other matters.

Scott Ermlick has been sued in the United States District Court in Johnstown by Kevin Siehl, an individual who served many years in prison for a murder he did not commit based in substantial part on the incomplete testimony of Scott Ermlick and a serious Brady violation which surrounded it. See, Siehl v. City of Johnstown, Civil Action No. 18-77 (W.D.Pa.).

---

[20] Moreover, of course, this revelation is: a) Brady material which fundamentally prejudiced Tedford; b) Brady material which would have impeached both Stanek and Ferry; c) proof that the improper bolstering of Ferry by Stanek also constitutes prosecutorial misconduct; d) shows the importance of counsel's failure to independently demonstrate the critical nature of the lack of finding of forensic evidence in the store; and, e) shows how the prosecution was improperly manufactured in the face of compelling evidence that refuted its basic premise.

In <u>Siehl</u>, Ermlick testified about blood analysis which he claimed linked Siehl to the murder of his estranged wife.  Later evidence revealed, however, that shortly before the trial, the police asked Ermlick to conduct another test, the results of which contradicted his previous examination and which demonstrated that his prior conclusions were not based upon a complete and authentic review of the records.  The police asked Ermlick *not to report* on the new tests, and he *agreed*.

The Honorable David E. Grine of Cambria County granted Siehl a new trial under the PCRA statute after determining that Ermlick's testimony was incomplete and inaccurate."  PCRA Opinion of July 21, 2016.  The Court held that the Commonwealth never disclosed what it learned from the retest to the Court or the defense and continued to rely upon false and misleading testimony in the trial.[21]

In the *Siehl* litigation, Ermlick testified at a post-conviction hearing that he had extensive training in serology and was well acquainted with all aspects of the analysis of potential blood findings.  Hearing of March 21, 2016 at 87-93.[22]  But, in Tedford's case, almost nothing was said about any blood analysis efforts Ermlick or anyone else made to determine whether blood was found either at The Finishing Touch or in Tedford's car.

In *Siehl*, Ermlick admitted that he never told the District Attorney about the tests that he had conducted prior to trial, July 24, 2019 deposition at 49*,* and that he agreed to a police request that he not produce a lab report on the inconsistent results he found in the retest*.  Id*. at 32.  Ermlick did admit, however, that he had kept extensive written notes ("bench notes") that constituted a "running tabulation" of what he was doing.  <u>Id</u>. at 101-

---

[21] A copy of Judge Grine's opinion is included in Tedford's Supplemental Appendix as <u>Exhibit W</u>.

[22] A copy of the March 21, 2016 transcript is included in Tedford's Supplemental Appendix as <u>Exhibit X</u>.

104.[23]  Those notes, which he said are archived by the Pennsylvania State Police, Id. at 106, reflect much more than what he put into formal reports he filed.

Ermlick acknowledged that while he did not put something into a formal report, it would have been reflected in his bench notes which, therefore, would constitute a far more comprehensive record of his forensic work on a case.  Id. at 217-243.  *And, critically, Ermlick acknowledged that because there was not a "formal discovery" request for the bench notes by Siehl's lawyer, they were never turned over to the defense.*  In Ermlick's view*, even if those bench notes contained exculpatory information, he was not obligated to give them over until and unless the defense requested them*.  Id. at 105-106.  In Tedford's case, defense counsel never made formal discovery requests and so, for the same reason, that which is contained in Ermlick's bench notes was never made available to Tedford *even if the materials contain **exculpatory** information*.

Ermlick visited The Finishing Touch as part of this investigation, TT 243, and his bench notes would reflect, among other things, what additional efforts were made by the State Police to confirm the Commonwealth's critical theory that the murder actually took place at The Finishing Touch. Given how critical that fact was to the Commonwealth's case, it is impossible to believe that everything possible was not done to find some speck of blood or bodily fluid of the victim in The Finishing Touch and or in Tedford's car.

But instead of admitting that there was doubt about the location of crime scene, the prosecutor had to blatantly distort the testimony of record in his closing to account for the fact that nothing was found.

---

[23] A copy of Scott Ermlick's July 24, 2019 deposition transcript is included in Tedford's Supplemental Appendix as Exhibit Y.

After again asserting that "[s]he was really killed at The Finishing Touch," the prosecutor asked: "how much blood are we talking about?" and asserted that the "pathologist didn't say." TT 713.  This was false. Dr. Abernathy testified quite clearly that the head wound "produced a very great deal of hemorrhage" and that a good deal of hemorrhage was all around the scalp. TT 38, 41. Abernathy testified that the 2.5 cm laceration itself would have produced "profuse bleeding." TT 65, 68. Ignoring this, the prosecutor referred to Ermlick's testimony about blood on the victim's clothes, which he said "are just drops of blood." TT 713.

This was a critical distortion.  The absence of any evidence that blood was in the store or Tedford's car completely undermined the fundamental theory the Commonwealth put forth. Indeed, the reports of Dr. Mark Persin, D.O.[24] and Dr. Lyndsie Ferrara, Ph.D.[25] a Forensic Scientist and teaching professor at Duquesne University, confirm this. Dr. Persin concluded:

> It is my opinion, to a reasonable degree of medical certainty, that the victim who was found with a gaping scalp laceration, caused by a blow to the head with enough force to cause a contrecoup injury having subarachnoid and subdural hemorrhaging, would have had a large amount of bleeding. As a result of such, blood would have been present on the victim's body, her clothing, and the environment where the injury occurred.

Dr. Ferrara added:

> The autopsy findings for Jeanine Revak indicate asphyxia due to ligature strangulation as the cause of death. The autopsy findings and testimony by Dr. Abernathy explain that the victim also suffered a scalp laceration (approximately 2.5cm in size) while alive supported by internal bleeding findings. Dr. Abernathy also testified that scalp lacerations usually bleed

---

[24] See Exhibit D.
[25] See, Exhibit E.

profusely. The criminalist Scott Ermlick described in his testimony the presence of blood on the victim's blouse localized to the right neck and chest area and drops of blood on the victim's jacket on the right front, sleeve, and back areas. Samples collected from The Finishing Touch were negative for blood. Based on the results of the autopsy, the injuries suffered by the victim, and the criminalist's finding of blood on the clothing, it is highly unlikely that no blood would be detected at the crime scene.

Moreover, the report from experts on hair/fiber analysis at Microtrace, Inc., give further evidence of the need to examine Ermlick's bench notes. That report draws the following conclusions:

1. Much of Ermlick's trial testimony is not reflected in the police reports Tedford received.
2.  The bench notes would reflect if his hair and fiber analysis were consistent with proper protocols later critically examined in the 2015 FBI report.
3. The bench notes will reflect if a critical effort was made to search for blood residue to confirm the location of the killing.
4. A pubic hair was found on the front seat of the victim's car. Was any further analysis or comparison done of it? Were it found to be consistent with Tedford, this would become enormously significant.
5. The prosecution's argument clearly distorted Ermlick's testimony.

See, Exhibit O.

Finally, if the State Police called in any outside law enforcement organization to assist in this effort, records of their examinations must be revealed. Stanek contacted the FBI for help in the Ohio case and Ermlick received extensive training from the FBI as well. The Finishing Touch as the crime scene was the lynchpin of this case. Instead of just hoping that the jury would accept the prosecutor's misrepresentation of the evidence, the Commonwealth must have exhausted every means to support that finding. Stanek's conclusion that the murder did not happen at The Finishing Touch suggests they tried but failed and that evidence of that failure exists.

## 3:  Jury Infiltration

Tedford made significant claims in his initial habeas corpus pleading about the infiltration of the jury pool by information about the case. The substantial nature of that infiltration was recently confirmed by Diane Perko, an individual who had been summoned for jury duty in Tedford's case but who was dismissed primarily because what she learned from her fellow jurors during the jury selection process.[26]

In the affidavit supplied by Perko, she indicated that she knew nothing of any substance about the case prior to being summoned for jury duty. But upon her arrival, the entire jury room was buzzing with information claiming that Tedford was the killer. She recalls approximately about a half of dozen jurors discussing how Tedford had stalked and killed the young woman with blonde hair and that one of jurors had a photograph of the deceased victim. She described the situation in the jury room as "a free for all" and was shocked that the Court's staff was doing nothing to enforce the Court's order that the jury not discuss the case among themselves.

Perko's affidavit demonstrates the thorough and complete corruption of the jury selecting processing in this case and confirms Tedford's view that no fair could have occurred by selection of the individuals in this panel. This was not a trial of a case but a confirmation of what the jurors thought they knew before the case began.

### 4. Christopher White

White's son has given a statement confirming that while he and his father were confined in the state prison system, his father regularly was housed in areas treating serious mental illness. See, Exhibit L and Exhibit S. White's history of mental illness is an established fact but the Commonwealth has never revealed anything indicating that White

---

[26] A copy of Diane Perko's affidavit included in Tedford's Supplemental Appendix as Exhibit Z.

was mentally ill, despite files in the PSP files marked "Psychiatric Information." Any evidence that White suffered from a condition that would have called into question his ability to perceive, remember or narrate perceptions accurately is <u>Brady</u> material that must be disclosed. <u>Lesko v. Dept. of Corrections,</u> ___ F.4th ___ at *44 (3d Cir, May 17, 2022). Files from the Department of Corrections and from any other source on this matter must be disclosed.

## VII.    MOTION FOR DISCOVERY

In light of the foregoing, Tedford respectfully requests that this Honorable Court reconsider its order denying the discovery requests he made at ECF No. 143, and he respectfully incorporates by reference the particular requests for discovery he made in connection with that application (ECF No. 144, 145 and 192).

In asking for reconsideration of the Court's prior denial of his discovery requests, Tedford recognizes that "a party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the [prior motion]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." <u>Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)</u>, quoted in <u>Gibson v. Wetzel</u>, 2016 US Dist. LEXIS 44418 (E.D.Pa. 2016).  See also, <u>Nunez v. McCool</u>, No. 21-3321, Third Circuit, filed May 3, 2022, at *6.

The new evidence presented above, and the evolving law under habeas discovery and <u>Brady</u> discussed *infra,* demonstrate the need to correct the prior denial of discovery in order to prevent the execution of a man the new evidence shows no reasonable juror could find guilty beyond a reasonable doubt.

50

**A.  Supplemental Discovery Requests**

To supplement existing requests, Tedford additionally requests the following discovery:

1.  All notes, compilations, observations and recordings made of any matter regarding this case by Tpr. Stanek and/or Tpr. Peters not reduced to police reports heretofore disclosed. Tpr. Peters admitted having such notes in his Preliminary Hearing testimony of 1/26/87 at 98-103.[27] Tpr. Stanek indicated keeping such a ledger on his cases in his book. See discussion, supra.

2.  Reports generated by anyone reflecting other suspects considered by the police in connection with this case. In testimony at the Preliminary Hearing on January 26, 1987, at 49, Peters admitted that Tedford was a suspect when he was first interrogated but that he was not the only one: "I believe he was a suspect as well as some other individuals possibly." Who were they?

3.  The reports of forensic investigation done by Tprs. Rea, Titler and anyone else in the employ of the Commonwealth of all possible scenes relevant to the homicide. The work of Rea and Titler was identified by Tpr. Peters in his Preliminary Hearing testimony at 109-115.

4.  The bench notes kept by Scott Ermlick regarding every scientific test or procedure he conducted in connection with this case, regardless of whether any such tests/procedures were later reflected in formal reports generated by his office and revealed as part of the discovery process.  It is specifically requested that any bench notes regarding an attempt to find blood or other evidence to establish that The Finishing Touch was the site of the murder of Jeanine Revak as well as any attempt to determine that Revak's body was transported in the vehicle of the Defendant be specifically revealed.

5.  All records of forensic examinations conducted by any institution other than the Pennsylvania State Police Crime Lab.

6.  All phone records obtained or sought to be obtained regarding the telephone number of the victim and all numbers of phones registered to the location of The Finishing Touch on or about the time of Revak's murder.

7.  Any psychiatric records or other mental health records in the possession of the Commonwealth that regard informant Christopher White, including, but not limited to the following: a) records in the possession of the Butler, Lehigh and any other  County Jail in which White was incarcerated regarding White's psychiatric condition; b) any presentence report prepared in connection with White's sentencing on any matter; d) all records from the Pennsylvania Department of Corrections regarding any psychiatric diagnosis and treatment regarding White during his incarceration; e) any records  of the Pennsylvania Parole Board considering White's application(s) for parole which relate in any way to psychiatric conditions,

---

[27] A copy of the January 26, 1987 Preliminary Hearing Transcript is included in Tedford's Supplemental Appendix as Exhibit U.

medications and/or treatment he was required to receive while incarcerated or while on parole.

8.     Scott Ermlick's curriculum vitae with specific reference to the details of the training he received from the FBI, the opportunity to inspect the hair and fibers that he compared and that formed the basis of the opinions he rendered at trial, any notes he prepared with respect to his comparisons and testing and any and all reports that were generated in connection with his inspections, comparisons and scientific testing.

### B.     Requests for Interrogatories.

In addition to the foregoing, Tedford requests that the Commonwealth answer the

following interrogatories:

1.     Before or during the trial, did Tpr. Stanek hold or express the view that the site of Jeanine Revak's death was not The Finishing Touch and was this information conveyed to District Attorney David L. Cook or Assistant District Attorney David A. Hepting?

2.     Did any other Commonwealth investigator, Crime Lab analyst or technician, or other employee hold such opinion? Was it expressed to the District Attorney's Office of Butler County?

3.     Did anyone from the Commonwealth make any representation to Christopher White and/or Michael Ferry regarding favorable treatment of any kind they would receive in exchange for their testimony? If so, specify.

4.     Was any consideration of any kind extended to Christopher White and/or Michael Ferry in connection with their testimony, before or after it was given?

5.     Did Christopher White or Michael Ferry express to any agent of the Commonwealth any expectation of benefit from their testimony?

6.     Does the Commonwealth have any information that Christopher White suffered from mental deficiencies/impairment that might have affected his recollection and/or credibility as a witness?

7.     Was any effort made to discover the presence of blood or bodily fluids, or any other evidence of a violent crime occurring at The Finishing Touch other than the testimony offered at trial?

8.     Did Scott Ermlick conduct any tests on any hairs or fibers for the presence of blood or other bodily fluids in connection with the investigation and/or prosecution of this case?

9.     Do the bench notes of Scott Ermlick reflect that he performed or was aware of any scientific tests or procedures done by him or anyone else in connection with the investigation and/or prosecution of this case which were not reduced to reports which were disclosed to the defense prior to trial?

10.    Did the lab analysis conducted by Scott Ermlick utilize any procedures now repudiated by the FBI?

11.     Did Tpr. Stanek generate or otherwise produce notes regarding his investigation of the case which were not disclosed to the defense prior to trial?

12.     Before or during trial, did Tpr. Stanek hold or express the view that Michael Ferry lied in testifying that Tedford confessed to murdering Jeanine Revak at *The Finishing Touch*?

13.     Were phone records other than those produced at trial obtained during the investigation of the case?

14.     Were other members of the PSP asked to discuss with their informants possible suspects or other information regarding the investigation of the case?

15.     Were any suspects other than Don Tedford identified during the investigation or prosecution of this case and, if so, who were they?

16.     Has any evidence been received by law enforcement since Tedford was convicted in 1987 that calls into question whether he was the individual who raped and murdered Jeanine Revak?

### C.     Evolving Caselaw Demonstrates the Need for Discovery

As Tedford will point out below, new cases decided since 2014 have shed new light on the critical importance of the grant of discovery here, not simply by recalling the underlying mandate that Rule 6(a) carries for a District Court but in giving an expanded understanding of the meaning of Brady material. As the scope of Brady has unquestionably expanded in these past few years, the demand that discretion under Rule 6(a) be properly exercised has concurrently increased. And Tedford, on his own initiative, continues to use the resources available to him to find new evidence which clearly illuminates the compelling need for the discovery he requests of the material that is clearly available.

But particularly because this is a capital case, the need to prevent a manifest injustice by failing to grant the discovery sought must be the first matter contemplated.

The history of the discovery process in this case is a tragedy of epic proportions. Tedford's trial attorney never filed a discovery motion and accepted without question the representation of the District Attorney that he had been given all to which he was entitled. By not filing such a motion, he arguably did trigger an obligation by the Commonwealth

to produce non-<u>Brady</u> material. <u>Commonwealth v. Long</u>, 753 A.2d. 272,277 (Pa. Super. 2000). He also never engaged an investigator to discover the case on his own. And even when, during his cross-examination of a PSP Trooper recounting Tedford's statement to him, defense counsel realized that he had never seen the report Trooper Stanek was referencing, TT 210-211, he did nothing further to demand whatever else he likely had not seen.

The sublime acceptance of the fact that there was nothing left to discover was then perpetuated for 25 years as the Commonwealth never disavowed the on the record assurances to the Court that nothing remained to be reviewed.[28]

---

[28] At trial, the Commonwealth specifically indicated that Tedford "had all the evidence" that was generated in the case.  TT 670.

At the hearing on Tedford's discovery request in connection with his initial PCRA on January 13, 1998, while Commonwealth counsel generally chided Tedford's new attorneys for not having obtained the file from trial counsel, the Commonwealth's attorney made certain quite specific representations about full discovery having been provided in the case: "It's the Commonwealth's position that full and complete discovery was made to original trial counsel" and "There is no additional <u>Brady</u> material since that discovery was given to trial counsel." January 13, 1998 Hearing Transcript at 6-7. Later, counsel disparaged Tedford's then attorney for not requesting discovery "which was fully and completely made to trial counsel before coming to the court." January 13, 1998 Hearing Transcript at 10. Regarding a request for information concerning an analysis of the victim's neck wounds, counsel once again stated categorically that "all <u>Brady</u> material was provided to trial counsel at the time the case was tried. We have no knowledge of any further <u>Brady</u> material being in existence." January 13, 1998 Hearing Transcript at 15. When asked about specific items of discovery like audiotapes, Commonwealth counsel once more said "we. . . aver that all discovery material was turned over to trial counsel." January 13, 1998 Hearing Transcript at 6-7. See also, p. 22 ("all <u>Brady</u> material was provided to trial counsel. . . .")

At the February 26, 2002, Hearing on Tedford's discovery request connected with his continued, initial PCRA, Tedford's lawyer first pointed out that efforts to get the file from trial counsel only succeeded after a time (and issuance of a court Order) when trial counsel turned over what he claimed was all he had. February 26, 2002, Hearing Transcript at 3-5.  As trial counsel had never filed for discovery and accepted the representation that what he received from the Commonwealth was all there was to receive, the Hearing then proceeded to challenge whether complete discovery had been made.

At that point, Tedford requested the disclosure of photographs relevant to the crime scene and otherwise. Commonwealth counsel, beyond simply asserting that no photographs were exculpatory, represented the following: "We also assert that that evidence was made available as was all the evidence in this case to prior counsel." February 26, 2002, Hearing Transcript at 7.

This categorical assertion was made again when the subject turned to Tedford's request for any drawings or illustrations. The Commonwealth's attorney affirmed that any such materials "were contained in the police report which was photocopied and provided to prior counsel that there are no additional drawings other than those contained in the police report and disclosed." February 26, 2002, Hearing Transcript at 15. This precipitated the Court to direct "that counsel provide a verified statement, somebody with sufficient knowledge." February 26, 2002, Hearing Transcript at 16.

This statement was never filed.

Based upon these representations, discovery was regularly denied by state and federal courts. But they were false. The March 4, 2011 letter is profound evidence that the PSP investigation generated hundreds of pages of material directly relevant to this homicide investigation, less than half of which were disclosed to Tedford. For Tedford, that nondisclosure likely means death. To the criminal justice system, that non-disclosure portends the prospect of the execution of an innocent man and the devastating impact on the public's perception of the integrity of that system such an execution would bring. A system which proclaims its reverence for due process cannot permit this.

There is no question that these reports exist. There is no question that these reports were generated as part of the investigation of the homicide of Jeanine Revak which resulted in the lead investigator reaching a conclusion at fundamental odds with the theory under which the District Attorney prosecuted the case. It is impossible to believe that at least a portion of those records should have been disclosed to Tedford's attorney prior to trial.

---

Additional contentions that all materials had been provided to trial counsel were made about tape recordings of witnesses, tapes of Tedford's calls to the police, and any UPS logs. February 26, 2002, Hearing Transcript at 17-22. Tedford again requested a verification but none was ever given. No explanation has ever been given as to why that verification was not filed.

The Commonwealth then asserted that no comparison of the wound to Ms. Revak was made with the twine it theorized was the ligature and that no fingerprint analysis was used as an identification procedure. February 26, 2002, Hearing Transcript at 24-26. As for the polygraph administered to the jailhouse informant, the Commonwealth stated "I'm frankly not sure if they are or are not [in the Commonwealth's possession]" but counsel dismissed them as inadmissible in any event. February 26, 2002, Hearing Transcript at 27.

The failure of the Commonwealth to acknowledge the existence of other investigative materials directly relevant to the death of Jeanine Revak continued when the matter progressed to the federal court, habeas corpus phase of this litigation. In response to Tedford's discovery request, Commonwealth counsel filed a pleading on May 27, 2010, (ECF No. 39) ridiculing Tedford's requests as a "fishing expedition" (multiple references) and as requests based on "nothing but speculation and hope." Id. at 9.

And twice in that pleading, Commonwealth counsel repeated the categorical denials made years earlier that no other materials existed.

At footnote 4, Commonwealth counsel criticized Tedford's discovery request as having been made "**despite his utter inability to proffer a shred of evidence to support the suggestion that exculpatory information of any kind was concealed from the defense**." Id. at 7-8.

And in response to Tedford's request for "any previously undisclosed police reports" the Commonwealth labeled this request, among other things, as "**based on the unsupported conclusory allegation that documents fitting that description actually exist**." Id. at 20.

And unless we are to disregard the <u>Brady</u> doctrine as it has been articulated by the courts in recent years, it is impossible to believe that certain documents should not be given to Tedford so that he may assess whether a good faith application can be made that these documents fit the definition of materiality under <u>Brady</u> and merit the consideration of a grant of a new trial.

In a system based on due process, the prosecutors should take the lead in demanding disclosure.[29]  To stand before the public and embrace the idea that the Commonwealth is justified in executing a man, prosecutors should not engage in a deadly game of hide and seek but put all cards face up on the table. Let the petitioner see what has been hidden, recognizing that he will still have to bear the burden of proving materiality before he could substantiate any request for relief from this verdict.

And if the prosecutors fail in this, the Courts must step in. Since discretionary authority has been given to allow courts to order the disclosure, the failure to do so makes the courts complicit in conduct which will surely cause a loss of confidence in the integrity of the system itself.  To execute Tedford without giving him some meaningful opportunity to review these documents is to make his execution the last act of a tragedy involving misconduct by the trial prosecutors, the failure of his counsel to act vigorously and timely and, perhaps most troubling of all, the indifference of the Courts to the grave injustice that happens when procedural rules are given preeminence over the search for the truth. The question of discovery should be an effort made by all parties to fairly set out such evidence

---

[29] An objection the Commonwealth has made to even an agreement that they *review* what they have failed to disclose is that they are not sure what Tedford already received pre-trial. They have demanded that Tedford reveal his file of discovery to them in this regard as a prelude to any further disclosure. But as the Third Circuit recognized in <u>Slutzker v. Johnson</u>, 393 F.3d 373 (3d. Cir. 2004*), the burden of proof of whether a defendant was given something already should be placed on the party with the better knowledge of the files it has and the files it disclosed: the Commonwealth*. Tedford has no burden here; the Commonwealth had and has the obligation of disclosure, one it has willfully failed to fulfill.

as exists to allow for a proper assessment of whether the judgment of the jury in Butler County is one in which the public may fully invest its confidence and go forward with carrying out of an execution which all believe is fully in accordance with the due process demands that must attend it.

Following the mandates of due process is the only way in which society can invest confidence in the work of its Court system. But due process is not just a slogan rapidly disregarded in substance. In 1855, Abraham Lincoln wrote to his friend Joshua Speed expressing great despair in that while our nation proclaims that all man are created equal, the practice of the country at the time was to except from that doctrine those Black Americans who were subject to the horrid institution of slavery. In decrying that circumstance, Lincoln said, "When it comes to this I should prefer emigrating to some country where they make no pretense of loving liberty -- to Russia, for instance, where despotism can be taken pure, and without the base alloy of hypocrisy." https://www.nps.gov/liho/learn/historyculture/knownothingparty.htm. To proclaim that no state may deprive someone of life "without due process of law" and then deny him access to the material critical to the integrity of his conviction is a form of hypocrisy that no system worthy of the confidence of the public can permit.

But Tedford's recent return to the Pennsylvania Courts in search of access to this critical material is a monument to the egregious manner in which the Pennsylvania state courts have foreclosed such inquiries under its PCRA scheme. Tedford's efforts demonstrate what a number of courts have already indicated: the PCRA scheme is, in its draconian effort to enforce a statute of limitations on such pleadings, a way that precludes any consideration except the convenience of a Court docket. As administered here, it

constitutes an unconstitutional deprivation of due process and one which is fully capable of producing horrific results that ignore the fundamental concern that the public has confidence that a guilty verdict represents a true judgment against a person responsible for the commission of a serious offense.

The Pennsylvania Supreme Court has continued to ignore the clear federal constitutional problems with the PCRA statute which some of its Justices have already recognized. And, in Tedford's case, while precedent of the Pennsylvania courts would have permitted him to proceed with his second PCRA claim and its attendant discovery request as a matter to be considered on the merit, the Pennsylvania Supreme Court without true explanation decided not to apply its own precedence and to close the door to that critical consideration. For this Court to ratify the actions of the Pennsylvania Supreme Court is to simply compound constitutional error which has been ongoing.

Ultimately, it is time to stop all of the procedural wrangling that has impeded Tedford's efforts to achieve justice and to get to the root of this matter.  No fair-minded person, now aware that a serious internal conflict existed between the prosecutors and investigators about the critical issue of the location of the homicide, cognizant of the strange lack of evidence that indicates any meaningful effort was made to find forensic evidence to sustain the prosecutor's theory, that the one jailhouse informant who was falsely corroborated by the testimony of the lead investigator later recanted and that the other informant suffered from lifelong mental issues of an undisclosed nature,  could possibly conclude that Tedford committed the murder of Jeanine Revak beyond a reasonable doubt.  To proceed without a review of the evidence which has not been disclosed is a manifest injustice on multiple levels.

The legal basis supporting the grant of discovery has significantly matured since this Court last visited it seven years ago. Cases decided since December 12, 2014 and others have refined the vision of what <u>Brady</u> material means must influence the clear discretionary judgment of this Court to grant discovery under Rule 6(a). The interconnection between the current understanding of <u>Brady</u> material and the grant of discovery under Rule 6(a) is of utmost importance.  As Courts have recognized an expanded understanding of what <u>Brady</u> material is, particularly in a death penalty case, a petitioner's rightful effort to obtain the Court's discretionary judgment to permit discovery under Rule 6 has concurrently expanded proportionately.

To be sure, this expansion is, in one sense, simply a return to the vision initially expressed by the United States Supreme Court for the sort of discovery a Habeas petitioner should expect as articulated in <u>Harris v. Nelson</u> 394 U.S. 286 (1969). <u>Harris</u> prefigured Rule 6, and as later opinions have pointed out, was the blueprint Rule 6 was meant to fully implement.  See, <u>Pham v. Terhune</u>, 400 F.3d 740, 743 (9th Cir. 2005), <u>Bracy v. Gramey</u>, 520 U.S .899, 908-909 (1997).

<u>Harris</u> tied the discretion of the court to grant discovery to the basic right of a prisoner to seek habeas corpus relief itself.

> The very nature of the writ demands that it be administered with the initiative and flexibility essential to ensure that miscarriages of justice within its reach are surfaced and corrected.

<u>Id</u>. at 291.

The obligation of a District Court to permit discovery is a constituent element of the obligation it undertakes when a Habeas petition is filed, an obligation unequalled within the array of matters a Court will find on its docket:

> There is no higher duty of a Court, under our Constitutional system, than the careful processing and adjudication for writs of habeas corpus, for it is in such proceeding that a person in custody charges the error, neglect, or evil purpose has resulted in his unlawful confinement and that he deprived of his freedom contrary to law. This Court has insistently said that the power of the federal courts to conduct inquiry in habeas corpus is equal to the responsibility which the writ involves:  "the language of Congress, the history of the writ, and the decisions of this Court, all make clear that the power of inquiry on federal habeas corpus is plenary."

Id. 292.  Quoting Townsend v. Sane, 372 U.S. 293 at 312 (1963).

The fact that the Federal Rules of Civil Procedure do not apply in this circumstance does not limit the mandate of a District Court to give "careful consideration" to federal habeas corpus claims and to afford a "full opportunity for presentation of relevant facts." Id. at 298.  In any case where "specific allegations before the Court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and therefore entitled to relief, it is duty of the Court to provide the necessary facilities and procedures for adequate inquiry."  Id. at 300.

The mandate of Harris is clear and subsequent cases have confirmed that particularly in death penalty litigation, a Court risks the finding of an abuse of discretion when it turns a blind eye to a legitimate request for inquiry into areas in which there is a clear good faith basis to believe that evidence may be found to support the fundamental allegations made by the petitioner. Indeed, the categorical denial of discovery represents a decision contrary to and an unreasonable application of the clear mandate of Harris.

Rule 6(a) of the Federal Rules governing Section 2254 cases embodies the Harris admonition. The Advisory Committee notes to Rule 6(a) specifically indicate that subdivision (a) is consistent with Harris and other Courts clearly agree.  See, Pham v. Terhun, 400 F.3d 740 (9th Cir. 2005), Williams v. Hall, 648 F.Supp.2d 1222 (D. Or. 2009).

That same Advisory Committee note clearly indicates that the grant of discovery is "left to the discretion of the Court" and, again, multiple other Courts agree.  See, e.g. Pham, supra and Williams, supra.  Indeed, other Courts have gone further and stated that, as the Supreme Court has indicated that in a death penalty case "a greater degree of reliability" regarding a verdict is required, liberal discovery in a death penalty case is needed.  See, Lockett v. Ohio, 438 U.S. 586, 604 (1978), Bracey, 520 U.S. 899, 904-909 (1997) and Payne v. Bell, 89 F.Supp.2d 967, 971 (W.D. Tenn. 2000).

The meaning of the phrase "good cause" in Rule 6(a) is one which requires careful consideration since it can readily be confused with other standards that affect habeas corpus proceedings, resulting in a confusion which will render the Court capable of abusing its discretion by failing to grant discovery that Rule 6(a) and cases interpreting it clearly indicate should be granted.  One recent case in which a District Court has granted discovery is Williams v. Wetzel, 2021 US District Lexis 63435, Civil No. 11-4681 (E.D. Pa. March 31, 2021).  In this case, the defendant sought certain notes from the prosecution for the purposes of establishing a Brady violation. The courts of Pennsylvania denied the relief saying that the discovery request was merely speculative and the prosecutor assured the Court that no other discovery existed.

The District Court granted the discovery request. A defendant need not show that the additional discovery will definitely lead to relief the Court held, citing Payne v. Bell, 89 F.2d 967, 970 (W.D. Tenn. 2000). The standard of good cause simply means that evidence is sought which could lead to relevant evidence concerning the issues raised in the petition.  See also, Johnston v. Love, 165 F.R.D. 444, 445 (E.D. Pa. 1996).  In Williams, three out of four of the government's key witnesses in the original trial had recanted and

the defendant was seeking information to support the view that evidence about their credibility had been withheld.  The Court found that, while ultimately the defendant would have to meet the standard of prejudice required in <u>Brady</u> in order to gain a new trial,

> At this stage, however, Williams need only show that there is reason to be that if the facts are fully developed, he may be able to demonstrate that he is entitled to relief.

<u>Id</u>. at *5. In this connection, the Courts cited the United States Supreme Court decision in <u>Bracey v. Gramley</u>, 520 U.S. 899, 908 to 909 (1997).

In <u>Gomes v. Homeland Security</u>, 559 F. Supp. 3d 8 (D. N.H. 2021) the court, in granting discovery, ruled that if a petitioner makes specific allegations indicating that if the facts underlying the claim are fully developed, he may be entitled to relief, good cause has been shown. Id, at *10. Indeed, if the allegations are not implausible and if they could, if true, entitle him to relief, discovery "must" be granted. Id, at *11. And as the Third Circuit recently noted, a District Court abuses its discretion when it denies discovery essential for the development of a petitioner's underlying claim. <u>Wallace v. Superintendent</u>, 2 Fed. 4th 133, at 143 and n. 12 (3d Cir. 2021).

These decisions give additional clarity to the standard under Rule 6 which other Courts previously have articulated. In <u>Johnston v. Love</u>, <u>supra</u>, the Court granted discovery noting that Rule 6 does not require a defendant to support his claim for discovery by producing factual evidence.  <u>Id</u>. at *7.  The Court further held that if the state court had either not allowed the development of the discovery at a hearing or denied it entirely, no deferral to the state Court on the issue of discovery was appropriate and no presumption that the state court proceedings about discovery were correct was to be afforded.  <u>Id</u>. at *10.

In Pham v. Terhun, supra, the Ninth Circuit reiterated that no deference to a state court denial of discovery was needed and that as long as the discovery appears to be essential to developing a petitioner's claim, it should be granted.  In Pham, the defendant sought the notes of a forensic scientist to try to show that another person had actually discharged the weapon used in the killing in which the petitioner had been convicted.  The Court granted the discovery holding that under Rule 6(a) a petitioner, "need not demonstrate that he will ultimately prevail on his underlying claim." Id. at 743, again citing the Bracey opinion of the U.S. Supreme Court.

The Third Circuit in Lee v. Glunt, 667 F.3d 397 (3rd Cir. 2012) held that a District Court would abuse its discretion under Rule 6(a) if the discovery sought was essential to the development of an underlying claim and that in the case before it, the defendant's request to view evidence about an arson expert's inspection of a crime scene was necessary to allow the defense expert to assess whether the state's expert was using techniques and scientific procedures fundamentally invalid.  The parallels between this case and Tedford's request for information regarding the Commonwealth's hair and fiber expert are profound. In Williams v. Hall, supra, the Court indicated that "good cause" in each case has to be seen in light of the underlying claims that a defendant makes and that if the discovery would help elucidate those claims and give the defendant the opportunity to satisfy his burden with respect to them, it should be given. Discovery, the Courts said, is essential when it "may well" uncover favorable evidence that would support a defendant's claim. Id. at 1225.  In Williams, interviews of jurors were permitted in this regard.

And in Payne v. Bell, supra, the Court held "that a petitioner need not show that the additional discovery would definitely lead to relief". Id. at 970-971. The only thing a

defendant needs to show is that a request could lead to relevant evidence regarding his position.  Id. The Payne Court cautioned that a standard for calling upon a District Court to hold an evidentiary hearing is very different from the standard of allowing discovery, the Court further warning that conflating these two standards would deny the defendant the opportunity to obtain evidence to bolster their claim to justify relief without even the necessity of a hearing, and potentially explain why defaulted claims should be heard on the merits.  Id.

The case of Cullens v. Pinholster, 563 U.S. 170 (2011), which holds that if a claim in state court has been denied on the merits, a hearing in federal court is not necessary and the petitioner can obtain relief only if he can show that the decision of the state court was contrary to or an unreasonable application of federal law or an unreasonable determination of the facts, is not by any means a limitation on the ability of a petitioner to obtain proper discovery to support their habeas corpus allegation.  Indeed, in Gibson v. Wetzel, 2016 US District LEXIS 4418, No. 11-4550 (E.D. Pa. March 31, 2016), the Court reiterated that as long as the defendant shows a "sufficient basis for believing that discovery may be necessary to adequately explore" his claim for relief, it should be granted. Id. at 2. In Gibson, the claims were rejected on the merits by the Pennsylvania courts and the Commonwealth took the position that any further discovery in federal court was precluded by the Pinholster doctrine. The Gibson Court pointed out that in Williams v. Beard, 637 F.3d 195, 211 (3rd Cir., 2011), the Third Circuit held that the application of Section 2254(d) does not limit discovery and that, while the full consideration of whether Pinholster has any effect on discovery is not completely settled, numerous other Courts have rejected its application in this regard.  See *10.

The <u>Gibson</u> Court noted that it is "particularly important to limit the application of <u>Pinholster</u> in the context of <u>Brady</u> challenges," <u>Id</u>. at 6, and that <u>Brady</u> claims are outside the reach of the <u>Pinholster</u> limitation. See also, <u>Running Eagle v. Ryan</u>, 686 F.2d 758, 788 (9th Cir., 2012) <u>Sample v. Colson</u>, 958 Fed. Supp. 2d 865, 889 (W.D. Tenn. 2013). <u>Gibson</u> warned that allowing <u>Pinholster</u> to bar discovery would allow the state to thwart the development of any facts that could underly a proper federal claim by simply rubber stamping a state court decision and effectively stacking the deck against the petitioner.

The Court in <u>Williams v. Wetzel</u>, <u>supra</u>, in March of 2021 echoed this view, holding that particularly in capital cases the rejection of the idea that <u>Pinholster</u> limits discovery is important since discovery, besides simply providing the petitioner the ability to prove an entitlement to substantive relief, is also capable of showing that a defaulted claim meets the standard of cause and prejudice that otherwise would face the petitioner in this circumstance. <u>Williams</u>, <u>supra</u>, at 5-9.

In all respects, Tedford has made a very specific connection between his discovery requests and the specific relief to which he respectfully asserts he is entitled. While it is easy for the Commonwealth to brush off his requests for discovery by labeling them "boilerplate" or characterizing this as a "fishing expedition," Tedford's discovery requests are nothing of the kind. In the discovery motion previously with this Court and as it is supplemented herein, he has painstakingly and specifically identified those areas arising from an organic analysis of the record in which the obvious questions and deficiencies in the Commonwealth's case are plain.

It is clear that those hundreds of pages of undisclosed documents held by the PSP, undisclosed materials of the Crime Lab, the State Prions system and the District Attorney

of Butler County contain answers to the deeply troubling issues which make it impossible to embrace this verdict with confidence. The files of the State Police have been identified and categorized. All other materials have been specifically identified by subject matter, and directly related to matters pertinent to Tedford showing that <u>Brady</u> violations have occurred and that, independently, there is reason to believe that he is actually innocent, with his execution offending the basic principles in the Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

While <u>Williams</u> and <u>Gibson</u> echo a compelling standard arguing for a liberal application of Rule 6(a) in a capital case as here, the nature of Tedford's discovery request is even further enhanced when the Court appreciates that since the time this case was returned to state court a further understanding of what <u>Brady</u> material means has been displayed by various courts. That discussion broadens the spectrum of what <u>Brady</u> material means and, by broadening it, concurrently broadens Tedford's ability to request that information in discovery so that he can assess it and, to the extent that he may make the good faith claim that it meets the standard of materiality under <u>Brady</u> meriting relief, to bring that application to the relevant courts.

A discussion of that evolving <u>Brady</u> standard is therefore appropriate.

Tedford does not come to this Court begging for his life. He invokes no esoteric doctrines or novel legal theories. Due Process entitles him to evidence to prove that what he has cried out from his jail cell for all of these years is true: that he did not kill this woman. The <u>Brady</u> doctrine is both an established and evolving doctrine but while the Pennsylvania Supreme Court has taken the unconstitutional path of avoiding its application, this Court must not. Tedford's specific allegations are that within undisclosed

files of the Commonwealth there lies evidence to show that his conviction was the product of a carefully arranged house of cards, constructed by the prosecutors and left undisturbed by an ineffective defense counsel.

In recent years, the Third Circuit and others have given a more refined explanation of the Brady doctrine in a way that significantly impacts this case. While at some point courts and others may have believed that Brady information only meant absolute evidence of innocence on the part of the defendant, the courts have clearly delineated that a standard for the disclosure of Brady material is far more expansive and serves the underlying critical purpose of allowing the defense to present to the jury a full view of all the facts so that the decision as to whether proof beyond a reasonable doubt has been made out can be honorably assessed.

A critical case regarding this evolving standard is Dennis v. The Pennsylvania Department of Corrections, 834 F.3d 263 (3rd Cir., 2016). In Dennis, the Third Circuit granted Habeas Corpus relief to a man on death row whose case had been summarily dismissed by the Pennsylvania Supreme Court, with the Circuit holding that the Pennsylvania Court had unreasonably drawn conclusions of fact and unreasonably applied the decisional law of the United States Supreme Court in rejecting a Brady claim there. Id. at 285. Important to the Dennis decision was the Court's explication that Brady material does not need to constitute an item that would make an acquittal more likely but is simply evidence that would undermine the confidence of the public in the jury verdict. Id. In this regard, the Court echoed the Supreme Court of the United States in Weary v. Cain, 577 U.S.385, 136 S.Ct. 1002, 1006 (2016) that the concept of materiality in a Brady assessment does not require a showing that an acquittal would have been more likely than not had the

evidence been available but rather that evidence of the kind that causes a reasonable person to be disturbed in their confidence that the verdict represents a true and accurate finding of fact in so critical a matter.  Indeed, this can be traced back to <u>Kyles v. Whitely</u>, 514 U.S. 419 (1995) and it should have a particular resilience in a death penalty case where society has given the government an ultimate amount of power, and for the citizenry to be confident that such power is being exercised in a way which accords to the fundamental principles of due process which we are expected to hold dear, true confidence in the execution of a death penalty verdict is absolutely critical.

<u>Dennis</u> refines this concept even further by explicitly stating that "exculpatory evidence need not show the defendant's innocence conclusively." <u>Id</u>. 287. The evidence should be found to be material as long as it would have the effect of causing a reasonable person to question whether or not a conclusion of guilt was properly reached.

Again, it is critical to remember that to say that exculpatory evidence need not show the defendant's innocence conclusively is to state a standard of relief under <u>Brady</u>. It is not the standard for discovery of that material in the first place. As the definition of what would constitute material upon which a defendant could get relief has now been expanded in this way, a much greater degree of urgency must be applied to the exercise of a Court's discretion in giving over that discovery to the defense in the first place in order to permit it to make that assessment and, if they believe in good faith that the evidence has the effect of impacting confidence in the verdict, to ask the Court to make that ultimate assessment and grant relief.

<u>Dennis</u> also teaches that the assessment by the prosecution of whether something should have the effect of altering confidence in the verdict is one which is subject to a

greater degree of scrutiny than what was previously perceived.  In <u>Dennis</u>, the Pennsylvania Supreme Court held that information about leads to other individuals who may have committed the homicide did not constitute <u>Brady</u> material because the Court and prosecution deemed the leads "fruitless" and thus not meeting the standard of materiality. <u>Id</u>. at 306.  The Third Circuit rejected this view, saying that information that another person committed the crime was <u>Brady</u> material that should have been disclosed by the prosecution and a later assessment of its materiality did not mean that the prosecution had the right to keep it from the defense in discovery. The Third Circuit admonished that the ultimate assessment of the usefulness of the material was up to the defense; the prosecutor's failure to disclose it was not excused by the belief that it was not helpful or relevant.

> Structuring a fair trial for defendants demands that prosecutors freely disclose material that is helpful to the defense. Consequently, making <u>Brady</u> disclosure depend on a prosecutor's own assessment of evidentiary value, as opposed to the benefit to defense counsel, is anathema to the goals of fairness and justice motivating <u>Brady.</u>"

<u>Id</u>. at 306.

Dennis directly held that information that fits the category of <u>Brady</u> material need not be evidence that is even admissible in the trial.  <u>Id</u>. at 302, and that <u>Brady</u> material can, at times, simply be information that a defendant can use to attack the reliability of the investigation. <u>Id</u>. at 308.  In <u>Dennis</u>, the Commonwealth's failure to disclose evidence of other persons who may have been investigated in the case was ultimately deemed <u>Brady</u> material and was one of the bases for the awarding of habeas corpus relief there. <u>Id</u>. at 311.

One other critical aspect of the <u>Dennis</u> case concerns the notion of whether relief could be denied because <u>Dennis</u> and his lawyers could have possibly obtained some of the evidence that was ultimately in the possession of the Commonwealth but not disclosed in

discovery. In this regard, the <u>Dennis</u> Court was categorical that the defendant has no duty of diligence when it comes to the disclosure of <u>Brady</u> material. <u>Id</u>. at 289. The Court held that diligence has never been accepted by the United States Supreme Court as an element of the analysis of a <u>Brady</u> issue and that a defendant is entirely entitled to presume that the prosecution has discharged its Constitutional duty to disclose the material it needs to disclose. <u>Id</u>. at 289. Nothing that the defense attorney does or does not do changes the obligation of the prosecution to disclose <u>Brady</u> material. <u>Id</u>. As the Court held, the government has "an unquestionable advantage" in a trial of a criminal case and <u>Brady</u> cannot be diluted as an obligation by putting any burden on the defendant to request it or seek it out. <u>Id</u>. at 290. There is no rule, the Court held, that a prosecutor is permitted to engage in a hide and seek process with <u>Brady</u> and that, unless the district attorney knows that the defendant already has the information, the prosecutor suppresses <u>Brady</u> by not disclosing it. <u>Id</u>. 292. Any other rule the Court held, is far "too slippery a slope" to entertain. <u>Id</u>. 292.

And yet, the Pennsylvania Supreme Court ruled to the contrary of this principle in its last two renderings in Tedford's case, holding that <u>Brady</u> violations do not occur if the information is available from sources other than the government, 960 A. 2d at 689, and more generally that a petitioner is not entitled to any material unless he can show that it exists. 228 A. 3d at 909.

Other courts have clearly supported the expanded notion of <u>Brady</u> that <u>Dennis</u> endorses. Quite clearly, evidence to support an "other suspect" defense (which often further entitles a defendant to argue that the investigation has been shoddy and incomplete) falls within this category. See, <u>Juniper v. Zook</u>, 876 F.3d 551 (4th Cir. 2017). The failure of the

prosecutor to give over other suspect evidence was not only clearly found to be a <u>Brady</u>

violation in <u>United States v. Lang</u>, 2019 US District LEXIS 65428, No. 2015-0018 (D. V.I.

April 17, 2019), it was further found to demonstrate such an egregious lack of attention to

this Constitutional obligation that outright dismissal of the case was warranted.

In <u>Mellen v. Winn</u>, 900 F.3d 1085, 1086-1087 (9th Cir., 2018), evidence that a key

witness was a habitual liar was held to be material evidence that should have been disclosed

to the defendant. In <u>United States v. Georgiou</u>, 777 F.3d 125, 141- 142 (3rd Cir., 2015), the

mental illness of a witness was potentially found to be material although corroborating

evidence diminished the value of that evidence in the context of that particular case.

Two other cases decided since this matter was returned to state court are instructive

insofar as an assessment of the existence of <u>Brady</u> information in yet undisclosed materials.

In <u>Harshman v. the Superintendent</u>, 368 F.Supp. 3d 776 (M.D. Pa. 2019), Habeas

relief was granted because the Pennsylvania courts applied the wrong standard of

materiality in insisting that the <u>Brady</u> material would have changed the outcome of the

case.  The critical evidence in <u>Harshman</u> regarded jailhouse informants and whether they

had motives to give evidence against the defendant in that case.  That case also involved a

circumstantial prosecution in a murder case in which some evidence existed of the

defendant's clear motive to kill the purported victim and the finding of a spent round in his

barn.  Countervailing this, however, was the fact that there was no body found and no blood

or DNA to indicate that the murder actually occurred where the Commonwealth surmised.

No murder weapon was ever located, and no eyewitness could substantiate the

Commonwealth's theory.  As the Court noted, "the evidence, while not insubstantial, is far

from overwhelming".  <u>Id</u>. at 797.

The testimony given by the jailhouse informants was thus critical and was reinforced by the fact the Commonwealth attorney made such a point of it in closing argument. As the Court noted, "the materiality of evidence "is best understood by taking the word of the prosecutor"" Id. at 797, citing Kyles at 444. In Tedford's case, a review of the prosecutor's closing argument as well as the summary of evidence given by the Pennsylvania Supreme Court on three  separate occasions clearly indicates the central position of the two jailhouse informants here, as corroborated by an investigator who did not adopt the conclusion his testimony was meant to support. Critical impeachment of corroboration of that informant was withheld, the informant later recanted, and the other informant has a documented history of psychiatric problems, the specific nature of which remain hidden.

The Seventh Circuit has analyzed in Sims v. Hyatte, 914 F.3d 1078 (7th Cir., 2019). There, the state withheld evidence that a critical identification witness had been hypnotized prior to testifying. Essentially, the state court of Indiana said the information was of insufficient materiality to warrant any relief. The Seventh Circuit held, as courts in this Circuit have often held with respect to the Pennsylvania courts, that this interpretation was contrary to and an unreasonable application of clearly established federal law. Sims held that Brady evidence need not be admissible evidence to be material and that materiality should be assessed upon consideration of various factors including the overall strength of the government's case, the importance of the credibility of the witness about whom the information was received, how strong the impeachment evidence was regarding that witness and whatever evidence the defendant had to attack the credibility of the witness in

that particular case. Granting habeas relief, the <u>Sims</u> Court held that the evidence about the hypnotizing of the witness was sufficiently material to grant a new trial.

Information about Ferry and White cannot be understated in terms of its importance. Ferry testified that he had no specific agreement about a deal with the Commonwealth in exchange for his testimony. He simply said that he hoped that it might help him and yet in the statement he gave defense investigators after the trial, he was very explicit in what was promised to him by the Commonwealth in exchange for his testimony. See, <u>Exhibit P</u>. If such a promise was made, it was never disclosed to the defense and that would be critically impeaching material on a witness whose importance to the case cannot be understated.

White's testimony was given as if White had absolutely no reason to give this testimony other than he was a public-spirited citizen wishing to see the murderer of Jeanine Revak brought to justice. But there is substantial reason to believe that White was mentally ill at the time of his testimony and that his mental illness is something that has been a feature of his life the entire time and continues to be the definitive feature in his life today. See, <u>Exhibit L</u>, <u>Exhibit Q</u>, <u>Exhibit R</u>, <u>Exhibit S</u> and <u>Exhibit T</u>. If there was any evidence to indicate that White had mental issues at the time of this trial or that he was promised anything by the prosecution in connection with this case, that would be information never given over to the defendant at any point. Unless the process of this capital murder case was unlike any other in the history of such prosecutions, information about these matters must exist and now must be disclosed.

<u>Brady</u> violations are not rare. Indeed, courts have been forced to recognize their occurrence on multiple occasions since the time Tedford retuned to state court to litigate

his discovery claim. A sampling of those cases is noted below.[30] The reality that courts must be vigilant to enforce this fundamental protection of the adversary system is evident. Tedford's prayer for discovery requests nothing more than an exercise of discretion compelled by that reality.

---

[30] **Commonwealth v. Johnson**, 231 A.3d 807 (Pa. 2020) -- Reckless violation of <u>Brady</u> may also result in Double Jeopardy dismissal.

*Commonwealth v. Bagnall, 235 A.3d 1075* (PA 2020) -- The Commonwealth of PA violated the due process rights of defendant because the prosecution failed to disclose a cooperation agreement between the DA's office and a key witness for the prosecution. The court granted a new trial.

*Commonwealth v. Johnson*, 174 A.3d 1050 (Pa. 2017) – Letter obtained from key witness to detective and federal court ordered discovery. Awarded a new trial.

*Commonwealth v. Williams*, 168 A.3d 97 (Pa. 2017) – Affidavits obtained from co-actor; Trial Court subsequently ordered PCRA discovery. Awarded new penalty phase.

*Commonwealth v. Adams*, 177 A.3d 359 (Pa. Super 2017)
– Defense learned of recording of interview favorable to the defense by cross-examining government witness; Prosecution previously denied interview had taken place. <u>Brady</u> violation merited mid-trial mistrial.

*Commonwealth v. Wilson*, 147 A.3d 7 (Pa. Super 2016) – Evidence disclosed in federal habeas proceeding where new trial granted insufficient to warrant double jeopardy dismissal.

*Commonwealth v. Lynn*, 192 A.3d 194 (Pa. Super 2018) – Facts regarding the conduct of the investigation should have been disclosed prior to trial but did not support double jeopardy dismissal.

*Commonwealth v. Washington*, 198 A.3d 381 (Pa. Super 2018) – "It is still unclear as to how the Appellant found this evidence." <u>Brady</u> violations require federal habeas relief of a new trial but not double jeopardy dismissal.

*Commonwealth v. Hart*, 199 A.3d 475 (Pa. Super 2018) – Undisclosed <u>Brady</u> material found "by happenstance" when defense reviewed prosecutor's files from an unrelated civil case. Order denying PCRA evidentiary hearing vacated and case remanded.

*Commonwealth v. Sandusky*, 203 A.3d 1033 (Pa. Super 2019) – Government witnesses' testimony included new information to indicate that <u>Brady</u> material was undisclosed before trial. Violation held insufficiently prejudicial  to warrant relief.

*Commonwealth v. Natividad*, 200 A.3d 11 (Pa. 2019) – Federal habeas discovery granted; Commonwealth produced over 200 previously undisclosed documents, including material found to be <u>Brady</u>. Violation insufficiently prejudicial to warrant relief.

*Haskell v. Superintendent SCI*, 866 F.3d 139 (3d Cir. 2017) – Counsel obtained letter from prosecutor to judge who sentenced the informant reflecting a deal in exchange for testimony against defendant. Federal habeas granted.

*Munchinski v. Wilson*, 694 F.3d 308 (3d Cir. 2012) – Witness who helped prosecution withhold potentially exculpatory evidence confessed to FBI; conversation released to Defendant. Federal habeas granted.

*Dennis v. Sec'y, Pa. Dept. of Corr.*, 834 F.3d 263 (3d Cir. 2016) – Defense obtained undisclosed receipt after learning its whereabouts from trial testimony; Defense then obtained PCRA discovery. Federal habeas granted.

*Bridges v. Sec'y of Pa. Dept. of Corr.*, 706 F. App'x 75 (3d Cir. 2017) – Federal habeas discovery granted; Federal habeas granted.

*Haskins v. Superintendent Greene SCI*, 755 F. App'x 184 (3d Cir. 2018) –Defense obtained letter written by one of its witnesses to their close acquaintance; Prosecution conceded that it previously obtained letter. Federal habeas granted.

## VIII.   MEMORANDUM OF LAW IN SUPPORT OF TEDFORD'S HABEAS CORPUS CLAIMS

While each of Tedford's claims will be further developed separately, it should be noted that in <u>Randolph v. Secretary, Pennsylvania Department of Corrections</u>, 5 F.4th 362 (3rd Cir. 2021), the Third Circuit reiterated the general standard for the grant of habeas relief. That standard requires a Court to review legal conclusions and factual inferences a District Court draws *de novo* and, to the extent it conducted an evidentiary hearing, to review its factual findings for clear error.  <u>Id</u>. at 372. Generally, to prevail at a habeas petition, a petitioner has to show that the decision of the state court was contrary to existing, established federal law, involved an unreasonable application of that law or was based on an unreasonable determination of facts.  <u>Id</u>. An unreasonable application will occur where fair minded jurists could not disagree that the state court's decision conflicted with U.S. Supreme Court precedent or a determination that a factual determination was unreasonable based upon an objective assessment of all the evidence of record.  <u>Id</u>. at 372-373. See also, <u>Witherspoon v. Stonebreaker</u>, 30 F. 4th 381 (4th Cir. 2022).[31]

In <u>Randolph</u>, the Court granted such relief where a request for a capital trial's continuance was arbitrarily denied. The Circuit noted that the Pennsylvania Supreme Court had only given passing consideration to issues of the defendant's right to counsel under the Sixth Amendment and had mis-read the critical facts of the case.  <u>Id</u>. at 375-378. The Circuit concluded that no fair-minded jurist could dispute the fact that the Pennsylvania Supreme Court's decision conflicted with the Sixth Amendment.

---

[31] Where a state court has considered an error on the merits but has concluded it was insufficiently prejudicial, a habeas petitioner must meet the standard for prejudiced expressed in both the AEDPA and <u>Brecht v. Abrahamson</u>, 507 US 619 (1993). See, <u>Brown v. Davenport</u> 142 S. Ct. 1510 (2022).

However, where the state court does not consider the federal Constitutional claim at all, a different standard than the "contrary to/unreasonable application of" standard applies. As the Third Circuit held in Jacob v. Horn, 395 F.3rd 92 (3rd 2005), if a state court does not reach federal constitutional issue on the merits, federal courts are to use the standard of prior habeas review which is to conduct de novo review over both pure legal questions and mixed questions of law and fact. Id. at 101.  See also, Slutzker v. Johnson, supra, 393 F.3d at 386.

These standard for habeas relief appears in various permutations given the issues raised and whether the state court properly considered those issues on the merits. Those individual applications are discussed below in the order in which the Grounds for Relief are articulated in **Section V** above.

Throughout this pleading, additional arguments and factual averments in support of these claims have been made in sections in which they are otherwise applicable.  All such arguments/averments are incorporated herein by reference except for matters specifically withdrawn by this pleading prior claims and legal support therefore are respectfully incorporated herein by reference.

**Ground V(A)(1)   TRIAL COUNSEL WAS INEFFECTIVE FOR A GROSS FAILURE TO INVESTIGATE, DISCOVER AND PRESENT EVIDENCE TO SUPPORT TEDFORD'S CLAIM OF ACTUAL INNOCENCE OR AT LEAST TO RAISE A REASONABLE DOUBT WITH RESPECT TO MULTIPLE, SPECIFIC INSTANCES OTHERWISE DELINEATED IN THE ORIGINAL HABEAS PETITION AND AS SUPPLEMENTED HEREIN; FAILING TO PROPERLY INVOKE THE PRE-TRIAL DISCOVERY PROCESS IN STATE COURT DENYING TEDFORD DUE PROCESS OF LAW PURSUANT TO THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY:  A) FAILING TO REQUEST SPECIFIC DISCOVERY FROM THE COMMONWEALTH AND THEREBY NOT TRIGGERING THE COMMONWEALTH'S OBLIGATIONS UNDER THE STATE DISCOVERY RULES; AND, B) FAILING TO DEMAND BRADY MATERIAL; C) FAILING TO CONDUCT A PROPER INDEPENDENT INVESTIGATION TO IDENTIFY THE**

**CRITICAL AREAS UNDER WHICH THE PRINCIPLE TENETS OF THE COMMONWEALTH'S CASE WERE FOUNDED TO DEMONSTRATE TEDFORD'S ACTUAL INNOCENCE AND THE ABSENCE OF PROOF BEYOND A REASONABLE DOUBT OF HIS GUILT BY, FOR EXAMPLE, FAILING TO DEMONSTRATE THAT FORENSIC EVIDENCE WOULD HAVE BEEN FOUND AT THE STORE IF THE MURDER WERE COMMITTED THERE. (CLAIM II IN TEDFORD'S ORIGINAL HABEAS CORPUS PETITION (ECF NO. 23)).[32]**

The duty imposed upon an attorney to make effective use of the discovery process and to conduct his own, thorough investigation of all salient facts is a critical component of effective assistance of counsel under the Fifth and Sixth Amendments to the United States Constitution.  The Supreme Court in Andrus v. Texas, 140 S.Ct. 1875, 1880 ( 2020) stated:

> It is unquestioned that under prevailing professional norms at the time of [Andrus'] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'"  Porter v. McCollum, 558 U.S. 30, 39, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (per curiam) (quoting Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L. Ed. 2d 389 (2000). Counsel in a death-penalty case has 'a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting Strickland, 466 U. S., at 691).

The Third Circuit has repeatedly pronounced the same fundamental principles.  In United States v. Baynes, 678 F.2d 659, 667  (3d Cir. 1982), the Court held that no amount of in-court vigor could atone for poor investigation and preparation, adding:

> Representation involves more than the courtroom conduct of the advocate. The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses or to arrange for their attendance.

---

[32] Contingent with this claim is one which relates to a reference in Crime Lab reports that a pubic hair was found in the victim's car and that Tedford could not be ruled out as the source. If the bench notes of the lab examiner reflect this to have been a valid conclusion, the failure to follow up on this by independent analysis and to present it to the jury would be ineffective.

Indeed, this principle is a centerpiece of the core of our system and the reason we invest faith in its outcomes:

> At bottom, our conclusion in this regard is grounded on a standard which is central to the successful functioning of our adversary system of criminal justice, a defense attorney, whether appointed or retained, is obligated to inquire thoroughly into all potentially exculpatory defenses and evidence.

Id. at 668.  The standards of the profession create a similar demand on the attorney and serve a deeply enduring value:

> This investigation, among other things, "should always include efforts to secure information in the possession of the prosecution and law enforcement authorities." Id. (emphasis added).[citing ABA Standards] If our society is to retain its commitment to the not-unattainable ideal that each accused, however destitute, ignorant, or seemingly culpable, is entitled to a complete and vigorous defense, the courts must continue to insist that trial counsel, at the very least, investigate all substantial defenses available to a defendant.

Id.

The Circuit reiterated this view in Blystone v. Horn 664 F.3d 397, 419 (3d Cir. 2011):

> Unquestionably, investigation is essential to the lawyer's duties as both advisor and advocate. See 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980).  After all, "[t]he effectiveness of advocacy is not to be measured solely by what the lawyer does at the trial; without careful preparation, the lawyer cannot fulfill the advocate's role." Id.

See, e.g. United States v. Gray, 878 F.2d 702, 712 (3d Cir. 1989) (counsel's failure to interview potential witnesses violates the duty to investigate and constitutes deficient performance).

Trial counsel made a mockery of this principle. He did not invoke discovery rules which would have heightened the Commonwealth's duty of disclosure. He engaged no private investigator or forensic scientist to support the essential claims of the defense. He did nothing to emphasize that there was no evidence to support the critical issue about

where the murder occurred. He made no effort to learn of Christopher White's mental illness.

The prejudice visited upon Tedford is clear: he is on death row for a murder that he could not have committed if the theory the lead investigator actually held is true, that is, that Revak dies somewhere besides The Finishing Touch. His lawyer had ample reason to gather evidence to prove that and failed. At a minimum, he accepted the prosecutor's representation that he was given everything and never invoked the process of the court to ensure that representation was accurate.

In <u>Jones v. Ryan</u>, 1 Fed. 4th 1179 (9th Cir., 2021), habeas corpus relief was granted where trial counsel failed to obtain a psychiatric evaluation of his client.  The Court recited the standard for granting such relief pursuant to Section 2254d(2), that is, that the decision was contrary to or an unreasonable application of established federal law, or was based on an unreasonable determination of fact. The Court also noted that where the state court does not reach a particular issue on the merits, Section 2254(d) does not apply and the federal court reviews the issue de novo.  <u>Id</u>. at 1189, citing <u>Rompilla v. Beard</u>, 545 US 374, 390 (2005). While <u>Cullen v. Pinholster</u>, 563 U.S. 170 (2011), generally limits the analysis to the facts of records in state court, where the petitioner demonstrates that he had exercised diligence in pursuing his claims in state court but was frustrated in making the factual showing, evidence developed in the federal court proceedings may be received. <u>Id</u>. at 1189.

<u>Jones</u> parallels important issues in <u>Tedford.</u>  Jones' trial counsel failed to conduct a basic investigation of his client's psychiatric deficiency and did not present that evidence in the mitigation phase of the capital case. While Tedford refuses to address mitigation

here, his trial counsel systematically refused to conduct a proper investigation of the guilt phase of the case, fundamentally prejudicing him from the outset.

Counsel also failed to invoke the discovery rules of the state court and place the full burden on the Commonwealth of producing all the information it was required to produce by the Rules, the case law and the Constitution. The lower court in <u>Jones</u> held that Jones was not prejudiced by his trial counsel's failure to obtain a psychiatric expert, and the state PCRA court both refused to grant him an evidentiary hearing and refused to give him funds to hire an independent expert to make that showing. The Ninth Circuit found that this interpretation of the standard of ineffectiveness of counsel under <u>Strickland</u> was clearly improper, and that the decision was based on an unreasonable determination of fact. <u>Id</u>. at 1192-1193. The Court said the unreasonable determination of fact had several "flavors" including whether the fact-finding process itself was defective because of no hearing, whether the defendant was given no real chance to make a record and or where the facts of record are plainly misapprehended on material issues. By refusing to give an evidentiary hearing and refusing to allow the petitioner to obtain an independent expert report, a fundamental failure of the fact-finding process occurred. <u>Id</u>. at 1196. That failure "fatally undermined the fact-finding process, in part because that decision resulted in the Court ruling on an unconstitutionally incomplete record." <u>Id</u>. at 1196. Without permitting expert testimony to be developed, it was "impossible for Jones to demonstrate he had been prejudiced to counsel's failure to obtain one earlier". <u>Id</u>. The state court thus created its own "self-fulfilling prophecy" by "preventing the development of the claim before it was ever presented." The petitioner was thus held to have satisfy Section 2254(d)(2) and his habeas corpus petition was granted.

Beginning before trial and continuing until the present day, the state court system of Pennsylvania has systematically refused to give Tedford access to critical information he needs to substantiate claims that his counsel was ineffective, that evidence the Commonwealth presented was fundamentally deficient and that the Commonwealth violated its obligation to disclose all evidence necessary in the fact-finding process. The Pennsylvania courts have systematically denied Tedford access to potentially huge amounts of information substantiating the various claim he had made in this case, even though he has made an irrefutable case that such information exists. That denial has presented the same self-fulfilling prophecy that has led to the unconstitutional denial of his claims repeatedly in the face of a clear demonstration that a full record would never support the conviction on the flimsy basis on which it was obtained.

In how it has handled Tedford's claims, the courts of Pennsylvania have forgotten the admonition of the United States Supreme Court in <u>Tehan v. Axp Ex. Rel. Shott</u>, 382 US 406 (1996) that "the basic purpose of a trial is the determination of truth, and it is self-evident that to deny a lawyer's help through the technical intricacies of a criminal trial or to deny a full opportunity to appeal a conviction because the accused is poor is to impede that purpose and to infect a criminal proceeding with a clear danger of convicting the innocent." <u>Id</u>. at 417.

Here, the determination of the Pennsylvania courts that trial counsel's actions in failing to investigate and failing to invoke the discovery rules, PCRA counsel's failure to return to state court within the 60 day limit to press the second PCRA, the failure of the Pennsylvania courts to recognize that its own procedural standards permitted Tedford's second PCRA to be considered on the merits in any event, and its overall failure to deny

the additional discovery plainly available is a clear violation of established federal law, and, to whatever extent these determinations are allegedly based upon factual findings, such finding is fundamentally corrupted by the refusal of Pennsylvania to permit a full development of the record on multiple critical points.

The most recent decision of the Pennsylvania Supreme Court in denying Tedford relief mimic its handling of Tedford's previous claims of this nature.

In Tedford's initial habeas corpus petition, Tedford set forth six separate instances of the ineffective assistance of his counsel throughout the stages of his trial and in post-conviction litigation, Tedford entitled to the effective assistance of counsel not only at trial pursuant to Strickland but also in connection with his appeal. Evitts v. Lucey, 469 U.S. 387 (1985). Some of these claims were addressed at the evidentiary hearing on the post-verdict motions held February 1-3, 1988, however, as discussed infra, appellate counsel ineffectively failed to present all of the relevant evidence in support of those claims at that hearing. Subsequently, these claims were raised both in the PCRA petition filed January 14, 1997 and in the Amended PCRA Petition filed on August 26, 2002, following remand from the Pennsylvania Supreme Court. Tedford sought an evidentiary hearing on all of the claims in the Amended Petition, and sought discovery to support this claim. See, Tedford's Consolidated Renewed Motion for Discovery, etc. (filed Jan. 9, 2002). On June 11, 2002, the PCRA court denied the requested discovery. On March 13, 2003, the PCRA court granted an evidentiary hearing, apparently with respect to all of the claims in the Amended Petition. Following further briefing, the PCRA court changed course and dismissed all of the claims in the Amended Petition without a hearing, with the exception of the conflict of interest claim, on which the state court held an evidentiary hearing on May 18, 2004.

That Court ignored, however, other critical failures plain from the record.

A.    The Failure to Investigate the Alleged Cancellation of the meeting with Susan Blackburn.

At trial, Susan Blackburn testified that on Wednesday, January 8, 1996, Tedford canceled their previously canceled dinner date for the night of Friday, January 10, giving the explanation that he would not be on furlough from prison that evening. TT 362-63. The Pennsylvania Supreme Court found this testimony admissible despite the fact that it revealed the prejudicial fact that Tedford was serving a prison sentence at the time of the offense in that it tended to establish premeditation (i.e., Tedford cancelled the date with Ms. Blackburn because he then planned to meet Ms. Revak the same day). Tedford, 567 A.2d at 622.

Prior to trial, however, Tedford informed trial counsel that it was in fact Ms. Blackburn who cancelled the date. Ms. Blackburn was scheduled to be travelling to Meadville, PA on January 10, 1986 as part of her duties as a juvenile probation officer and while she initially wanted Tedford to meet up with her in Meadville that night, Tedford could not meet her, as he was scheduled to work at The Finishing Touch the next morning. As a result, they mutually agreed to meet at The Finishing Touch around lunch on January 10, 1986.  It was Ms. Blackburn, however, who cancelled their January 10, 1986 lunch date because of her work requirements.   See, Tedford's original Appendix A to his original habeas corpus petition at 3 (11)-(13), and Exhibit L and M thereto (ECF No. 26-1 at 17-18, 47-48). Trial counsel, however, never spoke to Ms. Blackburn to learn these critical facts. Id. ECF No. 26-1 at 53.  See also, the February 2, 1986 Evidentiary Hearing Transcript at 163-177.

Had trial counsel interviewed Blackburn, counsel would have developed the true facts and conclusively shown that the whole matter of a cancelled date was a red herring and doing nothing to establish premeditation or intent on Tedford's part. By that effort, counsel could then have excluded the prejudicial reference to Tedford's work release status altogether. The thin case the Commonwealth offered would have been further weakened.

B. Failure to Investigate the Alleged Meeting with the Victim Away from The Finishing Touch.

Evidence from witnesses and telephone records demonstrated that Tedford was in The Finishing Touch for virtually the entire day on January 10, 1986. Indeed, the Commonwealth originally took the position that Tedford had not left the store the entire day between 9:00 a.m. and 9:00 p.m. in the criminal complaint that was filed by Trooper Peters. See, Exhibit BB.

But if Tedford never left the store that day, the Commonwealth's theory would have collapsed. The victim's car was located miles away and Tedford's presence in the store could be accounted for conclusively except for a few minutes mid-morning when no telephone records showed call traffic. Enter Michael Ferry, who supplied the Commonwealth with testimony he later recounted, claiming Tedford admitted leaving the store, meeting the victim and bringing her back there.

Constitutionally effective counsel would have seen the importance of establishing that Tedford had not left The Finishing Touch that day and sought evidence to discredit the Commonwealth's theory from multiple sources, particularly, (a) establishing the basis for Trooper Peter's assertion in the Affidavit of Probable Cause that "investigation revealed that Mr. Tedford had not left the store the entire day between 9:00 a.m. and 9:00 p.m.," See

the Affidavit of Probable Cause for the Arrest Warrant for Donald Tedford; (b) establish that Ms. Revak must have remained at her home as the Revaks' dog was outside as late as 10:10 a.m. the morning of January 8, 1986 but was inside when James Revak returned home that night;[33] and (c) evidence from a UPS delivery log concerning a delivery to The Finishing Touch that morning.

In Tedford's multiple applications for discovery before this Court, he requested the UPS log and the basis for Trooper Peters' assertion that investigation revealed Petitioner never left The Finishing Touch between 9:00 a.m. and 9:00 p.m. The District Court initially granted the request for discovery on the issue of Trooper Peter's basis for his assertions in the Affidavit of Probable Cause. See the Court's Order of September 28, 2010, ECF No. 40. The Commonwealth responded that it had no responsive documents with respect to this one item of discovery. Tedford then filed a motion seeking to follow up on that item of discovery through the deposition of Trooper Peters. See, ECF No. 54 and 55. The District Court, however, previously denied the request for follow up discovery. See the Order of June 30, 2011, ECF No. 67.

A habeas corpus hearing is appropriate when holding the hearing "would have the potential to advance the petitioner's claim." Campbell v. Vaughn, 209 F.3d at 287. Testimony from witnesses who gave statements to the police about seeing the Revak dog that morning, e.g., Bonnie Flink, has the potential to advance Tedford's claim. A hearing at which Tedford could take testimony from Trooper Peters and subpoena the UPS log certainly has the potential to advance Tedford's claim.

---

[33] The longest gap is the phone records was between 10:02 and 10:46 a.m. If Ms. Revak left the house after 10:10 a.m., there would not have been time for her to meet Mr. Tedford at the Pines Plaza and return to The Finishing Touch by 10:46 a.m.

The Pennsylvania Supreme Court found that this claim was without merit because Tedford supposedly failed to explain the significance of this information given that he admitted at trial that Ms. Revak came to The Finishing Touch that day, the UPS deliveryman who testified at the evidentiary hearing could only give an approximate time of delivery, and trial counsel had driven the distance in question and did not believe this to be an issue. Tedford, 960 A.2d at 30.

Thus, in resolving this claim, the state court addressed only the UPS delivery evidence. But even with respect to that evidence, the state court's decision was based on an unreasonable determination of the facts. Title 28 U.S.C. § 2254(d)(2). The state court believed any evidence discrediting the Commonwealth's timeline of events was insignificant due to Tedford's admission at trial that the victim was in the store that day. Tedford however, indicated that Ms. Revak arrived at The Finishing Touch close to noon, in her own vehicle, and that she left after they had sexual relations. He never met her at the Pines Plaza and did not know how her car got there. Given this testimony by Tedford, his admission to seeing the victim later in the day was irrelevant to the Commonwealth's theory of the case that Tedford left the store between 10:00 a.m. and 10:46 a.m. – the only opportunity he could have left the store to pick up the victim.  Moreover, the Pennsylvania Supreme Court ignored that establishing that Tedford did not leave The Finishing Touch that day would have completely eviscerated the credibility of Michael Ferry:  if Ferry lied about Tedford meeting Ms. Revak at the Pines Plaza, it would have eviscerated his credibility, Ferry's description of Tedford's purported confession unbelievable if it was shown he was lying about the one new thing the Commonwealth claimed he brought to the case.  TT 706-707.

The Pennsylvania Supreme Court also said that although the UPS log may have disrupted the Commonwealth's timeline, it did not impact their overall theory of the case. Tedford, 960 A.2d at 26. But this reading of the facts is unreasonable as well as the Commonwealth's theory of the case hinged on Tedford's ability to leave the store during this critical time period. If the Commonwealth could not prove that Tedford had enough time to leave the store, drive to the Pines Plaza Mall to meet Ms. Revak and then drive back to *The Finish Touch* by 10:46 a.m., the entire theory of the case would have no longer been viable. Thus, the state court's evaluation of the facts was unreasonable.

Although appellate counsel introduced some evidence at the post-verdict motion hearing in 1988 regarding the witnesses in the neighborhood, appellate counsel ineffectively failed to present all of the available evidence. Counsel did not call Trooper Peters to testify regarding the investigation he conducted that led him to believe that Tedford never left The Finishing Touch that day. Moreover, Tedford's trial counsel was never questioned as to any efforts he made to ascertain this information or any strategy he employed to refrain from doing so. Appellate counsel presented the testimony of UPS deliveryman, Robert Sintz, who testified his normal practice was to deliver to The Finishing Touch at around 9:30 or 10:00 a.m. every day. However, Mr. Sintz could not recall whether he went to The Finishing Touch on that date without referring to his delivery log, which he did not retain and which appellate counsel did not subpoena from UPS. While Mr. Sintz told appellate counsel where these logs were generally kept, appellate counsel never supplemented the record with these logs.

And while appellate counsel did present the testimony of several witnesses from the Revaks' neighborhood to determine whether they saw the Revaks' dog outside the

residence, only witness Thomas Horwat could testify to a certain time that he saw the dog, 10:10 a.m. The remaining witnesses called by counsel appeared unprepared and could not provide any useful testimony. Inexplicably, Bonnie Fink, who had previously told the police that she saw the Revaks' dog at 10:05 a.m. was not called to testify at the evidentiary hearing. Appellate counsel also failed to elicit clear testimony from trial counsel. In connection with PCRA proceedings, Tedford sought a hearing on his claim that appellate counsel was ineffective in these regards, but no hearing was permitted by the Pennsylvania courts.

Now, of course, this issue is even more acute given Stanek's revelation that he concluded the murder did not occur in the store. Whatever this veteran investigator found in his probe of this case led him to conclude a fact that perhaps he did not appreciate exonerated the man he ultimately suspected of the killing. Or perhaps he did and by voluntarily revealing it, he wants to set the record straight.

Under Title 28 U.S.C. § 2254 (e)(2), there was no failure to develop that claim and a hearing should now be convened.

C.     The Failure to Investigate and Present Evidence Impeaching Michael Ferry.

In Tedford's initial habeas corpus petition, Tedford alleged the ineffectiveness of trial counsel for failing to present the testimony of Timothy Sunday and David Geibel, witnesses who could discredit the testimony of Michael Ferry.

David Geibel was a cellmate of Ferry's and would have testified that Ferry was lying about his conversations with Tedford. See, Supplemental Appendix Exhibit Q. Timothy Sunday would have further testified that Ferry lied about the confession in exchange for a deal on his pending sentence and parole violation.  See, Supplemental

Appendix <u>Exhibit R</u>. While they were inmates at the Butler County Prison, Geibel and Sunday were eyewitnesses to the fraud Michael Ferry committed at Tedford's trial and trial counsel's failure to investigate and present this testimony amounted to deficient performance as the shadow of Michael Ferry's testimony continues to haunt Tedford to this day. Petitioner's allegations state a claim on which relief could be granted.

The Pennsylvania Supreme Court denied Tedford's claim of appellate counsel's ineffectiveness with respect to calling Timothy Sunday on the ground that counsel had a reasonable basis for not calling Sunday at trial. See <u>Tedford</u>, 960 A.2d at 28. The Pennsylvania Supreme Court did not address trial counsel's deficient performance for failing to call David Geibel. The state court never addressed counsel's failure to call David Geibel at trial and therefore, that portion of the claim has not been decided on the merits.

Had trial counsel conducted a professionally reasonable investigation, he could have discredited Ferry's testimony.  At the evidentiary hearing, trial counsel testified that he did not call Sunday because "he learned he would provide unfavorable testimony," and thus had no need to weigh the benefits of his testimony versus his potential for impeachment because "it never got that far." February 3, 1988, Evidentiary Hearing Transcript at 250. But appellate counsel never asked trial counsel how he learned of Sunday's purported change of heart about providing favorable testimony for Tedford and the purported change of heart is inconsistent with Sunday's Declaration. See Supplemental Appendix <u>Exhibit R</u>. Appellate counsel unreasonably accepted trial counsel's testimony without further inquiry or investigation.

The state court unreasonably denied the claim that appellate counsel was ineffective based on its belief that the claim of trial counsel ineffectiveness was without merit, where

the apparent lack of merit of the claim was the result of appellate counsel's own ineffectiveness. Under Strickland and Evitts, counsel's deficient performance cannot operate to shield counsel's deficient performance in this regard.

As discussed supra, Title 28, U.S.C. § 2254(e)(2) does not generally prohibit an evidentiary hearing where the petitioner "[sought] an evidentiary hearing in state court in the manner prescribed by state law." Williams v. Taylor, 529 U.S. 420, 437 (2000). Here, Tedford sought an evidentiary hearing in the PCRA proceedings "in the manner prescribed by state law," but the PCRA court denied the hearing. Under Williams, there is no § 2254(e)(2) bar to a hearing.

And a hearing is absolutely necessary at this stage. Appellate counsel *did not call Sunday or Geibel at the evidentiary hearing* and appellate counsel did not question trial counsel about his knowledge of these individuals nor did he challenge counsel's vague statement that he learned Sunday would provide "unfavorable" testimony. Appellate counsel failed to elicit any testimony regarding trial counsel's knowledge of Geibel or any reasons he had for not presenting his testimony. Appellate counsel also failed even to inquire of Tedford himself whether he had informed his counsel of Mr. Geibel's potential testimony on his behalf.

As Tedford sought a hearing in the state PCRA proceedings in the manner authorized by state law on his claim that appellate counsel was ineffective, a hearing on that claim is now appropriate under 28 U.S.C. § 2254 (e)(2) to further and fully develop these critical matters.

D.      Failure to Effectively Develop Alibi Defense.

As explained throughout this pleading, trial counsel should have used available testimony and evidence to explain for the jurors how the known locations and distances, as well as establish the timeline of Tedford's alibi, demonstrated his innocence.  If trial counsel had done this, Tedford surely would not have been convicted of the charges and he was surely prejudiced by trial counsel's failure to demonstrate that he simply could not have committed this murder.

E.      Failure to Challenge the Twine Murder Weapon Theory.

Tedford's trial counsel was ineffective for failing to challenge the twine murder weapon theory put forth by the Commonwealth by: (1) failing to investigate the results of the striation analysis; (2) not presenting evidence that the fibers present on the victim's body were consistent with a macrame hanger in The Finishing Touch; and (3) not impeaching Mr. Sosso (the store owner) with prior inconsistent statements regarding the twine. Appellate counsel was similarly ineffectiveness for failing to effectively litigate this claim in post-sentence motions and on direct appeal.

The twine murder weapon theory was a significant part of the Commonwealth's case and neither trial nor appellate counsel had a reasonable basis for failing to investigate evidence that could be used to challenge it and Tedford was surely prejudiced as there is a reasonable probability he would have been acquitted at trial or had his convictions vacated on appeal but for prior counsel's deficient performance in this regard.

The Pennsylvania Supreme Court ruled that the layered claim of appellate counsel ineffectiveness was without merit because (1) trial counsel did challenge the twine as the murder weapon, (2) no evidence of the striation analysis was offered by either side, and (3) the pathologist testified only that the ligature marks could have been made by the twine.

See, <u>Tedford</u>, 960 A.2d at 26-27. The state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceedings.

At the post sentence evidentiary hearing, trial counsel was briefly questioned on this issue. Trial counsel testified that he had "studied the issue of the twine," and "tried to determine whether or not there was an inconsistency between the ... conclusions from Greensburg, ... with respect to the twine." February 3, 1988 Evidentiary Hearing Transcript at 234.  Appellate counsel never followed up on what counsel "studied" or what he "determined" about the conclusions from the lab in Greensburg.  Trial counsel also testified that he never pursued the report of the striation analysis detailed as having been sought in the limited discovery provided prior to trial. <u>Id</u>. at 233.

This point is confounding. Counsel had a report that the PSP sent photos to their Harrisburg lab specifically to get an analysis of whether the twine caused the ligature wounds. Original habeas p. 26. What there was not was a report back with findings. Had the findings been favorable, the Commonwealth would have used them.

And given that Stanek discounted the store as the murder site, the twine theory is yet another McGuffin in the Commonwealth's tragic farce.

The state court's conclusion that trial counsel mounted an effective challenge to the Commonwealth's assertion that twine recovered from The Finishing Touch could have been the murder weapon is based on an unreasonable interpretation of the facts. The state court's reliance on the pathologist's testimony that the twine "could have been the murder weapon" *supports* Tedford's argument that this was critical testimony against him and that he suffered prejudice as a result of trial counsel's failure to mount an effective challenge to the evidence.

And the state court's assertion that trial counsel "challenged" the twine is not supported by the record, either of the evidentiary hearing or of the trial itself. Appellate counsel never asked trial counsel what specifically he learned during his purported "investigation" of the twine. Indeed, trial counsel was not asked and did not testify about his failure to seek the report documenting the findings of the striation analysis or why he did not submit the minimal information he had to an expert for independent review. The state court's conclusion that trial counsel's challenge to this evidence was effective is unreasonable given the lack of evidence developed on this issue at the post-verdict motion hearing.

Title 28, U.S.C. § 2254(e)(2) does not generally prohibit an evidentiary hearing where the petitioner "[sought] an evidentiary hearing in state court in the manner prescribed by state law." Williams v. Taylor, 529 U.S. 420, 437 (2000). Here, Tedford sought an evidentiary hearing in the PCRA proceedings "in the manner prescribed by state law," but the PCRA court denied the hearing. Under Williams, there is no § 2254(e)(2) bar to a hearing.

Appellate counsel ineffectively failed to present any meaningful evidence on this issue. Tedford has sought discovery regarding the striation analysis/photograph comparison that was requested pretrial by the State Police and the results of that comparison are important, and likely exculpatory. Tedford likewise sought such discovery and an evidentiary hearing in state court and there is no bar to an evidentiary hearing in this Court. 28 U.S.C. § 2254 (e)(2).

F.     The Failure to Investigate and Present Evidence That Another Person Was the Murderer.

In his original federal habeas corpus petition, Tedford alleged the ineffectiveness of trial counsel for failing to present to the jury the wealth of evidence contained that the victim's husband acted suspiciously on the night of his wife's disappearance and had the opportunity to commit the crime.  Most critically, trial counsel failed to subpoena Officer Kovach, who reported that he overheard the victim's husband say when he identified his wife's body, "I am sorry, I didn't mean it." TT 606. Tedford's appellate counsel was likewise ineffective for failing to effectively litigate this claim.

The Pennsylvania Supreme Court ruled that Tedford's layered claim of appellate ineffectiveness on this issue was without merit because it lacked specificity and because trial counsel did call some of the police officers who overheard comments made by Mr. Revak when he viewed his wife's body. See, Tedford, 960 A.2d at 27.

The state court's ruling was based on an unreasonable determination of the facts because it failed to consider the complete set of facts as developed in state court.  It is clear that trial counsel relied on the statements as provided to him that Mr. Revak viewed the body and stated, "I am sorry, I didn't mean it." However, he only presented certain officers at trial on this issue and they testified to different, less incriminating statements by Mr. Revak.  Because he failed to subpoena Officer Kovach, he was unable to introduce the incriminating statement as it was stated in discovery. See, e.g., Washington v. Smith, 219 F.3d 620, 630 (7th Cir. 2000) (counsel's "minimal attempts to contact" key witness and "failure to subpoena her until two days before she was to testify" were deficient performance). Furthermore, the state court did not consider all of the other evidence of suspicious behavior on the part of Mr. Revak and whether it was reasonable for counsel

not to present that evidence in support of his theory that Mr. Revak was likely responsible for his wife's death.

At the evidentiary hearing, appellate counsel ineffectively failed to question trial counsel as to why he did not request a short recess to have Officer Kovach brought in to testify, or why he failed to introduce all of the evidence contained in the police investigation file which suggested that Mr. Revak acted suspiciously on the day and evening of his wife's disappearance.

Here, Tedford sought an evidentiary hearing in the PCRA proceedings "in the manner prescribed by state law," but the PCRA court denied the hearing. Under Williams, there is no § 2254(e)(2) bar to a hearing. Williams v. Taylor, 529 U.S. 420, 437 (2000)

Appellate counsel was ineffective in failing to present any evidence on this issue at the post-verdict motion hearing. Given that trial counsel clearly contemplated Mr. Revak as the possible perpetrator by introducing evidence of his comments when viewing the body, reasonable appellate counsel would have developed this evidence himself and questioned trial counsel on his reasons for failing to introduce this evidence. An evidentiary hearing is now required to call both trial and appellate counsel to support Tedford's claim of deficient performance by them.

In summary, the state court record shows that counsel's performance was deficient in these multiple respects and that for purposes of Strickland prejudice analysis, these instances of deficient performance, individually or collectively, entitle Tedford to relief. See, e.g., Berryman v. Morton, 100 F.3d 1089, 1101-02 (3d Cir. 1996) (analyzing collectively the prejudicial effect of various instances of deficient performance).

**GROUND V(A)(2). TRIAL COUNSEL FAILED GATHER CONTRARY EVIDENCE TO DEMONSTRATE THE UNCONSTITUTIONALLY UNRELIABLE AND MISLEADING EXPERT TESTIMONY UPON WHICH TEDFORD'S CONVICTION WAS SUBSTANTIALLY BASED, AND TO OBJECT TO SERIOUS MISSTATEMENTS MADE BY THE PROSECUTOR ABOUT THE FORENSIC EVIDENCE OFFERED BY THE CRIME LAB AND PATHOLOGIST.**

At the trial, no fingerprints, bloodstains, DNA testimony, or any other scientific evidence allowed the Commonwealth to suggest Tedford killed Ms. Revak in a brutal and bloody fashion *at* The Finishing Touch and then placed her in his car for a 50 plus mile ride to Washington County, accomplishing all of this without leaving any trace evidence in either the store or his vehicle. The prosecutor tried to avoid the lack of forensic evidence at the scene by completely misrepresenting the testimony of the pathologist and others, claiming there was just "just drops of blood" as the result of the injuries sustained. TT 713. This critical misrepresentation should have been met with an objection by the defense but it was not. That was ineffective and as it related to a key point of the case, prejudiced Tedford. Witherspoon v. Stonebreaker, 30 F.4th 381 (4th Cir. 2022).

While it had no forensic evidence that the store was the crime scene the Commonwealth needed it to be, what the Commonwealth did have was the testimony of PSP Criminalist Scott Ermlick who offered expert testimony that, in his opinion, hairs and fibers recovered from The Finishing Touch linked Tedford to Ms. Revak's murder. The report of Microtrace, LLC, shows how readily subject to challenge his report was in some respects, how woefully incomplete it was in others, how counsel ineffectively failed to point out those deficiencies and develop a critically exculpatory line of defense as to other points, and how the district attorney perverted the testimony without challenge from counsel. See, Exhibit O.

Since Tedford's trial, there has been a sea change within the scientific and forensic communities related to microscopic hair and fiber comparison evidence. Scientists now agree that this type of evidence does not meet the scientific criteria for foundational validity because it is neither a consistent or accurate scientific method. Without meeting these criteria, any conclusions drawn from microscopic-hair-comparison analysis are scientifically meaningless.

Tedford's conviction and sentence thus rested on "what new scientific evidence has proven to be fundamentally unreliable expert testimony," and its admission "undermine[s] the fundamental fairness of the entire trial" in violation of his right to Due Process. Lee v. Glunt, 667 F.3d 397, 403–04 (3d Cir. 2012) (quoting Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001)). See also Dowling v. United States, 493 U.S. 342, 352 (1990).

The Commonwealth's opening statement was the initial reflection of the importance of Ermlick's testimony. The Commonwealth told the jury that a hair on the victim's pants was a pubic hair from some source that was neither the victim's nor her husband's but was consistent with that of Tedford. TT 22. The Commonwealth asserted the hair was identical with that of Tedford, although admitting it did not necessarily come from one person only. Id.

Later in its opening, the Commonwealth told the jury that fibers on the victim's outer clothing were similar to one found on Tedford's ski sweater. The jury was told that a white fiber from the victim's jacket matched carpet backing from The Finishing Touch, and that vegetable fibers found on the victim's jacket and slacks matched the carpet backing and twine from store. TT 23-24.

97

Twine, of course, was what the Commonwealth broadly suggested was the ligature used to strangle Ms. Revak, TT 24-25, and pictures of the twine were offered at trial juxtaposed to her garrote type wound.   TT 44-47.

Throughout the Commonwealth's case, repeated reference was made to hair and fiber analysis. Dr. Abernathy testified to finding 35 fibers on the victim's clothing but did not examine them further. TT 35.  Officer Peters observed red, curled-up, string-like fibers on Revak's clothing when he went to the wooded scene where her body was found. TT 98. Peters also testified that he took head and pubic hairs from Tedford, and samples from the victim's husband in order to do a comparison. TT 112-115.  Finally, he testified that he took hair from the blue desk chair at The Finishing Touch, presumably to match it to Tedford. TT 145.

Ermlick's testimony pulled all of this hair and fiber evidence into what the Commonwealth suggested were matters of significance.

Ermlick testified that his work dealt with hair, fiber, and particle analysis and that part of his training was attending an international symposium by the FBI. TT 224.  Indeed, part of the testimony to qualify him as an "expert" was that he occasionally did work with the FBI.  TT 225-226.

Ermlick's expert opinion was that the pubic hair found in the victim's underpants did not match her or her husband, but that it was consistent with Tedford's pubic hair.  TT 229-230.

Ermlick testified that red synthetic fibers from Tedford's ski sweater had the same microscopic characteristics and the same physical properties and dye components as fibers found on the victim. TT 231. He claimed to have found the same acrylic fibers on the

clothing of both Tedford and the victim, asserting that the acrylic fibers had the same color, optical properties, melting points, and the same dye and same solubility. TT 232-233.

Ermlick further testified to finding fibers from the victim's jacket and The Finishing Touch carpet backing that had "the same elongation, same melting point, and same spectroscopy." TT 233. He claimed to find vegetable fibers from the store's twine and carpet backing and testified that they were microscopically similar to those allegedly found on the victim's clothing.  TT 234.

Ermlick testified that it was *very strange* to find three different fibers on the victim's clothing. As he testified to having been doing hair and fiber analysis for 14½ years, he found it uncommon that hairs or fibers would be found in such a scenario. TT 234-235. He claimed the vegetable fibers found led him *to the conclusion* they did not come from the scene where her body was found, and that other fibers did not come from her home based upon his observation of the carpet there.  TT 236.

The prosecutor's closing made hair and fiber testimony a central feature of the Commonwealth's case. The government argued fibers found on the victim's clothing came from The Finishing Touch or from Tedford's sweater. TT 669.  The government claimed Ermlick testified that the victim's clothing had been very "linty" and the lint had come from The Finishing Touch in support of the contention that Tedford murdered Revak there. TT 683-684.  With respect to the hair evidence, the Commonwealth argued that "Pubic hair on her underwear that matched his [Tedford's]." TT 669.

The Commonwealth then argued that every hair found and described in its testimony had great significance, concluding that "what saved this case was the wool

clothing and also the apparent fact there were a lot of fibers at The Finishing Touch, and she somehow was in contact with them. Perhaps lying on the padding." TT 717.

After this matter was stayed to allow Tedford to return to state court to seek discovery, the Federal Bureau of Investigation publicly disclosed on April 20, 2015, that an internal investigation revealed that microscopic-hair-comparison analysts made erroneous representations about the reliability of microscopic-hair-comparison evidence. See, Exhibit H.

As Ermlick's testimony embraced not only hair evidence but also fiber evidence, it must be made clear that microscopic fiber analysis also lacks scientific validity for the same reasons as microscopic as hair analysis; both feature comparing disciplines resting on two assumptions: (1) that a well-trained examiner can associate a known item with an unknown item based on visual identification of similarities and differences, and (2) that that identification has value because of the uniqueness of those characteristics. "Strengthening Forensic Science in the United States:  A Path Forward" Committee on Identifying the Needs of the Forensic Sciences Community, National Resource Council (2009) at 161-163 and 155-161.[34]

The FBI Press Release followed a series of exonerations stemming from erroneous microscopic-hair-analysis evidence, and the FBI establishing a Review Committee to conduct expert analysis. The Review Committee, including representatives from the FBI, the Department of Justice, the Innocence Project, and the National Association of Criminal

---

[34] This report is available at https://www.ojp.gov/pdffiles1/nij/grants/228091.pdf.   See also, "Standard Practice for Interpretation and Report Writing in Forensic Comparison of Trace Materials" Organization of Scientific Area Committees for Forensic Science (OSAC) (March, 2020) at 1-15,   available at https://www.nist.gov/system/files/documents/2020/04/02/ChSAC-Mat_Interpretation_Document_MARCH2020_0.pdf

Defense Lawyers, examined 3189 cases.  Following this review, the Committee issued a joint press release reporting that "examiners' testimony in at least 90 percent of trial transcripts . . . contained erroneous statements"; that of the "268 cases where examiners provided testimony used to inculpate a defendant at trial, erroneous statements were made in 257 (96 percent) of the cases"; that "35 of these cases received the death penalty and errors were identified in 33 (94 percent) of those cases" and that nine of those defendants have already been executed, while five others died awaiting execution. (FBI Press Release).

The press release further noted that the "FBI has trained hundreds of state hair examiners" whose reports and testimony "incorporated some of the same scientifically flawed language that the FBI's examiners had used in some lab reports and often in trial testimony." (FBI Press Release).

In light of the report, Tedford filed a Supplement to Petition Pursuant to the Post Conviction Relief Act Based on Newly Discovered Evidence in which he requested a new trial, that discovery be produced regarding Ermlick's hair and fiber testimony (evidence that the Commonwealth described at closing as that which "saved the case", T717) and that an evidentiary hearing be convened in order to explore the extent to which he was prejudiced by the criminalist's testimony.  See, Exhibit H to Tedford's Supplemental Appendix to his Amended Habeas Corpus Petition.

The PCRA Court, however, denied all relief, stating that it was adopting the reasoning of the Commonwealth in denying relief.

Tedford appealed these rulings to the Pennsylvania Supreme Court. See, Tedford's principal brief at 66-81 and Tedford's principal brief at 34-39.  See also, Tedford's Concise Statement of Matters Complained of on Appeal at 8-9.

The Pennsylvania Supreme Court affirmed concluding that it need not reach the merits of Tedford's claim of error because Ermlick's testimony did not prejudice Tedford. Commonwealth v. Tedford, 228 A.3d 891, 912-913 (Pa. 2020).

And now with the resources afforded Tedford in the context of this application for federal Habeas Corpus relief, Tedford secured a report from Jason Beckert of Microtrace that further details the deficiencies with respect to Ermlick's trial testimony. A copy of Beckert's Curriculum Vitae and expert report is appended to Tedford's Supplemental Appendix as Exhibit O.

Beckert's conclusions are striking.

In the first instance, Beckert has concluded that the absence of the most rudimental discovery precluded him from even analyzing many of Ermlick's fundamental conclusions with respect to the hair and fiber evidence he examined:

> The absence of supporting laboratory data makes it impossible to complete a full scientific review of the technical aspects that are the foundation of this examiner's opinions. In other words, we have been unable to perform a scientific review of the evidence in this case due to the absence of the necessary scientific data to determine if it supports his testimony. Inspection of this examiner's notes and analytical data are the only way to know exactly what he did and what results he obtained.

See, Exhibit O to Tedford's Supplemental Appendix to his Amended Habeas Corpus Petition.

Based on what he was able to review, however, Beckert concluded:

> Our review of the trial testimony and excerpts from the prosecution's opening and closing statements has identified several problematic areas of testimony. These include areas where limitations of the science were not discussed and several occasions in which the prosecution misrepresented the testimony of the examiner.

Id.

But because the Pennsylvania courts denied discovery and a hearing with respect to his claims regarding Ermlick's deficient hair and fiber testimony, Tedford was unable to further develop the deficiencies of hair of the hair and fiber analysis that was conducted in Tedford's case. According to objective expert reporting, those deficiencies are legion.[35]

---

[35] Microscopic hair comparison is a feature comparison method of analysis. In the field of forensic evidence, a "feature comparison" method is "[a] procedure by which an examiner seeks to determine whether an evidentiary sample (e.g., from a crime scene) is or is not associated with a source sample (e.g., from a suspect) based on similar features." See, (President's Council of Advisors on Science & Technology, Executive Office of the President, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature Comparison Methods (September 2016) (PCAST Report) at 46.

Feature comparison methods may be either objective or subjective. Objective feature comparison "consist[s] of procedures that are each defined with enough standardized and quantifiable detail that they can be performed by either an automated system or human examiners exercising little or no judgment." PCAST Report at 47. By contrast, subjective feature comparison consists of "methods including key procedures that involve significant human judgment," such as "which features to select or how to determine whether the features are sufficiently similar." PCAST Report at 47.

Hair microscopy is recognized as a form of subjective feature comparison, where the key aspect of the decision-making process is solely up to the human to decide." See, David H. Kaye, Ultracrepidarianism in Forensic Science: The Hair Evidence Debacle, 72 Wash & Lee L. Rev. Online 227, 238 (2015) ("Hair examiners have always been clear that the conclusions drawn from a forensic hair comparison are subjective and result from an outgrowth of experience and judgment.").

Because subjective feature comparison methods, like hair microscopy, depend on human judgment, they are inevitably "more susceptible to human error, bias, and performance variability," and are, thus, less reliable than objective methods. PCAST Report at 47. This susceptibility to error makes it vital that subjective feature comparison methods, like hair microscopy, demonstrate scientific foundational validity. For a forensic examination method to be scientifically valid, it must be demonstrated that the method has achieved both consistency and accuracy. PCAST Report at 5.

Consistency assesses whether, if the method is repeated, the answer will be the same each time. Consistency is measured in two ways, repeatability and reproducibility. Repeatability assesses whether, if you give the same evidence to the same examiner at a different time when the examiner was not aware that it was the same, would the examiner provide the same conclusion. Reproducibility assesses whether, if you gave the same evidence to different examiners, would they get the same answer. Where a method is not repeatable or reproducible, it is not consistent, and does not have scientific foundational validity. PCAST Report at 47-50.

For a feature comparison method to meet the consistency prong, it must demonstrate a repeatable and reproducible procedure for identifying features within evidence samples, comparing the features in two samples, and determining, based on the similarity between the features in two samples, whether the samples should be declared to be a proposed identification. PCAST Report at 48.

Without demonstrated consistency, there can be no scientific foundational validity. PCAST Report at 47-48. Accuracy assesses how close a method is to getting the true value. "For forensic feature-comparison methods, establishing foundational validity based on empirical evidence is the *sine qua non*. Nothing can substitute for it." PCAST Report at 6. Reliably assessing error rates for a feature comparison method is "essential for determining whether a method is foundationally valid." PCAST Report at 53. "[I]f scientific hair analysis is to *mean* something, there must be actual *empirical evidence* about its meaning." PCAST Report at 121.

Because there is no way to assess the accuracy or error rates of microscopic hair comparison, an examiner's conclusion that two hairs are similar has no scientific meaning. The same can be said for any conclusions that two compared hairs did not come from the same source—i.e., an exclusion. Without any studies gauging accuracy, there is no way to measure whether one can trust that method. (PCAST Report at 121 noting that

The evidence presented during Tedford's trial was false, misleading, unreliable, and "so extremely unfair that its admission violates fundamental concepts of justice." Dowling v. United States, 493 U.S. 342, 352 (1990). When a conviction is "predicated on what new scientific evidence has proven to be fundamentally unreliable expert testimony," a petitioner successfully shows a violation of due process where the admission of the false evidence "undermine[s] the fundamental fairness of the entire trial." Lee, 667 F.3d at 403–04 (quoting Keller, 251 F.3d at 413). A claim arises under this "fundamental fairness" standard whenever "the probative value of . . . evidence, though relevant, is greatly outweighed by the prejudice to the accused by its admission." Bisaccia v. Attorney General, 623 F.2d 307, 313 (3d Cir. 1980) (internal quotation marks and citation omitted).

At a minimum, an evidentiary hearing before this Court is necessary to develop why the hair and fiber evidence presented at Tedford's trial was scientifically unreliable so as to properly assess the prejudicial impact of Ermlick's testimony.

Under Williams, 529 U.S. 420, 437 (2000) there is no § 2254(e)(2) bar to a hearing.

Ermlick's hair and fiber comparison testimony was cloaked with "aura of scientific infallibility," Barefoot v. Estelle, 463 U.S. 880, 927 (1983), and this aura was a lie.

---

without any empirical measurements of a hair microscopy's error rate, the fact that two samples are similar is "scientifically meaningless").

And because it has not yet been demonstrated that microscopic hair comparison is both consistent and accurate, any information derived solely from microscopic hair comparison is without scientific meaning. The only information a jury can take from an examiner's conclusion that hairs are microscopically similar is just that *that* examiner thinks that the hairs look very similar" at *that* time. Because the repeatability of the method has not yet been measured, a juror cannot know the likelihood that, if the examiner were to repeat the microscopic comparison at another time, he or she would come to the same conclusion. Because the reproducibility of the method has not yet been measured, a juror cannot know the likelihood that, if another examiner were to also conduct the same microscopic comparison, he or she would come to the same conclusion as the first examiner.

And because the accuracy of the method has not yet been measured, there is no way to know whether the association is correct—i.e., that the unknown hair truly can be associated with the known hair. The same can thus be said for an examiner's conclusions as to exclusions.

The error was prejudicial both under the standard of Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) and the AEDPA. Here because the "unreliable expert testimony" "undermined the fundamental fairness of the entire trial," Lee, 667 F.3d at 403–04, its admission per se meets Brecht's prejudice test. As the Third Circuit instructed in Lee, where the petitioner can show that the "admission of the Commonwealth's . . . expert testimony undermined the fundamental fairness" of the trial because "the testimony was premised on unreliable science," then the petitioner is entitled to habeas relief. Id. Moreover, the judgment of the Pennsylvania Court is plainly unreasonable since while any hair/fiber analysis conclusions could readily be explained by the fact that both sides admitted the victim was in the store and had sexual relations with Tedford, the fiber analysis was used explicitly by the Commonwealth to assert that she was brutalized there and her body later dumped in a disheveled state by Tedford. The Commonwealth attached "saved the case" significance to that evidence and to have a Court now discount that is disingenuous.

In United States v. Ausby, 916 F.3d 1089, 1094-1095 (D.C. Cir. 2019) the D.C. Circuit reviewed a 1972 murder case where the prosecution introduced several pieces of evidence connecting the defendant to the crime scene including the testimony of a forensic expert who testified that hairs found at the crime scene were microscopically identical to the defendant's.   While the court had previously concluded that the forensic hair examiner's expert testimony was not material to the rape/murder conviction as the defendant conceded to having been in the decedent's apartment, the D.C. Circuit reversed and concluded that there was a reasonable likelihood that the forensic expert's false testimony regarding hair and fiber evidence could have affected the judgment of the jury:

Ausby's defense theory plausibly explained the remaining evidence. First, the sightings of Ausby near Noel's apartment occurred four or five days before the murder and thus were consistent with Ausby's presence in Noel's apartment on an earlier date. Second, Ausby could have left the thumbprint and vials of oil in Noel's apartment while in her apartment sometime before the date of her rape and murder. And third, the ballistic evidence could not yield a positive identification. That Agent Neill's testimony played a key role in debunking Ausby's defense is borne out by the prosecution's emphasis in its closing rebuttal that Agent Neill's microscopic hair-comparison analysis "is not a positive means of identification but it amounts to a positive means here." Thus, without Agent Neill's hair-comparison testimony, there is a reasonable likelihood that the jury could have accepted Ausby's defense theory.

And in United States v. Butler, 955 F.3d 1052 (D.C. Cir. 2020), the Court of Appeals reversed the district court's denial of habeas corpus relief concluding that there is a reasonable likelihood that the false hair comparison evidence could have affected the jury's verdict even through the testimony was but a small part of the government's case that otherwise featured strong evidence of the defendant's guilt.

Like the defendants in Ausby and Butler, Tedford was linked to the crime through the false hair and fiber comparison evidence presented by Ermlick.

The Pennsylvania Supreme Court concluded however, that Tedford was not prejudiced by Scott Ermlick's hair and fiber testimony because the FBI report involved hair and not fiber comparison testimony and because Tedford conceded at trial that he had sexual relations with Ms. Revak at The Finishing Touch.  Tedford, 228 A.3d 891, 912-913 (Pa. 2020).

But as argued supra, the fiber comparison evidence is just as invalid as the hair comparison evidence in light of the FBI report; both comparisons involving visual comparisons and utilizing *the exact same techniques*, the difference between hair and fiber thus incidental.

Ermlick's fiber testimony surely prejudiced Tedford. The Commonwealth's opening statement proclaiming that vegetable fibers retrieved from Ms. Revak's jacket matched twine from the store with Ermlick testifying in support that fibers from The Finishing Touch *twine* and carpet backing were microscopically similar to those found on the victim's clothing, TT 234. Ermlick further testified that it was very strange [to him] to find three different fibers on the victim's clothing, Ermlick testifying that he had been doing hair and fiber analysis for nearly 15 years and that it was uncommon that hairs and fibers would be found in such a scenario. TT 234-235. Ermlick's conclusion that the fibers on her clothing did not come from where her body was found but from The Finishing Touch, TT 236, further permitted the Commonwealth to argue that Jeanine Revak was murdered at The Finishing Touch.

And although the Pennsylvania Supreme Court concluded that the Commonwealth's reference in closing argument to "what saved this case" was strictly limited to fiber evidence, the Commonwealth's closing argument at issue referenced hair evidence immediately before and in conjunction with the fiber evidence, the Commonwealth arguing, in effect, the significance of both the hair and fiber evidence in the passage. Indeed, that evidence only had meaning as a result of Ermlick's comparison testimony:

> Well, two points concerning what the defendant knew about this evidence. Take the identification of evidence on clothing. He could have been relatively unsophisticated and not realize **that even a single hair had significance, or** he could be very sophisticated he could have known as much as Ermlick, who told you it's an unusual case, you don't get fiber evidence usually unless you bring in the bed clothes or something like that.
>
> What saved this case was the wool clothing and also the apparent fact there were a lot of fibers in The Finishing Touch, and she somehow was in contact

107

with them. Perhaps lying on the padding. You recall the officer who took the samples went back where they cut the rugs and picked up individual pieces of fiber off the floor.

TT 716-717 (Emphasis added).

It simply cannot be lost that the microscopic-hair-comparison evidence in and of itself significantly prejudiced Tedford as it operated to refute the suggestion that James Revak had a part in his wife's murder.

While James Revak arguably confessed to the crime when he saw his wife's dead body, ("I'm sorry, I couldn't help it" or "I'm sorry, I didn't mean it").  TT at 604-610, Ermlick's testimony with respect to the hair Ermlick found on Ms. Revak's underclothing was vital in refuting the notion that her husband may have had a role in his wife's murder. With respect to a hair found in her underpants, Ermlick testified that the hair was a pubic hair, that the hair was *not* hers or her husband's: "I did examine them.  I did compare them and based on what my examination revealed, they are not from him."  TT 229-230.

While Ermlick did not testify that the hair in question definitively came from Tedford, it cannot be ignored that after testifying that he had a bachelor of science degree in chemistry from Penn State University, a master of science degree in forensic chemistry from the University of Pittsburgh and after having attended the FBI's International Symposium on Hair Analysis and subsequently doing work for the FBI, TT 224-225, that Ermlick's hair comparison testimony in this regard carried with it the serious threat that it would be received by the jury with  heightened impact and carry a devastating prejudicial punch.

Indeed, a proper challenge to Ermlick's testimony under Pennsylvania's <u>Frye</u> test would have excluded it. See, <u>Commonwealth v. Hopkins</u>, 231 A.3d 855 (Pa. Super.

2020)(trial counsel ineffective for failing to muster a <u>Frye</u> challenge DNA testimony). Under <u>Frye v, United States</u>, 293 F. 1013 (D.C. Cir. 1923) novel scientific evidence is presumed inadmissible unless (1) the scientific theory has gained general acceptance in the scientific community and thereby supports a reliable conclusion; and (2) the methodology underlying the proffered expert testimony is capable of producing reliable, valid results generally accepted in the scientific community.  <u>Blum v. Merrill Dow Pharmaceuticals</u>, 764 A.2d 1, 6 (Pa. 2000).

Proper discovery will show that Ermlick's testimony was the result of the same bad scientific evidence the FBI has now rejected.

At a minimum, counsel was Constitutionally ineffective for failing to exclude this junk science under <u>Strickland</u> and this evidence was prejudicial to Tedford.

Ermlick's testimony was not a mere technical violation of a rule of procedure but an ominous and tangible component of the phenomenon of wrongful convictions of which all of society has taken stark cognizance in the past several years. The United States Supreme Court in <u>Hinton v. Alabama</u>, 571 U.S. 263, 276 (2014) noted that in sixty percent of the cases where innocent people have been exonerated, invalid forensic science materially contributed to the wrongful conviction. That forensic "science" came through the testimony of experts whose testimony, with the heightened impact that expert testimony has on a jury, could readily occasion the conviction of an innocent man.

The Pennsylvania courts' findings constitute an unreasonable application of the facts and Supreme Court precedent and the admission of Ermlick's fiber testimony surely prejudiced Tedford. It simply cannot be concluded that Tedford would have been convicted had it not been for the trial testimony of Scott Ermlick.

Three more points of significance must be reiterated.

First, Ermlick has not produced all discoverable material. His bench notes exist within the files of the Crime lab and his trial testimony went far outside the evidence the reports he disclosed covered. His notes would also provide critical details on how his conclusions were reached, something the reports omit.

Second, one of his reports indicates a pubic hair was found in the victim's car and he cryptically observed that Tedford "could not be eliminated" as the source. If detailed analysis of this was done, counsel was fatally ineffective for not bringing that out. No part of the Commonwealth's theory had Tedford in the victim's car ever. If his hair was there, it was carried by the victim after she left the store after voluntary sex with Tedford, just as he claimed.

Third, the Commonwealth's failure to find trace evidence at The Finishing Touch was a critical point that trial counsel should have exploited by producing testimony from experts like Dr. Persin and Dr. Ferrara who would have been available to confirm that the lack of trace evidence undermined the theory that the murder happened there. This was ineffectiveness of the first order under Strickland.  See, Jones v. Ryan, 1 F.4th 1179 (9th Cir. 2021); Jacob v. Horn, 395 F.3d 92 (3d Cir. 2005); Ford v. Attorney Gen., 2022 US.App. LEXIS 13110 (3d Cir. May 16, 2022).

Habeas Corpus relief must ultimately be granted.

**GROUND V(A)(3).  TEDFORD'S POST VERDICT MOTIONS COUNSEL/APPELLATE COUNSEL LABORED UNDER A CONFLICT OF INTEREST THAT ADVERSELY AFFECTED COUNSEL'S PERFORMANCE DEPRIVING TDEFORD OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.**

At the time of litigating post-verdict motions and on direct appeal, Tedford's attorney was the Public Defender of Butler County[36] and the same Public Defender who represented two key witnesses supporting the Commonwealth's case, Michael Ferry and Christopher White.[37]

Tedford explained that witnesses were available to testify that Ferry lied about his purported confession and that White had serious mental health problems and had attempted suicide on more than one occasion because of his depression. This evidence was not developed properly by trial counsel. Some of those assertions generally made their way into the Post Verdict Motions and the amendments thereto filed by the Butler County Public Defender's Office on Tedford's behalf.  See, Tedford's filings in connection with his post-verdict motions which are collectively attached to Tedford's Supplemental Appendix as Exhibit CC.

The problem, however, was that Post Verdict Motions/Appellate counsel did nothing to pursue any evidence supporting these claims.  See, e.g. the May 18, 2004 Transcript at 45-63. [38] [39]

Ferry and White were inmates at the Butler County Jail at the time of Tedford's trial and although both denied having an actual "deal" in exchange for their testimony at trial, both made it clear that they hoped that their testimony would be of benefit to them

---

[36] Peter Shaffer, an Assistant of the Butler County Public Defender's Office, was the Public Defender most responsible for handling Tedford's post-verdict motion and direct appeal litigation.

[37] This claim was fairly presented to the Pennsylvania courts in the PCRA proceedings. See PCRA Initial Brief at 94-97.

[38] Tedford's post-conviction counsel ultimately acquired affidavits, see, Exhibits H, I and N of Tedford's appendix to his original petition for a writ of Habeas Corpus (ECF No. 26 at 91-93, 94-96 and 110-112)), that Ferry lied at trial.  Those affidavits are also included in Tedford's supplemental appendix as Exhibit P, Exhibit Q and Exhibit R.

[39] Undersigned counsel ultimately acquired evidence that Christopher White had mental health problems that existed his entire life.  See, Tedford's Supplemental Appendix Exhibit L, Exhibit S and Exhibit T.

with respect to pending charges. TT 383 (testimony of Ferry that he "figured it wouldn't

hurt me any"); TT 417 (testimony of White that he had heard of people getting deals in

exchange for testimony).

Richard Goldinger, the Public Defender of Butler County,[40] represented Ferry at

his meeting with the government that resulted in him preparing an affidavit attesting to

Tedford's purported confession.[41] It was Goldinger who advised Ferry to talk to the police

about Tedford, was personally present for Ferry's interview and who was responsible for

any formal or informal negotiations with the district attorney's office concerning benefits

that Ferry might receive in exchange for his testimony.

Further, it was clear that it was in both Ferry and White's interest to get out of the

Butler County Jail as soon as possible and their attorneys from the Public Defender's

Office,[42] were charged with doing their best to get them out of jail and in defending their

credibility in the aftermath of their trial so as to ensure that they did not return there.

Tedford's interests were completely contrary.

In this instance, how could the Public Defender represent Ferry and White while

also representing Tedford, legally and ethically?

Attorney Shaffer testified that very early on in his representation of Tedford

regarding post-verdict motions and direct appeal significant allegations came to light that

Ferry and White had lied at trial. Indeed, Shaffer filed a post-verdict motion for a new trial

and a series of amendments thereto wherein he specifically alleged: 1) that evidence existed

---

[40] Attorney Goldinger became the head Public Defender for Butler County in or around October, 1995. May 18, 2004 Transcript at 27.

[41] A copy of this affidavit and the police reports concerning its preparation is included in Tedford's Supplemental Appendix as Exhibit DD.

[42] Christopher White weas represented by John Morgan of the Public Defender's office at the time his case was pending.  5/18/2004 Transcript at 6-16.

to "discredit" the trial testimony of Ferry, particularly, the testimony of Timothy Sunday who provided an affidavit that Ferry lied in his trial testimony in conjunction with Tedford's alleged confession and, 2) that White suffered from mental health problems that impeached his credibility.  See, Exhibit CC and the May 18, 2004 Transcript at 47.

While Shaffer conceded that he was sure that he discussed Tedford's case with Goldinger, Shaffer was generally unable to recall any specifics of the conversations, but he did recall discussing with Goldinger his representation of Ferry. Thereafter, the Public Defender essentially did nothing to develop information refuting the testimony of Ferry. See, the May 18, 2004 Transcript at 47-54.

Likewise, Shaffer did nothing to develop that record pertaining to the mental health problems of White. May 18, 2004 Transcript at 6-15.

Under the Sixth Amendment, when "a constitutional right to counsel exists, ... there is a correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981). The Court's decision in Holloway requires "an automatic reversal rule" that applies "where counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict." Mickens v. Taylor, 535 U.S. 162 at 168 (discussing the Court's earlier decision in Holloway, 435 U.S. 475, 98 S.Ct. 1173).

Tedford himself recognized the problem and repeatedly objected to this conflict of interest, most specifically, through a February 19, 1988, pro se motion he filed alleging that the Public Defender had a conflict of interest in representing him.  See, Exhibit CC at 21-30.

Indeed, Tedford plainly averred in the motion in part as follows:

> 5.    Appellate Defender's Office defended Michael Ferry and Christopher White in unrelated cases, two (2) witnesses who testified for the prosecution at Defendant's trial, thereby constituting a conflict of interest.
>
> 6.    Appellate Defender's office arranged an interview for Michael Ferry with prosecuting authorities regarding his testimony at Defendant's trial, and represented Ferry at that interview, thereby constituting a conflict of interest.
>
> WHEREFORE, Defendant requests that this Honorable Court appoint counsel independent of the Butler County Public Defender's Office.

See, Exhibit CC at 30.

But the trial court denied Tedford's motion without taking appropriate and adequate steps to resolve what was, in fact, an unresolvable conflict:

> Now, February 24, 1988, after due consideration of the within Motion for Appointment of Counsel, the Court finding that there is no conflict, It Is Ordered that the Motion is Denied.

See, Exhibit CC at 31.

If the Court did anything to investigate the conflict or otherwise evaluate it, undersigned counsel is unaware of it.  And doing noting simply cannot equate to taking "adequate steps" to investigate a conflict.

In Holloway, the concluded that "an automatic reversal rule" applies "where counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict." In other words, where the conflict is raised with the trial court, reversal is automatic where the judge "fail[s] to either appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel." Holloway, 435 U.S. at 484.

 In order to establish a Sixth Amendment violation based on a conflict of interest when the defendant did not object, the defendant "must demonstrate that an actual conflict

114

of interest adversely affected his lawyer's performance." <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 348 (1980). An "actual conflict" means "a conflict of interest that adversely affects counsel's performance," not simply a "theoretical division of loyalties." <u>Mickens v. Taylor</u>, 535 U.S. 162, 171, 172 n.5 (2002). When a defendant makes this showing, the court presumes prejudice because the "assistance of counsel has been denied entirely or during a critical stage of the proceeding." <u>Id</u>. at 166,; <u>Sullivan</u>, 446 U.S. at 349–50. This is an exception to the typical <u>Strickland</u> standard, which requires a showing of prejudice. See <u>Strickland v. Washington</u>, 466 U.S. 668, 688, (1984) (defining prejudice as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). A defendant demonstrates an actual conflict when he shows that his counsel "actively represented conflicting interests." <u>Sullivan</u>, 446 U.S. at 350.

The Pennsylvania Supreme Court's decision denying Tedford relief turned a blind eye to all of this. That Court concluding that Tedford failed to establish how the conflict of interest adversely affected the outcome of the case. <u>Tedford</u>, 960 A.2d at 54. This decision is an unreasonable application of Supreme Court precedent, specifically, <u>Holloway v. Arkansas</u>, 435 U.S. 475, 490 (1978); <u>Cuyler v. Sullivan</u>, 446 U.S. 335 (1980); and <u>Mickens v. Taylor</u>, 535 U.S. 162 (2002).

In the first instance, the Pennsylvania courts should have applied the automatic reversal rule; a conflict existed, Tedford objected to the conflict and the trial court failed to take adequate steps to further investigate the conflict and resolve what was, in fact, unresolvable absent the appointment of other counsel. But even if the automatic reversal rule does not apply, however, the Pennsylvania Courts adjudication of Tedford's claim was still unreasonable.

When the Public Defender Peter Shaffer was appointed to represent Tedford in connection with post-verdict motions and on direct appeal, the Public Defender had an unavoidable conflict of interest.  As Tedford's attorney, the Public Defender had a duty to expose any possible deal between the prosecutor and Ferry and White. Moreover, the Public Defender had the duty to expose how their testimony should have been properly impeached at trial. Yet at the same time the Public Defender had a corresponding duty to protect Ferry and White, to not reveal any secret deals they may have made, and certainly not to do anything that would expose them to perjury charges. As Tedford's attorney, the Public Defender should have raised any and all possible challenge to their credibility, used whatever means were necessary to force out the truth, called them as witnesses, and otherwise vigorously examined them and exposed them as liars.

But in order to do so, the Public Defender would have "inherently encounter[ed] divided loyalties." Holloway v. Arkansas, 435 U.S. 475, 490 (1978).  Here, the Public Defender chose the interests of Ferry and White over Tedford and thus act in Tedford's best interest in contravention of Tedford's Sixth Amendment rights and his enormous prejudice.

In Taylor v. Grounds, 721 F.3d 809 (7th Cir. 2013) a single retained lawyer represented two brothers during their simultaneous murder trials, Levell and Lowell Taylor (Levell was tried before a judge and Lowell was tried before a jury at the same trial).  The state's theory was that Levell handed a gun to Lowell who then shot the decedent during a gang confrontation. While defense counsel attacked the credibility of government witnesses and argued that the state failed to prove its case beyond a reasonable doubt, defense counsel failed to call a series of witnesses who said that they did not see Levell

hand his brother the gun but they saw Lowell shoot the decedent. While the Supreme Court of Illinois found that Levell Taylor failed to establish an actual conflict of interest that adversely affected trial counsel's performance, the Seventh Circuit concluded the decision amounted to an unreasonable application of federal law and ordered the granting of habeas corpus relief.

As in Taylor, the conflict of interest here deprived Tedford of the effective assistance of post-verdict motion/appellate counsel to which he was entitled under the Sixth and Fourteenth Amendments to the United States Constitution and Habeas Corpus relief must result ensue.

**GROUND V(A)(4)   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE LACK OF EVIDENCE SUPPORTING THAT A RAPE HAD OCCURRED AND IN DENYING TEDFORD MEANINGFUL APPELLATE REVIEW REGARDING THE MATTER.**

Trial counsel has the absolute duty to thoroughly investigate potential defenses under Strickland and its progeny, the stakes never higher because this was a death penalty case.

Yet, despite this highest obligation, trial counsel failed to subject the Commonwealth's case with respect to the rape charge to any meaningful adversarial challenge in violation of Tedford's right to the effective assistance of counsel under the Sixth Amendment and Fourteenth Amendments.   Trial counsel harbored no strategic or tactical for not challenging the rape charge in this regard as Tedford's overall defense to the murder charge centered around the fact that the sexual relations he had with Ms. Revak on January 10, 1986 were consensual. Simply put, if this were not a case of rape, Ferry was lying and Tedford would have had no cause to murder Ms. Revak.

As a result of this abysmal failure to show that this was not a case of rape, Tedford suffered enormous prejudice. Indeed, but for counsel's failure, it is reasonably likely that Tedford would have been acquitted of the rape charge and while appellate counsel recognized that trial counsel was ineffective in this failure, appellate counsel also failed to adequately develop and litigate this claim at the evidentiary hearing and on direct appeal.

The Commonwealth's theory of the case was drawn from Ferry's testimony that Tedford set up a meeting with Ms. Revak, that he developed "hot nuts" for her, that he made sexual advances to her that were rebuffed and that as a result he raped and then killed her out of fear that a rape conviction would terminate his work release and result in a long prison sentence. TT 378 This testimony was summarized by the prosecutor in closing argument as follows:

> But what did he tell Ferry? He told him:
>
> I promised her a job. She was interested in a job as an interior decorator, decorating stores.
>
> She had a part time job. She wanted an interior decorating job. He promised her a job. He met her. He made the excuse to get her back to The Finishing Touch. She was a good-looking girl. She was an attractive girl. He made a pass at her. She tried to get away. Became hysterical. He tried to calm her down.  He said she had oral intercourse with him. Afterward he was fearful she would report what happened, so he killed her.

TT 704-705.

In contrast to Ferry's testimony, there was no physical evidence of rape. This was made clear by detectives shortly after the body was found and noted by Lieutenant Widdowson that there was no evidence of sexual assault. See, Appendix K to Tedford's original appendix to his original habeas corpus petition. ECF No. 26-1 at 100. The medical

examiner, Dr. Abernathy, further admitted at trial that his examination and the rape kit taken from the victim *revealed no physical evidence of rape*. TT 71-72.

Tedford himself defended against this allegation by testifying that he had sexual intercourse with Ms. Revak at The Finishing Touch on January 10, 1986 but that it was part of their ongoing consensual intimate relationship, not unlike the sexual relationships he was having with other local women. According to Tedford, Ms. Revak left after they had relations and he did not see her again.  TT 540-543.

And the physical injuries sustained by Ms. Revak certainly were not indicative of a sexual assault.  The severe blow to Ms. Revak's head and the ligature strangulation that killed her purportedly occurred *after* the rape. There simply was no evidence of a struggle with a conscious victim consistent with rape and there was no evidence that Tedford had access to a weapon to threaten the victim or inflict the extreme blow to Ms. Revak's head.

In the absence of physical evidence, the Commonwealth's case for rape was effectively dependent on the testimony of jailhouse informant Ferry who recanted his testimony after the trial consistent with the affidavits of David Geibel and Timothy Sunday, inmates at the Butler County Jail who were available at trial to testify at trial that Ferry was lying about Tedford having confessed to the rape and murder.  See, Supplemental Appendix Exhibit P, Exhibit Q and Exhibit R.

And, of course, the absence of any forensic evidence of a violent assault at The Finishing Touch, something which likely caused Stanek to conclude that the murder did not happen there, also wholly negated the rape theory. Counsel failed to call other forensic experts on the certainty that blood would have been found in the store if such a violent and bloody crime occurred there. That evidence was readily available and disregarded.

If trial counsel were acting in a Constitutionally proficient manner, trial counsel would have developed and effectively presented all of evidence negating the rape at trial. Instead, counsel failed to investigate the source and timing of the injuries suffered by the victim (including whether they were inflicted prior to death, around the time of death, or post-mortem) and failed to elicit testimony from Lieutenant Widdowson *that he found no evidence of sexual assault*. He left multiple areas exonerating Tedford undeveloped.

Counsel's performance was deficient and Petitioner suffered prejudice as a result.[43]

The Pennsylvania Supreme Court concluded that trial counsel had a reasonable strategy to refrain from challenging the evidence of rape because Tedford admitted to sexual contact with the victim. Tedford, 960 A.2d at 27-28. What the Supreme Court of Pennsylvania obviously and quite unreasonably missed, however, was that evidence of sexual contact does not equate with rape.

Negating the rape theory undercut the Commonwealth's case at its core, impeached its jailhouse witnesses and demonstrated Tedford's innocence.

---

[43] In post-verdict motions, appellate counsel raised the claim of trial counsel ineffectiveness for failing to challenge the evidence of rape and a hearing was held on February 1-3, 1988. At the evidentiary hearing in 1988, appellate counsel, however, ineffectively failed to ask trial counsel what if any reason he had for not investigating and challenging the Commonwealth's assertion that the victim had been raped, sexual contact and rape rather obviously not synonymous. The result was that appellate counsel presented no evidence at the hearing on the merits of the claim that trial counsel was ineffective. Thus, Tedford alleged in the PCRA proceedings that appellate counsel failed to elicit the facts supporting this claim and that this also constituted ineffective assistance. Tedford sought an evidentiary hearing on the claim that appellate counsel was ineffective. Accordingly, Tedford properly develop that claim. Indeed, Tedford raised this ineffectiveness claim both in the PCRA petition filed January 14, 1997 and as Claim VI at the Amended PCRA Petition filed on August 26, 2002, following the remand from the Pennsylvania Supreme Court.

Likewise, Tedford sought an evidentiary hearing on all of the claims in the Amended Petition, and sought discovery to support this claim. See, Tedford's 's Consolidated Renewed Motion for Discovery, etc. (filed Jan. 9, 2002).

While on June 11, 2002, the PCRA court denied the requested discovery, on March 13, 2003, the PCRA court granted an evidentiary hearing, apparently with respect to all of the claims in the Amended Petition. The PCRA court, however, ultimately  changed course and dismissed all of the claims in the Amended Petition without a hearing, with the exception of Claim XIII, the conflict of interest claim, on which the state court held an evidentiary hearing on May 18, 2004.

Although trial counsel testified that he did not feel it was important to contradict all of the circumstantial evidence the Commonwealth presented that sexual contact between Tedford and Ms. Revak took place, it is impossible to justify not contesting the rape charge as reasonable strategy and tactic when Tedford's defense centered around this incident not being a rape.  See, February 3, 1988 Hearing transcript at 248.

Evidence supporting Tedford having consensual sexual contact with Jeanine Revak, such as the seminal discharge found on Ms. Revak's clothing matching Tedford's blood type and the (now discredited) hair and fiber testimony purportedly identifying Tedford's pubic hair was as consistent with a consensual sexual encounter as it was with rape, Tedford in his mid 30's at the time of their encounter and Ms. Revak in her 20's and, deceitful with her husband about her plans for January 10, 1986.

Trial counsel's decision to not challenge the rape was blatantly deficient performance and the state court's conclusion that trial counsel's strategy for failing to challenge the evidence of sexual contact *applied to not discrediting evidence of rape* – is, respectfully, absurd and unreasonable.

Again here, Tedford sought an evidentiary hearing in the PCRA proceedings "in the manner prescribed by state law" but the PCRA court denied the hearing. Under Williams, there is thus no § 2254 (e)(2) bar to a hearing. Williams v. Taylor, *supra at* 437.

Tedford was fatally prejudiced by trial counsel's failure to point out the simple but understandable critical truth that the Commonwealth's case that Tedford raped Ms. Revak was fatally deficient.

## GROUND V(B)(1)   TEDFORD'S RIGHTS WERE VIOLATED BECAUSE OF THE PROSECUTORIAL SUPPRESSION AND WITHHOLDING OF MATERIAL EVIDENCE

The prosecution's suppression of material, exculpatory evidence violates due process. Brady v. Maryland, 373 U.S. 83 (1963); Agurs v. United States, 427 U.S. 97 (1976); United States v. Bagley, 473 U.S. 667 (1985), and their progeny. There simply can be no question that the prosecution must reveal to defense counsel any and all information that is helpful to the defense whether that information relates to guilt-innocence or punishment, and regardless of whether defense counsel requests the specific information.

Tedford has set forth specific grounds for the reasonable belief that the prosecution failed to disclose exculpatory and material evidence to the defense.[44]

Indeed, throughout the pendency of this application, Tedford sought discovery from the Pennsylvania courts and this Court in order to substantiate his allegations. He was rebuffed in state court and, to date, this Court denied all but one of Petitioner's discovery requests. See Order of Sept. 28, 2010 (ECF No. 40). Now, with evidence not only that the PSP has hundreds of pages of reports never disclosed to the defense but that the lead PSP investigator reached a critical conclusion completely inapposite to the prosecutors on a determinative issue, the need to direct the disclosure of further evidence withheld to date has become acute.

After the Commonwealth filed a letter indicating it had no responsive documents with respect to the one item of discovery that was granted, Tedford filed a motion seeking

---

[44] Tedford raised this Brady claim both in the PCRA Petition filed on January 14, 1997, and as Claim IX in the Amended Petition filed on August 26, 2002, following remand from the Pennsylvania Supreme Court. Tedford then sought an evidentiary hearing on all of the claims in the Amended Petition, and sought discovery to support this claim. See Petitioner's Consolidated Renewed Motion for Discovery, etc. (filed Jan. 9, 2002). On June 11, 2002, the PCRA court denied the requested discovery. On March 13, 2003, the PCRA court granted an evidentiary hearing, apparently with respect to all of the claims in the Amended Petition. Following further briefing, however, the PCRA court changed course and dismissed all of the claims in the Amended Petition without a hearing, with the exception of Claim XIII, on which the state court held an evidentiary hearing on May 18, 2004.

in part to follow up on that item of discovery. See Motion ... for Discovery Deposition of Trooper Peters and Brief in Support (ECF Nos. 54, 55). This Court denied that request. See Order of June 30, 2011, Doc. No. 67.

We now, know, however, that <u>Brady</u> evidence exists in this case.  As highlighted <u>supra</u>, Stanek concluded and believes to this day  that Ms. Revak was not murdered at The Finishing Touch but at some unknown location.   See, the Supplemental Appendix at <u>Exhibit A</u> and <u>Exhibit B</u>.

That the chief investigator reached this conclusion constitutes direct and compelling <u>Brady</u> material.  If Ms. Revak did not die at The Finishing Touch*, Tedford is not guilty. Since Stanek's conclusion must be based on more intimate knowledge of the investigation than has been revealed to Tedford to date, the Commonwealth has been sitting on this critical exculpatory information for over 36 years.

To prove a <u>Brady</u> violation, Tedford must show both non-disclosure and materiality. <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). A hearing at which Tedford could subpoena witnesses and the documents he has previously requested in discovery "would have the potential to advance the petitioner's claim." <u>Campbell v. Vaughn</u>, 209 F.3d 280, 287 (3d Cir. 2000).

The Third Circuit has most recently held:

> To prove a <u>Brady</u> violation, a defendant must show the evidence at issue meets three critical elements. First, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching." Id. at 281-82; see also <u>United States v. Bagley</u>, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed. 2d 481 (1985) ("Impeachment evidence . . ., as well as exculpatory evidence, falls within the <u>Brady</u> rule."). Second, it  "must have been suppressed by the State, either willfully or inadvertently."  Strickler, 527 U.S. at 282.  Third, the evidence must have been material such that prejudice resulted from its suppression. <u>Id</u>.; see also <u>Banks</u>, 540 U.S. at 691. The "touchstone of materiality is a 'reasonable probability' of a different

result." <u>Kyles</u>, 514 U.S. at 434.  Materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . [Rather], a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." <u>Id</u>. (internal quotation marks omitted).

<u>Dennis v. Secretary, PA Dep't of Corr.</u>, *supra* 834 F.3d 263, 285 (3d. Cir. 2016). The showing on each point is self-evident. Nothing was ever revealed to suggest that the murder site was other than the store; the Chief Investigator knew it was not; and without proving that it was, the case against Tedford could not be made.

Indeed, nowhere in the discovery provided to date was Stanek's conclusion that the murder did not happen at The Finishing Touch. What has been revealed is virtually absent of the intense efforts the Commonwealth made to find forensic evidence of a bloody murder at the store or in Tedford's car. Twine purportedly used to murder Ms. Revak was sent to Harrisburg for more refined scrutiny by the PSP but no results were revealed. Scott Ermlick's bench notes were never revealed and since his testimony reached a number of issues not in his official reports, those notes must contain more evidence of the efforts he made to forensically link Tedford to the crime. In sum, the evidence of the failed effort to support the prosecutor's theory, a theory their own investigator rejected, is noticeably and remarkably absent from anything disclosed so far.

The lead investigator's belief that the murder did not happen in The Finishing Touch is obviously material <u>Brady</u> evidence. <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995) (withheld evidence would have "raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation" constitutes material <u>Brady</u> material, as the withheld evidence denied the defense the ability to "undermine the

124

ostensible integrity of the [police] investigation" and "[lay] the foundation for a vigorous argument that the police had been guilty of negligence"). Not only did Stanek's conclusion reflect on the thoroughness of the investigation, it directly contradicted Ferry's testimony, the testimony the prosecutors called Stanek to corroborate. Giglio v. United States, 405 U.S. 150 (1972) (When the reliability of a given witness may determine guilt or innocence, the prosecutor must disclose evidence affecting the credibility of that witness).[45]

But without discovery or a hearing at which the Petitioner can use subpoena power, the Petitioner will be unable to further prove his claim and establish why Stanek concluded Ms. Revak was not murdered at The Finishing Touch.

The Pennsylvania Supreme Court ruled that, without the discovery requested, Tedford could not make out his Brady claim. Tedford, 960 A.2d at 30-31. The appropriate question for review under § 2254(d) thus, is whether, assuming that Tedford proves the facts alleged both in state court and here, the state court's application of Brady was unreasonable. Assuming Tedford can prove the proffered facts, the state court's decision was unreasonable and this Court can and should hold an evidentiary hearing to determine whether Petitioner is entitled to relief. See Morris v. Thaler, 2011 WL 1886096, *9 & n.1 (5th Cir. May 18, 2011) (unpublished) ("in this case, a hearing is necessary not to evaluate the state court's decision, but to determine whether [petitioner's] allegations are true"); accord Hearn v. Ryan, 2011 WL 1526912, *2 (D. Ariz. Apr. 21, 2011).

---

[45] See, Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 266-888 (3d Cir. 20160 (evidence favorable to defendant where signed, time stamped receipt corroborated defendant's alibi and could impeach witness); Juniper v. Zook, 876 F.3d 551, 565 (4th Cir. 2017) evidence favorable to accused where investigative notes and witness affidavit contradicted prosecution's theory of the case and could impeach witness); United States v. Walter, 870 F.3d 622, 630 (7th Cir. 2017) evidence favorable to defendants where damaging remark could cast doubt on defendants' involvement and impeach government's key witness);

But it has now become clear in light of Stanek's declarations that material exculpatory evidence was withheld from Tedford that resulted in his conviction. The only question that remains is how much additional evidence within the records of the PSP, the Crime Lab and the files of the District Attorney of Butler County exists and the extent to which it proves Tedford's innocence. This Court ultimately required to take into account the cumulative effect of suppressed evidence not merely the probative value of each item of suppressed evidence standing alone. Kyles, 514 U.S. at 421 ("[S]tate's disclosure obligation [under Bagley] turns on the cumulative effect of all suppressed evidence favorable to the defense, not on the evidence considered item by item.").

And still there is more.

Evidence of Christopher White's severe mental condition exists within the files of the Commonwealth and has never been disclosed. White admitted to the investigator that he has suffered from serious mental health problems throughout his entire life, and his son has established that White was often incarcerated in special units of the prison to treat the insane. Records within the prison system certainly exist of his treatment and diagnosis and to the extent that they would bear on his ability to truthfully relate testimony, they are clearly exculpatory. See, Lesko v. Dept. of Corrections, -__ F4th __ at *44 (3d Cir. May 17, 2022). The files of the PSP also have categories of "psychiatric" records, otherwise inexplicable since Tedford did not ever employ a mental defense.

With what Tedford has now presented, it is wholly reasonable for Tedford to assert that the following sorts of Brady material, among others, exist within the possession of the Commonwealth:

126

- Information reflecting specific agreements, promises or representations made to White and/or Ferry in connection with their testimony against Tedford at trial by the Commonwealth.
- Evidence impeaching the credibility of White and Ferry by showing that the testimony they related was based on public record information about the case and not to conversations they allegedly had with Tedford.
- Evidence reflecting the Commonwealth's concerns about the credibility of White and/or Ferry through polygraph examinations, research into the psychiatric history of these individuals, or otherwise.
- Evidence specifically regarding White's mental incapacity at the time of this testimony.
- Evidence of further failed efforts by the Commonwealth to establish that the bloody murder of Ms. Revak happened in The Finishing Touch through more extensive forensic efforts made by the Commonwealth to locate any trace of blood or other bodily fluids that would necessarily have to have been there had such a violent crime occurred there.
- Evidence of further failed efforts by the Commonwealth to prove that the bloody body of Ms. Revak was transported over 50 miles in the trunk of the Tedford's car to a dump site location in Washington County.  Such evidence could be constituted by forensic tests on extensive sweepings made of the interior of the vehicle to determine whether there was any evidence that a bloody body had ever been there so as to corroborate the Commonwealth's theory of the case.
- Evidence of other persons who were investigated in connection with this homicide. Tpr. Peters referred to other suspects in his preliminary hearing testimony.
- Evidence that the husband of Ms. Revak was the subject of some investigation by the police to determine his whereabouts during the day in question, his potential motive and other statements he gave via recordings or otherwise bearing on his knowledge of these instances.
- Evidence indicating that the scientific testing used to support the hair and fiber analysis resulted from the same techniques which the Federal Bureau of Investigation has now repudiated as junk science thereby undermining the entire validity of that testimony as being able to provide any evidence to support any aspect of the Commonwealth's theory.
- Evidence tending to show that Tedford never left The Finishing Touch during the day in question, specifically, that he never left to meet Ms. Revak at a remote location and drove her to The Finishing Touch.  Any evidence by way of telephone records, records of delivery companies or otherwise that would demonstrate that this critical aspect of the Commonwealth's theory was unsupported would clearly constitute <u>Brady</u> material in this matter.
- Any additional forensic evidence that specific attempts were made to corroborate the theory that Ms. Revak had been raped the day in question.
- Any efforts to obtain any expert or other forensic testimony to prove that twine was the ligature used to cause the injuries to her neck.

127

- Any additional efforts made to determine by analysis of the scene in which the body was found or otherwise the precise time of death.
- Any evidence of the statements taken from witnesses to better establish the time that Tedford was at the G-Whiz gas station on the day in question.
- Any evidence that an examination of Tedford's hands was made to determine whether they exhibited any indication that he had engaged in a brutal and bloody attack on another individual.

The discovery requests Tedford further articulated in this pleading (see, Section VII, supra) all are meant to develop the specifics of these categories of discoverable material which should be made available to him under Rule 6(a). Accessing that material is no fishing expedition. It exists either in the files of the State Police, the Crime Lab Bench Notes and related documents generated by Ermlick, or within the discreet archives of the Butler DA's office. The items are specifically delineated and derive from the specific claims Tedford has made which would clearly entitle him to relief.

It must be recalled that the evidence supporting the conviction is woefully thin despite the generous effort of the Court to identify "significant circumstantial evidence" tying Tedford to the crimes. Commonwealth v. Tedford, 228 A3d 891, 895 (Pa. 2020). The Court lists the sperm/seminal material on the clothes of Ms. Revak and the two jailhouse informants as this significant evidence.  Those stains were never subjected to DNA analysis and all that could be concluded is Tedford's blood type was within those possibilities. And of course, even if they were his deposits, he and Revak had consensual sexual relations that day. The seminal/semen evidence is thus of little or no value in confirming that a rape/murder occurred there on that day.[46]

And how can it not bother any fair-minded, objective observer that the Commonwealth rested a critical tenet of its theory on a fact its own investigator refuted?

---

[46] Indeed, that same Court dismissed an attack on Ermlick's hair comparison as not being prejudicial since the fact that the two had relations that day was not disputed. 228 A. 3d at 911.

Similarly, it mut be deeply troubling that critical circumstantial evidence was not presented by the Commonwealth. A gash of at least an inch in length, bleeding profusely, TT 38, 41, 65, 68, 249, would have left evidence a thorough investigation by the State Police and any affiliated crime lab would have found by an effort using all available technology. Is it possible that the State Police did not conduct any further examinations or tests to account for their initial failure to find such evidence? Did they call upon the help of any other agency in this critical effort? Were Stanek's current conclusions expressed back then?

Is it similarly possible that a similarly meticulous effort was not made to establish that Tedford's car transported the bloody body of Ms. Revak 54 miles to a remote location in Washington County without leaving any residual evidence of that bloody transport?

Was there seriously no effort made by anyone within the PSP or affiliated crime labs to provide authoritative testimony that the twine found at The Finishing Touch was indeed the murder weapon? Without evidence that a crime occurred in the store, some serious effort to actually establish that the twine was the murder weapon had to have been undertaken to corroborate the repeated attempts by the Commonwealth to suggest that possibility.  TT 9, 11, 36, 41, 47, 113, 292. Was the twine or photographs of it not submitted to any other crime lab or facility for analysis and was there no effort made to confirm whether it was the actual weapon used to cause her death?

Was the testimony of Ermlick that identified hairs and fibers which the Commonwealth tried to tie circumstantially to Tedford and the store not the product of scientific procedures which in 2015 the FBI officially debunked as junk science? Ermlick worked for the FBI as a hair and fiber analyst, TT 225. He likely did use analytical techniques that were consistent with those used by the Bureau at the time.  He was

considered a key witness by the Commonwealth, TT 22-25; 669-684, but did he conduct any other tests he again chose not to disclose?

And finally, in the 46 undisclosed files in the State Police archive gathering of "Suspect" information, is there truly no reference to anyone but Tedford as a possible killer? Was her husband more carefully investigated than disclosed documents would show? Were no other suspects ever considered, particularly when no evidence that a bloody crime occurred at The Finishing Touch was found? Trooper Peters testified that while Tedford was a suspect when he was first interrogated, he was not the only one: "I believe he was a suspect as well as some other individuals possibly." January 26, 1987, Preliminary Hearing at 49. Who were they?

The Pennsylvania State Police should not be considered as an agency guilty of such gross deficiencies in an investigation to have discounted from the outset all other possibilities, rejecting the documentation that could have flowed to them during a thorough investigation that may have suggested another suspect.  They have multiple files called "Suspect" information.  Is it truly possible that the only name in that file is Tedford?

### Ground V(B)(2): THE COMMONWEALTH MANIPULATED EVIDENCE AND PRESENTED INACCURATE EVIDENCE WHICH PREJUDICED TEDFORD.

As discussed, above, the prosecution's suppression of material, exculpatory evidence violates due process.  Likewise, the knowing presentation of false or misleading testimony and the failure to correct unsolicited false or misleading testimony violate due process. Giglio v. United States, 405 U.S. 150, 153-4 (1972). Promises to and "deals" with witnesses are classically exculpatory. Id.; Napue v. Illinois, 360 U.S. 264 (1959). Any

motivation for testifying and any official or unofficial agreements or understandings with witnesses must be disclosed. Id.

This Claim alleges that the Commonwealth withheld evidence of agreements with White and Ferry, and that White and Ferry presented false testimony against him. White and Ferry were fellow inmates of Tedford who both testified that he had made incriminating admissions to them while in jail. TT 378-403, 408-25. Their testimony provided support for the prosecution's otherwise totally insubstantial case against Tedford.

Both Ferry and White denied having received any kind of deal from the authorities in exchange for their testimony. TT 395 (Ferry), TT 417 (White). Tedford, however, proffered facts showing that those denials were false, and that Ferry and White testified falsely in other respects.

Ferry admitted to defense investigator Pamela Tucker that he testified against Mr. Tedford on the basis of a deal, and that Tedford never really confessed to him. See, Exhibit P to Tedford's Supplemental Appendix (Affidavit of Pamela Tucker). Ferry also told another inmate (Timothy Sunday) that he was planning to make up a story about Tedford having confessed to him if he could get a deal in exchange for his testimony. See, Exhibit R to Tedford's Supplemental Appendix. Ferry also gave other false testimony about alleged statements made to him by Tedford. Id.; See, Exhibit Q to Tedford's Supplemental Appendix (Affidavit of David Geibel).

Tedford has also alleged that White's denial of a deal was false. See, Exhibit L, Exhibit Q, Exhibit R and Exhibit S to Tedford's Supplemental Appendix. While it was not brought out at trial, White had serious mental health problems throughout his life that

the prosecution failed to disclose. Id. See also, Exhibit T to Tedford's Supplemental Appendix.

Tedford raised his Brady claim both in the PCRA Petition filed on January 14, 1997, and as Claim X in the Amended Petition filed on August 26, 2002, following remand from the Pennsylvania Supreme Court. Tedford sought an evidentiary hearing on all of the claims in the Amended Petition. On March 13, 2003, the PCRA court granted an evidentiary hearing, apparently with respect to all of the claims in the Amended Petition. Following further briefing, the PCRA court changed course and dismissed all of the claims in the Amended Petition without a hearing, with the exception of Claim XIII, on which the state court held an evidentiary hearing on May 18, 2004.

As discussed throughout this pleading, Title 28, U.S.C. § 2254(e)(2) does not generally prohibit an evidentiary hearing where the petitioner "[sought] an evidentiary hearing in state court in the manner prescribed by state law." Williams v. Taylor, 529 U.S. at 437. Here, Petitioner sought an evidentiary hearing in the PCRA proceedings "in the manner prescribed by state law," but the PCRA court denied the hearing. Under Williams, there is no § 2254(e)(2) bar to a hearing.

The prosecution's failure to disclose the existence of the deals with Ferry and White is a classic violation of Giglio. And the presentation of false testimony from Ferry and White – both with respect to the existence of the deals, and with respect to statements supposedly made by Tedford – is a classic violation of Napue.

The Pennsylvania Supreme Court ruled that the trial record contained denials by Ferry and White of the existence of a deal. Tedford, 960 A.2d at 31. The state court thus utterly ignored Tedford's proffer, which acknowledged that Ferry and White so testified,

132

but contained specific facts including an admission by Ferry that he did have a deal, and other evidence that Ferry and White testified falsely.

For purposes of ruling on a claim that had been denied without a hearing, the Pennsylvania Supreme Court was required to accept Tedford's proffers and allegations as true. Assuming Tedford proved the proffered facts, the state court's decision was unreasonable. Therefore, this Court should hold an evidentiary hearing to determine whether Petitioner is entitled to relief. See Morris v. Thaler, 2011 WL 1886096, *9 & n.1 (5th Cir. May 18, 2011) (unpublished) ("in this case, a hearing is necessary not to evaluate the state court's decision, but to determine whether [petitioner's] allegations are true"); accord Hearn v. Ryan, 2011 WL 1526912, *2 (D. Ariz. Apr. 21, 2011).

The testimony of Ferry and White cannot seriously be held up today as truly significant evidence to confirm a death penalty verdict.

Ferry has recanted and indicated that he told the prosecutor what they wanted to hear based upon information he learned in the public media. In assessing a factual determination that involves an original government witness who has recanted, the Court must consider Fernandes v. Krapa, 916 F.3d 215 (7th Cir., 2019).  There, where a witness recanted, the lower Court's determination that the recanting was unreliable was found to be an improper factual determination as there was no sound reason to disbelieve that recantation.  Id. at 230. Given that there was no plausible reason to discredit it, the state court's rejection of that recanting was deemed to be an unreasonable determination of the facts under 28 U.S.C 2254(d) and the denial of a new trial on that basis was therefore reversed.

Here, Ferry's recanting must be viewed as a significant matter supporting the claim that <u>Brady</u> material exists, demonstrating that the evidence was not of such a nature as to make the multiple errors which occurred here fail to meet the standard of materiality, and supporting Tedford's claim of actual innocence. Ferry had no motive to recant. His story was a careful construction from published reports about the case and taking Stanek's word in his most recent book, the crux of Ferry's trial testimony was wrong since the murder did not occur at The Finishing Touch.

Moreover, the key corroborative testimony offered to support Ferry was given by an investigator who had concluded that Ferry's account was necessarily false since the murder did not happen at The Finishing Touch.

White has admitted that his mental problems have gone on for years and years and Tedford, Tim Sunday and David Geibel, individuals who were incarcerated with White, all confirmed his mental health problems. White also served substantial time in a Pennsylvania institution for those individuals suffering serious mental health problems. His son confirms that. Yet White testified that he had absolutely no deal with the Commonwealth and Ferry testified that he simply hoped for some consideration down the line. As this Court analyzes the question, is it possible that the hundreds of pages of information gathered by the State Police during its investigation contain nothing which could arguably constitute <u>Brady</u> material about the testimony of these two critical witnesses? As the Court contemplates Its own understanding of the criminal justice system and its normal operations, do the following haunting questions not come to mind?

> Is it possible that neither the State Police nor the prosecutors had conversations with White and Ferry in connection with obtaining their testimony in this case?

Did those conversations involve specific promises of benefits that were never disclosed to Tedford's lawyer, which, in White's case were specifically denied on the witness stand?  Ferry indicated that he thought he would get some consideration but never indicated that any specific promise was made to him and yet in his recanted statement he indicated a very specific promise of a limited period of time on one of his upcoming sentencings was to be given. Did the District Attorney truly give these men *no indication of any kind* about a benefit they might receive from testifying?

Is it conceivable that in preparing for a capital murder case the Commonwealth did not have discussions with two jailhouse informants that specifically expressed some form of inducement to them about these matters? Is it possible that Ferry merely hoped for consideration but that no promise was made to him? TT 383, 395. Is it possible that White was not even aware that jailhouse snitches make deals to help themselves? TT 417, 421.

Is it possible that the Commonwealth was totally unaware of White's mental condition and had no indication that he was a psychiatrically unstable individual whose testimony about Tedford was inherently suspect?

Is it possible that State Parole officials did not review records of psychiatric diagnosis and treatment White received that caused his incarceration in a restricted institution for many years and which reflect the longevity of his mental affliction?

Why are there three sections in the currently undisclosed State Police files marked "Psychiatric Information" which contain 28 pages of material when Tedford did not defend upon the basis on a mental illness or defect? About whom was that "psychiatric information" gathered?

These are, by no means, the only questions that an objective view of this record cause to be asked. But they reflect honest and fact-based concerns that go directly to the central issue in a <u>Brady</u> matter: may we have confidence that the correct verdict was reached? That confidence must reach its ultimate level when the action we will take based upon it is an execution.

## <u>GROUND V (B)(3): THE PROSECUTOR IMPROPERLY INJECTED HIS PERSONAL OPINION, VOUCHED FOR THE JAILHOUSE INFORMANT AND SUGGESTED TEDFORD HAD A BURDEN TO HELP THE POLICE.</u>

In paragraphs 178-191 of his initial Habeas petition, Tedford alleged improper vouching by the prosecutor, particularly with respect to calling Trooper Stanek to bolster Ferry's testimony.[47]  Tedford initially argued that Stanek's testimony improperly meant to rebut the cross examination of Ferry regarding his record and pending charges, by suggesting that Ferry provided a key piece to cement the prosecution theory that Tedford transported the victim to the store where he raped and killed her.[48]

While this was improper bolstering, the error is far more pernicious than Tedford first knew.  Now it is clear that the underlying premise of Stanek's testimony, that Ferry helped account for how Revak got to where she was killed at The Finishing Touch, was a conclusion Stanek did not accept at all since Stanek concluded the murder happened elsewhere. His conclusion showed that Ferry's statement was a lie and perhaps manufactured to fit the huge hole in the case that Stanek had pointed out to the prosecutors. See, Supplemental Appendix Exhibit A and Exhibit B.

Improper vouching occurs when a prosecutor argues or offers evidence to assure the jury that a witness is telling the truth and bases that assurance either on his own belief or on evidence outside the record. United States v. Young, 470 U.S. 1, 18-19 (1985); United States v. Walker 990 F.3d 316, 323 (3d. Cir 2021). Defense counsel's failure to object to improper vouching may be ineffective assistance leading to a finding of prejudice and a new trial.  Jordan v. Hepp, 831 F.3d 837, 847 (7th. Cir 2016)(reversing conviction).  The

---

[47] Most of Tedford's original habeas corpus claim was fairly presented to the Pennsylvania courts in the PCRA proceedings. See PCRA Initial Brief at 64-72. Comments by the prosecutor made at the close of Mr. Tedford's direct testimony and, after a recess, prior to cross-examination, were fairly presented on direct appeal. See Direct Appeal Brief, at 31-34.

[48] Although the witnesses were sequestered, the Commonwealth explained that it had received permission from defense counsel to allow police witnesses to remain in the courtroom after giving their respective testimony. Trial counsel, however, was under the false impression that those officers who remained in the courtroom would not then be recalled to the stand. TT 429-33.

prosecution's duty in a criminal prosecution "is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935). As part of this duty to see that justice is done, the prosecutor has a special duty to avoid improper argument to the jury. Because of the prosecutor's prominent courtroom role as the Commonwealth's representative -- and the mantle of respect and authority this creates in the eyes of the jury -- the jurors are predisposed to give great deference to the prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight against the accused when they should properly carry none." Id.

Here, the bolstering evidence was far worse than just the prosecutor's opinion or some fact outside the record. What Stanek did was to testify in a matter which betrayed the critical conclusion he reached based on his investigation. He rejected the idea that Ms. Revak was killed at the store. But his testimony, which bolstered Ferry's, was used to confirm the Commonwealth theory of the case which neither the physical evidence nor Stanek supported. It vastly compounded the Brady violation which was ongoing. The issue of serious prosecutorial misconduct is clearly present in this case and demands a new trial.

And, as was previously submitted, even without considering the recently presented information concerning Stanek's conclusion that Ms. Revak was not murdered in The Finishing Touch, Stanek's testimony was inadmissible. While Ferry had been impeached by trial counsel during cross examination and thus the Commonwealth could have rehabilitated him as a witness, the presentation of Stanek's testimony did something else entirely: it told the jury that the prosecution and (falsely) the police vouched for Ferry's honesty.

The prejudicial effect of this improper bolstering of the Commonwealth's star witness and of the investigation conducted by the police is clear. This was a case built on circumstantial evidence and the prosecutor should not have been permitted to vouch for the police investigation into the crime by explaining to the jury the extent to which the police had put a great deal of time and effort building the case that Tedford committed this murder. That was tantamount to saying (especially in hindsight) that the police had conducted a thorough investigation that had ruled James Revak and everyone else out as a suspect when that was false.

In this regard, Stanek's explanation as to why Ferry's account was believable is particularly problematic as Ferry's "information" could have been invented by anyone who had read newspaper accounts of the crime and knew that this detail had to be accounted for in order for any purported "confession" by Tedford to hang together.

Tedford was prejudiced in extreme fashion by Stanek's bolstering testimony and on this basis, Tedford should receive relief. The calling of Trooper Stanek was not the only instance of improper vouching in this case, however.

The prosecutors in this case engaged in additional misconduct when they: 1) impermissibly suggested during opening statements that the defense had the burden of persuasion; 2) maligned the defense for receiving and reviewing mandatory discovery materials; 3) improperly commented on Tedford's testimony at trial, telling the jury that the testimony was inconsistent with previous answers Tedford had given when questioned, and then later commented on Tedford's post-arrest silence, telling the jury that Mr. Tedford had "made no effort to help the police" (TT 673); and 4) vouched for the integrity of the Commonwealth's case.

The prosecution has the burden, in a criminal case, to prove every element of the crime beyond a reasonable doubt. In re Winship, 397 U.S. 358 (1970). In turn, the accused has the affirmative right, under both the federal and state constitutions, to remain silent at his criminal trial, putting the prosecution to its burden without offering a word or shred of evidence in his own defense. Gilbert v. California, 388 U.S. 263 (1967); Griffin v. California, 380 U.S. 609, 615 (1965). The prosecution may not comment or draw the jury's attention to a defendant's post-arrest choice to assert his Fifth Amendment rights. Doyle v. Ohio, 426 U.S. 610 (1976).

To decide whether Tedford is entitled to relief, a two-pronged analysis of the prosecutor's statements is used. First, this Court is to determine whether the comment offended the Fifth Amendment by insinuating improperly that the Commonwealth utilized Tedford's silence as evidence of guilt. Griffin, 380 U.S. at 615. Next, the Court is to determine whether the comments had a "substantial and injurious effect or influence in determining the jury's verdict" such that reversal is warranted. Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

In Lesko v. Lehman, 925 F.2d 1527, 1544-1545 (3d Cir. 1991), the prosecutor at the penalty phase of a death penalty murder case asked the jury to consider Lesko's "arrogance" in taking the "witness stand" to present mitigating evidence about his background without even having the "common decency to say I'm sorry for what I did." The prosecutor then parodied Lesko's testimony: "I don't want you to put me to death, but I'm not even going to say that I'm sorry."

The Third Circuit concluded the prosecutor's remarks violated Lesko's Fifth Amendment rights and issued a writ of habeas corpus, concluding that "the natural and

necessary interpretation of these comments would be that Lesko had a moral or legal obligation to address the charges against him--indeed, to apologize for his crimes--during his penalty phase testimony, and that the jury could and should punish him for his failure to do so." Id.  See also, United States v. Preston, 873 F.3d 829, 843 (9th Cir. 2017).

As in Lesko, prosecutorial misconduct was evident here. In his opening statement, the prosecutor impermissibly gave the jury the impression that Tedford had a burden of proving his innocence and commented on Mr. Tedford's right to remain silent, when he stated that:

> So I ask you to listen as closely as you can to the evidence. All the evidence, both the Commonwealth evidence and the defense evidence.

TT 29.  The defense immediately objected to this inflammatory comment and requested a mistrial but the trial court denied the motion. TT at 29-31.

In addition, following Tedford's direct testimony during which he explained that he had been having an affair with Jeanine Revak, District Attorney Cook threw up his hands with dramatic flourish and asked for a recess because he had never before heard such a statement from Mr. Tedford.[49] When cross-examination began, following the 10-minute recess the court granted, Mr. Cook opened his questioning by saying:

> Mr. Tedford, I'm going to have to take some time since this is the first time you had ever told anybody that you knew Jeanine ....

TT 555.

---

[49] The exact language the prosecutor used was never transcribed. See Direct Appeal Brief at 32.

The purpose of the prosecutor's misconduct was as obvious as it was pernicious: to impeach Tedford and discredit his defense by dramatically insinuating that the claim that Tedford was having an ongoing affair with Ms. Revak was not a true version of the events because Tedford had not previously detailed his sexual relationship with Ms. Revak to the police.

Compounding this misconduct, the prosecutor made egregiously improper comments at closing argument.  First, he commented improperly on the fact that the defense had obtained discovery prior to trial and had reviewed those discovery materials, as if, by doing so, the defense had done something wrong. That, of course, is not the case and it was dramatically untrue as it is now known that over half the discovery that was generated in this case was never disclosed to Tedford.  In the second instance, the disclosure and review of discovery materials is part of the orderly process in the adversarial system and it is not a matter at which a defendant can ever be properly impeached.

The prosecutor then compounded the error at the close of the guilt stage of the trial:

The evidence the defendant heard was no surprise. The defense had all the police records in this case. You perhaps noticed the slip of the tongue the defendant made today when Mr. Cook was asking him a question about something. Did he remember something or the other?

He said: Well, I'm not sure if I know that from my memory or from reading a police report.

That gives you an understanding of exactly what happens with this case.

Defendant's testimony yesterday was designed to weave its way through the evidence. He had all the evidence. He knew what the Commonwealth had and what it didn't. He attempted yet to weave his way through the evidence explaining away what we proved and ignoring what we could not prove.

TT 669-70.

Thus, the prosecutor equated the orderly process of the adversarial system -- i.e., discovery -- and the required review of discovery materials by Tedford and his attorney, with the idea that the defense had presented a fabricated case because it was familiar with those very discovery materials. Such an assertion is impermissible, and violated Tedford's rights to due process and a fair trial.

By singling out Tedford's case as somehow different from the universe of all others ("[t]hat gives you an understanding of exactly what happens with this case"), the prosecutor only amplified this improper assertion and the extent of his own prosecutorial misconduct.[50]

Then, the prosecutor told the jury in closing that Mr. Tedford had "made no effort to help the police." This was a clear comment on Mr. Tedford's exercise of his constitutional right to silence and suggests further that Mr. Tedford, as a suspect accused of murder, had some affirmative obligation which he had abrogated to help the police solve this crime. This was a clear violation of the principles set forth in Doyle.

The prosecutor's efforts violated Mr. Tedford's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The prosecutor then engaged in additional misconduct when he impermissibly vouched for the credibility of the Commonwealth's case:

> The defendant has made no effort to try to help the police with their investigation .... You have seen how much time and effort the police had put in this case.

TT 673.

---

[50] Trial counsel was ineffective for failing to make a contemporaneous objection to this prosecutorial misconduct. Appellate counsel was ineffective for failing to raise the issue on direct appeal.

This comment served to tell the jury that it could trust the Commonwealth's case against Mr. Tedford, simply because the police had supposedly worked hard on the case. This message was amplified by the prosecutor's contrast between the "time and effort" of the police and Tedford's apparent lack of cooperation with the authorities. Both instances of bolstering were improper and so highly prejudicial that they undermine the confidence one can have in the jury's determination of guilt in this case.

Trial counsel has an obligation to object to improper prosecutorial statements and comments. To the extent that trial counsel failed to object to the comments and statements set forth above, counsel was ineffective under Strickland. See also, Witherspoon v. Stonebreaker 30 F.4th 381, *30-33 (4th Cir. 2022) (granting habeas).

Appellate counsel was likewise ineffective for failing to raise and litigate these issues properly in post-verdict motions and on direct appeal.

**GROUND V(B)(4).   TEDFORD'S TRIAL WAS RENDERED FUNDAMENTALLY UNFAIR UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION WHEN THE COURT PERMITTED THE COMMONWEALTH TO INTRODUCE UNDULY PREJUDICIAL VICTIM-IMPACT EVIDENCE DURING HIS TRIAL.**

Victim impact evidence admitted at Tedford's trial served no function other than to villainize Tedford in the eyes of a jury that was already predisposed against him and its admission transcended the due process protections to which he was otherwise entitled. Habeas Corpus relief should be granted as the admission of this evidence violated Tedford's rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.[51]

---

[51] This claim was fairly presented to the Pennsylvania courts in the PCRA proceedings. See, Tedford's initial PCRA Brief at 61-64.

During the guilt phase of Tedford's trial, the Commonwealth elicited facts about Jeanine Revak's popularity in school from her husband:

> Q.     I understand your wife was the home-coming queen? [in high school].
>
> A.     Yes, she was.

TT 158.

Tedford's objection to this highly improper testimony was overruled, the trial court, instructing the Commonwealth only not to "overdo it." Id.

Nevertheless, the Commonwealth then attempted to introduce a photograph of Ms. Revak in order to demonstrate how pretty she was. While this was ultimately unsuccessful, the transcript clearly reveals that a photograph of Revak was in the courtroom and was seen by jurors. See, TT 159 (statement by defense counsel that "[i]t appears now that [the Prosecutor] is attempting to introduce the photograph of Jeanine Revak" and the Commonwealth statement that it was attempting to introduce the photograph to demonstrate a motive for the rape.) TT 160.

Later, the Commonwealth admitted that the photograph would be used for impermissible means as the jury had only seen crime scene photos of the victim:

> The Court:     I am ruling that they can bring it [evidence concerning Revak's looks] out through testimony but I am not admitting the picture.
>
> Prosecutor:     We do want to make her look like a human being and not something else.

TT 164.

In the end, the Commonwealth accomplished its goal and successfully introduced prejudicial and inflammatory victim-impact testimony concerning Ms. Revak's looks. James Revak testified on direct examination:

> Q:   Mr. Revak, would you describe your wife to us, please[?], her physical description?
>
> A:   She was around five six, five seven, brown hair, brown eyes, and she was beautiful in my opinion.
>
> Q: And everyone else's?
>
> A:   Very much so.

TT 164.

The testimony was plainly irrelevant, inflammatory, and prejudicial. The testimony about Ms. Revak's looks and the fact that she was popular in high school was nothing but impermissible victim impact testimony. The issue before the jury was whether Tedford was guilty of the crimes with which he had been charged, not whether Tedford was guilty because of the looks and popularity of the decedent.

Victim-impact testimony was plainly inadmissible under the Pennsylvania capital sentencing code in effect at the time of Mr. Tedford's trial in February 1987.  See, Title 42 Pa. C.S. § 971; Commonwealth v. Fisher, 681 A.2d 130, 145-48 (Pa. 1996); Commonwealth v. McNeil, 679 A.2d 1253, 1259-60 (1996).[52]

In Fisher, the Court carefully explored the effect of the United States Supreme Court's 1991 decision in Payne v. Tennessee, 501 U.S. 808 (1991), on the admissibility of victim impact testimony in Pennsylvania under the statute applicable to Mr. Tedford's trial.

_____

[52] The capital-sentencing code was amended in 1995. 42 PA. C.S. § 9711(a) (Supp. 1996). Prior to the amendments, however, victim impact testimony was plainly inadmissible. Fisher, 681 A.2d at 145-48.

145

The Court made clear that nothing in <u>Payne</u> changed Pennsylvania's rules of admissibility concerning victim-impact evidence. <u>Fisher</u>, 681 A.2d at 146. The Court determined that victim impact evidence and argument "is not a legitimate factor on which a sentence of death can be based." <u>Id</u>. at 148; see also <u>McNeil</u>, 679 A.2d at 1259. Such improper victim-impact testimony includes statements concerning the qualities and personal characteristics of the victim, <u>McNeil</u>, 679 A.2d at 1259 n.11, and testimony concerning "[t]he impact of the victim's death on society and h[is] family. <u>Fisher</u>, 681 A.2d at 148.

The Commonwealth's attempted to add to this issue -- by implicitly telling the jury that this crime was somehow worse because the victim was popular and pretty -- is in direct conflict with the dictates of governing Pennsylvania law at the time per <u>McNeil</u> and <u>Fisher</u>. At its core, this testimony violated Mr. Tedford's right to a fundamentally fair proceeding.

While the United States Supreme Court has held that the introduction of victim impact evidence *during the sentencing phase of a capital trial* is permissible, "in the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process of the Fourteenth Amendment provides a mechanism for relief. See <u>Darden v. Wainright</u>, 477 U.S. 168, 179-183, 106 S.Ct. 2464, 2470-2472, 91 L.Ed.2d 144 (1986)." <u>Payne v. Tennessee</u>, 501 U.S. 808, 825 (1991). See also, <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-70 (1991); <u>Lisenba v. California</u>, 314 U.S. 219, 228-29, (1941); <u>Berger v. United States</u>, 295 U.S. 78, 89 (1935).

While acknowledging that motive was not an element of the crime of rape, the Pennsylvania Supreme Court concluded that there was no error in the admission of this testimony and no error in counsel's efforts to challenge it as Ms. Revak's attractiveness was admissible as it was relevant to Tedford's motive to have committed the crime: "The

victim of a murder is not merely a prop, and references to her humanity are not inherently and unfairly prejudicial." Tedford, 960 A.2d at 41-42.

This finding is more than dubious. Women are not raped because they are beautiful. The testimony here had no legitimate logical connection to relevance but was elicited by the solely to create an emotional reaction in the jurors. TT 160. Essentially, the Commonwealth wanted to have the jury react viscerally to hold someone accountable for a crime against a pretty young woman.

The Supreme Court of Pennsylvania unreasonably failed to ascribe to this evidence its true nature. Trial counsel was ineffective under Strickland for failing to properly raise and litigate these issues properly pre-trial, at trial, and/or in post verdict motions. Appellate counsel was likewise ineffective for failing to raise and litigate these issues properly in post verdict motions and on direct appeal. Because this claim presents clear constitutional error and is well supported by United States Supreme Court authority, appellate counsel could not, and did not, have a reasonable strategic reason for failing to raise this claim.

**GROUND V(B)(5). TEDFORD'S CONVICTION MUST BE VACATED BECAUSE THE TRIAL COURT TOLD THE JURY THAT IT COULD CONSIDER TEDFORD'S STATUS ON WORK RELEASE IN JUDGING HIS CREDIBILITY IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

At the guilt stage closing, the trial court instructed the jury that:

> There was evidence tending to prove that the defendant was on work release. I'm speaking of the evidence introduced by the Commonwealth and the testimony of the defendant as to the defendant's work release from Greensburg. This evidence is not evidence of the defendant's guilt. You must not infer guilt from the evidence of work release. This evidence may be considered by you for one purpose only, that is, to **help you judge the credibility and weight of the testimony given by the defendant** as a witness at this trial.

TT 749-750 (emphasis added).

While the fact of Mr. Tedford's work release was introduced as evidence during the guilt phase of the trial, the Court's instruction was clear legal error as his work release status had nothing to do with his credibility as a witness.

A criminal defendant has a right to testify in their own defense under the Due Process Clause of the Fourteenth Amendment, the Compulsory Process Clause of the Sixth Amendment and the Fifth Amendment's privilege against self-incrimination.  Rock v. Arkansas, 484 U.S. 44, 51-53 (1987); see also, Ferguson v. Georgia, 365 U.S. 570, 573-582 (1961); Faretta v. California, 422 U.S. 806, 819 (1975); Washington v. Texas, 388 U.S. 14 (1967).

It cannot be lost how critical an assessment of credibility was at trial.  The trial was a contest between two competing versions of what happened on January 10, 1986 at The Finishing Touch. This was either a situation where Ms. Revak rebuffed Tedford's sexual advances and he raped and murdered her there or this was a situation where a young woman met up with a slightly older man whom many women were much attracted to, had a sexual episode as part of an ongoing sexual relationship, and left the store. The resolution of this question required a proper weighing of the Commonwealth's evidence as well as Tedford's trial testimony and it should not have been impermissibly polluted by the jury being told that *Tedford's credibility and the weight of his testimony should be judged based on his work release status*.

Consistent with the proper weighing of this question, Pennsylvania's Criminal Jury Instructions provided a wide variety of factors that the jury could permissibly consider

when weighing the defendant's credibility.[53]   Those factors do not include a defendant's work release status or anything akin to it.   Perhaps even worse, the trial court's instruction had the natural side effect of encouraging the jurors to speculate why Tedford was on work release and contemplate his propensity to commit another criminal offense *at the guilt phase* of the trial.

This instruction was error and it served to violate Tedford's rights to a fair and impartial trial.[54]   The Pennsylvania Supreme Court somehow concluded that the instruction was favorable to Tedford as it narrowed the consideration of the evidence and that Tedford's work release status was relevant to his credibility.   Tedford, 960 A.2d at 37.

This decision was an unreasonable determination of the law and the facts at issue. While not quite the same as race, gender, age or religious affiliation, Tedford's work release status was nothing but a legal classification at the time the offense was committed and that classification cannot logically be linked to his credibility and the "weight" of his exculpatory testimony.

Work release status, much like immigration status, is irrelevant as to matters of witness credibility. See, Solis v. SCA Restaurant Corp., 938 F. Supp. 2d 380, 401 n.11 (E.D.N.Y. 2013) (noting that "immigration status was irrelevant to issues in the case and not probative on the issue of the credibility of the witnesses"); Velasquez v. Centrome,

---

[53] Under Pennsylvania law, the trial court may instruct -- and the jury may consider - - that a determination of the defendant's credibility as a witness can be based on his interest; prior convictions concerning truth and veracity; and motive. See generally Pennsylvania Criminal Jury Instructions (April 1991 Supp.) § 3.09. Pennsylvania law further instructs that evidence of a defendant's previous convictions is generally inadmissible in a criminal case, because of the danger that such evidence will be used to show propensity or that the defendant is a "bad person." See, generally Packel & Poulin, Pennsylvania Evidence §§ 405, 405.2 (1987 & 1996 Supp.).

[54] This claim was fairly presented to the Pennsylvania courts in the PCRA proceedings. See, e.g. Tedford's Initial PCRA Brief at 73-75.

Inc., 183 Cal. Rptr. 3d 150, 168 (Cal. Ct. App. 2015) ("[I]mmigration status alone has no tendency in reason to prove or disprove any fact material to the issue of a party's credibility.");  Ayala v. Lee, 81 A.3d 584, 598 (Md. Ct. Spec. App. 2013) ("Immigration status alone does not reflect upon an individual's character and is thus not admissible for impeachment purposes.");  see also Figeroa v. INS, 886 F.2d 76, 79 (4th Cir. 1989) ("An individual's status as an alien, legal or otherwise … does not entitle the Board [of Immigration Appeals] to brand him a liar.").

And the use of such extraneous status evidence raises the clear specter of evidence unfairly prejudicial to a defendant. Courts have highlighted the prejudicial effect of such evidence. See, e.g., Andrade v. Walgreens–OptionCare, Inc., 784 F. Supp. 2d 533, 535 (E.D. Pa. 2011);  Escamilla v. Shiel Sexton Co., 73 N.E.3d 663, 675 (Ind. 2017);  TXI Transp. Co. v. Hughes, 306 S.W.3d 230, 244 (Tex. 2010);  Salas v. Hi–Tech Erectors, 230 P.3d 583, 587 (Wash. 2010;  Gonzalez v. City of Franklin, 403 N.W.2d 747, 760 (Wis. 1987);  Sandoval v. State, 442 S.E.2d 746, 747 (Ga. 1994) (noting that "an appeal to prejudice is improper in a court of justice"); State v. Sanchez-Medina, 176 A.3d 788 (N.J. 2018); Serrano v. Underground Utilities Corp., 407 N.J. Super. 253, 258-274 (App. Div. 2009).

The same reason why immigration status evidence is prejudicial to a proper determination of a defendant's credibility mandate that the court's work release credibility instruction be found to be legal error fatally impinging on Tedford's credibility at trial here.

Trial counsel was ineffective under Strickland for failing to raise and litigate this issue properly pre-trial, at trial, and/or in post verdict motions. Appellate counsel was

likewise ineffective for failing to raise and litigate these issues properly in post verdict motions and on direct appeal.

Tedford's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated by the admission of this evidence and habeas corpus relief should issue.

**GROUND V(C)(1). TEDFORD WAS DENIED HIS RIGHTS TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL AND A MEANINGFUL APPEAL OF HIS CONVICTION AS THE RESULT OF NUMEROUS AND SUBSTANTIAL ALTERATIONS TO AND OMISSIONS FROM THE TRANSCRIPTS OF THE PRELIMINARY HEARING, SUPPRESSION HEARING, JUROR SELECTION, TRIAL AND EVIDENTIARY HEARING.**[55]

A. Introduction.

Since receiving his transcripts of the trial late in 1987, Tedford has strenuously and painstakingly attempted to document how the transcripts of the trial and other proceedings were altered and/or are inaccurate in significant respects that prejudiced his ability to obtain appropriate relief from the judgment of sentence and conviction at issue.[56]

That effort was significantly enhanced when prior counsel located the audiotapes of the trial proceedings and the review of these matters confirmed that there were in fact

---

[55] This claim was fairly presented to the Pennsylvania courts in PCRA proceedings. See, PCRA Initial Brief at 22-38.

[56] Post-trial counsel for Tedford first raised an issue concerning the transcripts on February 9, 1988, after the conclusion of the evidentiary hearing. Tedford subsequently filed pro se pleadings – which the trial court accepted – requesting inter alia a hearing on the transcript allegations. The trial court thereafter made a few alterations to the transcripts, but rejected all of the other counseled and pro-se objections, and sub silentio denied the request for a hearing to correct the transcript. See, the March 29, 1988 Order. Appellate counsel did not raise the issue on direct appeal.

problems with the transcripts and additional issues were also raised about the possible editing of the audiotapes.[57] [58] See, <u>Tedford</u>, 960 A.2d at 23.

During his recent return to the Pennsylvania Court system after this matter was stayed, Tedford meticulously went through the audiotapes at issue and supplied the Court of Common Pleas of Beaver County with a parallel transcript which he believed, in good faith, to be a more accurate rendering of the trial transcript in this matter.  A copy of the parallel transcript (2 volumes) is included in Tedford's Supplemental Appendix as <u>Exhibit EE</u>.

Based on the foregoing, testimony in this case appears to have been substantially and significantly altered in the official typewritten transcripts and records of the preliminary hearing, suppression hearing, selection of jurors, jury trial, sentencing, and post-verdict motion evidentiary hearing.  Evidence of alterations includes affidavits of spectators and witnesses who remember testimony which has been altered and or deleted. See, <u>Appendix A</u> of the Appendix to Tedford's original petition for habeas corpus, and <u>Exhibits A</u> through <u>M</u> attached thereto, Document No. 26 at 3-53.  In addition, anomalies heard in the audio-recordings suggest that the tapes themselves may have been edited.[59]

---

[57] The Capital Habeas Unit of the Philadelphia Federal Defender's Office obtained the audiotapes of the trial proceedings in connection with its representation of Tedford and raised the claim presented here both in the PCRA Petition filed on January 14, 1997, and as Claim II in the Amended Petition filed on August 26, 2002, following remand from the Pennsylvania Supreme Court.  Tedford also sought an evidentiary hearing on all of the claims in his Amended Petition. On March 13, 2003, the PCRA court granted an evidentiary hearing, apparently with respect to all of the claims in the Amended Petition.  Following further briefing, however, the PCRA court changed course and dismissed all of the claims in the Amended Petition without a hearing, with the exception of Claim XIII, on which the state court held an evidentiary hearing on May 18, 2004.

[58] During his recent sojourn back to the Pennsylvania courts, the original audio tapes of the trial were reproduced into cd format (16 cds) and made a part of the record.  The original audio tapes (or copies thereof), however, were also previously filed with the trial court on or about August 5, 1999.  See, Exhibit C to Petitioner's Consolidated Response to the Court's Order and Notice of Intent to Dismiss PCRA Petition. Butler County Docket 136.

[59] The issue of transcript alterations would not be unique to the Tedford case.  See, e.g. <u>Commonwealth v. Dougherty</u>, 18 A.3d 1095, 1096 (Pa. 2011) (concurring statement  of Justice Baer) ("The alteration of the transcript, however, is another matter.  Litigants and the appellate courts alike have but one vehicle through

The alterations of testimony prevent a fair review and assessment of Tedford's conviction and sentence, thus denying him meaningful appellate review. Many of the alterations appear to work to strengthen the Commonwealth's case by quelling information and testimony favorable to the defense and nullifying evidence of trial counsel's failings. All aspects of appellate review, and particularly review of ineffective assistance of counsel claims, hinge on an evaluation made in light of the totality of the evidence admitted at the trial. That is, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by [counsel's] errors than one with overwhelming support." Strickland v. Washington, 466 U.S. 668, 696 (1984). The inaccurately memorialized testimony in this case thus goes to create the false impression of support in the record for counsel's performance when an accurate rendition of the record would suggest otherwise.[60]

B.  Examples of Alterations, Edits, and Deletions of Testimony

(1) Objections by trial counsel.

At trial, Assistant District Attorney Hepting asked Trooper Stanek what the police were trying to achieve by checking bus stations. Trial counsel objected:

Audio Recorded Testimony

Q:	Officer, by checking the bus stations and that sort of thing, what were you trying to determine?  What was the problem you were trying to deal with?

A:	Well, the victim's car was, I believe, **_eight and about_** eight-tenths of a mile from the scene of The Finishing Touch.  And at this point we could never figure out how the car wound up that far from where she felt, or where we

---

which to examine a trial court's proceedings for potential irregularities:  the certified record.  Therefore, to alter a record is to strike at the very pillars of meaningful appellate review, and concomitantly therewith, the basic tenets of due process.  Thus, it is my opinion that a judge's extraordinary action in altering the official record of judicial proceedings, regardless of any protested justification, should precipitate serious repercussions).

[60] On July 9, 2003, Tedford's PCRA counsel filed a Motion for Funds for Expert Services and requested the audio-tapes and tape recorder for forensic analysis.  Butler County Docket 182B.  The PCRA court denied the application.  Butler County Docket 193.  See also, Tedford, 960 A.2d at 23.

felt she was, and all we were trying to determine was, was the car first at
The Finishing Touch and taken to this mall or did somebody take the car
**there** and perhaps have to catch transportation back to the Cranberry area.
**That's** all that we were trying to determine.

MR. SCHWARTZ:    I object to the response to that question.  It is **purely**
^61 without any probative value to the issues in this
case and move **that** it be stricken from the record.

THE COURT: MR. HEPTING?

MR. HEPTING:    The trooper explained precisely meaningful
questions that defense counsel was asking and not
allowed to explain **in detail**.  Defense counsel was
asking what was the puzzle?

MR. SCHWARTZ:    We clearly know what the puzzle was.  The puzzle
was the piece that Mr. Ferry supposedly told the
trooper **that's** not in the affidavit.  That question ¬62
**T**hat answer has nothing to do with that, Your Honor.


Trial Transcript

Q:    Officer, by checking the bus stations and that sort of thing, what were you
trying to determine?  What was the problem you were trying to deal with?

A:    Well, the victim's car was, I believe eight-tenths of a mile from the scene
of The Finishing Touch.  And at this point we could never figure out how
the car wound up that far from where she felt, or where we felt she was, and
all we were trying to determine was, was the car first at The Finishing Touch
and taken to this mall or did somebody take the car and perhaps have to
catch transportation back to the Cranberry area.  All that we were trying to
determine.

MR. SCHWARTZ:    I object to the response to that question.  It is without
any probative value to the issue in this case and move
it be stricken from the record.

THE COURT: MR. HEPTING.

MR. HEPTING:    The trooper explained precisely meaningful
questions that defense counsel was asking and not

---

61 The symbol "^" represents recognizable sounds which strongly suggest editing in the audio-recordings/.
Words in bold print and underlined are substituted or omitted in the Trial Transcript.
62 The symbol "¬" represents anomalies of sound in the audio-tapes which may indicate editing.

|  | allowed to explain.  Defense counsel was asking what was the puzzle. |
|---|---|
| MR. SCHWARTZ: | We clearly know what the puzzle was.  The puzzle was this piece that Mr. Ferry supposedly told the trooper s not in the affidavit.  That question that answer has nothing to do with that, Your Honor. |

PT 385-386 (TT 437-439).  Trial counsel's remark, "it is **purely**", appears to be cut short by an edit in the audio-recording.  The word does not appear in the transcript and whatever objection counsel made has been lost.  The potentially significant phrase, "in detail", is likewise omitted in the Trial Transcript.[63]

The Commonwealth recalled Robert Sosso who had contacted Dr. McCormick, Tedford's alibi witness, to inquire whether Dr. McCormick might have been mistaken about the day and time that Tedford visited Dr. McCormick's home.  Trial counsel objected to Mr. Sosso's answer to one of District Attorney Cook's questions:

Audio-Recorded Testimony

| A: | I told Tim that – **that um** – **Well**, I talked to  Officer Stanek and he said they could place Don somewhere other than **where** he was saying that he was that evening.  And I told him that, you know, if he didn't know for sure where he was, he should tell the truth. |
|---|---|
| MR. SCHWARTZ: | I object. It's irrelevant what Mr. Sosso may have told Doctor McCormick. |
| MR. COOK: | I don't believe so.  **Your Honor**.  **I believe it's** very relevant. |
| MR. SCHWARTZ: | **In what respect**?  **H**ow is **it** relevant? |
| MR. COOK: | Because he **said he's going to** get an answer from Doctor McCormick.  **W**ho was a witness in this case.  **W**ho testified. |

---

[63] Trial counsel did not ask Trooper Stanek about modes of transportation and the witness answered "in detail" under Mr. Hepting's earlier questioning.  See, PT 382-384.  It appears that part of this objection is misplaced and possibly transposed from somewhere else.

155

| | |
|---|---|
| MR. SCHWARTZ: | **Fine**.  There's no problem with that.  I'm concerned with what Doctor McCormick may have said, not what --- ^--- in this witness's mind, Your Honor. |
| MR. COOK: | **What it** ^ What he said is not in his mind, **It's** what he said, **Your Honor**. |
| THE COURT: | What he said to Doctor McCormick? |
| MR. COOK: | **Yeah**. |
| THE COURT: | Objection overruled. |

Trial Transcript


A:    I told Tim that I talked to Officer Stanek and he said they could place Don somewhere other than he was saying that he was that evening. And I told him that, you know, if he didn't know for sure where he was, he should tell the truth.

| | |
|---|---|
| MR. SCHWARTZ: | I object. It's irrelevant what Mr. Sosso may have told Doctor McCormick. |
| MR. COOK: | I don't believe so.  It is very relevant. |
| MR. SCHWARTZ: | **What he said**, how is **that** relevant? |
| MR. COOK: | Because he **at least would** get an answer from Doctor McCormick who was a witness in this case, who testified. |
| MR. SCHWARTZ: | There's no problem with that.  I'm concerned with what Doctor McCormick may have said, not what **is** in this witness's mind, Your Honor. |
| MR. COOK: | What he said is not in his mind.  **It is** what he said to him. |
| THE COURT: | What he said to Doctor McCormick? |
| MR. COOK: | Yes. |
| THE COURT: | Objection overruled. |

PT 585-586 (TT 634-635).

The objection was an exchange between trial counsel and District Attorney Cook, but that is not how it is represented in the Trial Transcript. Words and phrases which change the tone of the discussion are substituted. Also, sounds which suggest editing are heard in the audio-recording, and related words and phrases immediately before or after the sound of editing are not present in the Trial Transcript.

Commonwealth witness Bob Sosso did not say he told Dr. McCormick that he talked to Trooper Stanek. The trial transcript, however, makes it appear that Mr. Sosso did inform Dr. McCormick that he did talk to Trooper Stanek. Next is the District Attorney's statement that ""[Sosso] said he's going to get an answer from Doctor McCormick" being changed to "he at least would get an answer from Doctor McCormick", thereby changing the substance and meaning of the remark. Those two alterations work to conceal the fact that after talking to Trooper Stanek, Mr. Sosso was "going to get an answer) for him. By seeking information from Doctor McCormick about Tedford's alibi at the behest of Trooper Stanek, Sosso was acting as an agent of the prosecution. But he did not inform Doctor McCormick. A viable claim based on these facts could not be raised on appeal as a result of these alterations. See, Commonwealth v. Albrecht, 720 A.2d 693, 701 (Pa. 1998) ("To be entitled to relief due to the incompleteness of the trial record the defendant must make some potentially meritorious challenge which cannot be adequately reviewed due to the deficiency in the transcript.").

The alterations found in the above objections prevented the appellate courts and Tedford's appellate counsel, who was not trial counsel, from knowing the truth of the objections. The altered testimony deprived the courts of information and facts needed to

adequately assess the objections, and determine whether the trial court's rulings were proper.

(2) Interruptions and disruptions of testimony.

Throughout the trial, and especially during the defense phase of the trial, District Attorney Cook interrupted the questioning of witnesses by trial counsel.  The result was confusion amongst jurors and witnesses and the disruption of the trial proceedings.  Most of these interruptions have been minimized in the Trial Transcript or have been deleted entirely but a few remain.

One disruption is particularly telling.  In cross examination, District Attorney Cook asked Doctor McCormick about Bob Sosso's claim that he was told by Tedford that he had visited Doctor McCormick's home on Thursday evening, January 9, 1986 rather than Frida evening, which was Tedford's alibi.  On redirect, trial counsel attempted to clarify the day and District Attorney Cook interrupted:

(Cross examination by District Attorney Cook)

<u>Audio Recorded Testimony</u>

Q:   Could   you   have   told   Bob   on   one   or   two   days,   three   or four days later, **that** it could have been Thursday night **he was there**, not Friday ………………………………… (possible muting)………………………..[64]

A:   No, I never said that.

Q:   You never said that.

A:   No, I did not make ^ have a conversation with Bob to that effect.


<u>Trial Transcript</u>

---

[64] Forensic audio enhancement of the recordings may pull up testimony which has been muted and reveal additional errors.

158

Q:   Could you have told Bob on one or two days, three or four days later, it could have been Thursday night **and** not Friday ?

A:   No, I never said that.

Q:   You never said that?

A:   No, **no** I did not make **or** have a conversation with Bob to that effect.

* * *

(Redirect Examination by Attorney Schwartz)

<u>Audio-Recorded Testimony</u>

Q:   That would have been Thursday, the day you had this phone conversation with Don.

A:   Correct, **<u>none</u>**.

Q:   Now, you were asked about ¬ whether you ever told Bob Sosso that Don had been at your house on Thursday night. Had he been?

A:   I don't believe so.

MR. COOK:          Your Honor, **<u>excuse me</u>**.  I don't like to interrupt or object, but that wasn't what I asked him.

MR. SCHWARTZ:   Sorry. That's why I'm trying to clarify it in the record.

MR. COOK:          That's not what I asked him.

MR. SCHWARTZ:    What did you ask him?

MR. COOK:          I asked **<u>him did</u>** he ever did tell Bob Sosso **<u>that</u>** it could have been Thursday **<u>instead of</u>** Friday.  **<u>That's all.</u>**

MR. SCHWARTZ:   Well, okay—

MR. COOK:          **<u>Not whether he was there</u>**.

Q:   So the question is whether you ever told Bob Sosso that Don had been at your house on Thursday night and not Friday night?

MR. COOK:          No, no.  That's not the question. The question is whether he could have told him.  Not whether he did.  Whether he could have told Bob that **it** could have been Thursday rather than Friday …(muted)…………^ probably.

MR. SCHWARTZ:    **Well, that's** ^ as I understand it -- **and** I don't mean to be silly **about this** -- but all that means is did he have the capacity to utter those words, and to that extent I'm sure that's not what Mr. Cook means by that question.  Certainly he could have said anything.  But the question is, what did he say to Mr. Sosso.

Q:     Did you say that to Mr. Sosso?

A:     To the best of my knowledge I did not. I'm quite sure **of the day and time**.


Trial Transcript


Q:     That would have been Thursday, the day you had this phone conversation with Don?

A:     Correct.

Q:     Now, you were asked whether you ever told Bob Sosso that Don had been at your house        on        Thursday        night.        Had        he        been?

    A:     I don't believe so.

    MR. COOK:          Your Honor, I don't like to interrupt or object, but that wasn't what I asked him.

    MR. SCHWARTZ:    Sorry. That's why I'm trying to clarify it on the record.

    MR. COOK:          That's not what I asked him.

    MR. SCHWARTZ:     What did you ask him?

    MR. COOK:          I asked if he ever did tell Bob Sosso it could have been Thursday **or** Friday.  **Not whether he was there.**

    MR. SCHWARTZ:    Well, okay.

Q:     So the question is whether you ever told Bob Sosso that Don had been at your house on Thursday night and not Friday night?

MR. COOK:        No, no, that's not the question. The question is whether he could have told him, not whether he did.  whether he could have told Bob that **he** could have been **there on** Thursday rather than Friday, **and he said** probably.

MR. SCHWARTZ:    That as I understand it, I don't mean to be silly, but all that means is did he have the capacity to utter those words, and to that extent I'm sure that's not what Mr. Cook means by that question.  Certainly he could have said anything.  But the question is, what did he say to Mr. Sosso.

Q:     Did you say that to Mr. Sosso?

A:     To the best of my knowledge I did not. I'm quite sure --

PT 432-435 (TT 490-494).

District Attorney Cook's objection disrupted and confused the proceeding; he did, in fact, ask Doctor McCormick if "he was there" but that is deleted in the Trial Transcript. Cook said Dr. McCormick testified that Tedford "probably" was at his home on Thursday, but in fact Doctor McCormick did not say "probably".

An alteration in this objection also reveals that testimony is out of place.  When asked if Thursday was the day of a telephone conversation with Tedford, Dr. McCormick answered, "Correct, **none**." That answer is not consistent with the question, but it is heard in the audio-tape recording.  That word "none" is omitted in the Trial Transcript.  The alteration suggests that either testimony immediately before the answer is deleted, or that answer is transposed from some other part of Dr. McCormick's testimony.

(3) Shifted and transposed testimony.

The audio-recordings reveal numerous instances suggesting that testimony has been moved and translocated.  In one example, Assistant District Attorney Hepting ends his examination of Trooper Peters, but the testimony continues:

161

Audio-Recorded Testimony

Q:    What was done with that piece of evidence?

A:    That was also placed in the custody of Sergeant Durham on the twenty-fourth.  It was later taken to the lab by me and placed in evidence on the twenty- third with Sergeant Durham. On the twenty-fourth, I took it out to the crime lab in Greensburg, and on the seventh I **picked** the same piece of twine up and returned it back to the evidence custodian which would be Sergeant Durham.

        **MR.  HEPTING:  Thank you, nothing further**.

Q:    I believe you testified you were present when both blood -- well, first of all, when the blood sample was taken from the victim 's husband, Jim Revak.

A:    Yes, I was.

Q:     What property number was assigned to that?

Trial Transcript

Q:    What was done with that piece of evidence?

A:    That was also placed in the custody of Sergeant Durham on the twenty-fourth.  It was later taken to the lab by me and placed in evidence on the twenty- third with Sergeant Durham. On the twenty-fourth I took it out to the crime lab in Greensburg, and on the seventh I **took** the same piece of twine up and returned it back to the evidence custodian, which would be Sergeant Durham.

Q:    I believe you testified you were present when both blood -- well, first of all, when the blood sample was taken from the victim 's husband, Jim Revak.

A:    Yes, I was.

Q:     What property number was assigned to that?

PT 093 (TT 123).


        Assistant District Attorney Hepting's "Thank you, nothing further" is omitted from

the Trial Transcript but he is heard ending his direct examination in the audio-recording.

Where in the proceedings the testimony may have originated is not known.

162

In another example, Assistant District Attorney Hepting is heard beginning his next question, but that occurs in trial counsel's cross examination of the same investigating officer:

(Cross Examination by Mr. Schwartz)

Audio-Recorded Testimony

Q:      Were you ever back after that?

A:      Yes.

Q:      When?

A:      I went back there possibly two or three different times.  I imagine, you know, just to interview him.  But one time I recall you may be interested in when I went there with Scott Ermlick in which he removed physical evidence.

**MR. HEPTING:  Sir** ^65

Q:      And who did the sweepings of the Revak house?

A:      There were no sweepings of their house.

Q:      None at all?

A:      No.

Trial Transcript

Q:      Were you ever back after that?

A:      Yes.

Q:      When?

---

65 The tone and inflection of the "Sir…" strongly suggest that the voice was that of Assistant District Attorney Hepting, his voice seemingly cut-off in the recording.  Assistant District Attorney  Hepting often began his questions with "Sir…".  See, e.g. PT 185 (TT 226), PT 194 (TT 237), PT 206 (TT 249), PT 325 (TT 375), amongst others.

A:     I went back there possibly two or three different times.  I imagine, you know, just to interview him.  But one time I recall you may be interested in when I went there with Scott Ermlick in which he removed physical evidence.

Q:     And who did the sweepings of the Revak house?

A:     There were no sweepings of their house.

Q:     None at all?

A:     No.

PT 109-110 (TT 140).

Assistant District Attorney Hepting's misplaced "Sir…" was the beginning of his next question, which suggests the preceding answer is from Assistant District Attorney Hepting's direct examination which has been translocated to trial counsel's cross examination making it appear that it is a response to trial counsel's question.  And because the testimony is moved, it is not possible to ascertain what testimony was altered in the translocation, who actually asked the questions which prompted responses shown in the Trial Transcript, or whether any given answer is to the preceding question.  In any event, the Trial Transcript is unreliable in these respects.

(4) Judicial matters.

Commonwealth witness and jailhouse informant Christopher White alleged that Tedford confessed to him, although he offered no corroborating information or details.  Trial counsel asked White about the crimes he committed resulting in his incarceration and White was reluctant to answer:

Audio-Recorded Testimony

Q:     Where did you burglarize?

A:     Butler area.

Q:     What did you burglarize:

A:     I'm sorry, do I have to answer this?

THE COURT: Does he have counsel present?

MR. HEPTING:        No, Your Honor.

MR. SCHWARTZ:   **Since he is convicted** …..(muted)…..**problem**…..
           ………..(muted)…………

MR.  HEPTING:       I don't see **what the** need ¬ Fifth Amendment, Your Honor.

**THE COURT:**        **Do   you   have   any   specific   reason   why   you**
**……..**(muted)……..

**CHRISTOPHER WHITE**:   ……..(muted)……..

**THE COURT:**        **Why** ……..(muted)……..

**CHRISTOPHER WHITE**:       ……..**serving**……..(muted)……..
**convicted of**……..(muted)……..

**THE COURT**:       …… **wo** ….. (muted) ……….[66]

MR. SCHWARTZ:   I'm sorry, I don't believe it should be out of our hearing.

THE COURT:        Come up, please.

MR. HEPTING:       Your Honor, perhaps Mr. Schwartz could **just** read the
information in the record ……(muted)…… **pertaining to**
**the** guilty plea.

MR. SCHWARTZ:   I would like to know what he burglarized.

A:     It was a gas station.

<u>Trial Transcript</u>

Q:     Where did you burglarize?

A:     Butler area.

---

[66] The trial judge was the same judge who accepted White's guilty plea and sentenced him.

Q:      What did you burglarize:

A:      I'm sorry, do I have to answer this?

        THE COURT: Does he have counsel present?

        MR. HEPTING:        No, Your Honor.

        MR.  HEPTING:       I don't see **any** need **for the** Fifth Amendment, Your Honor.

        MR. SCHWARTZ:    I'm sorry, I don't believe it should be out of our hearing.

        THE COURT:          Come up, please.

        MR. HEPTING:        Your Honor, perhaps Mr. Schwartz could read the information in the record **and his** guilty plea.

        MR. SCHWARTZ:   I would like to know what he burglarized.

A:      It was a gas station.

PT 361-363 (TT 411-412).

        The telling parts of the that conversation are deleted in the Trial Transcript.  Based on what can be heard in the audio-recording, however, it suggests that White initially was inclined to exercise his Fifth Amendment rights and that the trial judge, in front of the jury, discouraged him from doing so.

        A viable claim for relief which could have been raised on appeal was again thwarted by the deficiencies in the transcript.

                    C.      Tedford was denied meaningful appellate review.

        This was a case driven by circumstantial evidence.  On direct appeal, the Pennsylvania Supreme Court reviewed the evidence in support of the conviction.  Tedford, 567 A.2d 610 (1989). In doing so, the Court necessarily relied on the accuracy and completeness of the typewritten transcript. The audio-tape recordings, however, reveal significant evidence of the inaccuracy of the transcript, as demonstrated by the examples

                                        166

shown above, and with respect to much of the testimony upon which the Court relied in finding the evidence of guilt to be sufficient.[67] Thus, the Pennsylvania Supreme Court relied upon typewritten testimony which was misleading, inaccurate, and did not reflect what truly occurred in the state court.  See, Commonwealth v. Dougherty, 18 A.3d 1095, 1096 (Pa. 2011) ("Litigants and appellate court alike have but one vehicle through which to examine a trial court's proceedings for potential irregularities: the certified record. Therefore, to alter a record is to strike at the very pillars of meaningful appellate review, and concomitantly therewith, the basic tenets of due process.").

Both the Pennsylvania and United States Constitution guarantee a defendant the right to a complete and accurate transcript of a trial, without which it is impossible to prepare an adequate and effective appeal.  This is particularly true where, as here, the defendant is represented on appeal by counsel who was not trial counsel. Hardy v. United States, 375 U.S. 277, 279-282 (1964) (without the transcript, appellate counsel cannot provide effective assistance); Griffin v. Illinois, 351 U.S. 12-19 (1956) (due process and equal protection require that an indigent defendant be provided transcripts); Mayer v. City of Chicago, 404 U.S. 289, 295 (1971) (the state must "provide a full verbatim record"). Where a state fails to provide all the important parts of a transcript, no particularized showing of the petitioner's need for the transcript is required, it is presumed the transcript is needed for the purpose of appeal.  See, Britt v. North Carolina, 404 U.S. 226, 227-28 (1971).

A petitioner is entitled to meaningful appellate review of his capital conviction as an indispensable component of the state and federal constitutional proscriptions against

---

[67] The alterations and omissions of testimony alleged in Subsection B, above, and throughout this pleading, do not represent a full and complete account of all the problems with the transcripts.

arbitrary and capricious capital proceedings. <u>Parker v. Dugger</u>, 498 U.S. 308, 321 (1991) ("We have repeatedly emphasized the critical role in meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally"). This, in turn, requires review of the full and accurate record of the proceedings in his capital case.  See, <u>Dobbs v. Zant</u>, 506 U.S. 357, 358 (1993); <u>Gregg v. Georgia</u>, 428 U.S. 153, 167, 198 (1976)) (transmittal of complete transcript and record on appeal is important to "safeguard against arbitrariness and caprice").

D.      Tedford Was Denied Access to the Courts.

The United States Supreme Court, in <u>Bounds v. Smith</u>, 430 U.S. 817, 822-823 (1977), ruled, "It is now established beyond doubt that prisoners have a constitutional right of access to the courts," and that, "meaningful access ... is the touchstone" of that right. Meaningful access means an indigent defendant must be provided "an opportunity to present his claims fairly."  <u>Id</u>. at 823.  The claims that Tedford raised on direct appeal and in state court proceedings, and those he seeks to present in this proceeding, cannot be fairly presented and adequately reviewed without an accurate transcript.  Thus, in addition to other basis for relief requested herein, the alterations of testimony deprived, and continue to deprive, Tedford of his state and federal right to meaningful access to the courts.

Neither Tedford, his counsel, the Pennsylvania Supreme Court, nor this Court has ever been provided the complete and accurate state court transcripts of what truly occurred in Tedford's capital proceedings. The failure to provide such transcripts deprived, and continues to deprive, Tedford of access to the courts, meaningful appellate review, and due process in violation of his rights under the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

E.      Tedford is Entitled to an Accurate and Complete Record as a Fundamental
        Prerequisite to the Fair Adjudication of his Habeas Corpus Petition

For habeas corpus purposes, capital cases must be reviewed upon a full record and the petitioner must be afforded the full record of his capital proceedings.  See, e.g. Dobbs, 506 U.S. at 357 (capital habeas corpus petition must be reviewed upon the full record); Gregg, 428 U.S. at 167 (review of the complete record of a capital conviction is an important safeguard against arbitrary and capricious imposition of the death penalty).  A trial transcript which is significantly inaccurate can, by no degree of legality or stretch of the imagination, be considered full or complete for purposes of appellate review.

Meaningful appellate review is indispensable to the reliability of the imposition and affirmance of a capital conviction.  See, e.g. Parker v. Dugger, 498 U.S. 308 (1991); Clemons v. Mississippi, 494 U.S. 738 (1990).  An indigent capital defendant, such as the petitioner Tedford, is entitled to a full, complete and accurate transcript in order for such review to be effectuated.  See, Griffin v. Illinois, 351 U.S. 12 (1956); see also, Meyers v. Gillis, No. 94-CV-7160 (E.D. Pa. 1995) (Weiner J.).

Denial of a complete and accurate transcript by the state is itself sufficient to warrant relief.  See, Meyers, Id. Griffin v. Illinois, supra.  Although Tedford has, for years, attempted to right the wrongs and prejudice accruing through the deficient transcript, he still has not been provided a record which reflects the truth of his capital proceedings.  Without that truth, an innocent man may be put to death because he did not receive the full and meaningful review envisioned for capital cases.  See, Riley v. Taylor, 62 F.3d 86 (3d Cir. 1995) (the first-time habeas petitioner must be afforded full and meaningful review, including the opportunity to amend and include all claims); Bundy v. Wainright, 808 F.2d

169

1410 (11th Cir. 1987) (first time habeas petitioner must be afforded full and meaningful review, including provision of the full transcript to the court by the state authorities); Dobbs v. Zant, 508 U.S. 567 (1993) (provision of transcript in first-time habeas petitioner's case is necessary for full and fair review).

This petition offers a mere glimpse into what are literally hundreds of errors in the memorialization of actual testimony. It also demonstrates that the audio-tapes themselves are less than perfect in memorializing the testimony. A review of the audio-recordings reveals: (1) numerous discrepancies between the actual (audio-tape recorded) testimony and the official transcripts; and (2) anomalous sounds and noises on the audio-tapes. Portions of the tapes have been examined by forensic audio expert Fausto Poza, who found numerous discrepancies in the testimony and noise anomalies which cannot be explained without proper analysis. See, Exhibit FF, see also Exhibit HH the affidavit of Don Tedford. Nevertheless, this mere glimpse alone demonstrates that the Trial Transcript of Tedford's capital proceedings are inaccurate and unreliable. Moreover, Tedford has demonstrated herein there are potentially meritorious claims which cannot be properly developed and reviewed due to the errors in the transcripts.

F.     Tedford was Denied the Effective Assistance of Appellate Counsel

Tedford was denied his right to the effective assistance of counsel on his direct appeal, when the Commonwealth failed to produce, and his direct appeal counsel failed to obtain, accurate transcripts of his capital proceedings. Evitts v. Lucey, 469 U.S. 387, 393 (1985) (defendants have a constitutional right to the effective assistance of counsel on a direct appeal the state grants as a right). Tedford was provided that right by the Pennsylvania Constitution, Article V, Section 9. Commonwealth v. Albrecht, 561 A.2d

736, 739 (Pa. 1989).  The right to a direct appeal is "an absolute right".  <u>Commonwealth v. Wilderson</u>, 416 A.2d 477, 479 (Pa. 1980).   In the absence of a complete and accurate record, counsel cannot provide effective assistance.  It is counsel's duty to ensure the record is complete.  See, <u>Commonwealth v. Peifer</u>, 730 A.2d 489,. 493, n.3 (Pa.Super. 1999). Here, counsel failed to carry out this duty.

Upon receiving a copy of the transcripts of his capital case proceedings, Tedford informed his appellate counsel of inaccuracies in the typewritten testimony and in early 1988, counsel filed objections to the transcripts, which he later amended, and Tedford himself filed pro-se objections, as well as a request for a hearing to correct the record.  The trial court denied all of the objections to the transcripts without ruling on Tedford's request for a hearing.  Despite Tedford's request, counsel did not brief or argue the alterations of the transcripts which would arguably support the appeal.

Failure to brief or argue the transcripts issue in post-verdict motions and the failure to present it in the direct appeal amounted to the ineffective assistance and abandonment of counsel.  See, e.g. <u>Shaw v. Wilson</u>, 721 F.3d 908, 915 (7th Cir. 2013) (appellate counsel's performance fell below the constitutional minimum ... when counsel ignored a claim that should have been "obvious" to him at the time, and had reasonable chance of success).  As demonstrated throughout this pleading, the record was – and continues to be – inaccurate. Counsel's failure to raise that issue was deficient performance, since without an accurate record, appellate counsel, who was not trial counsel, did not even have the basic tool necessary to be an effective advocate.

Appellate counsel could not provide effective representation – could not provide the "careful advocacy" envisioned by the Court in <u>Evitts</u>, nor :ensure that rights are not

forgone and substantial legal and factual arguments are not inadvertently passed over" – if counsel has not reviewed an accurate record. <u>Hardy</u>, 375 U.S./ at 280 ("… issues simply cannot even be seen – let alone assessed without reading an accurate transcript"). Moreover, the Commonwealth deprived Tedford the assistance of counsel when its own failure to provide an accurate record of his state court proceedings made meaningful appellate review little more than an illusion. Where, as here, counsel failed to ensure that there was an accurate record for review, counsel must be presumed ineffective without requiring a showing of prejudice.

The United States Supreme Court has recognized two exceptions to the requirement that a petitioner prove prejudice by counsel's substandard performance. See, <u>United States v. Cronic</u>, 466 U.S. 648 (1984). The Court ruled that prejudice will be presumed when an accused is denied counsel totally or at a critical stage of the proceeding. Cronic, 466 U.S. at 659 and n. 25, or "if counsel entirely fails to subject the prosecution's case to adversarial testing … mak[ing] the adversary process itself presumptively unreliable." <u>Id</u>. at 659. The Court held that in such cases, counsel's performance may be so inadequate that, in effect, no assistance of counsel was provided." <u>Id</u>. at 654 and n. 11; see, <u>Penson v. Ohio</u>, 488 U.S. 75 (1988).

Whereas, the ineffectiveness of counsel analysis under Strickland v. Washington, 466 U.S. 668, 686-87 (1984), focuses on counsel's actual performance, the analysis under <u>Penson</u> and <u>Cronic</u> looks to "the circumstances surrounding [counsel's] representation", Cronic, 466 U.S. at 658. If, under certain circumstances, "the likelihood that counsel could have performed as an effective adversary was so remote," Id. at 660-661, as to make the proceeding inherently unfair, ineffective assistance of counsel can be presumed "without

172

inquiry into counsel's actual performance."   Id. at 662.   Those same principles apply

equally at trial and on direct appeal.   "Because the fundamental importance of the

assistance of counsel does not cease as the prosecutorial process moves from trial to the

appellate stage, the presumption of prejudice must extend as well to the denial of counsel

on appeal."  Penson, 488 U.S. at 88.

The absence of an accurate record in many ways made futile the appeal of Tedford's

conviction and sentence and constructively denied him appellate representation.

Strickland, 466 U.S. at 692 ("In certain Sixth Amendment contexts, prejudice is presumed.

Actual or constructive denial of the assistance of counsel is legally presumed to result in

prejudice."); Penson, 488 U.S. at 88 ("As we stated in Strickland, the actual or constructive

denial of counsel all together is legally presumed to result in prejudice.") (emphasis added).

That this deprivation of counsel was the result, in part, of appellate counsel's failure to take

the necessary steps to obtain accurate transcripts – despite the fact that Tedford

immediately and repeatedly brought the alterations of testimony to counsel's attention –

magnifies the constitutional violations suffered by Tedford.   In such circumstances,

> counsel's failure was particularly egregious in that it essentially waived
> respondent's opportunity to make a case on the merits; in this sense, it is
> difficult to distinguish respondent's situation from that of someone who had
> no counsel at all.   Cf.   Anders v. California, 386 U.S. 738 (1967);
> Entsminger v. Iowa, 386 U.S. 748 (1967).

Evitts v. Lucy, 469 U.S. at 394 (parallel citations omitted).   Tedford's appellate counsel

was, thus, the functional equivalent of no representation at all, constructively denying

Tedford his right to appellate counsel.   See, Love v. Fulcomer, 729 F.Supp. 1514, 1517

(E.D. Pa. 1990)(counsel's failure to file brief on direct appeal was functional equivalent of

no representation at all); see also, United States ex rel. Thomas  v. O'Leary, 856 F.2d 1011

(7th Cir. 1990)(failure to file brief in the state's appeal of court's suppression hearing was constructive denial of the assistance of counsel).

Tedford did not receive the effective assistance of counsel on his direct appeal because counsel could not adequately review his case without accurate transcripts. Attempting to present an appeal in a death penalty case without a full review of an accurate record constitutes the ineffective assistance of counsel. Counsel's failures were objectively unreasonable and prejudicial. Therefore, Tedford's Sixth Amendment right to the effective assistance of counsel on his direct appeal was violated.

**GROUND V(C)(2). TEDFORD WAS DENIED HIS RIGHT TO COUNSEL AND DUE PROCESS UNDER THE 5th and 14th AMENDMENTS BY THE FAILURE OF THE PENNSYLVANIA COURTS TO CONSIDER THE CLAIMS HE MADE IN HIS SECOND PCRA ON THE MERITS BY ARBITRARILY FAILING TO APPLY THEIR OWN PRECEDENT WITH RESPECT TO SUCH CLAIMS AND OTHERWISE BY APPLYING THE STATUTE OF LIMITATIONS PROVISIONS OF THE PCRA IN AN ARBITRARY, CAPRICIOUS AND UNCONSTITUTIONAL MANNER.**

When this Court stayed its proceedings to allow Tedford to return to state Court in 2014 to pursue his discovery claims based on the March 4th RTKL letter, Tedford assumed that this Court did not expect the succeeding process to be an exercise in futility. Some substantive consideration of these critical issues had to be anticipated. But none occurred.

Instead, the Pennsylvania Courts refused to consider the claims on the merits, holding that since Tedford's prior counsel failed to file a second PCRA within 60 days of the letter's receipt, the claim was barred under the statute of limitations provisions of the PCRA.

To be sure, counsel did fail to conform to the 60-day limit. Perhaps counsel perceived they were on the horns of the dilemma outlined in Slutzker v. Johnson 393 F. 3d

174

373 (3d Cir. 2009), that is, worrying that if they dismissed their habeas and returned to state court they may have risked running afoul of the one year limit on filing a habeas petition once the state court litigation ended. But if so, they did not pursue the option of seeking a stay of the kind this Court would later grant; instead, they abandoned refiling in state court and, according to the Pennsylvania courts, thereby foreclosed Tedford from any further appellate review of his case there.  This was per se ineffective.

Tedford thereafter raised in state court related claims that this refusal violated his federal constitutional rights. First, Pennsylvania, having appointed counsel for him for PCRA review, was required to ensure that such counsel was effective pursuant to the 5th, 6th and 14th Amendments. By failing to file within 60 days. Counsel, in the view of the Pennsylvania courts, forfeited any review Tedford could have on this issue.

But, secondly, Tedford attacked the Pennsylvania collateral relief system itself as failing to meet basic standards of due process under the 5th and 14th Amendments.  In the first instance, Tedford pointed out that the Pennsylvania courts have recognized clear exceptions to the statute of limitations bar but arbitrarily and capriciously refused to apply those exceptions to his case. Alternatively, if the Pennsylvania system would actually operate to deprive him of proper appellate consideration because of the ineffective assistance of counsel which victimized him, the entire Pennsylvania process would violate 5th, 6th and 14th Amendment norms by ratifying a process whereby appointed counsel's error would visit ultimate prejudice on a petitioner but a petitioner would have no avenue to assert that ineffectiveness or obtain any relief.

The rejection of merits consideration of Tedford's claims by the Pennsylvania Supreme Court, <u>Tedford</u>, 228 A.3d 391 (Pa. 2020), thus constitutes a separate and distinct

violation of Tedford's federal Constitutional rights to Due Process of law for the reasons set forth below. This violation impacts several issues of this pleading and should be considered distinctly at this time.

In short summary, the application of the Pennsylvania Post-Conviction Relief system to Tedford's case (and others) operates in the following way to systematically violate the 5th and 14th Amendment Due Process rights of PCRA petitioners:

1. While the Pennsylvania courts have recognized:

    a. the obligation to provide persons convicted with a post-conviction vehicle to raise Constitutional challenges to their conviction; and,
    b. that by providing such a post-conviction relief procedure, that procedure must conform to standards of Due Process required by the 5th and 14th Amendments; and,
    c. that by providing that counsel be appointed for individuals accessing the post-conviction procedure, such counsel must provide Constitutionally effective assistance;

2. in direct contradiction to these principles, Pennsylvania courts affords *no procedure* for any petitioner to meaningfully challenge the effectiveness of the counsel appointed; and,

3. compounds this unconstitutional defiance by ratifying a system whereby the ineffectiveness of counsel may forfeit for the petitioner the right to raise substantive Constitutional claims through counsel's failure to meet strictly enforced timeliness requirements for filing, leaving the petitioner without a means to obtain merits consideration of his claims and without the ability to assert his counsel's failure to act in a timely manner on appeal.

The critical flaws in this system are not merely alleged by Tedford. As demonstrated below, they are flaws the Pennsylvania Court system has *admitted* exist but

176

only recently have addressed in perfunctory, cosmetic fashion which leaves Tedford and a hoard of others similarly situated without Constitutionally required redress.

This systemic failure has worked a very specific prejudice for Tedford.  It has kept from him the hundreds of pages of material he should have had before trial to help in proving that he is innocent of the crime charged.

What Tedford rightfully expected since the time he was charged was that the Commonwealth would fulfill the essential promise of Due Process It and every other jurisdiction must make to a criminal defendant pursuant to the Fifth and Fourteenth Amendments to give them an opportunity to fully and fairly oppose the effort of the government to strip them of their presumption of innocence. For Tedford, that promise meant that he would have an honest forum in which to show that his protestations of innocence were not just the desperate cries of a man seeking to avoid execution but represented something he believed the system was supposedly dedicated to searching for: the truth about who did kill Jeanine Revak.

But over the decades since he was charged, convicted and now awaits execution, it is abundantly clear that no one in the Pennsylvania court system has taken this promise seriously. Most recently, Pennsylvania has egregiously refused to apply Its post-conviction collateral relief rules to allow merits consideration of claims that he was systematically denied access to a vast amount of discoverable information due to the ineffectiveness of his prior counsel and decades of misrepresentations by Commonwealth agents that no such information existed. In doing so, the Pennsylvania courts have kept the truth of this case buried under layers of Constitutional errors those courts callously refuse to recognize.

First, the errors began when Tedford's trial counsel *never sought discovery from the Commonwealth prior to trial.*  At that time, discovery in Pennsylvania was governed by Rule 305 of the Rules of Criminal Procedure, a Rule adopted in 1977 to replace a system in which all discovery had to be sought by petition to the Court. See, Madeline Hartsell Lamb, *Pretrial Discovery and Inspection-New Criminal Rules For Pennsylvania,* 23 Vill. L. Rev. 308 (1978). The Rule required the parties to make a good faith effort to resolve discovery but mandated the Commonwealth turn over: <u>*Brady*</u> material, the defendant's statements, identification procedures, scientific tests conducted, tangible objects gathered, and wiretap evidence. <u>Id</u>. at 314-317. The Rule also required that to obtain the names and statements of eyewitnesses and any other evidence the defendant could "establish that its disclosure would be in the interest of justice" <u>Id</u>. at 318-319, however, the defendant had to seek an Order compelling disclosure. Counsel filed nothing. He accepted the assurance that he had everything he needed.

Second, Tedford's first post-conviction counsel failed to properly seek discovery by using a boilerplate motion but, of course, the ultimate dismissal of that request was certainly also the result of the continued assurance by Commonwealth attorneys that nothing else existed which could be discovered.  But the March 4, 2011 RTKL letter, dispelled any basis for those assurances. At the time Tedford's counsel received that letter, counsel minimally needed to consider seeking to stay the Habeas proceeding and return to the Pennsylvania courts within 60 days with a new Post-Conviction Relief Act (PCRA) petition to comport with timeliness rules then applicable. They failed to do so.

Months later, after Tedford discharged original PCRA counsel, new counsel tried to convince this Honorable Court to order discovery. At that point, the time for filing a

second PCRA within 60 days of the RTKL letter was long past and this Court denied discovery in part because Tedford had not exhausted his efforts in state court to obtain it based on the critical revelations that letter provided.

Pennsylvania's mockery of due process then entered a third stage. For when the state court was able to correct prior discovery errors caused by his counsels' ineffectiveness and the Commonwealth's now repudiated representations, Pennsylvania's draconian application of its own PCRA rules deprived Tedford of merits consideration, ostensibly because of former counsel's ineffectiveness, an ineffectiveness Pennsylvania gives Tedford no opportunity to challenge.

The vehicle used by the Pennsylvania courts to achieve this unconstitutional application is Title 42, Pa.C.S. §9545, which is not just viewed as a statute of limitations subject to normal tolling processes but as a jurisdictional bar which supposedly may never be breached.

Any post-conviction pleading (initial or subsequent) must be filed within one year of the date the judgment becomes final. See, §9545.  If filed after that deadline, a petitioner must rely upon one of three narrow exceptions: that government officials interfered with his filing, that "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence," or that he asserts a new right to be applied retroactively by the United States or Pennsylvania's Supreme Court.  See, § 9545(b)(1)(i-iii). If one of these applies, at the time relevant to Tedford's case, the petitioner had only 60 days to reinitiate a petition.[68]  If the 61st day comes without

---

[68] The Pennsylvania legislature recently expanded that to one year.

a filing, the Court theoretically has no jurisdiction to hear it regardless of whether an atrocious miscarriage of justice occurred.

While scholars disagree that the section is jurisdictional,[69] it is sometimes intoned as unassailable dogma in Pennsylvania jurisprudence. While deemed in accord with due process principles, Commonwealth v. Peterkin, 722 A.2d 638, 643 (Pa. 1998), it is arbitrarily invoked, even as it recognized that PCRA is the exclusive means by which any post-conviction remedy can be obtained. See, Title 42, Pa.C.S. § 9542; Commonwealth v. Peterkin, supra at 643. Thus, while PCRA "envisions that persons convicted of a crime be permitted one review of their collateral claims" Commonwealth v. Bennett, 930 A.2d 1264, 1267 (Pa. 2007), its protections are sometimes denied in many contexts, often inconsistently.[70]

Tedford submits that §9545 is unconstitutional as applied in his case. See, Commonwealth v. Brown, 943 A.2d 264, note 4 (Pa. 2008). It violates basic Fifth and Fourteenth Amendment norms of Due Process in multiple respects.

---

[69] See, Thomas Place, *The Claim Is Cognizable But The Petition Is Untimely,* Temple Political & Civil Rights Law Review 49 (2000), arguing that there is no support in this statute for the jurisdictional limit and that whenever a time for filing provision is made applicable to a lay person, it is particularly egregious to find that such a time limit is jurisdictional. Id. at 19-22, citing Zipes v. TWA, 455 U.S. 385 (1982).

[70] This statutory scheme categorically excludes certain types of cases from review regardless of how ineffective the attorney was who represented the defendant to its conclusion. It does not apply to civil commitment proceedings or to any case involving a juvenile adjudication. Commonwealth v. Tinsley, 200 A3d 104 (Pa. Super 2018); In re: K.A.T., 69 A.3d 691 (Pa. Super. 2013). The jurisdictional bar does not admit of an "actual innocence" exception as recognized in McQuiggin v. Perkins, 569 U.S. 338 (2013), finding that "our jurisprudence" has deemed such decisions as pertaining only to Habeas Corpus proceedings and not to PCRA actions. Commonwealth v. Brown, 143 A.3d 418, 420 (Pa. Super. 2016). No form of equitable tolling is permitted. Commonwealth v. Callahan, 103 A.3d 118, 122 (Pa. Super. 2014). And where a defendant receives a short sentence such that a direct appeal would eat up the time they were serving the sentence making them ineligible for a PCRA application which requires that the sentence still be extant, the solution of the Court in Commonwealth v. Turner, 88 A.3d 754 (Pa. 2013) was to advise a defendant that if they wish to attack the ineffectiveness of their trial lawyer, they would have to do it initially in post sentence motions and ask the trial court to exercise its discretion to consider the matter then. Of course, as the dissenting Justice in that case pointed out, such a procedure is practically impossible. It would require a lay defendant to know that counsel had been Constitutionally ineffective, fire that counsel and get new counsel who raised adequately the question of ineffectiveness, all within the 10-day period that rule strictly permits. Commonwealth v. Turner, Id. at 348.

First, a state must provide a mechanism for defendants to assert that their conviction violated federal Constitutional principles. Case v. Nebraska, 381 U.S. 336 (1965); Carter v. Illinois, 309 U.S. 173, 175 (1946). Indeed "State PCRA is …. a primary device by which the federal Constitution is enforced." Lee Kovarsky, *Structural Change in State Post-Conviction Review*, 93 Notre Dame L. Rev. 443, 445 (2018). While the United States Constitution does not require a state to set up a PCRA system, Pennsylvania v. Finley, 581 U.S. 551 (1987), if the state does create such a process, the procedures used "must comport with the demands of the Due Process and Equal Protection Clauses of the Fourteenth Amendment." Evitts v. Lucey, 469 U.S. 387, 393 (1985).

The Pennsylvania courts have consistently recognized that in implementing the PCRA statute, the rigorous standards of Due Process of the federal Constitution must be met. Commonwealth v. Smith, 121 A.3d 1049, 1053 (Pa. Super. 2015) (due process requires the post-conviction process be fundamentally fair); Commonwealth v. Turner, supra, 80 A.3d, 765-766, citing Evitts; Commonwealth v. Bennett, supra, at 930 A.2d 1273 ("[D]ue process requires the post-conviction process be fundamentally fair" and also citing Logan v. Zimmerman Brush Company, 455 U.S. 422, 437 (1982) for the proposition that a petitioner must be given a chance for the "presentation of claims at a meaningful time and in meaningful manner.") In Commonwealth v. Morris, 771 A.2d 721, n. 10 (Pa. 2001), the Court additionally noted that besides the statutory provision for PCRA relief, the Pennsylvania Constitution provides protection for appellate review from the judgment of the lower court in a PCRA matter.

Pennsylvania has also acknowledged that while a state need not necessarily appoint counsel in its post-conviction process, once it does, the appointed counsel must give

effective representation to fulfill Due Process standards. The services of a lawyer for virtually every lay person seeking to contest on appeal a claim with the government is necessary for the proper presentation of any form of merits review. Evitts v. Lucy 369 U.S. at 393, 396; Kimmelman v. Morrison, 477 U.S. 365, 377 (1986) (the right to counsel is the right to effective counsel).  In Commonwealth v. Haag, 809 A.2d 271, 283 (Pa. 2002) (cited in  Commonwealth v. Smith, 121 A.3d at 1053) the Pennsylvania Supreme Court held that, "not only does a PCRA petitioner have the 'right' to counsel, but also he has the right to effective assistance to counsel." See also, Commonwealth v. Albrecht, 720 A.2d 693, 700 (Pa. 1998) (a defendant has an enforceable right to effective post-conviction counsel); Commonwealth v. Morris, Supra 771 A.2d 721 at n.10.

The right to post-conviction review and to effective assistance of counsel with respect to that review are thus inextricably intertwined. As the Evitts Court held "a state may not distinguish [the right to appeal] because another right of the appellant --- the right to effective assistance of counsel --- has been violated."  469 U.S. at 399-400.  Clearly, the failure of counsel to properly preserve a petitioner's appellate rights and capacity to be heard by a higher court affects the overall integrity of the proceeding and constitutes an act of ineffectiveness.  Commonwealth v. Little, 2020 Pa. Super. 207 (August 24, 2020) citing Davis v. Department of Corrections, 341 F.3d 1310 (11th Cir. 2003).

But recognizing these paradigms and conscientiously enforcing them are two very different things. The acknowledged right to one full and fair opportunity to seek post collateral relief, Commonwealth v. Bennett, Supra at 1267, and to effective counsel in that effort has been rendered a nullity at best and a cruel joke at worst.  In Tedford's case and others, that opportunity has been foreclosed by the draconian interpretation of §9545 and

other sections of the PCRA which not only deny petitioners the ability to challenge the effectiveness of their PCRA counsel but which use that ineffectiveness as a justification to create a jurisdictional bar to hearing claims of serious Constitution violations on the merits.

Three cases illustrate this point but, perhaps most troublingly, the Pennsylvania Supreme Court has *admitted* this structural failure of its system.

At the time Tedford's case was decided by the Pennsylvania Court, once a PCRA petition has been filed and an answer of the Commonwealth has been received, instead of holding a hearing, the trial Court could give notice to the defendant that his petition will be summarily dismissed 20 days hence. See, then Rule 907 Pennsylvania Rules of Criminal Procedure. At this point, a defendant is undoubtedly represented by the attorney whose performance may have constituted ineffectiveness and led to the issuance of the dismissal warning. In response to that notice, the defendant was to file an objection and, as the Pennsylvania Courts have repeatedly held until very recently, this Rule 907 response is the *only chance* a defendant has to raise the ineffectiveness of the attorney who continues to represent him. Indeed, in <u>Commonwealth v. Rykard</u>, 55 A.3d 1177 (Pa. Super. 2012), and <u>Commonwealth v. Smith</u>, 121 A.3d 1049 (Pa. Super. 2015), the Pennsylvania Courts held that the defendant *must* raise ineffective assistance in the Rule 907 reply *or forever waive it*. <u>Id</u>. at 1054. The <u>Smith</u> Court added that the Court has "no duty" to tell a defendant how to preserve his rights to effective assistance of counsel. <u>Id</u>. The absurdity of requiring an indigent lay defendant to assess his counsel's performance particularly while his counsel is still performing, and make those thoughtful objections within 20 days or, in the alternative, fire that lawyer, find sufficient funds to retain a new one and then have this

new attorney make an effective argument about the prior attorney's Constitutional deficiency, all in that short period of time, is palpable.

It is imperative to note that when a defendant *is* afforded any sort of hearing regarding his PCRA filing, no Rule 907 notice issues and thus, in those cases, there is *no chance at all for him to claim his counsel was ineffective.*

A Panel of the Superior Court had the integrity to recognize the Constitutional violation this system creates. In Commonwealth v. Laird, 201 A.3d 160 (Pa. Super. 2018), the defendant filed a second PCRA claiming that the counsel in his first PCRA was ineffective for not raising certain critical issues. Laird pointed out that under Pennsylvania process, since he was granted a hearing by the trial Court, a Rule 907 notice never issued and he was not able to challenge his first attorney's effectiveness while the appeal of his first PCRA was pending. When that appeal was over, it was now more than one year past the time for him to file a new PCRA without invoking one of the three limited statutory exceptions. As none of the narrow exceptions fit, Laird had no chance at all to be heard on whether his Due Process rights to a fair hearing were denied because of an ineffective lawyer.

In footnote 1 of the Laird Opinion, the Panel plainly acknowledged that Laird was "deprived of his opportunity to challenge the effectiveness of his PCRA counsel. Given the fact that he had a hearing, the Rule 907 notice, as the only avenue open for such a challenge, was never presented to him." The Panel further acknowledged that a serial petition would most unquestionably be considered untimely and that the ineffectiveness could not be raised in any subsequent filing. The Court candidly concluded "[t]herefore, appellant has been denied an opportunity to challenge his PCRA counsel's effectiveness,

despite that he has the right to effective representation on collateral review. Nevertheless, we are compelled to adhere to the aforementioned precedent and affirm the order denying the Appellant's present position." Id.

Laird was not the first time a Pennsylvania court admitted this glaring deficiency of process. In Commonwealth v. Holmes, 79 A.3d 562 (Pa. 2013), the Supreme Court admitted that there is no "formal mechanism" to review the effectiveness of PCRA counsel and that "this Court has struggled with the question of how to enforce this 'enforceable' right to effective PCRA counsel within the strictures of the PCRA." Id. at 584.  While admitting that the "question of whether and how to vindicate the right to effective PCRA counsel has been discussed at length" in the end "no definitive resolution has emerged." Id. The hole in this critical process has thus been seen but no effort was made until a few months ago (and after the summary affirmance of Tedford's dismissal) to repair it. Pennsylvania's PCRA is thus an unfulfilled promise of fair procedure. It is a siren's song, luring defendants seeking one fair hearing of their post-conviction claims to an ultimate tragic demise.

The Supreme Court of Pennsylvania has recognized the grave deficiency in this system but has made an insignificant effort to correct it, not just leaving the violation of Tedford's rights fully evident but highlighting the gravity of the offense.

On March 25, 2021, the Court decided Commonwealth v. Shaw, 247 A.3rd. 1008 (Pa. 2021). Like in the later case of Commonwealth v. Bradley, 261 A.3d 381 (Pa. 2021), the Court was forced to recognize that Pennsylvania inmates have a "rule based" right to counsel, Shaw at 1010, Bradley at 391, with effective counsel, a right which, per Evitts, must be enforced as meaningful pursuant to the 5th and 14th Amendments.

In <u>Shaw,</u> PCRA counsel failed to include a key issue in the 1925 Statement. Counsel withdrew and a new lawyer was appointed for the appeal. That lawyer raised the critical issue as a layered claim of ineffectiveness but the lower courts, applying the rule in <u>Commonwealth v. Henkel</u> 90 A.3d 16 (Pa. 2014) held that the issue was waived since ineffectiveness of PCRA counsel cannot be raised for the first time on appeal. Effectively, this would mean that if your appointed PCRA counsel blundered, and you, a lay defendant, failed to recognize that during the proceedings before the trial court and then either get a new lawyer or proceeded pro se, your substantive Constitutional claims would be lost forever by counsel in a system supposedly affording due process of law.

Finally appreciating the Kafka-like, preposterous circumstance this has created, the <u>Shaw</u> court carved out the least possible exception, holding that the waiver doctrine should not apply here as it would not be reasonable to penalize a petitioner because his attorney did not raise his own ineffectiveness contemporaneously with being ineffective. Indeed, the classic rule of ethics and basic advocacy also occurred to the Court when it noted that a lawyer cannot raise their own ineffectiveness. <u>Id</u>. at 1016-1017. A rule was adopted allowing new appeal counsel to raise an issue PCRA counsel ineffectively preserved, advising that a remand might be needed to determine why the lack of preservation occurred.[71]

Consider that the parameters of this remedy are infinitely narrow. For a petitioner, his PCRA counsel has to withdraw or be fired prior to the appeal to make this apply. If that

---

[71] In a related context, the Third Circuit recognized a similar issue in <u>Lesko v. Dept. of Corrections,</u> ___ F.4th ___ (3rd Cir. Decided May 17, 2022). One lawyer represented Lesko in all phases through his first federal habeas. A second lawyer then filed IAC and the Pennsylvania Court held it time barred. The Circuit held that they would not consider the new matter a second habeas as the first lawyer could not raise his own ineffectiveness and a strict application of the rule would mean the petitioner had no chance to raise his former lawyer's effectiveness in any venue. Id. at *27-28.

counsel remains on appeal, and the issue has not been preserved, it is waived, presumably forever, since there was nothing in <u>Shaw</u> to indicate that the relief would go any further.

In <u>Bradley</u>, the Pennsylvania Court openly acknowledged that the procedure for enforcing IAC claims in PCRA "is inadequate." Id at 382. This remarkable understatement was followed by an exhaustive analysis which provided no relief to a multitude like Tedford whose case would not fit into a few highly constricted parameters rarely occurring.

Bradley's initial PCRA counsel filed a petition and the trial court issued a Rule 907 order stating an intention to dismiss, and then dismissing it after 20 days. New counsel was appointed for appeal and asked the Superior Court to remand the case so IAC claims about original PCRA counsel could be raised. This was denied, based on the rule that claims of IAC had to be raised during the 20 days after the Rule 907 notice, or they are waived. <u>Id</u>. at 384-386. The <u>Bradley</u> Court recognized that under its prior rulings, that holding of waiver/dismissal was correct.

The Court admitted that its requirement that IAC challenges be made is response to a 907 notice creates a conflict of interest for counsel to raise their own ineffectiveness or imposed an "insurmountable burden" on a pro se petitioner to recognize his lawyer's IAC and articulate it on his own. Id. at 398. Hiring new counsel is also an absurd option as a petitioner would not only need to know he needs one, and have the funds to hire one, but find one who can assimilate a record and file an effective claim in 20 days. The remedy thus offered is "impractical and ineffective" declared the Court, at 399, failing to mention it was also an indisputable violation of the Due Process rights of a petitioner to the effective assistance the statute promised him he would get.

With a reference to the Rule 907 approach as "pure dicta" now shown to be "deeply flawed" the Court hereinafter dispensed with it. At 400. But what replaced it?

The Court's "solution" was to adopt a procedure it used decades ago when the rule was that new counsel had to raise the IAC of prior counsel at the first opportunity, even if it was on appeal. So, if new counsel took over the direct appeal of a PCRA, they could raise prior PCRA counsel's ineffectiveness and ask for a remand to develop the record on it. At 401. The Court admitted this was not an "ideal" solution. Id.  Again, this was sublime understatement.

It was clear that in saying new counsel could raise the IAC of former PCRA counsel "at the first opportunity" the court meant only where new counsel enters on the direct PCRA appeal. If the ineffective lawyer continues with the appeal and loses it, their ineffectiveness is not, the Court held, grounds to extend the time for filing an original PCRA as a new fact that could give a defendant another one-year period to file a second one. Id. at 404, and n. 18. This means that once again a petitioner must recognize that his lawyer is ineffective, have him removed, appeal pro se or hope he can hire or get the Court to appoint another for the appeal. If the petitioner remains with the ineffective lawyer, he has no means of challenging the denial of his right thereafter. Justice Dougherty in concurrence made this point by observing that "only those petitioners who obtain new counsel or elect to proceed pro se following the conclusion of their Superior Court appeal would be able to take advantage" of this new procedure. Id. at 407. The insurmountable burden remains. The Pennsylvania Court, having identified the unconstitutional crisis it created, makes a further mockery of it by giving no meaningful solution to the vast number of petitioners so effected.

Tedford's predicament parallels Laird. In the first PCRA proceedings, a hearing was held and Tedford then had no opportunity to allege counsel's ineffectiveness for filing a boilerplate discovery motion and was not even put on notice that he was to be summarily dismissed.  As they continued to represent him at and after the receipt of the March 4, 2011 RTKL letter, he had no opportunity to contest their failure to return to the state court within the short 60-day window arguably opened. Only months later, his new counsel, having pressed the discovery issue before this Court, were then directed to return to state court to exhaust Tedford's discovery request there in light of the changed circumstances that the letter created. In reality, this **was** the first opportunity to raise the IAC of prior PCRA counsel but even after Bradley that ineffectiveness stands as an unchallengeable act forever foreclosing Tedford from obtaining the discovery that could prove his innocence.

But there is an even further twist to the unconstitutional treatment the Pennsylvania courts have given to this issue. The heavy-handed system Pennsylvania has erected to deny Tedford's claim *has not been applied consistently in other cases*. Before Shaw and Bradley, and in cases indistinguishable from Tedford's, Pennsylvania has granted exceptions to these oppressive rules but the Supreme Court here arbitrarily overlook its own precedents, compounding the Constitutional violations which have occurred.

Sometimes, the clear inequities of a situation have moved the state courts to circumvent the statute of limitations it otherwise enshrines as jurisdictional. This has been achieved by focusing on §9545(b)(1)(ii) and holding that the ineffectiveness **was** a "new fact" that allowed the petitioner relief from the jurisdictional bar. This consideration has been given on three distinct occasions but was arbitrarily and capriciously not applied to the materially indistinguishable facts here.

In Commonwealth v. Bennett, supra, PCRA counsel failed to file a brief. After the case was dismissed, Bennett filed a PCRA, but was told that it was untimely since it was filed more than a year after his conviction was final. The Supreme Court, however, found that the failure to preserve the basic avenue of appeal constituted a complete denial of counsel that mandated a presumption of prejudice requiring that his petition be allowed to proceed. In so ruling, the Court relied upon Roe v. Flores-Ortega, 528 U.S. 470 (2000) (prejudice is presumed when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken).

In Commonwealth v. Rosado, 150 A.3d 425 (Pa. 2016), PCRA counsel raised on appeal only the issues which had *not* properly been preserved for appellate review and abandoned all properly preserved issues. The Court found again that this constituted IAC per se and that counsel's actions effectively denied the petitioner the capacity to appeal. Id. at 433.  Errors that "foreclose merits review" are per se errors that permit a defendant's claim to proceed. Id.

And in Commonwealth v. Peterson, 192 A.3d 1123 (Pa. 2018), counsel filed the PCRA petition one day late, a fact only discovered *sua sponte* by the Superior Court on appeal.  The Supreme Court held that "counsel's untimely filing . . . constituted ineffectiveness per se, as it completely deprives [appellant] of any consideration of his collateral claims under the PCRA." Id. at 1130. Once again, since counsel deprived the defendant of a chance for review, circumvention of the otherwise rigid jurisdictional bar was permitted.

But when Tedford's prior counsel also foreclosed his chance to obtain a merits review of a discovery request made viable by the revelations in the March 4, 2011 RTKL

letter, the Pennsylvania Supreme Court arbitrarily ignored these precedents in violation of basic Due Process norms.

The Court began by intoning its oft stated maxim that claims of ineffectiveness assistance of counsel "do not overcome the statutory time limitations of the PCRA statute" and that Courts have no power to carve out exceptions. Commonwealth v. Tedford, 228 A3d 891, 905 (Pa. 2020). This, of course, ignored the exceptions to that very "rule" carved out by Bennett, Peterson, and Rosado. The Court then attempted to cast Peterson as a unique case involving ineffective assistance of counsel *per se*, allegedly unlike Tedford's. Id. at 906. The problem with that reasoning, of course, is that the same sort of ineffectiveness identified in Peterson also crippled Tedford's opportunity to be heard on the critical matter of discovery. His counsel's failures deprived him of the ability to receive a merit's determination of this critical claim as completely as the failures of the attorneys in Bennett, Peterson, and Rosado deprived those petitioners of their opportunity to have similar consideration.[72]

The Pennsylvania Supreme Court dismissed Tedford's "as applied" challenge without ever considering it in light of the precedent it established which would have at least paid some lip service to the need to have the proceedings conform to federal Due Process standards.[73] In doing so, the Court violated the most fundamental norm of Due Process by

---

[72] The attempt to circumvent this gross inconsistency by saying that somehow Tedford was not deprived of his collateral review because the lower Court did consider his challenge to the hair/fiber analysis set forth in his second PCRA, Id. 906, is deceptive. The issue of the hair/fiber analysis was an issue separately arising and timely presented by Tedford after the FBI admitted that the hair/fiber analysis it had engaged in, and which it taught to state Court analysts like the one who testified in Tedford's case, was essentially junk science.

[73] In his brief to the Pennsylvania Court, Tedford articulated the Federal Constitutional issues here, although that Court felt more was needed. But a petitioner need not cite "book and verse" to raise such an issue as long as the state court had the opportunity to pass on it. Williams v. Superintendent, 2022 US Dist. LEXIS 80503 (Middle Dist. Pa. May 3, 2022) at *8, citing authority.

arbitrarily failing to follow its own precedent in a consistent, thoughtful way or specifically altering that precedent though careful analysis. Here, the precedent was simply ignored without reason.

The egregious violation of Due Process here is not the only time in which the Pennsylvania Supreme Court's arbitrary and draconian interpretation of its PCRA statute has spawned fundamentally unjust results. Tedford has already described the circumstances in Commonwealth v. Laird in which the Superior Court recognized a situation in which a petitioner's right to the effective assistance of counsel in a PCRA setting was completely denied by operation of the Pennsylvania Supreme Court's rulings. In Commonwealth v. Callahan, 108 A.3d 118 (Pa. Super. 2014), the petitioner's first PCRA application resulted in a split decision, winning a reinstatement of his right to direct appeal but losing other substantive issues regarding his prior counsel's ineffectiveness. Callahan elected to persist in his appeal of the other issues denied by the PCRA trial Court instead of abandoning the continuance of his PCRA appeal and pursuing his direct appeal. After his PCRA appeal was concluded, he then filed a second PCRA to effect his direct appeal which was dismissed as untimely because, by not undertaking his direct appeal upon the grant of relief, the Court found that one year elapsed since his conviction became final. Since there are no exceptions to the one-year filing requirement, and since there is no equitable tolling under the PCRA statute, whatever merit might lie in the issues he could have raised on direct appeal, were now lost forever.  Id. at 122.

In Commonwealth v. Lark, 746 A.2d 585 (Pa. 2000), the Pennsylvania Supreme Court reiterated that a defendant cannot file a second PCRA when the first is still pending on appeal, presenting a defendant with the Hobson's choice of either abandoning the first

PCRA or foregoing the argument that his counsel was ineffective since the Pennsylvania appellate process takes far longer than the one-year window will allow. In Commonwealth v. Baroni, 827 A.2d 419 (Pa. 2003), the Court held that even if a defendant asserts that a structural error (not properly instructing the jury to find him guilty beyond a reasonable doubt) occurred, a violation of the PCRA statute of limitations means that such an error is lost to the annals of history forever.

In 2019, the Pennsylvania Supreme Court used the PCRA time limits in a manner almost as egregious as it has in Tedford's case. In Commonwealth v. Natividad, 201 A.3d 11 (Pa. 2019), the defendant was convicted of a homicide that occurred at a gas station. He had professed his innocence. In his collateral attack in federal habeas proceedings, he was granted discovery. In the hundreds of pages of never-before revealed materials he received on March 6, 2012 was a cryptic police note that alluded to the possibility that someone may have witnessed the shooting. The note mis-identified the alleged witness and gave very little details of what he supposedly saw. Counsel immediately tried to identify and locate the individual and, through a private investigator, finally tracked the man down. Natividad obtained an affidavit from him which was filed with the Court on August 9, 2012. In that affidavit, the witness stated that he was a security guard in the area, was at the gas station and witnessed the shooting. While the witness was not a friend of Natividad, he knew Natividad and stated categorically Natividad was not the shooter.

As far as the Supreme Court was concerned, however, this overwhelming exculpatory evidence was of no consequence since August 9th was more than 60 days from March 6th, and the affidavit, being filed out of time, could not be considered. The Court also disregarded other evidence that had been disclosed in federal habeas discovery

193

demonstrating that other suspects had been reviewed by the police but such evidence was never given to Natividad prior to trial. The Pennsylvania Supreme Court rejected all of this as insufficiently material to constitute a <u>Brady</u> violation and, as the affidavit of the eyewitness violated the PCRA statute of limitation provisions, Natividad was to remain on death row.

Fortunately, for Natividad, this outrageous situation was remedied when the office of the Philadelphia District Attorney changed its course and recognized that Natividad's constitutional rights had been violated. That office joined the petitioner in a federal habeas corpus action supporting the grant of relief given all that had been uncovered to that point. See, <u>Natividad v. Beard</u>, 2021 US District LEXSIS 159379 (decided August 24, 2021). In that case, the Commonwealth and the District Court recognized that the Supreme Court of Pennsylvania had applied the wrong standard and wholly underestimated the impact of the <u>Brady</u> material which had been disclosed, but also of key importance in the present case, examined whether Natividad had violated the statute of limitations of the PCRA in such a way that he had forfeited his claim in that regard.

The District Court recognized that the Supreme Court had said that because Natividad had not filed within 60 days of the initial disclosure of the note, he was barred under the statute of limitations from raising it. However, the District Court properly identified that a state law ground is adequate only if it is "firmly established and regularly followed" quoting <u>Walker v. Martin</u>, 562 US 307, 316 (2011). An examination was thus necessary to determine whether the rule being applied was exercised in a way to give petitioners proper notice that they are at risk of default in the actions they are taking. <u>Id</u>. at footnote 112, citing <u>Kindler v. Horne</u>, 642 F.3d 398 (3rd Cir. 2011). The District Court held

that at the time the cryptic note was turned over to Natividad, Natividad had no idea whether or not it could possibly meet the standard materiality under <u>Brady</u> and it was not until he investigated it and found the witness that he recognized that it could give him the opportunity to raise a Constitutional claim.  The Pennsylvania Court's interpretation of the law would produce the absurd result that Natividad "was required to file a PCRA petition before knowing if he had a plausible constitutional claim." <u>Id</u>. at footnote 113. Accordingly, Natividad was not provided with fair notice of what he must do to avoid default and the Supreme Court's ruling that the PCRA statute of limitations was an adequate state ground was overturned.

An alternative view of Tedford's case thus emerges. At the time Tedford received the RTKL letter, he knew much less than Natividad did about what the Commonwealth had disclosed.  He knew that a massive amount of material had not been disclosed and that for many years the Commonwealth had misrepresented to Courts that such material did not exist.  But the precise content of that material was unknown to him. The letter supported an active and viable claim for federal habeas corpus discovery and whether or not he should have immediately returned to state court with a new PCRA claim based upon the letter, the decision to seek further discovery in federal Court was not a willful abandonment of his claim that additional discovery should be given. Just as in <u>Natividad,</u> the Pennsylvania rule about the application of its statute of limitations is not one which can be considered an adequate ground and no procedural default on Tedford's behalf can be attributed.

The stinging criticisms Tedford uses in this pleading regarding the application of the Pennsylvania PCRA procedure are wholly justified. Indeed, Justice Max Baer has used words similarly acerbic regarding the unconscionable way in which his Court has given a

false promise to individuals that a truly fair post-conviction collateral process exists in the Commonwealth which comports with the requirement of the Fifth and Fourteenth Amendments. The dissent of Justice Max Baer was issued in a case in which a PCRA was dismissed as untimely in circumstances almost as bizarre and inexplicable as the one involving Tedford.

In Commonwealth v. Brown, 943 A.2d 264 (Pa. 2008), the defendant was convicted in a drug case.  At his sentencing, his lawyer made an oral post-sentence motion which the court believed was of sufficient substance to require that the matter be taken under advisement. While counsel pledged that he would follow up the oral motion with a written one, he failed to do so.  Eleven months later, the trial court issued an order denying the oral post-sentence motion and the defendant then filed notice of appeal. Id. at 265.The Commonwealth moved to quash the appeal because under Pennsylvania's rules only a written post-sentence motion will stop the 30-day time period for filing a notice of appeal from running. The Superior Court agreed with the Commonwealth and dismissed the appeal on its face.

Naturally, the defendant immediately filed a PCRA claiming that his attorney was ineffective for failing to preserve his appellate rights. But once again the cold hard mathematics of the Pennsylvania PCRA statute reared its head and was enforced despite the obvious inequities of the situation.  The one-year limit for the filing of a PCRA began 30 days after the sentence, the Court held, and with the trial court's lengthy consideration of the motion and the Superior Court's determination to quash the appeal, that one year had expired by the time Brown filed his PCRA. After all, the Court noted, "there is no generalized equitable exception to the jurisdiction of one-year bar." Id. at 267. While

acknowledging that an as-applied Constitutional challenge was possible to the application of the statute, Id. at note 4, Brown had made no such argument and the dismissal of his PCRA was affirmed.

Justice Baer dissented. He wrote that ever since the Supreme Court ruled that the time limits on the PCRA statute were jurisdictional the Court "has felt compelled to tolerate Constitutional violation upon Constitutional violation, sacrificing fundamental rights at the altar of finality." Id. at 272.  This is a grave mistake, he stated since "the United States and Pennsylvania Constitutions, however, do not countenance finality at the expense of Constitutional rights; rather, as a matter of due process, they promise convicted defendants one substantive appeal of their convictions and also the effectiveness of counsel throughout that appeal." Id. He chastised the majority for using the ineffectiveness of Brown's counsel to justify the deprivation of Brown's right to appeal and embraced the Evitts Court holding that ineffective assistance of counsel can never be the basis for a defendant to lose the substantive opportunity to pursue an appeal. Id. His final condemnation was that the Pennsylvania Supreme Court's unduly restrictive reading of the Pennsylvania PCRA statute "has painted us into a corner."  Id. At 273.

The corner into which the Court painted itself cannot be escaped by the limited resolution of Bradley which would impact none of the cases cited above in which arbitrary dismissals were granted since there was no changeover in counsel from PCRA trial counsel to PCRA appellate counsel. Those petitioners, like Tedford, can only wonder why relevant exceptions were made in some cases but not theirs. And while the Pennsylvania Supreme Court may be painted into a corner, it will not face execution. Tedford will unless the

unconstitutional deprivation of his basic due process rights that has occurred here is not vindicated by this Court.

Reduced to its essence, this case about the false promise of justice made by the courts of Pennsylvania that Tedford would receive a fair trial and the opportunity to properly litigate his case on appeal and on collateral review. The decision of the Pennsylvania Court ratifies the action of Commonwealth agents who, intentionally or otherwise, mislead the Court for 25 years into believing that no other documents of a possible discoverable nature existed when over 400 pages of discovery never seen by the defense lies in a PSP evidence vault. And now that the Court knows that the chief investigator held an entirely different conclusion than the one the Commonwealth needed the jury to adopt to convict Tedford, that ratification must be seen as intolerable. It not only excuses the ineffectiveness of Tedford's prior attorneys, but it perversely uses that ineffectiveness to justify shutting him out of Court when he sought to overturn prior discovery denials which were primarily predicated on those false representations. The decision is truly the worst kind of Due Process violation imaginable since it reeks of the bitter hypocrisy of claiming that the PCRA process comported with Due Process safeguards and protected Tedford's right to the effective assistance of counsel when, in its application here, it systematically used the denial of the latter to justify the obliteration of the former.

The ruling of the Pennsylvania Supreme Court constitutes independent grounds for Habeas relief as it represents a systematic denial of federal Constitutional rights. But it is also intertwined with the issue of whether the entirety of the issues Tedford now raised

have been properly exhausted and are ripe for substantive review. Those issues are specifically addressed, <u>infra</u>.

**<u>Ground V(D)(1) TEDFORD'S JURORS HAD ACCESS TO PREJUDICAL INFORMATION REGARDING THE CASE AND TEDFORD IN VIOLATION TO HIS RIGHTS TO A FAIR AND IMPARTIAL JURY AND TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO PROPERLY INVESTIGATE AND OBJECT TO THIS INHERENTLY PREJUDICIAL SITUATION</u>.** [74]

Tedford did not receive a trial by a fair and impartial jury. The jurors in his case were exposed to extraneous information that made his trial a mockery of justice, and his counsel failed to take the necessary steps to rectify the situation to preserve the Constitutional integrity of the trial when confronted with evidence that the jury was severely tainted by the exposure.

The errors and failings of counsel presented herein deprived Tedford of his rights under the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Accordingly, the issuance of habeas corpus relief is warranted.

All facts and matters contained in other sections of this pleading and in the appended exhibits are incorporated herein.

The jurors who convicted Tedford and sentenced him to death had access to and discussed prejudicial information about his case and his prior record, which was based in part on their exposure to prejudicial pretrial publicity prior to and during jury selection, and prejudicial conversations among prospective jurors as they waited in the jury assembly room.

---

[74] This claim was fairly presented to the Pennsylvania courts in Tedford's PCRA proceedings. See, <u>Commonwealth v. Tedford</u>, No. 456 Cap. Appeal Dkt., "PCRA Initial Brief at 11-21 (filed April 7, 2005). Aspects of this claim were also raised on direct appeal. See, <u>Commonwealth v. Tedford</u>, No. 43 W.D. App. Dkt. 1988, "Direct Appeal Brief (filed March 21, 1989).

Throughout the trial, the case was highly publicized and sensationalized. Spanning a year, numerous articles were published in the Butler and Pittsburgh newspapers regarding the murder.  See, e.g. <u>Exhibit GG</u>.  The case was also widely featured in television and local radio broadcasts throughout Butler County and the surrounding counties. Nearly half of all media accounts included both accurate and inaccurate, but highly prejudicial information about the case, Tedford's prior record and the fact that Tedford was on work release.

The voir dire transcript shows community saturation by the pre-trial publicity. Of the 159 prospective jurors that appeared for voir dire, 87 were asked about their awareness of the case. Of those 87 asked, 77 or 88.5%, said that they had heard or read about the case prior to trial.  Of the 77 who admitted awareness of the case, 61, or 82.4%, said that they recalled some or all of the media accounts. Of those 61 venire persons, 6 ended up being seated on the jury that decided Tedford's fate.

Of the 159 prospective jurors appearing for voir dire, only 57 were asked about the prejudicial conversations among the prospective jurors in the assembly room. Of the 57 who were asked, 30, or 52.6%, admitted overhearing or taking part in the conversations. Of those 30, five were seated on the jury.

Exposure of the jury pool, and of the actual jurors, to details about the Tedford case, went far beyond jury exposure to the prejudicial media accounts. During the first three days of voir dire, there were numerous indications that newspapers and other publications were distributed and circulated in the jury assembly room and that conversations about the case and Tedford's prior record were rampant among the prospective jurors. As the proceedings progressed, it became apparent that both accurate (but prejudicial) and inaccurate (and even

more prejudicial and exaggerated) information concerning the case and Tedford's 1972 arrest and conviction were widely discussed among prospective jurors. The conversations were repeated and ongoing throughout the jury selection process. The effect was to predispose the minds of the jurors to believe Tedford was guilty, effectively stripping him of the presumption of innocence.  See, e.g. Marshall v. United States, 360 U.S. 310 (1959) (exposure to news articles concerning a defendant's prior criminal conduct was prejudicial despite the jurors' claims that they could serve impartially).

A review of the record of voir dire from Tedford's trial reveals that, while the prospective jurors were waiting to be questioned by the court and counsel, newspapers and news publications were distributed in the jury assembly room. The record also reveals that the jury assembly room discussions about the case and about Tedford's 1972 arrest and conviction as reported by the media escalated as the jury selection progressed.  Prospective jurors began to talk more and more about Tedford and his prior offense. See, Exhibit A at 3(22) – 3(24) to Tedford's original appendix to his original habeas corpus petition, ECF No. 26-1 at 28-30.

Actual jurors Perry Ray, Shirley Pickerd and Ronald Stitt[75] have given affidavits stating that they were aware of information and misinformation about Tedford's prior arrest and conviction.  See, Exhibit B through Exhibit D of Tedford's original appendix to his original habeas corpus petition, ECF No. 26-1 at 74-81.  These statements and the voir dire testimony make it clear that both accurate and inaccurate information about Tedford's 1972

---

[75] Ronald Stitt was initially selected as an alternate juror.  On the first day of trial, Mr. Stitt replaced seated juror Robert Minich who was dismissed after he made it known to the Court that Commonwealth witness Michael Ferry was the man who had been charged with burglarizing the home of Mr. Minich's father.

offense circulated freely among prospective jurors. The information contained in the affidavits was not disclosed at trial or sentencing and was inherently prejudicial.

And in this regard, it must be noted that the complete breakdown of the jury selection process was recently confirmed by Diane Perko, the prospective juror who most directly brought the matter of the infiltration of the jury room with extraneous information to the court's attention during jury selection.   VDT 981-984. Despite being a perfect candidate to serve on the jury given her lack of knowledge of the case, Ms. Perko was dismissed as a juror because of what she learned from her fellow jurors during the jury selection process.  See, Exhibit Z.

In her affidavit, Ms. Perko indicated that she had known nothing of any substance about the case prior to being summoned for jury duty but that soon changed as the entire jury room was buzzing with information about Tedford being the killer. About a half dozen jurors discussed how Tedford had stalked and killed the young woman with blondish hair. One of jurors even had a photograph of the deceased victim. The situation was completely out of control and Perko was shocked that the Court's staff did absolutely nothing to address jurors openly discussing what they thought they knew about the case. Perko described the situation as "a free for all."  Perko's dramatic description of what happened 35 years ago reinforces the assertion that the jury selection process was thoroughly corrupted and compels that a hearing be convened to address the gravity of what occurred.[76]

---

[76] Standing alone, the voir dire transcript itself contains sufficient evidence of juror exposure to prejudicial information to presently require a hearing to evaluate the effects of the exposure. See, e.g., Smith v. Phillips, 455 U.S. 209, 215 (1982)  ("the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias"); Gov't of Virgin Islands v. Weatherwax, 20 F.3d 572, 578 (3d Cir. 1994) ("We have emphasized the importance of questioning jurors whenever the integrity of their deliberations is jeopardized"); United States v. Resko, 3 F.3d 684, 695 (3d Cir. 1993) (vacating convictions where juror misconduct was discovered mid-trial but no adequate determination of prejudice to defendants was made); Gov't of Virgin Islands v. Dowling, 814 F.2d 134, 138 (3d Cir. 1987) (court committed reversible

On January 26, 1987, the trial judge, the parties, and representatives from the local press met to discuss issues of pretrial publicity.  VDT at 9 (statement by trial counsel that "this court invited certain members of the local press into chambers to try to work out an accommodation between the court and the press so that any pre-trial publicity could be, one, eliminated, and/or two, if a compromise became necessary, minimized."). That meeting was not recorded and/or transcribed but trial counsel summarized the meeting for the record on January 27, 1987, the first day of voir dire, and explained the unwillingness of the local press to curb its coverage of this case.  Id. The first, a "WISR news sheet" announced that Tedford was on work release.  See, Exhibit S of Tedford's original appendix to his original habeas corpus petition, ECF No. 26-1 at 132-133.  The second, by the local newspaper, The Butler Eagle, offered more details:

> *In 1973 Tedford pleaded guilty to multiple charges for attacking a nurse* in Pittsburgh with a baseball bat.  He had served 12 years of a 15-30 year sentence when he was granted work-release status.

"Tedford Trial Jury Selection Gets Underway", The Butler Eagle, January 26, 1987 (emphasis added), See, Exhibit T of Tedford's original appendix to his original habeas corpus petition, ECF No. 26-1 at 134-135.

A review of the voir dire demonstrates how the misconduct among prospective jurors began to unfold. At the beginning of the second day of jury selection two prospective jurors, Janet Chambers and Donna Moore, came before the court together and asked to be excused.  Ms. Chambers said she had business dealings with Tedford at The Finishing Touch.  VDT at 191-193. Ms. Moore said her sister was a Commonwealth witness in the case.  VDT at 193.  Both were excused without being asked how, after one day of jury

---

error in failing to conduct voir dire after jury was exposed to prejudicial information about facts of case and defendant's prior record).

selection, they knew which case they were there for or how they knew Tedford was involved.

Judith A. Jackson, who was ultimately selected to sit on the jury, provided the next hint of misconduct when she explained that "someone" in the jury room told her the crime occurred in Cranberry.  VDT at 205.

Scott E. Smith was called next, and later excused. Smith explained that a news sheet with information about the case was circulating in the jury room, and that he read it.  VDT 225-228.  Smith also said he discussed the case at lunch with two men: "Larry" and "Mark". The court clerk determined that "Mark" was Mark Sarver who had been selected to sit on the jury.  VDT 233-237.  Once recalled, Mr. Sarver said he did not remember having lunch that day with Mr. Smith and "Larry" but he did recall seeing the news sheets on the tipstaff's desk in the jury room.  VDT at 244.  Mr. Sarver was then excused.

At the close of the second day John M. Craig stated that he had heard about the case in the jury assembly room. He was not pressed for additional information.  VDT at 373-385. Stanley Kashuba also recalled seeing the news sheet and began to read it.  VDT 400-403.  Counsel did not ask for additional information or about the conversations in the jury room.

Thus, the first two days of voir dire produced information about a "news sheet" being circulated in the jury assembly room, speculation among prospective jurors as to the nature of the case, and the recall and striking of one previously-chosen juror (Mr. Sarver) because he had discussed the case in the jury room.  Nonetheless, during that two-day period, trial counsel allowed no fewer than nineteen prospective jurors to be excused, and six jurors to be accepted, without asking about the activities in the jury room.

Also on the second day of voir dire a particular comment made to the press began to emerge: i.e., that Ms. Revak went for a job interview and disappeared. Recalling the television, radio and newspaper reports, prospective juror George W. Compton stated: "I believe he (Mr. Tedford) was interviewing her (Ms. Revak) for a job or something to that effect. VDT at 300. Potential juror Rex Jewell further explained: I remember the story of a girl going down to be interviewed for a job…". Id. at 460. Based on his memory of the media reports, Mr. Jewell went on to say that he believed Mr. Tedford was guilty. VDT at 462.

On January 29, 1987, potential juror Patricia Mastermonico provided additional information, "… that she was missing, you know and where she had gone or something, that she had applied for a job or something that's the place she was last seen as I recall from the news, you know her picture was on TV and everything." Id. at 481. Potential Juror Roger M. Strock clarified the news account: "Well, the girl I believe was working or went for an interview at an establishment where the defendant was working, and she never came back home … and the fact that the defendant was on work releasee from prison and had been convicted of an assault on a woman I believe." VDT at 566. Mr. Strock was then quickly dismissed. Potential juror Laverne M. Stierheim said she had read that Ms. Revak went to "a place for an interview.'" VDT at 612-613. Potential juror Thomas Rodger, Jr., recalled, "something about she went for a job interview or something like that, and that was the last they seen of her …". VDT at 695. Mr. Rodgers went on to say that "a whole bunch of people" were talking about the case in the jury assembly room. VDT at 696.

Robert J. Minich – who was selected as a juror (and who was later excused when he realized that Commonwealth witness and jailhouse snitch Michael Ferry was the man

who had been charged with burglarizing the home of Mr. Minich's father) was asked what

he remembered from the news reports he had read about the case:

> A:     Just really that a girl was killed and supposedly somebody *interviewed her for a job as I read in the paper and she wasn't seen again*.
>
> Q:     She wasn't what?
>
> A:     Seen again.

VDT at 1162 (emphasis added).

On January 29, 1987 – the third day of voir dire – potential juror Patricia

Mastermonico revealed that in addition to news sheets, the Pittsburgh Post-Gazette was

being circulated in the jury room:

> Q:     Since arriving for jury duty this past Monday, have you spoken about the case with anybody, the court personnel, the jurors?
> A:     *Well, just what you hear downstairs.*  I really didn't speak directly or voice my opinion.
> Q:     What did you hear downstairs?
> A:     Just what case was being heard or what case the jurors are being chosen for, the incident that occurred in Cranberry.  *But that was in, you know they had it in the papers that was being passed out to us downstairs in the jury room*, you know that a jury would be selected.
> Q:     What papers were passed out to the jury?
> A:     Well, they had the Post Gazette there and someone brought in the local, the WISR little new letter or something giving the facts.

VDT at 482-483 (emphasis added).

Jennifer A. Mariacher said jury room conversations about the case were occurring

and she did not think she could overlook her opinion of the case:

> The only opinion I have is the opinion I formed after having read about it when it occurred which was at the time it seemed relatively a solid piece of information that caused him to be arrested.

VDT at 525-528.[77]

Frederick L. Neely admitted he overheard jury room conversations and said he could not set aside his feelings that Tedford was probably guilty.  VDT at 537-542.

Mark Monnie explained that he heard in the jury assembly room, "How many people you know they've picked …They had half the people picked for the jury selection. VDT at 583.[78]

Jeffrey Rodden – who was eventually selected and served as a juror – explained that the first he ever heard of the case was in the jury room when he came in for jury duty. VDT at 658.

Finally, Thomas Rodgers, Jr., explained that he had been told by another prospective juror in the jury room that Ms. Revak worked at The Finishing Touch, VDT at 695-696, although he could not recall the identity of the prospective juror.

Despite the fact that prospective jurors were still testifying that they had engaged in discussions about the trial and had read about the case in the newspapers *in the jury assembly room*, trial counsel still continued to allow panelists to be selected and excused without asking about the activities in the jury room.

At the beginning of the fourth day of jury selection, January 30, 1987, the defense made a motion to excuse for cause any selected jurors who admitted to reading the newspaper articles about the case. The Commonwealth noted that the parties had already agreed to this. However, trial counsel never requested that the trial court recall those previously selected jurors who had not been asked whether they had read the newspaper

---

[77] The only "solid piece of information" reported at that time was that Ms. Revak had been found in Washington County, that the District Attorney said she "died within hours" of an interview and disappeared, and that Tedford was in prison for assaulting two women in Pittsburgh and was on work release.
[78] The media reported that same morning that half the jury had been selected.

articles distributed in the jury room, e.g., Juror Harry Berger, VDT at 76-87 (not questioned about reading newspapers in the jury room).  Moreover, Juror Jeffrey Rodden admitted that he read the news sheet, but trial counsel never requested that he be recalled and/or excused for cause.  VDT at 651-662.

Voir dire then continued with the selection of Dennis F. Goggins as a juror.  VDT at 777-778.  Goggins readily admitted that he heard about the case in the jury room, but he was never specifically asked if he saw or read the newspapers in the jury room. Again, a review of voir dire shows that a great number of prospective jurors were excused for various reasons without being asked about the events, conversations, or newspapers in the jury assembly room.

On the next day of jury selection, the most complete picture of misconduct emerged.  Donna M. Hertzhog explained that those waiting to be called for voir dire were speculating (and angry) as to why Tedford was out of jail on work release.  VDT 970.

Diane Perko, a paralegal, (discussed previously) was then called during voir dire. Ms. Perko explained that prospective jurors in the jury room were openly discussing the case and Tedford's prior conviction:

Q:      And you know no facts about this case whatsoever?

A:      *Other that what I heard while we were all waiting*.

Q:      What did you hear at that point?

A:      I heard, basically, what the judge said today that this woman's body – Her car was found in Pine Creek Shopping Center.  Her body was found in Washington County.  She did not know the defendant.  She was raped and murdered.  What else?

Q:      *Who told you this*?

A:      *The other prospective jurors*.

Q:      Did any of them express their opinions about the case in addition to –

A:      Yes, yes.  *A good many thought that the defendant was guilty.*

***

Q:      Had you already received the instructions from the court in the orientation when this discussion took place or was it even before then?

A:      *Well, immediately when I walked in someone had said to me: You know why we're here?  I said:  No, I didn't.  The murder case.  And I said:  What murder case?  And I was informed as soon as I walked in that this was basically what it was about.*

***

Q:      Did anybody relate any information to you that you overheard about the defendant himself as to his background?

A:      Yes.

Q:      What did you learn?

A:      *I learned today that twelve years ago he beat up a nurse.*

Q:      *Where did you learn that information*?

A:      *Here.*

Q:      *Among the prospective jurors*?

A:      *Downstairs.*

Q:      *That was more or less common knowledge of the people down there*?

A:      *Yes.*

VDT at 980-984 (emphasis added).

When evidence of jury room discussions about extraneous information came to the court's attention during jury selection, Tedford moved for a mistrial but the trial court denied the motion. Trial counsel, however, *never took the obviously necessary step of moving to question the several jurors who had already been selected about their exposure*

209

*to the prejudicial information after it was revealed that such information was being openly discussed in the room where the potential jurors were located.*  VDT at 965-970, 974-980-995.

The trial court's response to learning of the exposure of the potential jurors to this extremely prejudicial information was further inadequate and prejudice to Tedford should be presumed. See, Irvin v. Dowd, 366 U.S. 717 (1961); Turner, supra, 379 U.S. at 473 (presumption of prejudice applies when jury is exposed to damaging extra-record material) and the further discussion infra.

Subsequent questioning of potential jurors shows, however, that information about Tedford's prior conviction was known to the prospective jurors. For example, Merle N. Shearer heard that Tedford "had been like on a probation or had been in trouble prior to this problem."  VDT at 1002. Sherry L. Pfeiffer stated that she "never learned anything *until* [she] came in here [for jury selection].  VDT at 1045.  Glenda Seybert stated that the prospective jurors discussed the case.  VDT at 1067-1085.  Mary J. Graham explained that she had been discussing the case with other prospective jurors in the smoking room, however, she had been in and out of the smoking room and was unsure about everything that was discussed.  VDT 1099-1104.

Ramona Rezzatano explained that she had talked with others about Tedford's prior criminal history and recalled someone mentioning –falsely—that he had a prior conviction for child abuse.  VDT at 1105-1110.[79] Rezzatano was also in the smoking room, and stated that potential jurors were milling in and out of the room.  Treva J. Weichley said she heard

---

[79] When asked about the judge's admonition to prospective jurors not to speak to anyone.  Ms. Rezzatano explained that she and the others thought that admonition would apply only if they were selected as jurors. VDT at 1110.

the same information in the jury assembly room as she had read in *The Butler Eagle*. VDT at 1137-1142. Ella J. Frost[80] was part of the group discussing the case in the smoking room, but she stated that she had "visited around" with other prospective jurors outside the smoking room in the jury assembly room. VDT at 1174-1182. Margaret Cupps stated that she knew that Tedford "was working at this place as an inmate work, whatever you call it, he was in jail and came to work." VDT at 1185-1186. Flora Voigt explained that "everybody everywhere" discussed the case, that it was generally known that Tedford was on work release and that Tedford had "supposedly raped and killed a nurse." VDT at 1190-1200. When asked about her knowledge of Tedford's prior record, Clara L. Hanny stated that she had learned from her discussions with other prospective jurors that "Evidently, there was another incident several years ago with another young woman." VDT at 1210-1219. The final person called that day, Mark W. Donaldson, said the case was a subject of discussion in "plenty of instances", and that "a lot of opinions" had been expressed. VDT at 1219-1226.

Aside from the misconduct readily apparent from the Voir Dire Transcript, in the absence of an evidentiary hearing, the full extent and nature of the information that reached the actual jurors is unknown. Juror affidavits, however, reveal that the jurors did, in fact, have inaccurate and prejudicial information about Tedford's prior arrest and conviction.

The fact that Tedford had a previous conviction *involving a nurse* was never disclosed at trial or at sentencing, nor was any information or facts about the extent of the victim's injuries and/or hospitalization. The only place that information was found was in the newspapers. See, e.g. "Tedford Trial Jury Selection Gets Underway", The Butler

---

[80] Ms. Frost was identified by Ms. Weichley as one of the persons who was discussing the case.

Eagle, January 27, 1987 ("In 1973 Tedford had pleaded to multiple charges for *attacking a nurse* in Pittsburgh with a baseball bat.  He had served 12 years of a 15-30 year sentence when he was granted work release status")(emphasis added); "Judge Denies Two Mistrial Motions in Tedford Case", The Butler Eagle, January 28, 1987 (same).  See, Exhibit T to Tedford's original appendix to his original petition for a writ of habeas corpus, Document No. 26-1 at 135-136.

However, it is clear that prospective jurors, and the actual jurors who deliberated on Tedford's conviction and sentence, somehow knew that his prior conviction involved a nurse.  See, Diane Perko, VDT at 983 ("I learned today that twelve years ago he beat up a nurse"); Gerald P. Baker, Jr., VDT at 1145 (admitting to discussing Tedford's prior criminal history with others in the jury room); Margaret Cupps, VDT at 1185-1186 (same); Flora Voigt, VDT at 1198 (statements that "everybody" was discussing Tedford's prior criminal history and "[s]upposedly he [Tedford] raped and killed a nurse"); see also the Ramona Rezzatano, VDT at 1107 (stating, in response to a question about Tedford's prior criminal history, "I think somebody said something about child abuse or something of that nature.").[81]

The prejudicial impact of those jury room discussions is obvious. Tedford was on trial for allegedly raping and murdering a young woman. The Commonwealth's case was largely circumstantial. Tedford had an alibi the chief witness against him was a jailhouse snitch with a lot to gain by testifying and the decedent's own husband was a viable suspect. Exposure to claims and information that Tedford had a prior conviction, particularly one

---

[81] Tedford was never charges with, tried for, or convicted of rape, murder or child abuse.  The false and prejudicial information the jurors carried into their deliberations was a result of sensationalized and inaccurate reporting by the news media.

for assaulting or raping another young woman, was more than likely to poison the minds of the jurors and tip the scales towards the guilt of Tedford.

Indeed, the actual jurors were exposed to and influenced by that same prejudicial information and misinformation. Juror Ray "was shocked to learn that Mr. Tedford had attacked *two nurses*. One was blinded in one eye and *one was raped*." See, Exhibit B to Tedford's original appendix to his original petition for a writ of habeas corpus, Document No. 26-1 at 75 (emphasis added). Juror Pickford also "knew" that one of the 1972 victims was a nurse, and her injuries required hospitalization. See, Exhibit C to Tedford's original appendix to his original petition for a writ of habeas corpus, Document No. 26-1 at 77-78. Juror Stitt believed Tedford had a prior conviction for "*raping the nurse* and the other woman." See, Exhibit D to Tedford's original appendix to his original petition for a writ of habeas corpus, Document No. 26-1 at 80-81.

As the affidavits clearly demonstrate, untrue and prohibited information reached the jurors who deliberated on Tedford's guilt. The taint caused by that information was amplified by the jurors' speculation about the prior offense and the extent of the victim's injuries. Jurors Stitt and Ray both were under the impression that Tedford "raped" an "nurse." Juror Ray seemed to think one was "blinded in one eye." See, Exhibit V and Exhibit D to Tedford's original appendix to his original petition for a writ of habeas corpus, Document No. 26-1 at 75 and 80-81. The nature and extent of any injury to the victim in the 1972 offense was never placed before the jury. To do so would have been inherently prejudicial. Instead, at sentencing the jurors were simply read the indictment from the 1972 arrest. TT 774-779. The indictment made no mention of injury to the victim or that

213

Tedford had "raped" anyone or had been charged or convicted of rape (he had not been), or that the victim was a nurse.  Id.

As the Voir Dire testimony discussed herein reveals, the information concerning any injury and an alleged rape came from the jury assembly room conversations prior to the start of trial.  The prejudice to Tedford is undeniable. Jurors Perry Ray, Shirley Pickerd and Ronald Stitt, and surely other jurors as well,[82] predicated their decisions on the prohibited information – some of which the court had barred them from hearing (i.e., the underlying facts of the 1972 arrest) – and some of which was false (i.e., information relating to rape and victim injury) – to convict Tedford and sentence him to death.

Based on the affidavits of Jurors Ray, Pickerd and Stitt, and on the voir dire record showing the repeated and ongoing prejudicial conversations among prospective and actual jurors, it is clear that the jury was impermissibly tainted.

The record also reveals that over the six days of voir dire, trial counsel made several requests for a mistrial and change of venue.  All of those requests were denied despite the fact that the trial court indicated it "would look into" any effect the newspaper articles describing Tedford's prior arrest and conviction had on the venire members.  VDT at 100.

---

[82] Juror Joseph E. Gannon, VDT 103-115, Larry McCormick, VDT 505-526, Jeffrey M. Rodden, VDT 651-653, Patricia M. Maizland, VDT 664-675; Gerald J. Heindl, VDT 699-710, Dennis F. Goggins, VDT 778-788, and Margaret D. Mahan, VDT 814-825, stated they either received early newspaper reports or had heard of or read the early news accounts of the case, but at the time of voir dire they could not remember those accounts.  Juror Goggins said he did not recall the case at all but that he was "sure it made national news…", VDT at 784.  All of those early news accounts, i.e., newspapers, radio and television broadcasts, reported that Tedford was on furlough and/or work release from prison.  For several months, newspaper reports included front page headlines such as "Furloughed Inmate Held For Killing, Post Gazette, February 25, 1986, and "Prisoner on Furlough Charged in Murder", Butler Eagle, as carried by the Associated Press, April 4, 1986.  Without an evidentiary hearing, it is not possible to determine whether those jurors recalled the early reported accounts they had read or heard about, including the false and inaccurate information, when they began hearing trial testimony that Tedford was on furlough work release.

Under such circumstances, Tedford was certainly deprived of his right to a fair trial. Numerous jurors were exposed to highly prejudicial pretrial publicity, which *continued to be distributed and circulated in the jury assembly room* on the eve of trial. Moreover, the prejudicial effect of the pretrial publicity was exacerbated by the freewheeling discussions of that publicity, and the even more salacious rumors and speculation, by prospective and actual jurors.

The Sixth Amendment right to trial by an impartial jury coupled with the Fourteenth Amendment Due Process right to a fundamentally fair trial require jurors to disregard extraneous influences, set aside their preconceived notions and decide whether the defendant is innocent or guilty "based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 723 (1961); Marshall v. United States, 360 U.S. 310 (1959) (exposure to news articles about defendant's prior criminal conduct was prejudicial despite jurors' claims that they could serve impartially); Sheppard v. Maxwell, 384 U.S. 333, 362 (1966). The right to a fair trial by an impartial jury is violated if even one single juror is biased. Parker v. Gladden, 383 U.S. 363 (1966).

Impermissible juror exposure can occur through information conveyed by prospective jurors, other trial jurors or third parties. Parker, supra ( a bailiff gave out information); Turner v. Louisiana, 379 U.S. 466, 472 (1965) (deputy sheriffs' rendering of testimony against the defendant at a trial where they also supervised the jurors and freely mingled and conversed with them violated the defendants right to a fair trial) See, e.g., Turner v. Louisiana, 379 U.S. 466 (1965); Mattox v. United States, 146 U.S. 140, 149 (1892) ("in capital cases [ ] the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment").

Based on prevailing Supreme Court precedent, prejudice here should again be presumed, and relief granted. See, e.g., <u>Turner,</u>  <u>supara</u>, 379 U.S. at 472-73; <u>Mach v. Stewart</u>, 137 F.3d 630, 633-34 (9th Cir. 1998) (granting habeas corpus relief and finding structural error may have existed where, during voir dire of a potential juror in front of the jury pool in a sexual assault case with a juvenile victim, the potential juror, although ultimately struck for cause, repeatedly indicated that in her career as a social worker she had never learned of a case where a child had lied about being sexually assaulted).

But if this Court holds that actual prejudice is required, actual prejudice in this case has been demonstrated through the evidence that the jurors who decided Tedford's fate were exposed to and affected by the publicity, rumors and misinformation. See, the Pickerd, Stitt and Ray affidavits, <u>Appendix B</u> through <u>Appendix D</u> of Tedford's original appendix to his original habeas corpus petition, ECF No. 26-1 at 74-81.

At a minimum, an evidentiary hearing should be convened to determine the full extent and effect of juror exposure and misconduct at Tedford's trial, Perko's affidavit demonstrating that even at this late date, juror recall regarding the "free for all" that was the jury room in Tedford's case should be quite vivid. <u>Smith</u>, 455 U.S. at 215, 217; <u>Weatherwax</u>, 20 F.3d at 578-80.

After the PCRA court denied Tedford a hearing and relief at this issue, the Pennsylvania Supreme Court held that the underlying claims of denial of a fair trial and ineffective assistance of trial counsel were waived. <u>Tedford</u>, 960 A.2d at 13.  Given the Pennsylvania Supreme Court's established practice of relaxed waiver in capital cases, that ruling was not adequate to bar federal habeas review. Indeed, settled Third Circuit law in this area is that the Pennsylvania Supreme Court's practice of relaxed waiver made clear

that a "claim of constitutional error in a [Pennsylvania] capital case would not be waived by a failure to preserve it." Bronshtein v. Horn, 404 F.3d 700, 708 (3d Cir. 2005) (Alito, J.) (quoting Szuchon v. Lehman, 273 F.3d 299, 326 (3d Cir. 2001)).  As a result, there is no adequate state bar in Pennsylvania capital cases from the Tedford era.[83]

The Third Circuit has further held that "when a petitioner requests a hearing to develop the record on a claim in state court, and if the state courts ... deny that request on the basis of an inadequate state ground, the petitioner has not failed to develop the factual basis of [the] claim in State court proceedings for purposes of § 2254(e)(2)." Morris v. Beard, 633 F.3d at 194-95 (quoting Wilson v. Beard, 426 F.3d 653, 665 (3d Cir. 2005)) (internal quotation marks omitted). Because the state court denied the claims of denial of a fair trial and ineffective assistance of trial counsel on the basis of an inadequate state ground, there is no § 2254(e)(2) bar to a hearing on those claims.

Throughout the PCRA proceedings, Tedford alleged that his trial counsel was ineffective for failing to take the necessary steps to protect his right to an impartial jury and that post-verdict/appellate counsel was ineffective for failing to raise the issue properly in post-verdict motions and on direct appeal.

The situation here, and trial counsel's inadequate response, are analogous to the situation confronted by the Third Circuit in Weatherwax, supra.  In Weatherwax, trial counsel was informed that a juror had entered the jury room with a prejudicial newspaper article but took no action in response. The Third Circuit determined that absent some

---

[83] See, e.g., Wilson v. Beard, 589 F.3d 651, 658-59 (3d Cir. 2009); Lewis v. Horn, 581 F.3d 92, 105-06 (3d Cir. 2009); Thomas v. Horn, 570 F.3d 105, 117 n.4 (3d Cir. 2009); Holland v. Horn, 519 F.3d 107, 115 (3d Cir. 2008); Taylor v. Horn, 504 F.3d 416, 428 (3d Cir. 2007); Laird v. Horn, 414 F.3d 419, 425 (3d Cir. 2005); Bronshtein, 404 F.3d at 708-10; Jacobs v. Horn, 395 F.3d 92, 117 (3d Cir. 2005); Crews v. Horn, 360 F.3d 146, 153 (3d Cir. 2004); Carpenter v. Vaughn, 296 F.3d 138, 147 (3d Cir. 2002); Szuchon, 273 F.3d at 326; Jermyn v. Horn, 266 F.3d 257, 278-79 (3d Cir. 2001); Fahy v. Horn, 240 F.3d 239, 245 (3d Cir. 2001).

strategy or tactic, this failure constituted deficient performance, and that the "district court erred in not holding an evidentiary hearing to determine the truth of Weatherwax's assertions ...." Weatherwax, 20 F.3d at 580.

Here, while fully aware of the flood of prejudicial information that had inundated this jury pool, counsel failed inexplicably to question the jurors who had been seated about what they heard in the jury room. Moving for a mistrial and conducting some inquiry of the as-yet unselected jurors was an inadequate remedy. See, e.g., Smith, supra; Weatherwax, supra; United States ex rel. Greene v. New Jersey, 519 F.2d 1356, 1357 (3d Cir. 1974) ("[i]n light of widespread dissemination of prejudicial information, at the very least, the state court should have conducted an immediate voir dire to determine if the jury had read the offensive articles.").

Trial counsel's failure to demand this inquiry was deficient performance. The juror declarations proffered in state court and included in Tedford's original appendix show that if trial counsel had demanded such an inquiry, it likely would have resulted in the dismissal of already selected jurors, and/or the preservation of a meritorious claim that likely would have resulted in reversal on direct appeal.

Tedford's post-verdict and appellate counsel were likewise ineffective for failing to investigate the extent to which actual jurors were exposed to prejudicial publicity and discussions of the case regarding Tedford's history, for failing to call such jurors to testify at the post-verdict evidentiary hearing and for failing to properly raise this issue on direct appeal. *Juror exposure to prejudicial information is apparent from the voir dire record*. Post-verdict and appellate counsel had a duty to investigate this matter further and there was no reasonable strategic or tactical basis in play that was designed to effectuate

Tedford's interests that motivated counsel's failure to investigate. Had counsel then properly investigated the matter, litigated and raised this claim, Tedford would likely have received a new trial on appeal.

On direct appeal, Tedford raised two related record-based claims alleging that the jury was tainted by pretrial publicity and materials circulated in the jury room during voir dire.[84] The Pennsylvania Supreme Court denied both claims, essentially on the grounds that Tedford had failed to show that the publicity was so egregious that prejudice should be presumed, and had failed to show any actual prejudice. Commonwealth v. Tedford, 567 A.2d 610, 618-21 (Pa. 1989).

In his first PCRA, Tedford raised the claim presented here in a thorough and comprehensive fashion.[85] The Pennsylvania Supreme Court, however, first held that all claims of trial court error and ineffective assistance of trial counsel were waived and were reviewable only as "'layered' claim[s] of ineffectiveness focusing on appellate counsel." Commonwealth v. Tedford, 960 A.2d 1, 13 (Pa. 2008). The Court did not review the

---

[84] Tedford filed a Nunc Pro Tunc Motion for New Trial and Motion in Arrest of Judgment on April 27, 1987, and two amendments to that motion.  In each of those pleadings, Tedford raised record based claims that the jury was tainted by pretrial publicity, and that a change of venue or mistrial should have been granted. In the amended pleadings, Tedford further asserted that additional irregularities were revealed during voir dire.
Appellate counsel did not support those record based claims with any extra record evidence that actual jurors had been exposed to prejudicial information, and did not request an evidentiary hearing on those record based claims. Appellate counsel did not allege that trial counsel had been ineffective in his handling of this issue.
On December 9, 1987, the trial court ordered an evidentiary hearing on Tedford's claims that trial counsel was ineffective. The court did not order a hearing on the record based claims that the jury was tainted. No evidence regarding those claims was presented at the evidentiary hearing that was held on February 1-3, 1988.
[85] Tedford raised the claim presented here both in the PCRA Petition filed on January 14, 1997, and as Claim I in the Amended Petition filed on August 26, 2002, following remand from the Pennsylvania Supreme Court. Tedford sought an evidentiary hearing on all of the claims in the Amended Petition. On March 13, 2003, the PCRA court granted an evidentiary hearing, apparently with respect to all of the claims in the Amended Petition. Following further briefing, the PCRA court changed course and dismissed all of the claims in the Amended Petition without a hearing, with the exception of the claim relating to post verdict motions/appellate counsel laboring under a conflict of interest, on which the state court held an evidentiary hearing on May 18, 2004.

record-based tainted jury claim because it concluded that it had been previously litigated, a factually inaccurate assertion. Id. at 18.

With respect to the component of the claim that relied on the juror declarations that were submitted to the Court in connection with the PCRA litigation, the Pennsylvania Supreme Court concluded: (1) the declarations did not provide new evidence that seated jurors had been tainted, Id. at 18-19; (2) post-verdict/appellate counsel had no obligation to investigate and interview jurors to obtain support for the jury taint claim, Id. at 20; and (3) that Tedford had failed to show prejudice, given the efforts undertaken by the trial court to ensure an impartial jury. Id. Such a ruling was patently unreasonable.

In the first instance, rejecting presumed prejudice was an unreasonable application of clearly established federal law. See, e.g., Rideau v. Louisiana, 373 U.S. 723 (1963); Skilling v. United States, 130 S. Ct. 2896, 2915-16 (2010) (discussing long-established factors governing whether prejudice should be presumed); United States v. Casellas-Toro, 807 F.3d 380 (1st Cir. 2015) (presuming that pre-trial prejudiced the defendant's ability to be judged by a fair and impartial jury and reversing conviction).

At the time of Tedford's trial and as can be seen by a survey of the voir dire transcript, Butler County was a compact, insular and largely rural community. The Tedford trial was a huge event, and the trial court's efforts to restrain the pervasive media frenzy that attended it were simply insufficient and ineffective. The trial court's inability to insulate the jurors/potential jurors from the media frenzy that accompanied the trial, however, made the situation dramatically worse. The media described Tedford as serving a sentence for the rape of a nurse and the blinding of another in one eye with a baseball bat

in such a blatantly prejudicial way as to make this trial a mockery.  The nature of the publicity at issue could not have been worse for the prospects of a fair trial.

The plethora of Supreme Court cases cited herein make it abundantly clear that prejudice against Tedford must be presumed and the abridgment of Tedford's Sixth and Fourteenth Amendment rights require the granting of habeas corpus relief.

As to the state court's waiver ruling as to the denial of a fair trial and ineffective assistance of trial counsel claims, the Pennsylvania Supreme Court's decision was not a ruling on the merits of those claims but the application of a procedural bar. A procedural bar ruling is not an adjudication of the merits, and hence is not subject to review under § 2254(d). See Bronshtein v. Horn, 404 F.3d 700, 710 (3d Cir.2005). To the extent, however, that the state court decision is construed as having adjudicated the merits of the fair trial, ineffective assistance of trial counsel and ineffective assistance of appellate counsel claims, the decision is prima facie unreasonable.

First, the state court's assertion that the juror declarations did not provide new evidence of juror exposure was blatantly unreasonable in light of the state court record.

At the guilt phase of the trial, the jurors learned that Tedford was on work release at the time of the offense and at the penalty phase they were told the bare fact that he had a prior conviction for assaulting a woman. No evidence, however, was ever presented as to the details of that assault. But information about the prior offense was published in newspapers and a radio station newsletter that were available to jurors in the jury room and the jurors freely discussed that information among each other.

During voir dire, prospective jurors said that they had heard Tedford attacked a nurse, and that he had raped and killed the nurse. See VDT at 983, 1198.  But no evidence

at either phase was presented that the victim was a nurse, or that she was raped, or about any specific injuries that she suffered.

In the PCRA proceedings, Tedford presented the sworn declarations from three of the seated jurors. They confirmed that their verdict was based on information learned outside the trial record. [86] The Pennsylvania Supreme Court gave two reasons for discounting these declarations.

First, the Court stated that the declarations "appear to be referring to learning of appellant's prior record at the penalty phase ..., and not from any jury room discussions during voir dire." Tedford, 960 A.2d at 19 (citing Ms. Pickerd's reference to the "second part of the trial"). This inference is unreasonably wrong, however, as all three of the jurors recounted learning of information that: (a) was inaccurate, and (b) was not conveyed to the

---

[86] In relevant part, they attested the following:

> I remember when we were told about Tedford's past criminal history. I was shocked to learn that Tedford had attacked two nurses. One was blinded in one eye and one was raped. I know that my fellow jurors were just as upset as I was by this information.

Declaration of Perry Ray, Appendix B to Tedford's original appendix to his original habeas corpus petition. B, ¶ 3 at ECF No. 26-1 at 74-75.

> I remember that second part of the trial when we were given information about Mr. Tedford's criminal history to take back to the jury room with us.... [W]hat we heard about him just reinforced our decision. He had beaten a nurse and another woman. One woman's injuries were so extensive that she was in the hospital a long time.

Declaration of Shirley Pickerd, Appendix C to Tedford's original appendix to his original habeas corpus petition, ¶ 5 at ECF No. 26-1 at 76-78.

> [T]he defendant was given a second chance when he was put on work release after his convictions for raping the nurse and the other woman. He used that chance up when he committed this murder and so he automatically deserves the death penalty.

Declaration of Ronald Stitt, Appendix D to Tedford's original appendix to his original habeas corpus petition. ¶ 2 at ECF No. 26-1 at 79-81.

jury at penalty phase, but (c) was consistent with what prospective jurors reported hearing in the jury room.[87]

Second, the Pennsylvania Supreme Court *openly speculated* that the jurors "could have learned" the misinformation they recounted in their declarations "in another way during the close to 10 years between appellant's trial and the date of [their] declarations to PCRA counsel." Tedford, 960 A.2d at 19 n.11.

This is precisely why an evidentiary hearing was needed and should have been convened. Tedford had no burden to disprove every hypothetical scenario the Pennsylvania Supreme Court could come up with as a basis for denying him relief and he should have *at least been afforded a hearing* by the Pennsylvania courts to further develop the facts necessary to properly resolve this claim rather than have the Pennsylvania Supreme Court contrive reasons to deny the claim.  Indeed, under Pennsylvania law Tedford was entitled to an evidentiary hearing if the "petition for post-conviction relief ... raises material issues of fact." Pa. R Crim. Pro. 908(A)(2).

In any event, the Pennsylvania Supreme Court's conjecture ignores the similarity between what these jurors "knew" about Tedford and what other prospective jurors had heard about him in the jury room, facts strongly supporting the need for a hearing.

The state court's ruling that appellate counsel had no duty to interview jurors, Tedford, 960 A.2d at 20, was also an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984), and its progeny, including Evitts v. Lucey, 469 U.S. 387 (1985).

_____

[87] Only Ms. Pickerd made a specific reference to the penalty phase in her declaration.

The per se bright line rule applied by the Pennsylvania Supreme Court for judging counsel's performance is inconsistent with Strickland. The Strickland Court repeated that each case must be judged on its own facts. See, e.g., Strickland, 466 U.S. at 688-90.

"Whether a rule inures to the benefit or disadvantage of the defendant, Strickland does not permit the imposition of such bright-line rules." Lewis v. Johnson, 359 F.3d 646, 659 (3d Cir. 2004) (Pennsylvania courts unreasonably applied Strickland when they used bright-line rule that "counsel cannot be held ineffective for failing to file an appeal when his client has not asked him to do so"); accord Hughes v. Beard, Civil No. 06-250, 2007 WL 2791423, *8 (E.D. Pa. Sept. 25, 2007) (Pennsylvania Supreme Court unreasonably applied Supreme Court precedent  where it applied bright-line rule that "where a defendant has testified at trial and has denied committing a crime," counsel will not be found "ineffective for failing to present a defense that would have been in conflict with his client's own testimony" (quoting Pennsylvania Supreme Court's opinion)); Roe v. Flores-Ortega, 528 U.S. 470, 478 (2000) (rejecting bright line rules as inconsistent with Strickland).

Rather, what the Sixth Amendment requires is that the court consider "whether counsel's assistance was reasonable considering all the circumstances." Harrington v. Gillis, 456 F.3d 118, 125 (3d Cir. 2006) (quoting Strickland).

In this case, Tedford's claim was and is specific and tied to the facts of this case. From the perspective of appellate counsel, those facts include: (a) the voir dire record revealing a high degree of juror exposure to and pretrial discussion of prejudicial information and misinformation; (b) the voir dire record further revealing that the issue of jury contamination was so pervasive that it prompted trial counsel to move for a mistrial in the midst of jury selection, (c) the issue of potential jury taint being sufficiently meritorious

and important that it was the first issue raised in Tedford's brief on direct appeal; and (c) while there was reason to conclude that actual jurors were absolutely exposed to the same prejudicial information, the direct appeal record did not disclose whether the seated jurors were actually exposed to it *because trial counsel did not make the proper inquiries*.

In these circumstances, appellate counsel had a duty to investigate the case ant interview the jurors. As the Pennsylvania Supreme Court pointed out in <u>Tedford</u>, 567 A.2d at 620-21, the inability to show that the actual jurors were exposed to prejudicial information undermined the issue that appellate counsel chose as the lead issue in the direct appeal brief.

Given what was apparent from the record of the voir dire proceedings, appellate counsel had every reason to believe that actual jurors were exposed to the same prejudicial information as prospective jurors. Under the Pennsylvania's rules at the time, appellate counsel was aware that failure to plead and fully develop claims that trial counsel was ineffective would lead to a "waiver" of such claims. See, e.g., <u>Commonwealth v. Moore</u>, 860 A.2d 88, 97-98 (Pa. 2004) (finding appellate counsel ineffective for failing to investigate and present evidence showing prejudice resulting from trial counsel's deficient performance where appellate counsel raised claim of trial counsel's ineffectiveness on direct appeal). The only way to investigate this particular claim was to interview the actual jurors to determine whether they, too, were exposed to the prejudicial information pretrial.

It must also be noted that the state court ruling that prejudice cannot be demonstrated because the trial court attempted to ensure selected jurors were impartial, <u>Tedford</u>, 960 A.2d at 20, is an unreasonable application of <u>Strickland</u>.

The fact that the trial court made some attempt to ensure that the selected jurors were impartial does not preclude a showing of prejudice, particularly here, where information about juror exposure to and discussion of highly prejudicial matters became known to the court near the end of the voir dire process after several jurors had already been selected. The law is clear that in such instances further inquiry concerning the jurors' exposure to such information is required. See, e.g., Smith v. Phillips, supra; Weatherwax, supra; Dowling, supra,

While it was obviously preferable to conduct such an inquiry as close in time to the events as possible and it is reasonably likely that had trial counsel demanded such an inquiry, the trial court would have undertaken it and that a mistrial or the exclusion of seated, biased jurors would have occurred.  And it is reasonably likely that if appellate counsel had investigated and raised the issue, the post-verdict motion court would have held a hearing on the claim, and that the facts so developed would have resulted in vacation of the conviction on direct appeal.

The jury here was predisposed to believe that Tedford was guilty and Tedford was stripped of the presumption of innocence. What happened in this case was, in reality, not a trial at all about whether the Commonwealth could prove that Tedford raped and murdered Ms. Revak but a formality driven by what the jurors perceived they knew about the case before the trial even began.  Juror exposure to prejudicial information about Tedford was so severe that it compels habeas corpus relief as the extraneous information completely eroded any possibility of a fair weighing of the actual evidence presented at trial.

## GROUND V(D)(2).  THE JURORS AT TEDFORD'S TRIAL CONSULTED AND RELIED UPON THE BIBLE DURING THEIR DELIBERATIONS IN VIOLATION

**OF HIS RIGHTS UNDER THE FIRST, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**.

Instead of a trial starting from the premise that Tedford was presumed innocent and requiring the jury to assess through proper deliberation whether the Commonwealth had proven its case beyond a reasonable doubt, the jury in this case relied upon the Bible and interpretations of It to find Tedford guilty in clear violation of Tedford's rights,[88]

The Sixth Amendment guarantees a defendant "a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). The right to trial by an impartial jury is violated if even a single juror is biased. Parker v. Gladden, 383 U.S. 363 (1966). Due process requires that the jury be willing and able to decide the case solely on the evidence before it.  Smith v. Phillips, 455 U.S. 209, 217 (1982). These rights are violated if jurors are impermissibly exposed to external influences conveyed by third parties or by other jurors or prospective jurors.[89]

In his original habeas corpus petition, Tedford proffered sworn declarations from seated jurors attesting to the fact that Juror Gannon brought his Bible to the jury deliberations; "led the jurors in prayer and read us verses from his Bible" during

---

[88] Tedford raised this claim both in the PCRA Petition filed on January 14, 1997, and as Claim VIII in the Amended Petition filed on August 26, 2002, following remand from the Pennsylvania Supreme Court. Tedford sought an evidentiary hearing on all of the claims in the Amended Petition. On March 13, 2003, the PCRA court granted an evidentiary hearing, apparently with respect to all of the claims in the Amended Petition. Following further briefing, however, the PCRA court changed course and dismissed all of the claims in the Amended Petition without a hearing, with the exception of the claim regarding which the state court held an evidentiary hearing on May 18, 2004.

[89] Parker, 385 U.S. at 364-65 ("the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel" (internal quotation marks omitted)); Turner v. Louisiana, 379 U.S. 466, 472 (1965) ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."); Remmer v. United States, 347 U.S. 227, 229 (1954) (stating that "private communication, contact, or tampering" with the jury is presumptively prejudicial); Mattox v. United States, 146 U.S. 140, 149 (1892) (stating that "in capital cases [ ] the jury should pass upon the case free from external causes tending to disturb the exercise of deliberated and unbiased judgment").

deliberations; and that this took place "[e]ach time we went into the jury room to deliberate." See, <u>Exhibit C</u> and <u>Exhibit D</u> to Tedford's original appendix to his original habeas corpus petition, ECF No. 26-1 at 76-81.[90]

With respect to consideration of the Bible, it is well recognized that juror consultation of the Bible during deliberations constitutes an impermissible external influence. See, e.g., <u>Oliver v. Quarterman</u>, 541 F.3d 329, 340 (5th Cir. 2008) ("the jury's consultation of the Bible passages in question during the sentencing phase of the trial amounted to an external influence on the jury's deliberations"); <u>McNair v. Campbell</u>, 416 F.3d 1291, 1308 (11th Cir. 2005) (where jury consulted Bible during guilt phase deliberations, "it is undisputed that jurors ... considered extrinsic evidence during their deliberations"); <u>Gapen v. Bobby</u>, 2011 WL 5166566, *4, Civil No. 08-280 (S.D. Ohio Oct. 31, 2011) (collecting cases). Courts are divided, however, as to whether consultation of the Bible creates a rebuttable presumption of prejudice or whether the effect should be examined under <u>Brecht v. Abrahamson</u>, 507 U.S. 519 (1993) to determine whether the error 'had substantial and injurious effect or influence in determining the jury's verdict. Compare <u>McNair</u>, 416 F.3d at 1308 (applying rebuttable presumption of prejudice) with <u>Oliver</u>, 541 F.3d at 341 (reviewing issue under <u>Brecht</u>) with; See also, <u>United States v. Brown</u>, No. 3:16-cr-93-J-32JRK (M.D. Fla. August 16, 2017) (explaining why juror had to be dismissed during trial after expressing that he had "received information as to what [he] was told to do" from his "Father in Heaven" and that "the Holy Spirit "told him that

---

[90] While Tedford is no longer challenging the imposition of the death penalty, it should be noted in evaluating his active claims that Tedford additionally proffered that Juror Berger informed defense investigator Pamela Tucker that Juror Gannon "reminded the jury that God and the Bible were in favor of the death penalty and that sentencing the defendant to death was not only approved of by the Christian religion but was required by the Lord." See, <u>Exhibit M</u> to Tedford's original appendix to his original habeas corpus petition, ECF No. 26-1 at 103-105.

Corrine Brown was not guilty of all charges"); <u>Martinez v. Royal</u>, No. CIV-16-1278-D (W.D. Okla. January 2, 2019 (granting evidentiary hearing on a Bible access related claim).

Applying either the rebuttable presumption of prejudice standard, see, <u>Irvin</u>, <u>supra</u>, or the prejudice standard set forth in <u>Brecht</u>, <u>supra</u>, Tedford should be granted relief.

While there is no record on this issue beyond the proffered affidavits and no factual findings from the state courts, the affidavits are compelling proof that the jurors in Tedford's case not only consulted the Bible during the guilt (and penalty phase deliberations), but that those consultations fatally harmed Tedford, Juror Gannon arguing that the Bible and God required the jurors reach certain conclusions in the case. These types of Biblical arguments that urge a particular result are what "cross an important line." <u>Oliver</u>, 541 F.3d at 339.

Given that the Pennsylvania courts failed to permit Tedford to further develop the record in this regard, this Court should hold a hearing at which the jurors can testify (or to take their testimony by deposition). See <u>Gapen</u>, 2011 WL 5166566 at *4. Accordingly, an evidentiary hearing has the potential to advance Tedford's claim and may be convened by this Court. See <u>Morris v. Thaler</u>, 2011 WL 1886096, *9 & n.1 (5th Cir. May 18, 2011) (unpublished); accord <u>Hearn v. Ryan</u>, 2011 WL 1526912, *2 (D. Ariz. Apr. 21, 2011). Nothing here prevents the court from conducting such a hearing. <u>Williams v. Taylor</u>, 529 U.S. 420, 437 (2000).

The Pennsylvania courts reviewed this only as "'layered' claim[s] of ineffectiveness focusing on appellate counsel." <u>Tedford</u>, 960 A.2d at 13. Accordingly, the Pennsylvania Supreme Court did not address the underlying exposure to external influence claim, but only a claim that appellate counsel was ineffective for failing to investigate and

raise the underlying claim. With respect to that ineffective assistance of appellate counsel claim, the state court ruled that appellate counsel's failure to question jurors was not and could not be deficient performance, and that Tedford had not "prove[d] improper use of the Bible ...." Id. at 39-40 (emphasis original).

The state court's ruling on the underlying external influence claim is thus a procedural ruling that was not adequate to preclude federal habeas review of the merits, given the state court's relaxed waiver practice. Accordingly, this Court's review of the external influence claim is de novo. Bronshtein, 404 F.3d at 708; Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).

And the state court's review of the ineffective assistance claim was an unreasonable application of Strickland and Evitts. As discussed supra, the state court's bright line rule regarding juror interviews is inconsistent with Strickland's case-by-case approach to ineffective assistance claims.

Indeed, the state court's assertion that counsel had no duty to engage in an inquiry of the jurors to flesh out the extent to which the Bible influenced the verdict is inconsistent with prevailing law in this Circuit as articulated in Rompilla v. Beard, 545 U.S. 374, 390-91 & n.8 (2005).

The state court's assertion that Tedford failed to prove improper use of the Bible by the jury, Tedford, 960 A.2d at 40, is also procedurally unreasonable. For purposes of ruling on a claim that had been denied without a hearing, the Pennsylvania Supreme Court was required to accept Tedford's proffers and allegations as true. Assuming Tedford proved the proffered facts at a hearing properly convened, the state court's decision was plainly an unreasonable application of the external influence decisions discussed supra.

See, e.g. <u>Fahy v. Horn</u>, 516 F.3d 169, 183 (3d Cir. 2008) Here, Tedford alleged and proffered that jurors consulted the Bible during their deliberations and Tedford's allegations establish a Sixth Amendment violation. It was simply unreasonable for the state court not to hold hearing and then deny the claim for lack of proof.

The jurors in this case should not have decided Tedford's fate based on anything other than the evidence in this case and a writ of habeas corpus should issue.

## GROUND V(E)(1).   TEDFORD IS ENTITLED TO RELIEF BASED UPON THE ACCUMULATION OF ERRORS.

Tedford's conviction was the product of multiple, egregious constitutional violations by the Commonwealth, the trial court, and chronically deficient trial and appellate counsel. As set out throughout this amended petition, each of these violations was of such magnitude as to undermine the reliability of the verdicts and require relief.

However, even if this Court determines that Tedford failed to meet his burden to prove the prejudice resulting from any one of these violations, it is well-established that this Court must also examine whether the cumulative effect of these errors violated Tedford's right to due process of law. See, e.g., <u>United States ex rel. Sullivana v. Cuyler</u>, 631 F.2d 14, 17 (3d Cir. 1980) ("[T]he cumulative effect of the alleged errors may violate due process, requiring the grant of the writ, whereas any one alleged error considered alone may be deemed harmless."); <u>Taylor v. Kentucky</u>, 436 U.S. 478, 487-88 & n.15 (1978); <u>Chambers v. Mississippi</u>, 410 U.S. 284, 290 n.3 (1973).

Assessing the prejudicial effect of the cumulative errors requires examination of the entire record. This Court must consider the prejudice stemming from all constitutional errors, including the ineffective assistance of Tedford's counsel in failing to investigate, prepare and present the defense case; misconduct by the prosecution, including the

231

suppression of exculpatory evidence and improper and inflammatory argument to the jury; errors by the trial court, including the denial of a mistrial when the extent to which extraneous information had infiltrated the jury room became known; and that the conviction rested on fundamentally unreliable expert testimony. This Court's cumulative analysis includes an assessment of both evidence, argument and instruction the jury should have heard, but did not, and evidence and argument that the jury heard, but which should have been excluded.

During jury selection, Tedford's jury had access to prejudicial information about him and his case that undermined their ability to plausibly answer the question of whether Tedford had murdered Ms. Revak in an unbiased fashion.  Diane Perko described the jury room as a "free for all" by the dissemination and discussion of prejudicial information. When the trial commenced, the jury relied on the Bible instead of exclusively focusing on the evidence to reach a verdict an honest assessment of the evidence in the case would not have sanctioned.

The question for the jury was whether to believe that Tedford had consensual sex with Ms. Revak at The Finishing Touch or whether the Commonwealth proved beyond a reasonable doubt that he raped and murdered her there. Against this backdrop, the Commonwealth failed to meet the most minimal standard of due process even before the trial began, supplying Tedford less than half of the discovery to which he was entitled including the most exculpatory evidence imaginable: never disclosing to Tedford that the lead investigator concluded the Commonwealth's theory of the case was wrong, effectively making Ferry a liar. The question remains, however, as to why Stanek reached this

conclusion, the answer undoubtedly lying in the undisclosed reports of the PSP, the Criminalist's bench notes and the files of the District Attorney of Butler County.

As for the forensic evidence, while it was generally consistent with Tedford's testimony, and to the extent the prosecutor twisted it otherwise, the science upon which it was offered was an utter fallacy, the Federal Bureau of Investigation refuting the validity of this type of visual inspection comparison testimony by its trained examiners.

Of the two jailhouse informants, we now know that Ferry was lying, and two fellow inmates of his were willing to explain how he lied about Tedford at trial.  As for White, while it appears that everyone close to White knew that you could not believe a word out of his mouth due to his mental health problems, the jury heard none of it, White's testimony was virtually un-impeached at trial.

And the critical question that haunts this case remains:  where was the blood? While the Commonwealth tried to diminish its significance in contravention of trial testimony it offered, Ms. Revak suffered a severe bleeding head wound that drenched her clothing with blood.  Where was it at The Finishing Touch and where was it in Tedford's car? Scientific tools existed in 1986 to find even microscopic evidence of such blood, but the failure to find it was no doubt a part of Stanek's calculus that Ms. Revak was not murdered in The Finishing Touch.  And counsel's failure to offer affirmative expert opinion that blood had to be present if the murder occurred at The Finishing Touch was inexcusable.

Unable to accept Stanek's true conclusions about the case, the Commonwealth distorted the evidence through various instances of prosecutorial misconduct and obtained a result an honest assessment of the evidence in no way supports.

The errors outlined in this Amended Petition in part and otherwise, contributed to and exacerbated by ineffective trial and appellate counsel, have resulted in a true tragedy, the only remedy available to this Court the grant of Habeas Corpus Relief.

**GROUND V(E)(2).  TEDFORD ALSO SPECIFICALLY CLAIMS THAT HE IS ACTUALLY INNOCENT OF THE CRIME.  HE ACKNOWLEDGES THE BURDEN PLACED UPON HIM BY SUCH AN ASSERTION AND HE CONJOINS THIS ASSERTION WITH THE CLEAR RECOGNITION THAT THE DISCOVERY HE REQUESTS WILL SUPPORT HIS POSITION FOR THE REASONS THAT HAVE OTHERWISE BEEN EXTENSIVELY ARTICULATED BY HIM THROUGHOUT THE COURSE OF THESE PROCEEDINGS.**

Tedford's assertion is thus made wholly in good faith and is based upon the fundamental notion of the United State Supreme Court that a truly persuasive showing of actual innocence would make an execution unconstitutional. Herrera v. Collins, 506 U.S. 390, 417 (1993).  At a minimum, a viable showing of actual innocence overcomes procedural defaults, claims of statute of limitations bars and any argument that the petitioner has not acted with due diligence in bringing the matter forward. House v. Bell, 547 U.S. 518, 554 (2006); McQuiggin v. Perkins, 569 U.S. 383 (2013); Wallace v. Superintendent, 2 F.4th 133, 2021 US App. LEXIS 19517 (3RD Cir. 2021); Reeves v. Fayette SCI, 897 F.3d 154, 160 (3rd Cir., 2018); Cal v. Garnett, 991 F.3d 843 (7th Cir. 2021). Tedford recognizes that the showing of actual innocence is a daunting standard that requires him to show by a preponderance of evidence that no reasonable jury would have convicted him based on a fair assessment of all of the evidence which is presently before the Court.  House v. Bell, supra, 537-588; McQuiggin, supra, at 387 and Cal, supra, at headnote 4.  The standard is, however, particularly important in capital cases.  See, In re: Davis, 557 U.S. 952 (2009).

As the Court must now view this case, the Commonwealth's evidence failed to establish by competent circumstantial proof that a bloody murder happened at The Finishing Touch as no physical evidence whatsoever was gathered from there to support that theory. Indeed, the chief investigator has published his view that the murder *did not happen* at the store, an admission which fatally undercuts the entire theory of the Commonwealth, rejects any claim of credibility for their jailhouse informants, and compels the conclusion that someone else committed this murder. Stanek should never have been called to corroborate Ferry; he should have been called to discredit him. Indeed, were Stanek's true conclusions and the evidence on which they were based made known to the jury, the Commonwealth's theory would have been rejected and Tedford freed.

Similarly, no physical evidence of any sort was gathered to support the view that the victim's bloody body was transported 50 miles in the back of Tedford's vehicle and no evidence was gathered to support the view that Tedford exhibited any injuries he allegedly sustained from having engaged in a brutal and bloody assault on Revak on the day in question.

Objectively assessed, the Commonwealth's case teeters upon the testimony of two jailhouse informants, one of whom has recanted and the other of whom is, and likely was, seriously mentally disturbed at the time of his testimony; and the testimony of a forensic analyst in a subject matter that is most likely now confined to the realm of junk science not to be considered reliable in a Court of law.

The doctrine of actual innocence is necessary to prevent the incarceration of innocent people.  Evidence may be considered even if it was not necessarily presented at trial.  Actual innocence is "an unconditional safety net to ensure that Constitutional claims

235

receive consideration in the extraordinary case." <u>Fontenot v. Crow</u>, 4 F.4th 982, 1033 (10th Cir. 2021). Anything other than strict application of the Third Circuit rule would hinder this and erect a barrier where the Supreme Court insists none should exist.  <u>Id</u>.

The view of the Third Circuit is clearly articulated in <u>Reeves v. Fayette SCI,</u> 897 F.3d 154, 164 (3d Cir. 2018), where the Court held that "when a petitioner asserts ineffective assistance of counsel based on counsel's failure to discover or present to the fact-finder the very exculpatory evidence that demonstrates his actual innocence, such evidence constitutes new evidence for purposes of the . . . actual innocence gateway." As Tedford's trial counsel did nothing to investigate the case, this principle applies here.

In assessing actual innocence, a Court must again consider the entire record, both new and old evidence, to see what reasonable jurors would do under the circumstance. <u>Fontenot,</u> Id. at 1053.  In <u>Fontenot</u>, an actual innocence claim was made out as the evidence there was extremely weak.  <u>Id</u>. at 1056.  The question then becomes whether there were Constitutional errors which require a grant of a new trial. To assess that, the Court asks if a state court decision is contrary to or an unreasonable application of Federal law or an unreasonable factual determination. But where no state court decision was made on the merits, no deference to a state court's decision is required. The errors identified herein involving <u>Brady</u> violations and ineffective assistance of counsel supply that linkage.

To be sure, Tedford inextricably ties his discovery request into this claim of actual innocence. But even without being able to finally see that material he should had seen decades ago, he is able to point out the following matters which must cause the Court to consider whether any reasonable juror aware of the current state of this record could find that he was guilty beyond a reasonable doubt of this homicide.

Today the Court knows that there is no circumstantial evidence which supports Tedford's guilt in connection with this murder. To be guilty of this murder, Tedford had to have killed the victim in The Finishing Touch by striking her head with some unidentified blunt object producing a one-inch gouge in her skull that bled profusely. Coupled with this, he wound have had to have affixed some sort of ligature (again with an unidentified object) that caused excessive bleeding in her neck as well. And while the Commonwealth admitted fibers harvested from Tedford's sweater that were linked to Ms. Revak's clothing, the fiber evidence was *consistent with Ms. Revak and Tedford being together for consensual sex.* **But no blood was found on that sweater.** And despite the Commonwealth's presumably best efforts, absolutely no evidence whatsoever of the victim's blood or bodily fluid was ever found at The Finishing Touch, or in the vehicle in which Tedford supposedly transported the bloody body of the victim some 50 miles to leave it in a remote area in Washington County. The absence of any critical circumstantial evidence is devastating to the Commonwealth's case and wholly undercuts the possibility that their theory could possibly be sustained beyond a reasonable doubt.

The pillars of the Commonwealth's case were the testimony of the two jailhouse informants. One has since recanted and has advised that he told the prosecutors what the prosecutors wanted to hear in exchange for what he believed to be a specific agreement with respect to an upcoming sentence. At present, there has been no acknowledgement by the Commonwealth of such a specific deal or arrangement, but it is clear to any sensible person aware of how the system works that such a deal had to have been made in some form in order to have this man appear and give testimony. He has now recanted that testimony.

The second man's testimony is even more incredible than the first. White would actually have the courts believe that he was unaware that an inmate could get any special advantage in any upcoming case or parole hearing because of cooperation with the police in giving testimony in a homicide case. Either White was a liar in saying that he was unaware of this despite his long period of time in incarnation or White was then what he is today, a person with serious psychiatric problems. White has received intensive psychiatric treatment while incarcerated over a substantial period. If the Commonwealth was aware that White exhibited those mental deficiencies back at the time of testimony and that was never revealed to Tedford, the final critical pillar of the Commonwealth's case is obliterated. To now know for sure that White suffers severe mental problems and yet to continue to believe that Tedford should remain on death row borders on unconscionable.

The argument for actual innocence is compelling. In Howell v. Superintendent, 978 F.3d 54 (3rd Cir., 2020), the Circuit confronted a case in which three witnesses had recanted and the lower Court dismissed their recanting as unreliable. The Circuit disagreed and remanded the case for an evidentiary hearing. It reminded the lower Court of the need to assess the new evidence under the standard of "no reasonable juror" as enunciated in cases Schulp v. Delo, 513 U.S. 298 (1995). The Circuit indicated that while a recantation may be suspicious, if it is corroborated by other evidence, a Court cannot reject it in the overall assessment of whether an actual innocence claim has been made out.

Tedford's case presents both a recantation by one critical witness and the fact of mental illness of another. As there is no corroborating evidence of the fact that a murder occurred in The Finishing Touch, more than ample evidence is present to sustain his

assertion of innocence or, minimally, to require the production of the files and records the Commonwealth has hidden for decades.

In this connection, the Court is asked to consider a recent scholarly article which provides tremendous insight into the assessment of cases like Tedford's. In the 2021 edition of the American Criminal Law Review, Professor Carrie Leonetti has set forth an analysis of cases of documented wrongful convictions, suggesting a blueprint to apply when a similar case is assessed.  In *The Innocence Checklist,* 58 American Criminal Law Review 97 (2021), Professor Leonetti sets out an analysis which is compelling when applied to the facts here.[91]

First, but of all the specific indicia of wrongful convictions, the greatest single cause of wrongful conviction in the United States is "the formable procedural barriers to post-conviction relief" that the Courts have erected.  <u>Id</u>. at 99.  Tedford has confronted a morass of these procedural barriers, not the least of which is the reluctance of the courts to grant minimal discovery into those documents which have been clearly self-identified by the Commonwealth as relevant to his claims of <u>Brady</u> violations, ineffective assistance of counsel and actual innocence. Those procedural barriers do nothing to serve the cause of justice. They do nothing to advance the cause of the finding of the truth. All they do is cast a pall over the system. Can the public not question the legitimacy of the capital process if a man is to be executed when these hundreds of pages detailing the State Police investigation of the case are, for some reason, kept from open and fair scrutiny? If the documents that have been kept from the defense actually inculpate Tedford, so be it. If they

---

[91] See also, the National Registry of Exonerations which details as of last count the 3,102 exonerations of innocent persons and the more than 27,080 years of lives lost because of these false convictions which is available at https://www.law.umich.edu/special/exoneration/Pages/about.aspx

do nothing to exculpate or inculpate him, again, so be it. But if any of these documents serve to call into question the legitimacy of his conviction and the confidence the system should have in this verdict to any degree, that must be examined and assessed by a Court before his execution is to be carried out.

Upon the realization that this case fits into an established paradigm of wrongful convictions, an examination of the evidence becomes all the more critical. Professor Leonetti identifies a variety of sources of wrongful conviction, noting, for example, that microscopic hair and fiber comparisons have now been debunked by recent science. Id. at 100. Her overall analysis goes much deeper and identifies multiple factors that have led to the finding of wrongful convictions in the hundreds of cases currently identified. From this, she articulates a checklist of factors "that indicated an unacceptably high likelihood of a false conviction." Id. at 143. She breaks those factors down into three clusters.

First, there are Constitutional errors that affect the accuracy of the conviction. Among these are the failure of the prosecution to disclose favorable evidence regardless of whether it ultimately meets the Brady standard. As long as any such evidence reasonably relates to issues contested at trial, the failure to turn it over undermines the basic confidence in the system. Id. at 145-146.

An additional Constitutional error is the presentation of false evidence regardless of whether the state intended to introduce such evidence or not. Here, Ferry has asserted that his evidence was false and whether the Commonwealth was aware of it or not, the fact remains that a critical piece of the Commonwealth's case has now been repudiated by the very individual who produced it.

The list of Constitutional errors includes coaching of witnesses, the hiding of critical witnesses who may have given testimony favorable to the defense and the deficient performance by defense counsel. In this, Professor Leonetti identifies the failure of counsel to investigate the case and obtain experts to challenge forensic evidence.  Id. at 145-149. All of this is painfully present in this case.

Errors in forensic evidence are yet another subcategory in this first cluster and based upon the FBI Report of 2015 it cannot be said with any degree of assurance that the testimony of Commonwealth's hair and fiber analyst in this case was not fundamentally flawed regardless of whether the analyst believed it to be accurate at the time.[92]

The second cluster of factors indicative of a wrongful conviction is "new evidence." Id. at 146-148.  The revelation of Stanek's conclusion is foremost here.  Also important in this would be evidence of an alternative suspect.  Here, while the State Police have files marked "suspect evidence" no other suspects in this case were identified.  If any such evidence did exist, this would be a critical alternative means of suggesting that the prosecution of Tedford was the result of a laser like focus on one person from the outset, disregarding everything else that may have occurred, a conclusion evident from Trooper Stanek's affidavit.

---

[92] Police misconduct is the seventh element of the first cluster identified by Professor Leonetti and this would include intentionally losing or omitting evidence from records.  Tedford cannot know whether this occurred given the fact that he has not received all of the Commonwealth's evidence to this point but one blaring question undoubtedly suggests the presence of this factor, that question being:  **What exactly led Trooper Bernard Stanek to conclude that the murder did not happen in the Finishing Touch?** That answer must lie in the hundreds of pages of undisclosed reports in the possession of the Pennsylvania State Police, the bench notes of Scott Ermlick and/or in the files of the District Attorney of Butler County, every logical inference suggesting that these documents detail the failed forensic efforts to corroborate The Finishing Touch as the crime scene or which relate to evidence from witnesses that refute the central theory of the Commonwealth case.

To the extent that new evidence casts doubt on whether the defendant was present at the crime scene, this too is indicia of a potential wrongful conviction. Stanek has concluded that the prosecution got it wrong.  Furthermore, if other Commonwealth records indicate additional efforts were made to find blood or other evidence that a crime occurred in The Finishing Touch and that these efforts failed, this would be critical information to undermine the very theory of Tedford's supposed liability and be consistent with the conclusions Stanek reached.

Among other new evidence identified by Professor Leonetti would be evidence of recantation by government witnesses, evidence of impeachment of government witnesses and evidence of inducement by government witnesses to testify.  Tedford has never received any indication that the Commonwealth attorneys promised any witness anything in exchange for their testimony.  If any such evidence existed, it would be critically impeaching information to support the recanted testimony of Ferry and undermine the unbelievable testimony of White.

Changing scientific evidence and evolution of scientific method, evidence that a particular science used was biased and any other evidence to corroborate the defendant's version of the offense are also factors in determining whether a conviction should rightly be considered one likely to have been wrongfully obtained.  The presence of all of this here is clear.

The final category of evidence that Professor Leonetti identifies is a collection of various factors each of which have been shown to have been present at one point or another in a wrongful conviction.  Id. at 148-149. These include:

- Where the defendant has consistently maintained his innocence.

- Where there is inadequate missing corroboration that otherwise should have been present in order to sustain the Commonwealth's theory.
- Where there is unreliable identification evidence.
- Where there has been a questionable confession.
- Where the Commonwealth has used inconsistent theories.  Where the police have been corrupted.
- Where there has been testimony of jailhouse informants.
- Where the prosecution witnesses have been inconsistent; and,
- Where there has been an excess of pre-trial publicity.

While some of these are not present in Tedford's case, many others profoundly are and "any conviction with multiple factors present from this checklist should be treated as unsafe because it carries too much of a risk of a wrongful conviction."  Id. at 149.

Analyzing these categories, Tedford respectfully submits that of the 27 possible indicia of wrongful conviction, 15 can be easily established on the basis of the record to date.  Any amount of further discovery may well establish as many as 6 more such indicia while 6 are simply inapplicable to this analysis.  No matter how one makes this assessment, the Tedford case is a classic example of one in which a tremendous degree of skepticism must be attached to the ultimate outcome.

To deal with that skepticism, this Court must critically review the actual evidence in this case and, most importantly, demand that the rest of that evidence be made available to Tedford and to the Court for its unbiased scrutiny.  For Tedford to assert his actual innocence is thus an exercise in complete good faith.

## IX.     TEDFORD'S CLAIMS HAVE BEEN EXHAUSTED AND ARE NOT PROCEDURALLY BARRED.

According to Title 28, U.S.C. § 2254, an applicant for habeas corpus must show that he has "exhausted the remedies available in the courts of the State" or that there is an absence of available "corrective process" or that circumstances make such process "ineffective to protect the rights of the applicant." Section 2254(b).  Tedford's claims as

set forth in his original habeas corpus petition were all presented to the courts of Pennsylvania and litigated through h his direct appeal and/or first PCRA application and are thus sufficiently exhausted.[93]

With respect to Tedford's additional claims for relief based on his recent return to the courts of Pennsylvania, these additional grounds for relief have also all been sufficiently exhausted in the Pennsylvania court and are ripe for federal habeas review.

As for Tedford's supplemental claims, while this Honorable Court (and Tedford) may have assumed that his second PCRA would be assessed on the merits, Pennsylvania Courts denied any state corrective process. Those Courts refused to consider his application on the merits, applying statute of limitation principles of the PCRA law. Tedford respectfully challenged this application on two bases.

First, as set forth in detail supra, while the Pennsylvania courts held that the ineffectiveness of his prior counsel in failing to file the second PCRA was a jurisdictional bar, bountiful existing state precedent clearly permitted the courts to consider his claims on the merits since the ineffectiveness of his initial PCRA counsel deprived him of the opportunity to access an avenue of appeal that was plainly available to him. But the state courts arbitrarily refused to apply their own precedent here and denied Tedford a critical opportunity which had been granted to others situated in the same circumstances he faced.

Second, if the state system did operate to deny him merits review, despite clear authority to the contrary, the system categorically violates his rights to due process of law and effective assistance to counsel pursuant to the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. He specifically articulated these grounds in both his

---

[93] See, Williams v. Superintendent, supra.

PCRA application and on appeal to Pennsylvania Supreme Court and as previously articulated herein. Pennsylvania cannot, consistent with the federal Constitution, provide an avenue for collateral relief but make it arbitrarily inaccessible; It cannot provide counsel for an indigent prisoner and then allow that counsel to fail to meet minimal professional standards without providing a remedy for these failures.

A petitioner exhausts a claim by presenting it to the state court and giving notice of the Constitutional basis of the claim.  Fontenot v. Crow, 4 F.4th 982, 1019 (10th Cir., 2021).[94] If the state court does not adjudicate the claim on the merits, or if there are no state court remedies available, or if a return to state court is futile, the claim is exhausted. Id. at 1019-1020.  Importantly, if the state court has exceptions to its process that were not properly applied in the case, the state can no longer claim that the matter was not properly exhausted.  Id. at 1025.

Likewise, none of Tedford's claims are procedurally defaulted. Procedural default occurs where a petitioner fails to properly invoke a state procedure that is fairly available to him and can show no just cause for such failure and no prejudice resulting therefrom. There are multiple reasons why no procedural default occurred here.

First, it was only the state's improper rendering of its own precedent and its refusal to recognize that applying the statute of limitations to Tedford's case violated his federal Constitutional rights that the matter was not undertaken on the merits.  Where a state does not apply its own rules consistently, proper exhaustion has occurred, and no procedural default can be attributed to a defendant.  Woodfolk v. Maynard, 857 F.3d 531, 551 (4th Cir.

---

[94] No extended briefing is needed to exhaust; citing federal authority is sufficient. See, Bridges v. Beard, 941 F.2d 584, 592 (E.D.Pa. 2013); Meador v. Bransow, 688 F.3d 433, 435 (8th Cir. 2012); Bennett v. Superintendent, 886 F.3d 268, 281 (3rd Cir. 2018).

2017).  State procedural rules that are erroneously applied or applied in such way as to unfairly preclude a defendant from addressing claims on the merits cannot be considered a basis for a finding that a defendant has defaulted his remedies in state court. See, <u>Lambert v. Blackwell</u>, 387 F.3d 210, 232 (3rd Cir. 2004); <u>Lines v. Larkins</u>, 208 F.3d 153 (3rd Cir. 2000); <u>Manning v. Alexander</u>, 912 F.2d 978 (6th Cir. 1990); <u>Franklin v. Johnson</u>, 290 F.3d 1223 (9th Cir. 2002); <u>Austin v. Davis</u>, 876 F.3d 757, 777 (5th Cir. 2017).

Pennsylvania's draconian application of its own procedural remedies cannot be the basis for finding that Tedford has failed to present his claims properly in that forum. The question is whether there was an independent and adequate ground to deny Tedford's application based upon a proper procedural rule of the state. This requires that the rule be "firmly established and regularly followed." <u>Fontenot</u>, at 1028. In the seminal case of <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012), the Supreme Court emphatically made this point by saying that a procedural default can only be found where the state rule has been "firmly established and consistently followed."  <u>Id</u>. at 9. An inconsistently applied rule, or a rule involving procedures fundamentally inadequate to meet basic due process norms, cannot be the basis of a defaulted claim. Tedford has demonstrated multiple occasions in which the Pennsylvania courts allowed circumventions of its PCRA limitations, and none are materially distinguishable from Tedford's.  Even if the Court would consider that whatever rule the state Supreme Court was invoking was one "firmly established" this constituted an "exorbitant application" of it, presenting no procedural bar. <u>Shotts v. Wetzel</u>, 724 F.3d 364, 371 (3rd Cir. 2013), citing, <u>Lee v. Kemma</u> 534 U.S. 362, 376 (2002).

Moreover, as Tedford has made a credible claim of actual innocence, any claim of procedural bar is overcome. But even if the Court finds some procedural defect in his

efforts, Tedford may still invoke the cause and prejudice standard and allow this Court to consider these critical matters in substance, as can a claim of actual innocence. Fontenot, at 1029. House v. Bell, 547 U.S. 518, 554 (2006); McQuiggin v. Perkins, 569 U.S. 383 (2013); Wallace v. Superintendent, 2 F.4th 133 (3RD Cir., 2021); Reeves v. Fayette SCI, 897 F.3d 154, 160 (3rd Cir. 2018). His support for this assertion is set forth previously and is incorporated herein.

Of course, even if the Court would find that some form of procedural default occurred here, Tedford may properly make the claim of cause and prejudice to overcome it. "Cause" means some factor external to the defense that has impeded the efforts of a petitioner to comply with a state rule and ineffective assistance of counsel is one of those impediments. See, Murray v. Carrier, 477 U.S. 478, 490 (1986). And while the United States Supreme Court has held that no right to counsel under the Sixth Amendment exists for state habeas review, see Pennsylvania v. Finley, 481 U.S. 551 (1987), Tedford has pointed that because Pennsylvania specifically provides counsel to a defendant in a post-conviction relief act proceeding, the state adopts a due process obligation under the Fifth and Fourteenth Amendments to ensure that counsel is effective. Evitts v. Lucey, 469 U.S. 387 (1985). See also, Ross v. Varano, 712 F.3d 784, n. 1 (3d Cir. 2013). The violation of the Fifth and Fourteenth Amendments is a serious as any violation of the Sixth Amendment and in either case, the failure of counsel to properly preserve Tedford's ability to challenge the actions of his trial counsel in failing to obtain discovery cannot be readily excused because one Constitutional violation occurred and not another.[95]

---

[95] Two scholarly articles also make these key points. McConville, *The Death Penalty &the Question of Actual Innocence,* 42 Tulsa L.J. 253 (2006), and Givelber, *The Right to Counsel in Collateral, Post-Conviction Proceedings,* 58 Md. L.R. 1393 (1999) (the right to effective collateral counsel is critical "to guarantee our most basic right of constitutional criminal procedure, the right to adversarial testing of the questions of guilt

Indeed, where a statute generally creates an obligation to provide counsel and that counsel fails, a basis for a finding of cause is identified. See, Federal Habeas Practice and Procedure, Volume II, Section 26.3, Note 35 LEXIS 2021. And while ineffective assistance of counsel in this regard may not in some cases be the basis of relief, it can certainly be a route for a finding of cause to allow a Court to consider the important matter on the merits. See Fischetti v. Johnson, 384 F.3d 140, 154-155 (3rd Cir., 2004). The Third Circuit recently reaffirmed this, holding in Richardson v. Coal Twp, 905 F.3d 750, 759 (3d. 2018), that "ineffective assistance of counsel is one such cause; an 'objective factor external to the defense' that can excuse procedural default." *Citing,* Murray, supra at 488. See also, Mack v. Mahaony, 714 Fed. Appx. 151 (3d. 2017); Ross v. Varano, supra (holding that equitable tolling also occurs where a petitioner is abandoned on appeal by counsel). The Third Circuit also recently held that a claim of ineffective counsel first raised in the District Court may be heard where the default was caused by ineffective assistance of post-conviction counsel in the initial review collateral proceeding and where the underlying claim of trial counsel ineffectiveness is substantial. Gaines v. Superintendent, 33 Fd.4th 705, *7 (3d. Cir. 2022). All elements are clearly present here.

Moreover, application of the rule of Martinez v. Ryan supports Tedford's view that this circumstance should be considered on the merits. In Martinez, the Supreme Court held that "inadequate assistance at the initial review proceedings may established cause for a prisoner's procedural default of a claim of the ineffectiveness of trial counsel". Id. at 566 U.S. 7-8. The critical inquiry is whether the error of initial review counsel allowed for review of the matter at some level. Id. 1316. Here, initial review counsel, by failing to

---

and death." at 1399). See also, Jackson v. State, 732 So. 2d 187 (Miss. 1999), imposing guarantee of effective counsel in death penalty collateral litigation.

return to the state court with the newly found evidence of the March 4, 2011 RTKL letter deprived Tedford of the opportunity to have the state court consider on the merits the critical issue of discovery and <u>Brady</u> violations the letter portends.  It left Tedford with no state process whatsoever (according to the Pennsylvania Supreme Court) and this fatally prejudiced his ability to have the matter considered on the merits.  How can this failure be considered a procedural default when the procedure itself is so fatally flawed?

The <u>Martinez</u> rule is that if there was no counsel or if a claim of ineffectiveness by counsel was not effectively raised, cause has been established.  This was later extrapolated in <u>Trevino v. Thaler</u>, 569 U.S. 413 (2013).  Here, the claim of the existence of <u>Brady</u> material and trial counsel's failure to properly discover the case and present defense evidence only truly matured when the March 2011 RTKL letter surfaced. At that time, initial review counsel needed to go back to state court to revisit those facts in, essentially, a continuation of the initial review process they had initiated without that critical piece of information. Their failure to do so must respectfully constitute cause to permit this Court to review the matter in spite of the Supreme Court of Pennsylvania's assertion that Tedford did not follow the procedures of Pennsylvania properly.

And on yet one final level must any notion of procedural default be dismissed. While the Pennsylvania Courts essentially faulted prior counsel for not refiling in state court within 60 days of receiving the RTKL letter, <u>Slutzker v. Johnson</u> 393 F. 3d 373 (3d 2009) must be considered. There, the petitioner got critical <u>Brady</u> material while litigating his federal habeas pleading and opted not return to state court to file a second PCRA. While he thus technically did not exhaust possible state remedies, he clearly established cause and prejudice to excuse procedural default. He was presented with the Hobson's choice of

abandoning his federal Habeas claim by dismissing it and ultimately refiling after a year had elapsed or proceeding with the habeas and the unexhausted claim. The Court found this to be sufficient cause, Id. at 381-382, and correctly noted that the real cause of this procedural conundrum was that the Commonwealth had not disclosed the material earlier when they were required to do so, forcing him into that time crunch. Id.

Similarly, the Court must also consider the thoughtful analysis set forth in Washington v. Beard, Civil No. 07-3462, 2015 U.S. Dist. LEXIS 5387 (E.D. Pa.  January 16, 2015). There, United States District Judge Stengel confronted a circumstance in which the Commonwealth was arguing that Washington had not properly exhausted his state court claims. The Court rejected this on the basis that the state courts had closed off any avenue of discovery to Washington regarding important information that would later constitute a viable Brady claim.  While Washington was chastised for actually receiving discovery in federal court but not then immediately returning to state court to file a supplemental PCRA, Judge Stengel held that "to think that [Washington] then must return to the state to exhaust which was created by the Commonwealth's own error is prosperous.  Requiring him to do so would further delay the finality of his conviction and would contravene the purposes of the exhaustion requirement."  Id. at footnote 183.

*Tedford has done all he can* to try to obtain discovery from the state court.  Through an unconstitutional application of the state's PCRA statute of limitations, he has been denied a determination by the state courts on the merits.  To use that denial as a further reason to deny him in federal court on the basis that he has procedurally defaulted this claim is to reward the Commonwealth for its lack of candor in perpetuating for over 25

years the belief that the entire discovery process was an exercise in futility because no other information existed which could possibly be discovered.

The prejudice that was visited upon Tedford in this matter clearly meets the standard of prejudice identified by the Court.  While the Supreme Court has not given an ultimate definition of the level of prejudice necessary to meet this standard, see Amadeo v. Zant, 486 U.S. 214, 221 (1988), the courts have held that the standard of prejudice here is coterminous with the standard of prejudice required to make out a claim under Brady. Strickler v. Greene, 527 U.S. 263, 266 (1999); Banks v. Dretke, 540 U.S. 688, 691 (2004). Tedford is ultimately prejudiced here by his inability to address with the state courts a critical matter in which his claim that Brady material exists is now wholly substantiated and, concurrently, the compelling request that he otherwise presented for discovery of the specifics of that information.  Any objective person looking at this case and understanding that hundreds of pages of material generated by the PSP in this homicide investigation was never revealed to Tedford and that, for 25 years, the Commonwealth denied the existence of any such material, and hid until very recently that the chief investigator concluded that the central thesis of the Commonwealth's case against Tedford was unsupported, must certainly have their confidence in the outcome of this proceeding disturbed to the degree that the standard of prejudice the Courts require has been met.

Lastly, no hearing is needed to establish the ineffectiveness that would otherwise underlie certain claims of cause and prejudice here, meaning that no concerns are raised by Shinn v. Ramirez 142 S.Ct. 1718 (USSC 2022). If the state Court properly applied its own PCRA rules, Tedford's counsel failed without any justification to return or seek to return

to state court within 60 days if its receipt of the RTKL letter. This was *per se* ineffectiveness, wholly unjustified by any possible strategic or tactical motive.

The claims are thus ripe for decision and compel the relief Tedford seeks. The case of Ricardo Natividad discussed <u>supra</u> was saved from ultimate public shame and discredit when the District Attorney of Philadelphia recognized its constitutional obligation to right the errors of its past and to afford Natividad something he had not had to that point, a fair trial. A United States District Court had to intervene there as well to ensure that the state efforts to block the finding of truth behind its bizarre application of its statute of limitations rule did not succeed in keeping an innocent man on death row.  Tedford now pleads with both the Court and the Commonwealth to value above all else the faith we must have that we are a people committed to due process of law and that none of us can presently invest confidence in the current outcome of this matter knowing what is yet to be revealed and the gossamer quality of the justifications for keeping it secret.

## X.      REQUEST FOR AN EVIDENTIARY HEARING

Tedford respectfully prays that the Court will grant an evidentiary hearing at which he may summon witnesses and documents to establish his claim to relief. His entitlement to such a hearing is well-established.

In <u>Juniper v. Zook</u>, 876 F.3d 551 (4th Cir., 2017), the Court reversed the judgment of the District Court and ordered an evidentiary hearing, finding an abuse of discretion where a legitimate <u>Brady</u> claim had been raised. Juniper struggled mightily to obtain any further discovery in the matter and was able to ultimately secure some notes of the lead detective which indicated that there was evidence implicating another shooter in the case. <u>Id</u>. at 559. That undisclosed evidence was inconsistent with the police theory of the case

and since the defendant had diligently pursued his Habeas Corpus claim in state court he was entitled to obtain a hearing in the Federal Court proceeding.

The <u>Juniper</u> Court held that under <u>Townsend v. Sain</u>, 372 U.S. 293 (1963), an evidentiary hearing should be held in any circumstance in which the state court factual determination was not full and complete. See also, <u>United States v. Valenta</u>, No. 20-1673 (3d Cir. January 28, 2022) (non-precedential) (If any facts are alleged that are not clearly resolved by the record, a hearing must be held). Where the state court did not resolve the merits of the claim, where its resolution was not supported by the record, where its fact-finding was inadequate to substantiate a full and fair hearing, where there was a substantial allegation of new evidence arising after the state court proceeding, where there were material facts not developed at the state court hearing or where there was any other reason to believe that the current record generated by state court was wholly inadequate for the purpose of making a thoughtful rendering of the matter, an evidentiary hearing in federal court was necessary. <u>Id</u>. at 562-564.

The <u>Juniper</u> Court found that the Commonwealth of Virginia had showed "an entrenched resistance to transparency" in its conduct regarding <u>Brady</u> material and that its ostensible reason for not disclosing certain information, that it contradicted the government's theory, was precisely what made that information <u>Brady</u> material. <u>Id</u>. at 564-566. While there was forensic evidence that linked Juniper to the crime, and while the Court recognized that forensic evidence was "strong", the Court further held it was "not unassailable" and an evidentiary hearing was thus necessary to flesh out the issue of materiality. <u>Id</u>. at 569.

In the present case, the state courts have engaged in massive procedural gesticulations to avoid having to face the evidentiary issues Tedford has raised. This has often been done with a dismissive but wholly unsubstantiated conclusion that the Courts thought the evidence against him was substantial. It was anything but that. The forensic evidence against Tedford is non-existent. While it corroborates that Tedford and Jeanine Revak engaged in sexual relations on January 10, 1986 as Tedford himself testified at trial, the most critical conclusion drawn from the forensic record here is what was *not found,* that is, any evidence that the murder happened at The Finishing Touch. The passage from Stanek's book and his affidavit confirm the need for further examination of this matter via an evidentiary hearing and otherwise.

In <u>Siehl v. Grace</u>, 561 F.3d 189 (3rd Cir. 2009), the Third Circuit held that the Superior Court's determination of the materiality of <u>Brady</u> material that Siehl was able to gather (much of which concerned Criminalist Ermlick), was indeed material making the state court's determination unreasonable under federal law. Siehl was found to have diligently pursued his efforts to develop the factual basis in state court and an evidentiary hearing was due him so he could make the showing that would potentially advance his claim.  <u>Id</u>. at 197. The matter was remanded for an evidentiary hearing which ultimately led to <u>Siehl's</u> vindication.

In the present case, Tedford has diligently pursued his quest to obtain necessary discovery. To the extent it has been frustrated, the fault lies either on the ineffectiveness of his counsel or the unconstitutional actions of the Pennsylvania courts to deny him a forum in which a discovery request was clearly proper and should have been granted.

In <u>Lee v. Kink</u>, 922 F.3d 772 (7th Cir., 2017), Lee repeatedly asked the state court for an evidentiary hearing to supplement information he had otherwise provided in affidavits.  Repeatedly, and without justification, the state court denied a hearing.  The Seventh Circuit, however, found that Lee was entitled to a hearing since the state court's refusal to consider other evidence constituted an unreasonable determination under Section 2254(d)(2).  <u>Cullen v. Pinholster</u>, 563 U.S. 170 (2011) presented no bar to the federal court granting an evidentiary hearing since finding that a state court made an unreasonable factual determination under Section 2254(d)(2) does not preclude a federal court from finding under Section 2254(e)(2) that the defendant has met his showing that he is entitled to one due to the unconstitutional barriers presented by the state court.

Moreover, under Section 2254(e)(2), if a defendant is not at fault for failing to develop an evidentiary record due to ineffective assistance of his initial PCRA counsel or the draconian application of state court rules, he is not to be denied an evidentiary hearing in federal court.  In that circumstance, "the applicant has [not failed] to develop the factual basis of a claim in state court proceedings", Section 2254(e)(2).  Where counsel has been at fault in these matters, the forfeiture of a hearing right does not occur. See, <u>Williams v. Taylor</u>, 529 U.S. 420, 435-437 (2000); <u>Martinez v. Ryan</u>, 566 U.S .1 (2012).  Here, had prior PCRA counsel acted within the 60-day initial window set forth by the Pennsylvania Statute, no hearing could possibly have been denied.

And if the state court did not address the merits of the claim, a federal court is free to hold a hearing. <u>Garner v. Lee</u>, 908 F.3d 845, 860 (2nd Cir. 2018), accord <u>Lambert v. Wartin</u>, 861 F.2s 459, 472-473 (3rd Cir., 2017).  Further, as noted in <u>Lee v. Kink</u>, 922 F.3d 772, 745 (7th Cir. 2019), where the state court has made an unreasonable factual

determination, a federal court hearing should be held. Ultimately, where a state court prevented a defendant from developing a record, he has not failed under Section 2254(e) and that limitation on his ability to get a federal court hearing does not apply.  <u>Han Tak Lee v. Glunt</u>, 667 F.3d 397, 406 (3rd Cir. 2012). Here, Pennsylvania has systematically refused to consider the merits of Tedford's claims by applying their own procedural rules in and arbitrary and capricious way. This Court need not be a party to such chicane.

Lastly, in <u>Keeny v. Tamayo</u>, 504 U.S. 1, 11-12 (1992), a Court may always hold a hearing where it believes that otherwise there will be a miscarriage of justice.

This is such a case.

## **XI.    CERTIFICATE OF APPEALABILITY**.

If this Court were to find that Tedford is not entitled to the issuance of a writ of habeas corpus, it is respectfully submitted that Tedford has at least made a substantial showing of the denial of a constitutional right at the claims he has made and is entitled to the issuance of a certificate of appealability pursuant to Title 28, U.S.C. § 2253(c)(2).

## **XII.    CONCLUSION**.

WHEREFORE, in light of the foregoing and all other proceedings and submissions, the Petitioner, DON TEDFORD, respectfully prays that the Court grant him the following relief:

A)   That Petitioner be granted such discovery as is necessary for full and fair resolution of the claims contained in this Petition;

B)   That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

C)   That Petitioner's conviction be vacated.

RESPECTFULLY SUBMITTED,

s/ADAM B. COGAN
ADAM B. COGAN, ESQUIRE
PA I.D. NO.:  75654

s/BRUCE A. ANTKOWIAK
BRUCE ANTKOWIAK, ESQUIRE
PA ID. NO, 25506

257