# EXHIBIT U

*def*

IN THE COURT OF COMMON PLEAS

BUTLER COUNTY, PENNSYLVANIA

COMMONWEALTH                    :
                                :
V                               :  C.A. NO. 241 of 1986
                                :
DONALD TEDFORD                  :


P R E L I M I N A R Y    H E A R I N G


Held Before


DISTRICT JUSTICE LEON GANT

Butler County Courthouse
Jury Assembly Room


April 3, 1986
1:30 P.M.


- - -


A P P E A R A N C E S

For the Commonwealth:   DAVID L. COOK, District Attorney
                        DAVID A. HEPTING, Assistant
                                       District Attorney

For the Defendant:      CHARLES M. SCHWARTZ, ESQUIRE


- - -


Susan Lynn West
Official Court Reporter

| WITNESS | DIRECT | CROSS | REDIR. | RECROSS |
|---------|--------|-------|--------|---------|
| JAMES REVAK | 5 | 18, 34 | -- | -- |
| GARY SCHELLER | 36 | 42, 55 | 65 | -- |
| TROOPER PETERS | 57 | 77 | -- | -- |

- - -

Commonwealth's Exhibits 1 - 6

(All exhibits  were retained by the
District Attorney's Office.)

- - -

Reported and Transcribed By:

Susan Lynn West
Official Court Reporter

DISTRICT JUSTICE GANT: Before we proceed, I am going to make an announcement. When the, when we finish with the hearing, no one will be allowed to leave this room until after the prisoner is taken out. So, anyone finds that a problem you can leave now.

I don't see any cameras; I think they took care of that out there. We won't have any problem. If anybody is taping, I want to know it.

Commonwealth versus Donald Mitchell Tedford. Defense counsel prepared? Ready?

MR. SCHWARTZ: We are ready, Your Honor.

DISTRICT JUSTICE GANT: Counsel? All those who intend to testify, if you will please stand, raise your hand and be sworn.

(The oath was administered by District Justice Gant.)

DISTRICT JUSTICE GANT: You may be seated. Commonwealth may proceed. You are going to use that?

MR. COOK: Do you, you will waive the reading?

MR. SCHWARTZ: Yes.

DISTRICT JUSTICE GANT: Good.

MR. SCHWARTZ: I waive the reading on behalf of Mr. Tedford. At this time I'd request a sequestration. I would ask for a sequestration order be put into effect with respect to the witnesses.

DISTRICT JUSTICE GANT: Okay. Any objection?

MR. COOK: I object. This is a preliminary hearing; it's not a trial in front of a jury. It's not necessary at this level to have a sequestration order, in any case.

MR. SCHWARTZ: Well, I don't think we are talking about the problem with Your Honor so much as we are about the natural tendency for one person to possibly pick up the testimony of another and unconsciously -- I am not suggesting bad motive or otherwise -- just unconsciously testify as to something he may have heard. I think the sake of the, the fairest and easiest way is that I ask the other witnesses to step outside.

MR. COOK: If it was a trial where you had twenty witnesses and testimony,

yes; but it's a three-witness hearing, Your Honor.

I think it's unnecessary at a preliminary hearing.

       MR. SCHWARTZ:  I think

the whole thing could have been accomplished

during the time we are arguing about it, Judge, and

nobody would have suffered anything.

       DISTRICT JUSTICE GANT:  Motion

to sequester is denied.  Proceed.

       MR. COOK:  We call James

Revak.

       - - -

       <u>MR. JAMES RICHARD REVAK,</u>  being

       duly sworn according to

       law, testifies and says as

       follows:

<u>D I R E C T</u>   <u>E X A M I N A T I O N</u>

BY MR. COOK

Q    Jim, state your name for the record, please.

A    James Richard Revak.

Q    Where do you reside?

A    Two oh three Opal Drive in Cranberry Township,

    Mars, Pennsylvania.

Q    Are you the husband of Jeanine Ravak?

A    Yes, I am.

Q       The late Jeanine Revak?

A       Yes.

Q       At the time in, January 10th, 1986, how many months

        had you been married?

A       Eight months.

Q       Eight months.  The week of that, that week, January

        10th being on a Friday, what was the general

        condition of your wife?

A       Friday?

Q       No, that week.

A       She was sick during the week.

Q       And had she had employment prior to January 10th?

A       Yes.

Q       Okay.  And  did she report off work during the week,

        including January 10th?

A       Yes, she did.

Q       What was her routine that week, as far as you can

        tell?

A       I don't understand -- routine?

Q       Did she stay at home, was she sick in bed?

A       Yes, she was at home.

Q       Now, on Friday, January 10th, 1986, did you go to

        work that day?

A       Yes.

Q       And what time did you leave your home?

A       At 7:30 in the morning, approximately.

Q       Is that your normal time to leave?

A       Yes, between --

Q       Was Jeanine awake at that time?

A       Yes, she was.

Q       Okay.  And when you left her, did you know of anything
        that she was supposed to do that day, other than
        stay at home?

A       No, nothing.

Q       Okay.  Now, when did you -- when did you return home?

A       At approximately 5:30 P.M.

Q       P.M.  Is that the normal time you get home from
        work?

A       Yes.

Q       Okay.  Did you talk to your wife at all that day
        by telephone?

A       No.

Q       Did you attempt to talk to her that day by tele-
        phone?

A       Yes, I did.

Q       At about what time or times did you call your wife?

A       At approximately two o'clock.

Q       Two o'clock in the afternoon?

A       Uh-huh.

Q    Did you receive an answer at the home?

A    No, I didn't.

Q    So you didn't talk to her at all?

A    No.

Q    Okay.  When you got home at 5:30, Jeanine was not
     present; is that correct?

A    That's correct.

Q    What did you do later that evening with regard to
     trying to locate your wife?

A    Well, I waited and I had assumed that she had gone
     to work somewhere -- she had done that in the past.
     And later in the evening at, after approximately
     nine o'clock I started to, you know, get a little
     worried.  And even later in the evening, approximately
     eleven, 11:30, I tried to make phone calls to try to
     find out where she was.

Q    Okay.  During that timeframe of eleven, 11:30, did
     you call the Finishing Touch in Cranberry Township?

A    Yes, I did.

Q    Could you describe to the Magistrate what occurred
     during that phone call?

A    Well, the phone was answered, and I was calling,
     using a business card that I had a name of Frank --
     I forget the last name --  but it had Frank on it from

the Finishing Touch. And I got an answer. And
it was a gentleman. And I said: Is this Frank?
And he said: No, this is Don. And I said: Oh,
Don, you are the one I want to talk to anyway.
Jeanine, that's who she had been talking to. And
I asked him if he had seen Jeanine or heard from
Jeanine. And he said no, he didn't. First he said
he didn't. He took a moment to remember, sounded like
he was trying to remember, or who she was. And he
said: Oh, yes, a very talented girl. He said he
hadn't seen her.

Q    Was that the extent of the conversation at that point,
Jim?

A    Well, I asked him if he heard anything to let me
know.

Q    Did you give him your phone number?

A    Not over the phone; I assumed that he had it from
Jeanine's resume.

Q    What was her connection to the Finishing Touch to
the best of your knowledge, your wife's?

A    The best of my knowledge, she had applied for a job
there, and been interviewed there.

Q    Do you know by whom was she interviewed?

A    She always said Don.

Q       Don?

A       Never used the last name.

Q       Never used the last name, but the name was Don
        she talked to?

A       Yes.

Q       Did she, she give a resume to the company?

A       Yes.

Q       She told you this?

A       Yes.

Q       You didn't see her give --

A       Right, right.

Q       And are you aware of the portfolio being given to the
        people at Finishing Touch?

A       Well, on her interview she showed the portfolio.

Q       Do you remember when that was, what month it would be?

A       It was, I believe it was in the beginning part of
        November; maybe the end of October.

Q       Nineteen eighty-five?

A       Eighty-five.

Q       After that, did she have any more interviews or contact
        with Don or anybody else at the Finishing Touch?

A       Prior to that?

Q       No, after the interview with the portfolio being
        shown.

A      Yes, she followed up with a phone call as an inter-
       view follow up.  And to see how things were going to
       go and if she was going to be considered.  And she
       made that phone call.

Q      Who did she say told you that?

A      Pardon?

Q      Who did she say told her that?

A      Don.

Q      Don.  Did she have any expectation of going to work
       at any certain time?

A      Immediately after that, the phone call?

Q      During the timeframe of November on through January,
       to January.

A      Well, no, but he said that, to wait and hold on and
       he had, there were some changes that had to be made
       in the store, and that she was, she was up on the list --
       I mean, going to be considered for the job.

Q      Okay.  Now, the week of January 6th, did she make any
       statements regarding contact by phone with Don  that
       week?

A      Yes; on Tuesday.

Q      On Tuesday; that would be the 7th of January?

A      Yes.

Q      What did she tell you that day when you got home?

A    Well, she actually, I talked to her from work first.

Q    Okay.  Did she call you at work?

A    No, I called.  Okay.  And she said that she was

     talking to Don and that he had said he was going to

     offer her a job and, to be starting in about two weeks.

Q    Okay.  And that was on the 7th of January?

A    Yeah; Tuesday, whatever date that is.

Q    Okay.  Now, you were unable to locate your wife

     the night of the 10th and early morning hours of the

     11th; is that correct?

A    True.

Q    And when you got up in the morning, what did you do

     to try to locate Jeanine?

A    When I got up?

Q    Yes, that --

A    Well, I wasn't asleep very long; I may have dozed off

     an hour, but I had called the Finishing Touch again

     or -- no, I went over to the Finishing Touch with my

     father-in-law.

Q    What time was that?

A    About, between 9:30 and ten o'clock.

Q    Saturday morning?

A    Yeah.

Q    And with whom did you talk that day?

| | |
|---|---|
| A | I talked with Don. |
| Q | The Defendant? |
| A | Yes. |
| Q | Do you know the Defendant? |
| A | No, I don't. |
| Q | You don't recognize him? |
| A | Here I do. |
| Q | Okay.  But you, is he the man you talked to the following morning? |
| A | Yes, it is. |
| Q | And what did you ask him, or what was the conversation with Mr. Tedford? |
| A | I asked him -- well, I asked him again if he had seen Jeanine, or heard anything.  And he said no.  Actually, he said:  You still haven't found her?  Referring to the phone call last night.  And we said no.  And then I said:  Well, if you hear anything, let me know. And then he asked me to write down my phone number at that time, and I wrote it on a little piece of paper with my name and phone number, and I gave it to him. |
| Q | Okay.  And then after that, later that afternoon, the evening, were you notified of the finding of your wife's body? |

A       Yes, I was.

Q       Were you called to the Washington County, by the

        Washington County State Police authorities to come

        down and identify a body?

A       Yes, I was.

Q       And did you identify your wife at the Washington

        Hospital?

A       Yes, I did.

Q       As your wife -- Can you remember, can you describe

        how she was dressed when you saw her that, that

        following evening?

A       Which evening?

Q       When you identified her, the body?

A       No.

Q       You can't remember?

A       No.

Q       Okay.  Going back to her normal routine, Jim, there

        is going to be testimony later on, developed at the

        hearing how she was dressed, and nice pair of slacks

        and business --

                        MR. SCHWARTZ:   That's

                objected to.

                        MR. COOK:   I say I am going

                to go --

MR. SCHWARTZ:  He testified
he can't remember, so I objected to
the suggestion about how she was dressed.

MR. COOK:  I understand.
There is going to be testimony as to how
she was dressed, when the body was located.

DISTRICT JUSTICE GANT:  We will
handle that when that happens.

Q   (By Mr. Cook)  What was her normal routine as far as
her clothing if she would be going to a store or to
shop for groceries, et cetera, even when she was ill
or whatever.

A   Very casual clothes; blue jeans, like that.

Q   If she was dressed up in a nice sport coat, a blazer,
slacks and blouse and high heels and hose, would that
be unusual for doing anything normal for your wife?

A   Yes.

Q   Was there anything unusual when you got home regarding
the way her clothes were left at the house that
evening when you got back on the 10th?

A   Yes, there was.

Q   What was unusual about that, Jim?

A   Well, her nightgown was on the bed.  And her, she
had a casual pair of corduroy slacks and a flannel

shirt that were on the floor in the hallway outside
the bathroom.  And it, it appeared as if she had
been in a hurry to get somewhere.

Q    So she would not normally leave the house with her
clothes in disaray that way?

A    Right.

Q    Unless she had some specific reason to get out of there
right away or something?

A    Yes.

Q    Okay.  During your, the time from 5:30 until
11:30 that evening of January 10th, what made you call
the Finishing Touch to try to locate your wife?

A    Well, I had to try the places that she worked first.

Q    She didn't work at the Finishing Touch, though.

A    No, she didn't.  But she had been interviewed,
interviewed for the job and was excited about
getting it that I figured if, if someone from the
Finishing Touch had called that she could have gone
out.

Q    Would she have on the same type of dress clothes,
dressed up if she were going to the flower shop or
the other places where she worked, Jim?

A    No.

Q    What kind of clothing would she wear to those places?

A        To the flower shop?

Q        Or to her other job.

A        Little dressier than casual clothes; not with a

         blazer, certainly not a blazer or nice blouse, but

         nicer than jeans.

Q        High heels?

A        No high heels.

Q        That's what made that different than the other places

         she could go to?

A        Yes.

                        MR. SCHWARTZ:  That's objected

                   to.  The witness testified he didn't

                   know what she was wearing.

                        MR. COOK:  I used a hypothet-

                   ical, if she wore a blazer, slacks, blouse

                   and shoes, if she was dressed up.

                        MR. SCHWARTZ:  And now he is

                   asking for a conclusion of fact from

                   which --

                        DISTRICT JUSTICE GANT:  Are

                   you objecting to that?

                        MR. SCHWARTZ:  Yes.

                        MR. COOK:  If anybody can

                   describe how his wife dressed, it would be --

he is the best --

   MR. SCHWARTZ:  That's not my objection.

   DISTRICT JUSTICE GANT:  Are you expecting him to respond?  Is he to respond to something at this time?

   MR. COOK: He did.

   DISTRICT JUSTICE GANT:  Well, I understand that.  I didn't see anything wrong with that kind of question at all. Overrule it; in fact, it's already passed.

   MR. COOK:  That's all.

   -  -  -

# C R O S S   E X A M I N A T I O N

BY MR. SCHWARTZ

Q Mr. Revak, I believe you indicated that your wife had been sick that week, that was the week up to the date of the 10th; is that correct?

A Yes.

Q How long had she been sick?

A Since the, a week, a week ago from Friday, from that Friday.

Q Was she taking any sort of medication?

A Yes.

Q        What was she taking?

A        I don't know what the medication was.

Q        What -- how would you describe the illness she was

         suffering?

A        Well, she went to the doctor's, and the doctor

         diagnosed it as being an inflamed ovary.  And she had

         a bladder infection before and had similar symptoms.

         And we immediately thought it was that re-occurring.

         But the doctor said it wasn't but gave her medication.

Q        And as a result of that illness she wasn't going to

         her normal job; is that correct?

A        Right.

Q        Which was where?  Where was her normal --

A        At Decoratifs and another job at Flowers by

         Janice.

Q        Where is that located?

A        In Cranberry.

Q        Did she have regular hours at either of those places?

A        Well, she would be assigned a schedule, I believe,

         a week or two in advance.

Q        As a result of the illness she wasn't able to go to

         either of those places?

A        Yes.

Q        And what's the first time that you had some information

that she had submitted a resume to the Finishing

Touch?

A    Whenever she went around submitting resumes in

November or October; I think it was in October.

Q    Were these printed resumes she had had professionally

done?

A    No, I worked on it with her.

Q    So they were typed up, photocopied?

A    Yes, sir.

Q    Is that how they were done?

A    Yes.

Q    How many phone numbers did you at your house have

at the time of this incident?

A    How many phone numbers?  One.

Q    And was her phone number, what you have, was that

put on the resume?

A    Yes.

Q    And was that the same phone number which you asked

Don to call you at in the event that he heard from

her?

A    Yes.

Q    So you left, you left your house that day at 7:30

in the morning; you say your wife was awake; is that

correct?

A      Yes.

Q      And you had no discussion with her about what her
       plans were for that day?

A      Not that morning.

Q      Did she indicate to you she was going to go to either
       of her jobs?

A      No, she wasn't going to them.

Q      She wasn't?

A      Right.

Q      When you left the house, was she already dressed for
       the day?

A      No, she was laying in bed in her nightgown.

Q      Did you eat breakfast?

A      No.  I always just have a glass of juice, and that's
       usually it, if that.

Q      Had you noticed whether she ate anything that morning?

A      She was in bed when I left, so she didn't.

Q      And what was the first time you tried to call back
       to the house; was that two in the afternoon?

A      Yes.

Q      She knew your phone number at work?

A      Yes.

Q      And you hadn't gotten any calls from her; correct?

A      No.

Q      You tried to call her at two in the afternoon the first
       time that day and didn't hear from her; is that
       right?

A      Yes.

Q      You -- I take it then from your testimony that you
       don't know what she wore that day; is that right?

A      That's correct.

Q      And you have no present recollection of what, of how
       she was found, what she was wearing?

A      That's correct.

Q      What was the first time that you made some inquiry
       as to her whereabouts that evening, that Friday
       evening when you got home?

A      When I started calling after eleven; after eleven,
       around 11:30.

Q      When -- you indicated earlier that you had made a
       phone call about eleven to 11:30.

A      It was closer to 11:30.

Q      That was still the 10th of January, is that right?

A      Yes.

Q      And I believe you said you called the number that you
       had on a business card?

A      Yes.

Q      From the Finishing Touch?

A       Yes.

Q       That wasn't the first place you called, was it?

A       I don't know what order I called, but I did try to

        call the flower shop and --

Q       The flower shop, being Flowers By Janice?

A       By Janice.

Q       And what other places did you try to call that night?

A       I had, I believe I tried calling the Decoratifs

        shop; just the places that she worked.

Q       Any other places come to mind that you might have

        attempted to call?

A       No; I don't remember.

Q       And you say that when you called the Finishing

        Touch the phone was answered?

A       Yes.

Q       And you had never met Don Tedford, had you?

A       No.

Q       But whoever spoke with you identified himself as

        Don, is that right?

A       The man did.

Q       You mean on the phone?

A       Yes.

Q       How long did that phone conversation last?

A        A minute; two; very short.

Q    And at that time, did you give the person who

identified himself as Don the number to call you?

A    No, I didn't.

Q    In case anything happened?

A    No.

Q    What did you tell that person during that phone

conversation?

A    Well, I asked if he had seen Jeanine or heard about

Jeanine, heard from Jeanine.  I asked if he had --

I went -- I asked if he would let me know if he did

hear.

Q    Was it, was there any other communication beside that

request that you made of the person that described

himself as Don?

A    Well, no, other than the fact, me introducing myself

and saying I was looking for her and that; him

recollecting that, who Jeanine was, that he knew her.

Q    What were, what were his precise words to the best of

your recollection when he indicated that he knew her?

A    He said:  Oh, yes, I remember.  That it was, she was

a very talented girl.  That Jeanine -- he told her --

I assumed that was from what he saw of her portfolio

and the interview.

Q    Do you remember when the interview took place with

your wife?

A    I don't remember exactly, but it was either the end
     of October or the beginning of November.

Q    You weren't present at that interview?

A    No, I wasn't.

Q    You had simply learned about it from your wife?

A    Yes.

Q    And was there any discussion between you and her as
     to any prospects of her getting hired by the
     Finishing Touch?

A    Yes, she had said this person was very impressed
     with her work and to, that he would get back to her.

Q    What is the next time that you had any knowledge
     from her -- I take it that anyone from the Finishing
     Touch had gotten back to her?

A    Well, she had followed up first on a phone call to
     there.

Q    When would that have been?

A    That would have been around the holidays, around
     Thanksgiving, either before or after.  I believe
     it was after.

Q    And what did you learn from her in respect of that
     communication?

A    That the job prospect looked good and that he, that

Don that she talked about had indicated that he had
to make arrangements in the store and Jeanine had told
me that it seemed like he was working with another
person, that they, a partnership status, and they had
to okay it between each other.  And --

Q    Did you ever learn the name of that other person?

A    No.  Jeanine never told me.

Q    So after that communication around the holidays,
what is the next time that you learned from your
wife that --

A    That Tuesday, during the 7th.

Q    What did you learn at that time?

A    That a job was going to be offered to her.

Q    How did she know that?

A    From the, the conversation with this Don.

Q    Do you know whether she called him on this occasion?

A    I believe he called her.

Q    All right.  Did she tell you when the job was to be
offered her?

A    She said around two weeks.

Q    From the 7th?

A    (Witness nods head.)  Yes.

Q    What kind of, kinds of automobiles did you own, you
and your wife own at the time of this incident?

A       I own a Toyota, 1982 Toyota Starlet, and a 1977
        Chevy Impala.

Q       And did you drive one of those more regularly than --

A       Yes, I drive the Toyota.

Q       And your wife drove the Impala?

A       Yes.

Q       Did you drive the Toyota the day of January 10th?

A       Yes, I did.

Q       And when you arrived back home, she wasn't there;
        was her vehicle there?

A       No.

Q       The Impala.  When is the first time that you, that you
        saw that Impala after the 10th?

A       When I located it in, Saturday.

Q       Which would be the 11th?

A       Right.

Q       Were you with your father-in-law at the time you
        located that?

A       No, I was with my brother-in-law.

Q       Who is that?

A       Gary Remlinger.

Q       Gary --

A       -- Remlinger.

Q       Remlinger?

A       (Witness nods head.)

Q     About what time did you locate that car?

A     I don't even remember.  Late morning.

Q     Morning?

A     Late morning, early afternoon.

Q     And once you located it, where did you locate it?

A     I believe the name of the place is Pine Creek
      Plaza.  It's on McKnight Road.  And, almost the
      intersection of Route 19 and McKnight Road.

Q     What did you do when you found it?

A     We had, I had Gary go in and, into the Murphy's
      Mart there and call at my house where the police were
      and where the rest of my family were and tell them
      that it was there, to send someone down.

Q     After he did that, did the two of you drive the
      car away or --

A     No, we didn't touch it.

Q     You never even got into it?

A     No.

Q     Did you have keys to it at the time?

A     Yes, I did.

Q     Did you open the door and look inside?

A     I looked in the trunk.

Q     And was there anything unusual about what you
      observed in the trunk?

A       No.  There was nothing unusual inside, either.

Q       How do you know that?

A       Because I cleaned the car the week before.

Q       And I take it then that when you found it you looked inside the car?

A       I just viewed inside.  I didn't open it.

Q       How about Gary; did he go inside?

A       No.

Q       Were you and Gary present at the scene of the car when your relatives came down from your house?

A       Yes, we were.

Q       And who arrived; who arrived at the car then?

A       Well, the local police were there.

Q       Who do you mean by that?

A       I believe it was McCandless Township; around there.

Q       Do you know which officer from there?

A       No, I don't.

Q       Who else was there?

A       My father-in-law was there; my other brother-in-law Don, Donald Remlinger, Gary's brother; and another brother-in-law Jeff.

Q       What's Jeff's last name?

A       Remlinger.

Q       And your father-in-law is --

A    Donald Remlinger, Senior.

Q    Did you notice who did what to the car?  Who drove

     it away?  Did you see what happened at that point?

A    (Witness shakes head.)  No.

Q    What, what did you and your brother-in-law do then,

     or what did you do at that point after everybody came

     down to that shopping center?

A    Well, I just waited for a while until the police

     came and then we, I drove home to my house.

Q    With whom?

A    I don't remember.  I believe it was Gary.

Q    Now, when was, when were you first notified that your

     wife had been found?

A    It was in the afternoon.  I was at the Cranberry

     Police Station.

Q    For what reason?

A    I don't know.  I was, just at the station, waiting.

Q    And who were you with at the station?

A    My father-in-law was there; Gary was there; and

     the police officer was there.  Kovach is the policeman's

     name.

Q    Kovach?

A    Kovach.  Corporal Kovach.

Q    Now, I believe that you also testified that you had

another conversation with Don at the Finishing Touch
that next day?

A     Yes, Saturday morning.

Q     The 11th?

A     With my father-in-law; we drove over there.

Q     And what time did you and your father-in-law arrive
there?

A     Well, between 9:30 and ten o'clock in the morning.

Q     You weren't with your brother-in-law at that point?

A     No, I was with my father-in-law.

Q     Was the Finishing Touch open for business?

A     We walked right in.

Q     And who, if anyone, did you meet then?

A     There was a woman there at the front of the store.
We didn't meet, we asked where we could get the
manager, and I did say Don.  And she said in the
back of the store.  And then I went back there and
he was behind the counter, and met Don.

Q     So you met the woman somewhere closer to the front
door?

A     I actually didn't meet her, she was --

Q     When you -- she was closer to the front door of the
store?

A     Yes.

Q       When you say behind the counter, you mean out in the
        display area there is a counter?

A       Yeah; I guess it's halfway back through the store.

Q       That's where this gentleman was?

A       Yes.

Q       Don Tedford.  And what, if anything, did you or
        your father-in-law say to him at that point?

A       Well, I introduced myself and I told him that we were
        still looking for Jeanine.  And I gave him my phone
        number and name.

Q       What did he say to you?

A       My first name.  And said, after I introduced myself
        he said:  You still haven't found her.  And I said
        no.  And I asked him --

Q       Was that a question he asked of you, still haven't
        found her?

A       Yes, yes.

Q       And then what did you say?

A       I said no.  And I said:  Have you ever heard or seen
        any work.  And he said no.  And then I, again I said:
        If you do, let me know.  And then he asked for my
        name and phone number.

Q       And you gave, you then gave him your name and
        phone number?

A       Yes, I did.

Q       Did your father-in-law have any conversation with

him?

A       Just to shake hands and meet him.  I introduced him,

that that was my father-in-law.

Q       So the conversation, that was the  extent of it?

A       Yeah.

Q       How long would that have lasted?

A       Five minutes at the most.

Q       Five minutes at the most?

A       Uh-huh.

                    MR. SCHWARTZ:  Thank you.

          That's all the questions I have.

                    DISTRICT JUSTICE GANT:  Any

          redirect examination?

                    MR. COOK:  No.  That's all.

                    DISTRICT JUSTICE GANT:  You

          can step down.  Thank you.

                    MR. COOK:  Thank you.

                    (The witness left the stand.)

                    MR. SCHWARTZ:  I am sorry,

          Your Honor.  I just have one other

          question and we agree the witness can

          be excused.

JAMES REVAK, being previously
duly sworn, further testifies
as follows:

C R O S S     E X A M I N A T I O N (Further)

BY MR. SCHWARTZ

Q    You indicated that you were with your brother-in-law
     when you found your Impala automobile.  How was it
     that you happened to be in that particular area?

A    I was searching.  I was, first I went down Route 19.
     And I went all the way down to where Decoratifs is
     and made a circle eventually over to McKnight Road
     and then came up there and went through that parking
     lot.

Q    Any particular reason why you went through the park-
     ing lot?

A    We usually shop there for groceries, and --

Q    At which store?

A    -- I just wanted to check everything.

Q    Where --

A    There were a lot of cars.  Oh, at the Giant Eagle.

Q    All right.  Was there any other particular reason
     why you might have gone to that shopping center?

A    No.

Q    And can you remember what time it was that you began

driving around, looking that morning with your

brother-in-law?

A    That morning?

Q    Yes.

A    Yes, later in the morning.

Q    How far is, how far is that shopping center from your

house?

A    It's about seven miles.

Q    And your house is what direction from --

A    North.  My house is north of the shopping center.

Q    How far is your house from the Finishing  Touch?

A    Two miles or so; real close.  Real close.  And my

house is south of, southwest of the Finishing Touch.

Q    How about your house from Flowers By Janice?

A    Again, mile and a half, two miles.

Q    And Decoratifs?

A    That's probably eight or nine miles.

Q    Which direction?

A    South.

                      MR. SCHWARTZ:  Thank you.

That's all I have.

                      (The witness left the stand.)

                      (The witness was excused.)

- - -

                                    MR. GARY THOMAS SCHELLER, being

                                    first duly sworn according to

                                    law testifies and says as follows:

                    D I R E C T    E X A M I N A T I O N

BY MR. COOK

Q       Your name for the record; spell your last name

        for the record.

A       Gary Thomas Scheller, S-c-h-e-l-l-e-r.

Q       Where do you reside, Gary?

A       Reis Run Road, Pittsburgh.

Q       What's your occupation?

A       I am a truck driver.

Q       And by whom are you employed?

A       By the Bennett Supply Company.

                            MR. SCHWARTZ:   I am sorry.

                    Can I get that, what company?

A       Bennett Supply Company.

                            MR. SCHWARTZ:   Thank you.

Q       (By Mr. Cook)   What kind of company is that, Gary?

A       We are a wholesale building materials distributor.

Q       As part of your job description, do you deliver items

        of materials to different businesses in Pittsburgh,

        North Hills area?

A       Yes, I do.

Q       Did you ever have occasion -- have you had an occasion

to deliver to the Finishing Touch?

A     Yes, I have.

Q     In Cranberry Township?

A     Yes, I have.

Q     Okay.  Going to January 10th, 1986, did you have

      occasión to go there that day?

A     Yes, I did.

Q     Would you tell the Magistrate what happened that day,

      what time you got there?  Just describe what occurred.

A     Approximately 11:45, arrived at the store.  And I

      had one piece of material.  And I crawled in the truck,

      got it out and took it to the door and the door was

      locked.  And the guy came out and opened the door

      for me and I took it in and sat it down.  And at

      the time I asked why, just casually asked him why

      the store was closed.  And at the time they said

      they were going on a service call.  And I didn't think

      nothing of it.  And signed the bill and I was on my

      way.

Q     Okay.  Now, when -- you went through that a little

      bit fast.  You got out of your truck in front of

      the store?

A     Yes, I parked in front and I just had a little bit of

      stuff, it was, just took a matter of minutes, so I

double parked, took the material to the door, and the

door was locked.  And at the time --

Q    Excuse me.  When you say the door was locked, that's

the main front door of the building?

A    Yes.

Q    Where customers would normally walk into?

A    Right.

Q    Okay.  Do you recall whether there was a sign on the

door saying open, closed, or anything like that, Mr.

Scheller?

A    No, I don't.

Q    Okay.  When you tried to open the door and it was

locked, what occurred then?

A    Well, I opened, tried to open the door; of course it

was locked.  And I saw lights on in the building

and I was two people inside the building and, you

know, right away they came and opened the door up for

me.

Q    Okay.  Who came to the door?

A    Mr. Tresco.

Q    Pardon?

A    The, Mr. Tedesco.

Q    Tedford is his name.

A    Tedford.

Q       Do you recognize Mr. Tedford?

A       Yes, I do.

Q       You have seen, been there or seen Don?

A       Yes, I have been there maybe one other time.

Q       Do you know him by name as Don?

A       No, I don't.

Q       You knew him by face?

A       Yes.

Q       He is the one that came from somewhere in the store
        to come to the front door?

A       Possibly -- oh, out towards the back of the store
        there was a, they have some sort of a counter or
        something back there; that's where they were at.

Q       Okay.  You say there were two people.  Who was the
        other person?

A       It was a woman in there; attractive-looking woman
        standing back there with him.

Q       Did you ever talk to her?

A       No, I didn't.

Q       Where in relation to Donald, how far in feet would
        she have been to Donald when you talked to Donald?
        Just make a guess -- this room from where you are to --

A       Say from here over to the corner.

Q       Over here?

A       Yes.  Thereabouts.  Maybe a little further away.

                    MR. SCHWARTZ:  Excuse me.

            For the record, it's, estimate that as

            twenty feet?

A       Twenty feet.

                    MR. COOK:  Fifteen, twenty

            feet.

                    MR. SCHWARTZ:  To that wall

            or the --

A       That corner.  Twenty to thirty feet.

Q       (By Mr. Cook)  Okay.  Now, when you --

                    MR. SCHWARTZ:  I am sorry.

            That is what distance who was from

            where --

                    MR. COOK:  The lady from

            Donald and he; I think that's, wasn't

            that my question?

A       Yes.

                    MR. COOK:  I think that was

            my question.

Q       (By Mr. Cook)  Do you remember anything about this

        worman?  Can you describe her in any detail?

A       Just, I felt that she was an attractive-looking girl,

        and I thought that she, I also felt she was dressed

rather attractively-looking dressed up.

Q     And what about her hair?

A     Well, dark-colored hair.

Q     Okay.  About how tall?  If you can, now.

A     Yes, average height.

Q     Okay.

A     Five six; whatever average height.

Q     Taller or shorter than Mr. Tedford?

A     A little bit shorter.

Q     Shorter than Mr. Tedford?

A     Yes.

Q     Do you remember what kind of clothes she had on, as
      far as being nice clothes, but you don't remember the
      color or anything?

A     No, I don't.

Q     If you had seen a picture of her, were you able to
      identify her, the person that was there as Jeanine
      Revak?

A     No, I wasn't.

Q     You were not?

A     No.

Q     All you can say she is a young, attractive, dark-
      haired, well-dressed woman?

A     Yes.

Q    About what age, if you can, if you can recall.  If

you don't know, don't worry.

A    Mid-twenties, possibly.

Q    Did he say anything to her while you were there?

A    No, he didn't.

Q    Other than saying:  We are going on a service call --

that's all he said to you?

A    That's all I got.

Q    And that's his reason for having the store closed;

is that what he said?

A    Yes, that's all.  I just, you know, just heard that

and that was it.

Q    Did you ask him if he was going to lunch?

A    Did I?

Q    I just wondered.

A    No, I don't recall.

                    MR. COOK:    Okay.  That's all.

        Cross examine.

                    -   -   -

        C R O S S    E X A M I N A T I O N

BY MR. SCHWARTZ

Q    Mr. Schiller, or Scheller?

A    Scheller.

Q    I am sorry.  Scheller.  Mr. Scheller, how long have

you been employed by the wholesale building

distribution company?

A     Approximately ten years.

Q     I take it your position is that of a driver,

deliverer?

A     Yes, driver.

Q     You have made deliveries, you testified, to the

Finishing Touch on other occasions before January

10th; is that right?

A     Yes.

Q     And you keep a log of the deliveries you make on a

daily basis?

A     Yes, I do.

Q     Did you have a chance to review notes you might have

had from the Finishing Touch before that day?

A     Well, I was there that I can remember of one other

time.  And that was, I don't even know.  That was --

I am going to say in the fall, late fall of the year,

maybe.  And that was the last that I was there.

Q     The fall?

A     Of 1985.

Q     Of 1985?

A     Right.

Q     But you do keep a log of the times you have been there?

A       Yes, I do.

Q       And that log is kept with your employer in the
        regular course of business, I take it?

A       Yes, yes.

Q       You complete this log on a daily basis and at the end
        of your given day you return it to the office?

A       Yes.

Q       So the one other time you recall being to the
        Finishing Touch would have been the fall of 1985.  You
        can't say that you remember meeting this gentleman,
        Mr. Tedford, on that occasion?

A       Well, I could, yes.

Q       But --

A       He was there.

Q       In the fall of 1985?

A       Yes.

Q       Okay.  And you didn't know his name; is that correct?

A       No.

Q       Was there any -- every time you make a delivery
        someone signs or something, right?

A       Yes.

Q       And those invoices or requisition documents, what do
        you call those?

A       They are invoice delivery sheets.

Q      They are always signed by the person who receives
       something?

A      Yes.

Q      On the occasion of January 10th, you would have had
       somebody sign the invoice as well, is that correct?

A      Yes.

Q      And so Mr. Tedford would have signed that invoice?

A      Yes.

Q      On that occasion, what did you deliver there that
       day?

A      It was a, I believe it was just one five gallon
       can of some sort of adhesive or something.

Q      Okay.  And was there a payment required at the time?

A      No, there wasn't.

Q      Simply somebody sign for it?

A      Just a signature.

Q      And you keep on your log, you keep what time you
       arrived at their place?

A      Yes.

Q      Did you review that log data before coming to Court
       to see what time it was you were there?

A      Yes.

Q      Did you bring that with you, by any chance?

A      No, I don't have it with me.

Q     Where were you when you reviewed that document for
      today?

A     Oh, I didn't look at it today; I looked at it a
      month ago or so.  I didn't see it today.

Q     Now, I take it then that you parked very close to the
      front door of this store.

A     Not very close, no; I was parked facing the south.
      I was parked to the left side of the parking lot.

Q     The left side?

A     Yes.

Q     To --

A     To allow cars that were parked against the building,
      they was able to get out if they had to.  But I was
      only there for a minute or two, so there was no
      problem.

Q     And the, the Finishing Touch has a front that's made
      of glass, doesn't it?

A     Yes, it does.

Q     So that although the door was locked you could see in
      and people could see out through that glass?

A     Yes.

Q     You could see the people inside when you tried to get
      into the locked door, couldn't you?

A     Once I looked in, yes.

Q    And how far was it from your position looking in
     through that, whether it be window or the door,
     to where you saw someone, or some persons?

A    Toward the back of the store, maybe forty feet.
     Thirty feet, there --

Q    And can you describe what Mr. Tedford was wearing
     that day?

A    No, just, near as I can remember now just some sort
     of, you know, your basic denim clothes of some sort;
     just average-type clothes.

Q    When you use the term denim --

A    A good pair of Levi slacks and a dressier shirt.

Q    A dress shirt?

A    Yes, you know, a dress type, not just a T-shirt.

Q    Right.  And you are pretty certain it was a shirt as
     distinguished from a jacket?

A    It, it may have been a jacket.  I just didn't,
     didn't recognize, didn't look that close.

Q    Well, are you sure it was a jacket, a shirt, as
     compared with a sweater, for example?

A    Could have been a sweater also.  Like I said, I did
     not observe the clothes.

Q    He was not in some uniform that identified him as an
     employee of the Finishing Touch, in any event?

A    No, no.

Q    And, and did you knock on the door to get his

attention or was he able to see you, to your

knowledge, and be able to see you to come and let you

in?

A    That, I don't recall.  It -- I just remember sitting

down -- I remember rattling, pulling on the door,

it had a deadbolt on it, could not shake, but the

door opened up.  And I wasn't really paying any

attention at that point.

Q    All right.  And then I take it you were greeted by

Mr. Tedford --

A    Yes.

Q    -- who you have identified.  The woman that you

said was in there did not come up to the front door

to stand with you, did she?

A    No, she didn't; no, she didn't.

Q    She remained toward the back toward the counter?

A    Yes, yes.

Q    And you say that's what, how far from the front door

is that counter?

A    I am just, from the front door to the counter is

approximately thirty to forty feet.

Q    Where did the transaction, where you delivered the

item to the person you have identified as Mr. Tedford

and he signed for it, that took place by the front
door; is that correct?

A    I went into the store a little ways; maybe, I don't
know, fifteen, twenty feet, thereabouts. Part
way into the door and sat it down.

Q    You didn't go all the way back to the counter, did
you?

A    No, I didn't.

Q    The woman you say you saw, she never came forward
from where she was?

A    No, she didn't.

Q    And the only conversation you had with either of
those people was with the person you have identified
as Mr. Tedford?

A    Yes; that's all. .

Q    You described the woman as having dark hair. You
mean by that black hair?

A    Just dark.

Q    As distinguished from a blond?

A    Yes, she wasn't blond.

Q    You couldn't tell us whether it was long cut or
short cut, how it was?

A    I, I am going to say that it was shorter, shorter
cut. It wasn't real long-type hair.

Q    Shorter than what?

A    It wasn't down to her waist.  It wasn't the real long-
     style hair.  It was just a basic haircut.

Q    It was past her shoulders?

A    No, it wasn't.

Q    Wasn't?

A    Not that I -- I don't really know.

Q    You don't know?

A    I don't know how, the exact length of her hair.

Q    You can't tell me whether she was wearing glasses
     or not wearing glasses?

A    No, I can't.

Q    You can't tell us any distinguishing features about
     that lady?

A    No, I can't.

Q    You indicated you thought she was about five foot
     six inches, average height?

A    Yes.

Q    Is that right?  Could she have been taller than five
     six?

A    She could have been, but I, at that point she looked
     to me approximately five six; just little bit shorter.

Q    You are married?

A    Yes, I am.

Q    And how tall is your wife?

A    About five foot two.

Q    She was certainly taller than your wife?

A    Yes.

Q    And she was never standing alongside Mr. Tedford,

     was she, that you saw?

A    Just when I first glanced at the store itself; that's

     all.

Q    Right.  And that was just for an instant?

A    Yes.

Q    For a second?

A    Yeah.

Q    Yeah, or --

A    Yes, I just glanced into the store.

Q    You couldn't tell what kind of shoes she was wearing?

A    No, I don't.

Q    And you couldn't tell whether she was wearing a dress

     or slacks?

A    No, I don't.

Q    And the, the distance which you previously described

     as thirty feet  was the distance, -- correct me if

     I am wrong -- but the distance you said she was away

     from Mr. Tedford when you saw her?

A    Yes.  I said twenty to thirty feet away.

Q    Twenty to thirty feet away.  There was no conversation

between the two of them that you heard?

A    No.

Q    And it's certain, of course, there was no indication
there was anyone in distress?

A    No.

Q    Who was it that first approached you, or how was it
that you approached somebody else about your having
been there that day relative --

A    I approached the officer.

Q    Who did you approach about that?

A    Officer Stanek and Officer Peters.

Q    When did that happen?

A    I don't know the exact day.  January -- the exact
date I don't know.  It was a couple weeks after --
no, wait.  It had to be later than January.  I don't
know the exact date.

Q    And how did you know to go to these officers?  You
read about them in the paper or something?

A    Yes.

Q    You read about -- you saw their names in the papers
and you decided to go tell them what you have told
us here in Court?

A    No, I have a friend that's a retired police officer
and I called him and he got in contact with these fellows.

Q       Who is your friend?

A       Charles Wilker.

Q       And then Mr. Wilker called them and they called you?

A       Yes.

Q       Had you come down to the station and discuss this matter?

A       No, they met me.

Q       At your house?

A       No, we went somewhere else.

Q       Where did that meeting take place?

A       At a restaurant in Wexford.

Q       Which restaurant?

A       Carmody's.

Q       Carmody's?

A       Carmody's Restaurant.

Q       And at the time you gave them the statement, it was the same as what you have told us here in Court?

A       Yes, it is.

Q       And they made a report of that fact?

A       Yes, it is.

Q       Did you sign any statements for them?

A       No, I didn't.

Q       Did you have the occasion to observe any pictures?

A       At that time, no.

Q     Did you know Mr. Tedford's name at that time when
      you spoke with the officer?

A     No, I didn't.

Q     Did you even know the name Don when you spoke with
      the officer?

A     I just knew from the delivery receipt after the,
      you know, that thing come down.

Q     Did they show you his picture?

A     No, they didn't.

Q     Did they tell you his name?

A     Yes, they did.

Q     Is there anything else that you can remember telling
      the officers about your involvement in that story
      that you haven't  told either the assistant district --

                  MR. COOK:  I resent that.

            It's been too many years.

Q     (By Mr. Schwartz)  I am sorry, District Attorney.  My
      apologies.

A     No, I, you know, I just told you everything that I
      told him.

                  MR. SCHWARTZ:  Okay.  That's
            all the questions I have.

                  DISTRICT JUSTICE GANT:  You
            can step down.  Thank you.

(The witness left the stand.)

- - -

MR. COOK: Trooper Peters.

MR. SCHWARTZ: Let me ask

him one more question.

MR. COOK: Gary, he wants

to ask you something.

- - -

MR. GARY SCHELLER, being

previously duly sworn, further

testifies as follows:

C R O S S    E X A M I N A T I O N (Continued)

BY MR. SCHWARTZ

Q    I forgot to ask you, Mr. Scheller, you can't remember

having noticed any particular cars that were in that

parking lot when you arrived on that day, can you?

A    There was a dark-colored car, some sort, some sort

of a foreign car, some --

Q    Foreign car, that --

A    Yes.

Q    That's the only car you can remember?

A    The only one I recall, yes, that was parked in the

vicinity of the store.

Q    How was it that you can remember having seen that car?

A     It just sort of stuck out in my mind there, an

      odd-colored car; odd-color car for that type of car,

      I felt, anyhow, and I --

Q     It was definitely a foreign car?

A     I felt it was, yes.

Q     And you, do you wear glasses or not?

A     No.

Q     You don't need glasses to drive a car?

A     No.

                    MR. SCHWARTZ:   That's all the

              questions I have.

                         -  -  -

      R E D I R E C T   E X A M I N A T I O N

BY MR. COOK

Q     Gary, do you know what kind of car, do you remember?

A     I am going to say it was a Datsun, Toyota, one of

      those particular --

Q     Was it a sedan or was it a sports model?

A     Sports model; two door.

Q     Sports model Datsun or Toyota.  And what was the color

      again?

A     It was a dark; could have been dark green or dark

      blue.

Q     Where was that parked in relation to the Finishing

Touch?

A     If you was facing the building, parked to the right
      of the door, the entrance door.

Q     Which way would the car, the front of the car be
      facing; toward the building or away?

A     Yes, it would be nosed in toward the building.

Q     Toward the building?

A     Yes.

Q     You didn't get a license number, did you?

A     No, I didn't.

                              MR. COOK:  That's all.

                              MR. SCHWARTZ:  That's all.

                              DISTRICT JUSTICE GANT:  Okay.

           Step down.

                              (The witness left the stand.)

                              (The witness was excused.

                    -    -    -

                              EDWARD S. PETERS, being first

                              duly sworn according to law,

                              testifies and says as follows:

           D I R E C T   E X A M I N A T I O N

BY MR. COOK

Q     State your name, normal station duty and your
      relationship to this case, Mr. Peters.

A     Edward S. Peters; I am a criminalist for the

      Pennsylvania State Police, Criminal Investigations,

      stationed in Washington, P.A.

Q     How did you become involved with the death of

      Jeanine Revak?

A     On the 11th of January, 1986, I was contacted by

      radio to go on duty at quarter to one in the

      afternoon, that there was a body in the gameland

      area in Washington County; and proceeded to that

      location.

Q     Okay.  When you say the gameland area of Washington

      County, would you be a little more specific for

      our --

A     That area is approximately twelve miles southeast

      of the City of Washington.

Q     Your barracks are at Washington, right?

A     Right, in the City of Washington.

Q     In the city.  Can you describe fo the Court the

      general scene -- it's a gameland -- but just describe

      it as far as population is concerned.

A     The scene in that area would be relatively sparce;

      it would be a farming-type area.  The road leading

      from the main road, which is U.S. 40, and all the

      country roads that lead down to the area where the

body was found, there is probably twenty, thirty

homes in that area along the road, and the stretch

of that road is approximately five miles in length

from the main intersection of U.S. 40.

Q    I show you a picture marked Commonwealth's Exhibit

Number 1 and ask if you can describe that, please?

A    This is the legislative route, 62062, I believe.

Q    Where is that road in relation to where the body was

found?

                    MR. SCHWARTZ:  May I

               approach the witness and look at the

               picture?

                    DISTRICT JUSTICE GANT:  Sure.

A    In relation to the position where they found, the

body was found, approximately two hundred feet

north of this intersection here, it was approximately

twenty feet off the highway there.

Q    So this is the actual road; right in here is where

the body would have been --

A    Yes.

Q    -- laid?

A    Yes.

Q    If you'd like to make a mark on that --

                    MR. SCHWARTZ:  If you'd like to

make a mark where he found that.

    MR. COOK:  Okay.

A    Would be over in the other side of these trees;

that is a slight embankment.  Found in the area here.

And it went about two hundred feet from here up,

about down in this area.

      MR. SCHWARTZ:  For the record

I made a ink mark on Exhibit 1, or

did you call that --

      MR. COOK:  One, we use.

      MR. SCHWARTZ:  On Exhibit 1

indicating where the body was found.

Q    (By Mr. Cook)  Show you what has been marked

Commonwealth's Exhibit Number 2 and ask you to

describe that?

A    This is a photograph depicting the weeded area of

where the body was located and also where some trees

were cut down near the body and there is a few

stumps in the photograph.

Q    In relation to that photograph, that is where the,

pinpointed  on that photograph to show the actual

body twenty feet off, approximately twenty feet off

the road?

A    Yes, sir.

Q     Okay.

                    MR. SCHWARTZ:  Twenty feet

        off the road would have been east?

A     It would be west.

Q     (By Mr. Cook)  One more question:  Is the, is, which direction is that?

A     In this photograph?

Q     The end of this log where the head is of the body --

A     In this photograph, the photographer appears to be standing right near the berm of the roadway and photographing down upon the body.

Q     You were there and you saw that scene itself?

A     Yes.

Q     Okay.  And photograph number three, what is that?

A     Photograph three depicts the body as it was found at the scene with a log underneath the feet of the victim, showing the clothing, what the victim had on.  This is exactly how they found the victim at the scene.

Q     So at that point this, it does not show  that Jeanine, they moved her or anything?

A     No.

Q     That's the way she laid?

A     That's exactly how she laid.

Q       Okay. And photograph number four, Exhibit 4, which
        is a photograph, describe that.

A       Exhibit 4 depicts her laying. I believe that is the
        right leg here showing a laceration of some sort
        of laceration mark on the upper part of the ankle.

                    MR. SCHWARTZ: Well, that's

                objected to as a conclusion without

                proper foundation but -- just for the

                record.

                    MR. COOK: That would be,

                the description is of this -- he said

                he objected to that. We will tie that

                in later with the autopsy report.

                    DISTRICT JUSTICE GANT: All

                right. Sustain the objection.

Q       (By Mr. Cook) Trooper Peters, at that time how did
        you become --

                    MR. COOK: Strike that

                question. Excuse me.

Q       Did you later learn that, through your identification
        at the scene, certain items, that that body was
        Jeanine Revak?

A       At the autopsy is where she was identified.

Q       But did you gather certain evidence at the scene which

later tied into the fact that that was Jeanine Revak?

A    Yes, I did.

Q    What did you recover, if you can recall?

A    At the scene, the autopsy, we recovered the clothing
     and discovered a ring, wedding band on her which had
     her initials inside the wedding band and there was,
     I believe, ten chips of diamonds going across the
     wedding band.

Q    When you were at the scene did you know of a missing
     person from Butler County?

A    No.

Q    No missing person report?

A    No.

Q    Or Cranberry Township or anyplace up here?

A    No.

Q    When did you have -- well, in that afternoon, is
     that when it was there was location of Jeanine in
     connection with the body in Washington County?

A    It was later on that afternoon, yes.

Q    And then were you at the autopsy performed by Dr.
     Abernathy?

A    Yes, I was.

Q    Okay.  Were you the officer that was scheduled to go
     to that autopsy?

A     Yes.

Q     Show you what has been marked Commonwealth's Exhibit
      Number 5 for identification purposes; ask you if you
      can identify that, please?

A     The first sheet is a toxicology-type of report from
      the coroner's office which I received as to the,
      the toxicological results of the blood and the
      urinalysis which they took on the victim Revak.
      And the other pages all contained the report of the
      autopsy in which Dr. Abernathy performed on the
      individual on the 11th of January, 1986.

Q     Okay.  And his autopsy report, would you describe,
      would you describe the cause of death of Jeanine?

                         MR. SCHWARTZ:   Excuse me,

                  Your Honor; I object to the introduction

                  of this without the, without the doctor

                  present who performed the autopsy.

                  It's clearly hearsay, and I understand

                  that, that Commonwealth is relying upon

                  the case of Commonwealth versus Rich

                  But this doctor is obviously available.

                  He is within minutes -- or an hour at

                  the most -- of being here.  And the

                  charges in this case are so serious that

it seems to me that our basic right of
confrontation guaranteed by the Sixth
Amendment, that clearly is being violated
by the introduction of this document
without the doctor here.

DISTRICT JUSTICE GANT: Let
me see the document.

It's overruled. This is a
preliminary hearing. This is, looks to
me like a, a document, official document
from a laboratory. This Court always
allows those matters to be introduced
without having the doctor here. Certainly
he'd have to be available at trial.

MR. COOK: The right of
confrontation, the Sixth Amendment, is
the trial stage, not the preliminary
hearing.

MR. SCHWARTZ: The reason is
under United States versus Coleman; this
is a critical stage of the proceedings.

DISTRICT JUSTICE GANT: I
have ruled.

MR. SCHWARTZ: I have said it.

Q       (By Mr. Cook)  Would you state for the Court the

        cause of death stated in Dr. Abernathy's report,

        please?

A       His diagnosis was asphysiation due to ligature

        strangulation.

Q       Now, along with that report are there indications

        of other wounds to Mrs. Revak?

A       Yes, sir.

Q       And what are they?

A       There is bilateral pulmonary collapse.  Hemorrhages,

        subdural and --

                        UNIDENTIFIED MAN:  Subarachnoid.

                        DISTRICT JUSTICE GANT:  What

                did you say, sir?

                        UNIDENTIFIED MAN:  Subdural

                and subarachnoid --

                        DISTRICT JUSTICE GANT:  Who

                is that?

                        MR. COOK:  That's all right.

Q       (By Mr. Cook)  Just read what it says there.

A       All right.  Subdural and subarachnoid, contrecoup

        type,, left temporal lobe.  Hemorrhage of --

Q       --epiglottis.

A       Compression of epiglottis and larynx.  Pe --

| | |
|---|---|
| Q | Petechial hemorrhages of epicardium -- |
| A | Small.  Chronic passive congestion of spleen due to |
| | unknown cause.  Multiple abrasions and contusions. |
| | Ligature mark around neck.  And further examination |
| | of the face shows very marked congestion of the |
| | conjunctiva bilaterally but no definite petechial |
| | hemorrhages are encountered. |
| Q | Okay.  Did you observe head wounds on this body? |
| A | Yes. |
| Q | You have been a police officer how long? |
| A | Sixteen years. |

                    MR. SCHWARTZ:  What was your

                        original question; what did he observe?

| | |
|---|---|
| Q | Head wounds that are described in here.  You saw them |
| | yourself at the autopsy? |
| A | Yes, I did. |
| Q | And at the scene? |
| A | Yes, I did. |

                    MR. COOK:  We offer Exhibits

                        1 through 5.

                    MR. SCHWARTZ:  I renew my

                        objection with respect to Exhibit 5, Your

                        Honor.  No objection as to one through four.

                    DISTRICT JUSTICE GANT:  Objection

                        is overruled.

| | |
|---|---|
| Q | I show you what has been marked Commonwealth's Exhibit |
| | Number 6 and ask you to identify that, please? |

A       ~~This is a laboratory report from the laboratory~~

        examination of the Pennsylvania State Police Regional

        Crime Lab in Greensburg, Pennsylvania, submitted by

        Criminalist Scott Ermlick.

Q       And what do the, what are the comparisons made on

        that criminal lab report from Greensburg?

A       On there was, sperm cells were identified on the vagina

        slide found in the rape kit. Seminal material were detected on

        the black slacks of the individual.

                        MR. SCHWARTZ:  Excuse me.  All

                this does, rather than paraphrasing, this is

                a document which he did not prepare.  Why don't

                we just allow the Court to read the document,

                have it speak for itself.  I object to the

                document being introduced in this fashion, in

                the first place.  But if the Court is going

                to rule as it has on Exhibit 5 then I would

                simply ask the Court to read it because it

                does speak for itself.

                        MR. COOK:  Well, I think I want

                to get -- I won't ask him about that again, I

                will just get the results then.

Q       (By Mr. Cook)  For purposes of hearing, Mr. Peters,

        would you state to the Court the results regarding semen

        found on her clothing with respect to the Defendant

        ~~Donald Tedford?~~

A    Based on the information in the second page of item

three and four, semen stains detected on the victim's

slacks demonstrated blood factors that are consistent

with Tedford's blood and could not be that of James

Revak.

Q    Okay.  What about the results of testing of pubic

hair?

A    The pubic hair removed from the victim's underpants

was compared to pubic hair samples from Donald Tedford.

Based on visual microscopic examination of the pubic

hair found on the underpants, is consistent with Tedford's.

Q    With respect to cat hair that was found on her fibers,

could you describe the result of that?

A    Animal hairs, that is consistent with the animal

hair from item one.  Item one was Caper's cat, was

detected on victim's red jacket, which is item three.

MR. COOK:  We offer Exhibit

Number 6 into evidence; noting the

same objection.

Q    Throughout your --

MR. SCHWARTZ:  Excuse me.

Q    During your investigation, Mr. Peters --

MR. SCHWARTZ:  Excuse me,

Mr. Cook.  While I understand the Court

has ruled on my, on my objection for the
last offer, the Commonwealth is going to
obviously rely upon these documents and
conclusions drawn from these documents
to ask you to bind over for Court my
client, Mr. Tedford.  There is, there is,
there is absolutely no way that I can
cross examine this witness or any witness
as to the accuracy or the legitimacy or
the reliability of the conclusions, the
Commonwealth is asking you to draw
from these documents.  So, in effect, we,
by reason of your ruling, Judge, and our
inability to confront or question for
this Court's benefit the way that those
conclusions were drawn, we are left with
absolutely no ability to test, which is
the fundamental principle of our system.
We are left with no ability to test the
conclusions drawn by this criminalist
and by Dr. Abernathy.  So I think maybe
putting it in this perspective, Your
Honor, will see how, how powerless this
renders the accused at this critical

stage of the prosecution.

DISTRICT JUSTICE GANT: Counselor,
this is not heresay in this Court's
opinion. It's always been acceptable in
all cases to allow the introduction of
these documents in a preliminary hearing
because it would not be this Court's respons-
ibility to determine guilt or innocence
of the Defendant. And it, next year I
will rule the same way because it's my
belief that is not hearsay; it is allowed
to be introduced in a preliminary hearing
and I have always allowed it to be
introduced in many serious cases such
as this.

MR. SCHWARTZ: Just seems to
me this --

DISTRICT JUSTICE GANT: I don't
want to -- I don't think it's going to
help, counselor. I am going to overrule
your objection, finally, for the last
time. And I don't want to get into it
any more. I'd like to proceed with our
preliminary hearing.

MR. SCHWARTZ: Very well,

Your Honor. Thank you.

Q   (By Mr. Cook) From the photographs, now, Mr.
Peters, would you describe the exact clothing that
you recall taking charge of the evidence, the clothes
that Jeanine wore that day that she was found at the
scene on the 11th?

A   Clothing which she had on was one stretch-type
ankle high stocking; black wool-type slacks; a white
silk-type blouse and a red blazer. She had fan-
type earings, pierced earings on and she was wearing
the wedding band I mentioned previously.

Q   What about facial makeup?

A   She had very little facial makeup on.

Q   That you could see?

A   That I could see.

Q   Okay. Now, after the, after the 10th of January,
did you have occasion to interview Mr. Tedford?

A   Yes, I did.

Q   Okay. When was that?

A   That was on the 13th of January at approximately 10:30,
eleven o'clock in the P.M.

Q   Okay. And did you take a statement from Donald
Tedford at that time?

A       Yes, a verbal statement was taken.

Q       It was transcribed or typed or anything like that?

A       No, it wasn't.

Q       Okay.  During that statement, were Mr. Tedford's
        rights given to him, his Constitutional Rights?

A       Yes, he did.

Q       Did he voluntarily talk to you and Trooper **Stanek?**

A       Yes, he did.

Q       During that interview, did he describe his whereabouts
        and his business on January 10th at the Finishing
        Touch?

A       Yes, he did.

Q       Would you describe to the Court what he told you
        regarding his movements that day during the business
        hours and whatever, 8:30 to five or whatever?

A       He related that he got in there at approximately
        8:30, between 8:30 and nine o'clock at the Finishing
        Touch and he had worked there until approximately
        4:30, when he closed the place.  And then he was there
        from 4:30, 4:30 to 4:38, from 4:38 he was there until
        approximately 9:15 in the P.M., after closing.

Q       Now, did he tell you what business he had that day
        at the Finishing Touch, that Friday?

A       He mentioned that he had one customer in there

earlier in the morning. He believes that it was a
woman customer who had signed out some wallpaper
and that if this customer did, was in fact there that
her signature would be on a tablet in that area.

Q     Did you later learn there was a customer there?

A     Yes.

Q     Nine, or whatever?

A     Yes.

Q     Did you ask Mr. Tedford specifically had he had contact
      in any manner with Jeanine Revak that day?

A     Yes, I did.

Q     What was his response?

A     He said he had no contact with her whatsoever.

Q     That, did he say what contact he had with her and when?

A     He told us it was either Tuesday or Wednesday -- he
      couldn't remember -- that he had called Flowers By
      Janice to try to get in contact with her and that he
      couldn't get ahold of her there and that he called
      at her residence and talked to her.

Q     And what was that, the tenure of the conversation?

A     The tentative conversation, he alleged that it was in
      relation to this jos hiring; that's all.

Q     He told you that he talked to Mr. Revak that night at
      11:30, approximately?

A       Yes, he did.

Q       And he did talk to Mr. Revak the following Saturday

        morning?

A       Yes, he did.

Q       And he denied any knowledge of having any contact

        with Jeanine at least by phone since Tuesday?

A       Yes, sir.

Q       Is that the summary of the statement?

A       That's correct; yes, sir.

Q       Okay.  Did he ever tell you if that day of anybody

        beside that woman coming to the store?

A       No, he said no other customers were in there.

Q       And Jeanine Revak is what age; what age was she at the

        time of her death?

A       Jeanine was twenty-two years old.

Q       And describe her just in general terms to the Court,

        please?

A       Jeanine was, Jeanine was approximately five foot two

        inches; attractive, young girl, with dark, dark

        black hair down to about, below her ears, it covered

        her ears.  Real clean.  Just a clean, upstanding

        looking, attractive girl.

Q       Do you remember her height from the records?

A       Her height was approximately five foot two inches.

Q        Now, there has been mention of a cat, a cat at the

         store.  Would you describe to the Court the, Tedford's

         cat and how you became aware of Tedford's, Donald

         Tedford's cat?

A        We became aware of Tedford's cat when we were taking,

         speaking to his, Robert Sosso.  Sosso said he went in

         there on Thursday, which would be the 9th of January,

         and there was a cat in the store and mentioned to

         Tedford to get rid of that cat.  We asked Lynn

         Kaper, who is also the bookkeeper.

Q        Isn't her name Kampers?

A        Kampers, K-a-m-p-e-r-s.

Q        K-a what?

A        K-a-m-p-e-r-s.  She had some cats and she was the

         one who had a conversation with Don Tedford about this

         kitten and she said that she would take the kitten from

         Don.

Q        Okay.  Was the cat, the first time to your knowledge

         the cat first in that store the previous night then?

A        Yes.

Q        It was actually Mr. Tedford's cat, not Kamper's

         cat as according to the report that --

A        That's right, it's Tedford's.

Q        Okay.  And was that there the next morning on Friday

January 10th?

A       On Friday January the 10th, Lynn Kampers reported to
        us that she had taken the cat back and left it there.

                                MR. COOK:   Okay.  We rest.

                        -   -   -

                C R O S S   E X A M I N A T I O N

BY MR. SCHWARTZ

Q       Mrs. Kampers indicated to you that he had taken the
        cat back when?   It wasn't her cat?

A       It was Don Tedford's cat.

Q       So that, so that the conclusion drawn in this
        Commonwealth's Exhibit 6 where it says animal hairs
        that is consistent with animal hair item number
        one, Kampers' cat, that's, that's an error, that's a
        mistake?

A       That isn't an error.  On our reports we have to put
        down where we received this animal hair from.

Q       It's not Kampers' cat?

A       It was her cat at the time we received the animal
        hair.

Q       When are you telling --

A       I am telling you that on the 9th and the 10th it was
        Donald Tedford's cat.  On the 11th Donald Tedford
        give it to Kampers and says:  Here, keep the cat, I

can't take it anymore, and she took the cat. When

we began our investigation, we came across the cat

later on, she was the owner of the cat at that time.

Q    So she still is the owner of the cat?

A    She is still the owner of the cat.

Q    So it's still Kampers' cat?

A    Yes, sir.

Q    Although before the 11th it was Tedford's cat?

A    Yes, sir.

Q    Trooper, Trooper Peters, you witnessed the autopsy

     of Ms. Revak, is that correct?

A    Yes, sir.

Q    And that was conducted by Dr. Abernathy?

A    Yes, sir.

Q    You were there from beginning to end?

A    Yes, sir.

Q    And were you the only one present in addition to Dr.

     Abernathy?

A    There was the coroner there. There was also one of

     our trooper assisting me.

Q    Who was that?

A    That was Trooper Larry Maggi.

Q    Larry Maggi?

A    Yes.

Q       How do you spell that?

A       M-a-g-g-i-e?

A       And how did Dr. Abernathy conduct the autopsy?

        By that I mean as he was, as he was going through

        the process from beginning to end, was he dictating?

A       Yes, he was.

Q       And essentially what we have introduced here as

        Commonwealth's Exhibit 6 is the transcribed document

        of his dictation during that autopsy?

A       As he was progressing he was dictating.

Q       He wasn't making any notes while he was dictating?

A       No, he has a dictation right there.

Q       No one else was making any notes during the  autopsy?

A       No.

Q       You nor Mr. Maggi, Officer Maggi?

A       No.

Q       Neither of you were?

A       No.

Q       The only thing that's recorded to the best of your

        knowledge from that autopsy is, was done by the

        dictation machine?

A       Yes, sir.

Q       Who was it that reported having found this body

        to your barracks?  If you know?

A       It was some **hunters** in the area there.

Q       Did you get their names?

A       Yes, I did.

Q       What are their names?

A       David Richard Lijewski, L-i-j-e-w-s-k-i.

Q       And who else?

A       And his brother David Lijewski.

Q       I thought you said the first was David.

A       I am sorry.  Harry, Harry Lijewski is the brother.

Q       What time did they report having discovered this
        body?

A       They reported it about 12:30, 12:45.  I'd have to
        look on the report to be sure, but it was right
        around --

Q       Twelve thirty or 12:45 P.M.?

A       Yes.  I got it at 12:45, so it had to be around 12:30
        they reported it.

Q       Were  both of these gentlemen present when you arrived
        at the scene?

A       Yes.

Q       And you went with whom; who accompanied you to the
        scene?

A       I went by myself.

Q       The only three people there were the Lijewskis
        and yourself?

A      And the records and identification officer who

       photographs it, and the coroner showed up about ten

       minutes after that. _(SEE line 2, pg. 82)_

Q      What's the gentleman's name who photographed it?

A      Trooper George Titler.

Q      T-i-t-l-e-r?

A      Yes, sir.

Q      And the coroner was there?

A      Yes, sir.

Q      Coroner is who?

A      Farrell Jackson.

Q      He is the coroner of Washington County?

A      Washington County Coroner.

Q      And did you make -- did you take a report from the

       Lijewskis as to their findings?

A      Yes.

Q      And that's --

A      That's in the report.

Q      That's in the report which you completed personally?

A      Yes, I did.

Q      And who was the first person that actually did something

       to attempt to move the body?

A      We moved the body after Dr. Abernathy arrived on

       the scent to check it out.

Q     What time did he arrive?

A     I believe it was probably an hour after I was there;
      hour, hour and a half.

Q     And during that whole period, the hour, hour and a
      half, did the Lijewskis stay there?

A     No; after I interviewed them, I told them they could
      leave.

Q     Did you ever call them back in for questioning?

A     No.

Q     And so they left.  Was it then you, the coroner,
      Trooper Titler?

A     Yes.

Q     And Dr. Abernathy?

A     Dr. Abernathy hadn't left -- or Dr. Abernathy hadn't
      arrived and there were other officer at the scene, though.
      The one was Corporal Galingane.

Q     Who else?

A     I couldn't tell you.

Q     Galingane?

A     Yes, sir.

Q     Again from the Washington Barracks?

A     These were all from the Washington Barracks.

Q     All the officers were from the Washington Barracks?

A     Yes, sir.

Q    There were no other officers from the police, office,
     State --

A    There is no other police department in that area.

Q    And were you in charge?

A    Yes.

Q    And who was, who was put in charge of maintaining
     the area, of making sure that nothing was disturbed?

A    I was.

Q    You were personally in charge?

A    Yes, sir.

Q    So you remained at all times?

A    Until the body was removed; I and Trooper Titler,
     each one of us.

Q    Each one, the two --

A    Yes.  Normally Trooper Titler who is R and I, he
     goes to the scene, he photographs it and he stands
     by and does the measurements and everything and we
     always, we are right there by the body the whole time.

Q    Okay.  And once Dr. Abernathy arrived, he, of course,
     began, he began rendering the services that he was
     called to do?

A    Yes, and called him to examine the body.

Q    And he began to examine the body?

A    Yes, sir.

Q     He examined the body physically?

A     Yes.

Q     He was the first person that touched the body?

A     Yes, sir.

Q     Did he actually change the clothing at that time?

      Did he pull clothing off or re-arrange it at the scene?

A     The only thing we pulled was her back of her blouse.

Q     See lividity on her body.  Who did that?

A     I did.

Q     Per Dr. Abernathy's instruction?

A     No.  After Dr. Abernathy examined the individual,

      the, the victim, and before we turned her over I

      wanted to get a picture of lividity on her back, if

      there was any at all, and I lifted up the back of

      her blouse.

Q     How did you lift the back of her blouse; with your bare

      hands?

A     One hand, pulling it up.

Q     And then once that was done -- so it would have been

      at that point you and Dr. Abernathy having had

      physical contact with the body, or the clothing of

      the body, then how was she transported from there

      to the coroner's office?

A     We got a white body bag, placed it underneath her and

then we lifted her over and laid her into the body

bag, zipped in the body and transported by the local

ambulance, Ambulance and Chair, transported her

to the Washington County Morgue in the Washington

City Hospital.

Q     So it was a Washington County ambulance service, is that

what you are saying?

A     Ambulance and Chair.

Q     I am sorry?

A     Ambulance and Chair is what they call it.

                  MR. COOK:  I didn't quite --

      chain --

A     Chair; c-h-a-i-r.

                  MR. COOK:  Okay.

                  MR. SCHWARTZ:  Ambulance and

      Chair.

Q     (By Mr. Schwartz)  Okay.  Okay.  So they were called

and once the body was rolled over onto the body

bag then the body bag was transferred to the

ambulance personnel; is that correct?

A     Yes, sir.

Q     Did the ambulance personnel have anything to do with

actually lifting the body from the scene?

A     The coroner, he lifted her onto the stretcher and onto

the ambulance.

Q     Was she already in the body bag?

A     Already in the body bag, zipped up.

Q     Who was in charge of placing her into the body bag?

A     Well, the coroner, he brings the body bag, and laid

      it down underneath her.  I stand there and watch

      what they are doing.

Q     The coroner did that by himself or with the assistance --

A     No, there was assistance, the ambulance technicians.

Q     And you have their names in your report?

A     No; that's no problem, I can get it.

Q     Did you then immediately go to the coroner's office?

A     No, I didn't.

Q     Who did?

A     The body was transported to the Washington County

      Morgue where it was placed in the refrigerator

      section of the morgue.  I went back to--

Q     How do you know that?

A     That's how they normally do it.  I am going by

      normal procedure.

Q     But you don't know that for a fact?

A     I don't know that for a fact, no.

Q     All you know, it left the scene in the ambulance?

A     Yes.

Q       When is the next time you saw the body?

A       When they pulled it out of the drawer.

Q       What time was that?

A       That was at approximately 3:45 P.M.

Q       Approximately what time had it left the scene?

A       Probably, I would say maybe forty-five minutes before
        that.

Q       When you arrived then at 3:45, who accompanied you?

A       Where?  At the hospital?

Q       Yes.

A       I was along with Trooper Maggi.

Q       I take it then it was sometime that afternoon you
        became aware of the identification of that body?

A       Yes.

Q       What time was that?

A       That was during the autopsy; would be probably
        around quarter after four or somewhere around there;
        4:30, maybe.  I was notified by Sargeant Neville
        to check the ring on the individual, which I did, and
        the initials were on it.  I gave him a complete
        description of what she was wearing and approximate
        size and what she looked like.  At that time we were
        told that probably it was Jeanine Revak from Cranberry
        Township.

Q    You weren't present when the clothes were removed
     from the victim, were you?

A    Yes, I was.

Q    You were?

A    Yes, sir.

Q    Who was in charge of that?

A    The coroner and I take the clothes off.

Q    All right.  And which, which pieces of clothing were
     assigned to each one of you to remove?

A    We just undress her.  You take a -- he will stand
     on one side, I will stand on the other, pull the
     jacket off and place it in the bag.

Q    All right.  And neither of you made any notes about
     the condition of the clothing as you removed it from
     her, did you?

A    No; I believe it's in his report.

Q    You don't have any additional notes other than the
     notes in Dr. Abernathy's report?

A    No, I don't.

Q    And neither does the coroner, does he, to your
     knowledge?

A    To my knowledge, no.

Q    And were those clothing, was the items of clothing
     put in some identification bag?

A    Yes, they were.

Q    How was that marked?

A    Marked with each item as we closed it in there, it
     was marked.

Q    Each  item of clohting is in a separate bag?

A    Yes.

Q    I understand then in the first contact -- well, let
     me back up.  You then remained during the time that
     Dr. Abernathy did the autopsy?

A    Yes, sir.

Q    And you, and once that was completed, your assignment
     was complete with respect to the body?

A    No -- yes, in respect to the body, yes.

Q    What did you -- where did you leave the body at that
     time?

A    At that time, the body was left at the, at the
     Washington County Hospital.  It was later transported
     to a, another refrigerater located in a, oh, it's
     an old, it was the citizen's old folks type home
     located on the other side of Washington; we didn't
     know when exactly the family was going to come
     down, how long they would tie this area up.

Q    Back up now; who was in charge of obtaining evidence
     from the scene where the victim's body was found?

A       I would be.

Q       You were?

A       Yes, sir.

Q       And what were your instructions with respect to
        gathering evidence at the scene where the body was
        found?

A       There was really no instruction; it's just general,
        generally we go to the scene, look out in the whole
        area, check it out, see if we can find any evidence
        which may pertain to the evidence.  If there is
        none there is no picking up at the scene.

Q       Nothing was picked up  at this scene?

A       No.

Q       No leaves were taken from the scene of any sort?

A       Not at that time, no.

Q       When were they taken?

A       They were taken about three weeks later by the
        criminologist, Scott Ermlick.

Q       Three weeks later?

A       I am saying three, four weeks; maybe longer than that.

Q       Were you present when he came out to do that?

A       Yes.

Q       There were some differences, of course, in the
        conditions three or four weeks later of those leaves
        and at the time  he was out there, weren't there?

A      There was no leaves out there that I can recall; it
       was mostly weeds that you can see in the photographs;
       weeds and cut down trees.

Q      Leaves were found on the body of the victim, weren't
       they?

A      Yes, one, I believe, in her mouth area.

Q      Did you find similar leaves at the scene where
       the body was found?

A      I didn't pick up leaves.

Q      At the time you first arrived there, you saw other
       leaves like that, didn't you?

A      Yes, the area --

Q      Three or four weeks later when the criminalist came
       back out, he wasn't able to take any leaves out there
       because there were, the conditions were a little
       different then?

A      We weren't looking for leaves.

Q      What were you looking for there?

A      Fibers.

Q      Fibers.  Were any fibers found, to your knowledge?

A      Yes, he came up with, it was a weed-type of thing,
       type of fiber he was looking for.

Q      A weed-type of fiber?

A      Yes, sir.

Q       None of that is contained within Commonwealth Exhibit
        6?

A       No.

Q       What finding did you have as reported to you by the
        criminalist about the fiber?

A       None.

Q       Have you discussed those weed-type fibers with the
        criminalist?

A       No, not yet.

Q       And so you actually saw him seize some items?

A       Some weeds.

Q       Some weeds?

A       Yes, sir.

Q       And put it into some kind of evidence bag?

A       Yes, sir.

Q       And leave the scene with that?

A       He left the scene with me; I went down there with
        him; we were in the same automobile.

Q       Okay.  So originally, though, the day that the
        victim's body was found, there were no items of evidence
        seized at the scene?

A       No.

Q       Only the victim's body and what she was wearing?

A       That's correct.

Q       No dirt samples were taken?

A       No.

Q       Was there any attempt to take any kind of footprints
        around the area where the body was found?

A       We didn't see any.

Q       You didn't see any?

A       No.

Q       Do you have any special training in printing, foot-
        printing or fingerprints, you personally?

A       Yes, sir.

Q       You have been trained specially in particularly in
        the area of footprints?

A       Yes, sir.

Q       And did you make any attempt to take any casts of
        any sort at the scene in the mud?

A       There was no mud there.

Q       It was totally dry at that time?

A       Totally dry.

Q       How was -- how would you describe the ground where
        she was found?

A       Covered with weeds, you know, mostly all weeds area.
        You can see in the photograph there; the berm was very
        hard with a little bit of stones on it and the roadway
        itself was of an asphalt nature.

Q    Do you remember the temperature that day?

A    I believe it was somewhere between thirty and thirty-

     five degrees.

Q    And did you notice, you didn't take any scientific

     photographs of any of the brush, the way it was bent

     down or broken?

A    There were later photographs taken without the body

     in there.

Q    When were they taken?

A    They were taken after we removed the body.

Q    By whom?

A    By Trooper Titler.

Q    That would have been around the very same hour?

A    Yes, sir; after we removed the body.

Q    All right.  So all the photographs that were taken

     were taken by Trooper Titler that same day?

A    Yes, they were.

Q    You, you had the occasion to speak with Mr. Tedford

     on January 13, is that correct?

A    Yes, sir.

Q    And where did that conversation take place?

A    That took place at the Cranberry Township Police

     Department.

Q    And you indicated that was about 10:30 or eleven o'clock,

somewhere around there.

Q    You advised Mr. Tedford of his Constitutional Rights?

A    Yes, sir.

Q    Did you advise him by a form which you asked him to sign?

A    Yes, sir.

Q    And did you advise him that he was the suspect in a homicide?

A    At that time, no, he wasn't a suspect in a homicide.

Q    So in other words were you advising him of his Miranda Rights with respect to a charge of escape; isn't that right?

A    No.  We were just advising him on his Miranda Rights as a witness to a possible homicide.

Q    All right.  So at that point he was not a suspect?

A    No, not until we started talking to him.

Q    And when you began talking with him that evening --

A    Yes, sir.

Q    -- he became a suspect in your mind?

A    Yes, sir.

Q    And when he became a suspect, did you advise him of the fact now he was a suspect in your mind?

A    No.

Q    So you didn't re-Mirandize him after you changed

impressions about his status as a witness versus

a suspect, did you?

A     No; he was well aware of his Miranda Rights.

Q     Okay.  But you were -- when you advised him of

his Miranda Rights, you told him basically you were

questioning him as to some evidence which he may have

as a witness?

A     No.

Q     What did you tell him?

A     We told him we were questioning him in relation to

a criminal investigation of a homicide that we were

looking into.

Q     And was he under arrest at that time?

A     Yes, he was.

Q     And was he advised of his rights with respect to

his being a defendant in that other charge?

A     I don't believe he was, unless Cranberry Township

did because  they picked him up.

Q     Cranberry Township was obviously there before you

because they picked him up and took him back to the

station?

A     Yes, sir.

Q     And they called you in?

A     No, we were already there.

Q    How had you already been there?

A    We just got there, interviewing another individual
     who was involved in this investigation.

Q    Who was that?

A    That was Elizabeth Manuel.

Q    I see.  So you had interviewed her when Mr. Tedford
     was brought in, you just followed up with Mr. Tedford?

A    Yes, sir.

Q    He didn't sign a statement waiving his right to
     remain silent, did he?

A    Yes, he did.

Q    He did sign a statement?

A    Yes.

Q    And the statement which you took from him was
     recorded or unrecorded?

A    Unrecorded.

Q    And was it reduced, were the notes that you took
     reduced to a narrative or statement form which he was
     asked to sign?

A    Yes -- no.

Q    He was asked to sign, you say?

A    No.

Q    The notes which you took, are they the notes which
     you have in front of you today?

A    No.

Q    There is a different set of notes which you took
     those notes and then transcribed them in some fashion
     into the notes you have with you today?

A    There were two of us taking it; primarily Trooper
     Stanek took the majority of notes.

Q    And you?

A    I just took a few preliminary notes.

Q    So what are the notes you have with you today?

A    I don't have any notes on that right now; I have a
     report, that's it.

Q    So all the written recollection that you have of the
     conversation with Donald Tedford that night, January
     13, 1986, at around 10:30 or eleven P.M. are contained
     in the report that you are referring to?



A    Yes, sir.

Q    Is with you today, but not personally on you?

A    Yes, sir.

Q    You, you reviewed that report prior to coming to
     Court today, did you not?

A    Yes, sir.

                    MR. SCHWARTZ:  I'd like to

          see that report to --

                    MR. COOK:  He gets that after

Arraignment Court, Your Honor, under

the Rules of Criminal Procedure, which I

told Mr. Schwartz he will get.

MR. SCHWARTZ: Yes, I have no

doubt about that. The witness testified

he reviewed those notes before coming to

Court today, and I think under the Rules

of Court I have a right to look at that

report in cross examining the witness.

DISTRICT JUSTICE GANT: We

are going --

MR. COOK: If he was using

the report, I would agree, but he is not.

DISTRICT JUSTICE GANT: We,

we will see to it that you get anything

that is available in the way of discovery

that, when the, when this proceeding

is concluded.

MR. SCHWARTZ: Yes, I

understand.

MR. COOK: He was --

MR. SCHWARTZ: We are

talking about apples and oranges. I

know under discovery rules I am entitled

to it, and I have no doubt I will get

it.  We are talking about my right of

confrontation and cross examination.

And since the witness has testified that

he refreshed his recollection by having

read those reports prior to coming

here today, I have the right under the

Rules of Evidence to review it.  There

is a unanimous shaking of heads.

            MR. COOK:  Well, that's our

table; you have to expect that.

            MR. SCHWARTZ:  But obviously --

            MR. COOK:  I don't think he

said --

            MR. SCHWARTZ:  -- Commonwealth

knows that's my right.

            MR. COOK:  Wait a minute.  I

think you are missing something, Mr.

Schwartz.  He didn't say he testified --

he didn't testify that he read his notes

or read the report today, he reviewed

them before today, before the hearing.

I think that's what he testified.

            MR. SCHWARTZ:  You read them

today before coming?

OFFICER PETERS:  Not the whole

report.

MR. SCHWARTZ:  Part of it?

MR. COOK:  Your Honor, to

clarify this, if he uses a report to

clarify something he is not quite sure

of on the stand, that't correct, Mr.

Schwartz is correct; he has not done that.

This is merely oral testimony.  He will

get the report when it's due him under

the Rules of Criminal Procedure.  And

until he says I don't know something, I

have to refer to my report, it's not, it's

not necessary for him to get the report.

That's the Rules of Evidence.

MR. SCHWARTZ:  I disagree.

MR. COOK:  Well, I know that,

Charles.  I realize that.

MR. SCHWARTZ:  It's my table

over here.

MR. COOK:  Yes, I understand

that.

DISTRICT JUSTICE GANT:  Your

motion is denied.  We are going to give
it to you at the conclusion of this
session.

          MR. SCHWARTZ:  Okay.

Q    (By Mr. Schwartz)  Mr. Tedford voluntarily spoke
to you that evening then?

A    Yes, sir.

Q    And the notes which you have in front of you, are
what notes?

A    These are notes of the investigation.  There is
nothing in these notes that pertain to Mr. Tedford's
statement.

Q    Nothing in there?

A    No, sir.

Q    And how, how are those notes described by you, the
ones you have in front of you there?

A    These are sort of notes on the beginning of the
investigation and who I interviewed, the time I
interviewed them, so on.

Q    Do you ever refer to a little booklet as something
in the course of police work?

A    Yes.

Q    What do you call that little booklet?

A    Just a notebook, that's all.

Q    You, would you call it your notebook on the case

     of Commonwealth versus Tedford?

A    No, sir, just a notebook that we take notes in; there

     is several other cases in here, too.

Q    There are?

A    Yes.

Q    Do you intend to preserve those notes for the time

     of trial for Mr. Tedford?

A    Yes, sir.

Q    Are there any notes that you have not preserved

     in connection with the prosecution of Mr. Tedford?

A    No.

Q    So the notes that were taken that night, during the

     course of Mr. Tedford's conversation with you and

     the Cranberry Township Police, were taken by Trooper --

A    -- Stanek.

Q    -- Stanek?

A    Right.

Q    And you were not taking any notes at all?

A    I just briefly took some notes.

Q    And what did you use as a basis for transcribing

     or otherwise transferring your recollections of

     the conversation with Mr. Tedford onto your police

     report?

A       I had a sheet of paper like that, this; there was a
        piece of paper lying on the table.  And since Trooper
        Stanek was doing the primary interview there I
        was sitting in the back there taking briefly some
        notes.

Q       Did you use Trooper Stanek's notes in helping you
        to prepare your report?

A       No.

Q       Did you prepare your report the same night as you
        spoke with Defendant Tedford?

A       No.

Q       When did you do that?

A       Probably about, maybe a week later; somewhere around
        there.

Q       And as I understand it, you asked Mr. Tedford whether
        he had any phone conversations with the victim on
        or about Tuesday or Wednesday of the week preceding
        her death, didn't you?

A       Trooper Stanek would ask that.

Q       Trooper Stanek; you were present when he asked?

A       Yes.

Q       Was it just the three of you present in this room?

A       There was Chief Scarfo from Cranberry Township.

Q       The four of you?

A     Yes.

Q     The entire time during that questioning?

A     Yes, sir.

Q     No one left the room before the conversation was
      complete?

A     To my recollection, I would say maybe Stanek
      left the room for a phone call or something in,
      another office.  I don't -- I think that was about
      the extent of it.

Q     When he left, the conversation didn't stop, did it?

A     No, the conversation stopped right there.

Q     I am sorry?

A     The conversation stopped right there.

Q     When Trooper Stanek left?

A     Yes.  And didn't resume until he came back.

Q     All right.  Getting back to your questioning about
      Mr. Tedford, any conversation he had with the victim,
      that Tuesday or Wednesday, he indicated to you that
      he had called her, he had tried calling her at her other
      place of employment and couldn't reach her and called
      her at her home; that is consistent with what her
      husband testified to today?

A     Yes, sir.

Q     And there was also, he indicated that he had spoken

with her on another occasion, didn't he?

A   I believe he did.

Q   When was that?

A   Something about her portfolio; he had seen a portfolio when she came in there originally -- I think maybe the second time she had been in the store -- and then he had spoken to her on the phone.

Q   When?

A   Afterwards, after seeing the portfolio, I think.

Q   That was again consistent with what you learned from the victim's husband?

A   The husband, yes.

Q   And there was indication by Mr. Tedford that a certain customer had been to the store at a certain time on the 10th?

A   Yes.

Q   And you checked that out and that proved to be true?

A   Yes, sir.

Q   Who was that customer?

A   That was a Mrs. Maxwell, M-a-x-w-e-l-l; that's also in the report.

Q   And what time was she in the store?

A   She, I believe she said she was in the store at nine A.M., in the morning; between nine and 9:15.

Q    When the conversation turned toward what other

customers were at the store, it was never likely

asked of Mr. Tedford what other people or service

people arrived at the store that day; was it?

A    Yes; it's in the report.

Q    What's the report say about that?

A    Says there was no one there.

Q    No other delivery people?

A    No other delivery people, no.

Q    And that's, that's your recollection of what Mr.

Tedford told you?

A    Yes, sir.

Q    That he told you no other delivery people came?

A    No delivery people or customers in the store.

Q    How long did the conversation last between you and

Donald Tedford?

A    Probably about, maybe two, two and a half hours;

somewhere around there.

Q    Did you at any time have the occasion to conduct a

search of the Finishing Touch?

A    Yes, sir.

Q    When did that occur?

A    That occurred on the 12th of January, 1986, in the,

toward the evening; probably around four or five o'clock

in the evening.

Q     Was that in the consent of the owner of the Finishing
      Touch?

A     Yes, sir, the owner was there.

Q     Mr. Sosso?

A     Yes, sir.

Q     He was there when this was conducted?

A     Yes, sir.

Q     Who was with you at the time?

A     Trooper Stanek was with me.

Q     Just the two of you and Mr. Sosso?

A     As far as I can recall; and the District Attorney
      was with us.

Q     Who would that have been?

A     Dave Cook.

Q     And were any, any items or samples of evidence sought
      to be removed from the Finishing Touch on that
      occasion?

A     Yes, there was.

Q     What were they?

A     I can recall there was the blotter removed; a sort
      of a calendar-type of sheet; not the whole blotter but
      the calendar thing.  I believe there was a, I'd have
      to go back to my report on that.  I don't know exactly

what it is.

Q    Did you search for evidence of blood or fibers,

anything like that?

A    Yes, we did, as far as we could.

Q    What's that?

A    As far as we could at that time.

Q    What was preventing you from being able to do that?

A    Well, we didn't have the necessary lighting and

normally we will send a records and identification

man to go in there and pull fibers and things like

that; that was later on done.

Q    Who was that done by?

A    That would be Trooper Cunningham and, I believe,

Trooper Rea removed some items -- I am not too sure --

from the Butler Barracks.

Q    Were you present at that time?

A    No.

Q    Did you have anything to do with sending those

items to a criminalist?

A    Yes.

Q    And they were sent to --

A    Criminalist Scott Ermlick.

Q    In Greensburg?

A    Yes, sir.

Q    And did the results of any of those items come back

to you?

A    The fiber items, no; all I have got is what I have

     got there on the report.

Q    And how about any items of blood?

A    We didn't lift any blood from the scene.

Q    You never have?

A    No.

Q    You didn't find any blood at the scene?

A    That's correct.

Q    By the scene, you are referring to the Finishing

     Touch?

A    The Finishing Touch, yes, sir.

Q    Did you have the occasion to send any, to print,

     to take any fingerprints of the Finishing Touch?

A    Trooper Cunningham took some fingerprints, yes, he

     got some prints at the Finishing Touch.

Q    They were sent to Criminalist Ermlick?

A    No, they are, our fingerprint man at Washington

     handles that, Titler.

Q    And what are the results of that?

A    We came up with a fingerprint that belonged to

     Don Tedford at the Finishing Touch.

Q    And no fingerprint that matched the victim's?

A    No.

Q    Did you have the occasion to conduct an investigation
     into either Mr. Tedford's vehicle or the vehicle
     which has been indicated driven by the victim,
     that is that Chevy Impala?

A    Yes, sir.

Q    Both of those vehicles were investigated by you?

A    By Trooper Titler and Trooper Rea up here in Butler.
     Trooper Rea had the Chevy; Trooper Titler had Mr.
     Tedford's vehicle.

Q    Trooper Rea had the Chevy?

A    Yes, sir.

Q    And Trooper Titler had Mr. Tedford's?

A    Yes, sir, for examination purposes.

Q    And were any items of evidence seized from either of
     those vehicles?

A    Everything in Mr. Tedford's vehicle was seized at
     the time.  There was clothing, a sweater; there was
     a bag; there was items belonging to the Finishing
     Touch, paper items; there was a blueprint on a
     solar house.  I believe Mr. Tedford's made up some
     other items that I have to refer back to the report.

Q    And as a result of all of those items seized from
     Mr. Tedford's car, there was nothing linking him to
     the victim in this case, was there?

A       No, not that I know of at this time.

Q       And you have gotten reports back on those items?

A       No.

Q       You have not got --

A       No, we swept his rug last and the sweepings were
        given to the criminalist.

Q       The sweepings of the rug in the Finishing Touch?

A       No, the rug -- well, the sweepings in the rug of the
        Finishing Touch; the sweeping in the Chevy; the
        sweepings in Mr. Tedford's vehicle.

Q       And were those sweepings done with a  particular-type
        broom?

A       No, we have a special vacuum  that is done with this
        type of sweeping.

Q       Who is in charge of using the vacuum?

A       I swept Mr. Tedford's rug in his car, and Trooper
        Rea, I believe, swept the Chevy, or it was oneof his
        assistants because there is three of them working
        that detail so they would be together.  Normally
        two of them would work together.  And the floormat in
        the Chevy was picked up by me, the whole floormat
        in the trunk area, and transported down to the
        State Police Barracks in Washington.

Q       Let's talk about the sweeping first in the Tedford

vehicle.

A    I have no results on them whatsoever.

Q    They were sent off somewhere?

A    Yes.

Q    Where were they sent?

A    In the lab in Greensburg.

Q    And when you prepared, when you sought to seize
     whatever could be picked up in that special vacuum
     that you use, you used one filter that day in --

A    It comes in --

Q    -- sweeping everything up?

A    It used to come in filters, but they don't any more
     so we have to use, we pull off paper towels and we
     place it in this canister and the vacuum pulls
     it through and ends up in the canister and the air
     is blowing out the other end.  Everything that is
     picked up within that area is stopped in the paper
     towel.  The canister itself is unscrewed and you
     lift the paper towel out and place it in the evidence
     bag.

Q    So you submitted one filter from your findings,
     one can, paper towel from your findings?

A    Not necessarily one; that might be more than one
     because if you sweep it, you get so much evidence
     that you have to screen it all out into a bag and

.then get, sweep the same item over again.

Q     You don't know how much you swept out of there?

A     No; it might have been two or three; might have been

      just two.

Q     Did you have any personal knowledge of what was

      discovered, if anything, by Rea and Titler in the

      Chevy and in the Finishing Touch?

A     No, I have no report on that yet.

Q     Who was in charge of taking these hairs from the cat?

A     That was Trooper, I believe it was Trooper Rea, to

      be maintained, because these two gentlemen are from

      Butler.  I think it was Trooper Sherwin and -- I

      can't think of the other officer's name.

Q     You conducted fingerprinting of the '77 Impala, is

      that correct?

A     No, I didn't.

Q     There were fingerprints done?

A     There was fingerprints done.

Q     By whom?

A     That would be the Trooper Rea up here in Butler

      Barracks.

Q     And the results of that were that none of Mr. Tedford's

      fingerprints were found in that car; right?

A     That's correct.

Q    And the fingerprints were sought to be uncovered in
     Mr. Tedford's vehicle, right?

A    Yes.

Q    None of the victim's were found in that vehicle,
     right?

A    Correct.

Q    And, in fact, there is, as a general statement,
     correct me if I am wrong, but there is no evidence
     of any sort that you have found from the Tedford
     vehicle that would show that the victim was ever
     in that vehicle.

A    That's correct.

Q    And now the converse of that, there is no evidence
     that, of any sort, that was found in the '77 Impala
     that would link Mr. Tedford with that vehicle, is
     that correct?

A    That's correct.

Q    And as, and, finally, there is, as a general statement --

                    MR. SCHWARTZ:   Strike that.

Q    What, what tests were conducted with respect to
     blood found at the scene where the victim's body
     was found?

A    There was no test at the scene for blood.

Q    What, what items were taken from the scene that

contained any blood at all?

A    None.

Q    And what, what test was done of the hair of the

     victim; that is, were any of her head hairs removed

     for inspection by a criminalist or otherwise?

A    Yes, sir.

Q    Who, who took those hair fibers?

A    Dr. Abernathy takes them; placed them in the rape

     kit -- it's a standard kit that they use -- and I

     take the rape kit and place it into evidence.

Q    All right.  And those, those hairs, what, were

     there any results turned in to you as, in connection

     with findings in these hair fibers?

A    Just that it was her hair.  There wouldn't, all

     you are giving him is a sample of this victim's

     hair, that' it.

                    MR. SCHWARTZ:  Okay.  I have

          no further questions.

                    MR. COOK:  That's all, Your

          Honor.  We rest.

                    DISTRICT JUSTICE GANT:  You

          can step down.

                    (The witness left the stand.)

                    MR. SCHWARTZ:  We have no

witnesses to present.

If the Court please, I respectfully ask
you to dismiss the charges against Mr. Tedford.
Maybe I am missing something, but there is simply
not a sufficient quantity of evidence to indicate
that Mr. Tedford is responsible for this very tragic
death of the victim in this case. We don't have,
certainly, any form of eyewitness testimony. The
only attempt that the Commonwealth has sought to
make in that regard was an individual who very
candidly could not identify a woman who he saw at
the Finishing Touch on the day in question. But
there is not even evidence in this case as to when
Miss Revak died, let alone that Mr. Tedford had
anything to do with her tragic death.

Unless this, unless this -- the
Commonwealth is asking us to simply say we have got a
Defendant and we have got a tragically murdered
woman; therefore, he must be the one.

There is not, there is no evidence in
this case. The only evidence that I can see, which
might have had some probative value, was, was the
indication that, that the seminal stain detected
on the victim's slacks contain characteristic factors

that are consistent with Mr. Tedford's blood.  But

that, that doesn't tell us anything.

The Commonwealth sought not, they chose

not to bring in the criminalist to even tell us

what percent of the population has the type of

blood which is being attributed to that found in the

seminal stain.

I am, I respectfully ask you to dismiss

these charges.  They are, the Commonwealth has not

produced the kind of evidence that, in the way of

false statement, in the way of eyewitness testimony,

in the way of sufficient circumstantial evidence, by

way of scientific tests, to hold this man on these

charges.

I respectfully submit there is, although

the seminal stains apparently were found on the victim,

this is not the kind of evidence of a rape sufficient

to hold the rape charge here.

Now I am not saying that, that there was

not a rape, but it's just as likely that there was

not from the evidence presented by the Commonwealth.

And you are asked to rule on both homicide and rape

charges here today.  And it just hasn't been produced.

We, of course, don't have that burden.

I, therefore, ask you to dismiss the charges and to release Mr. Tedford.

MR. COOK: Your Honor, we believe there is sufficient evidence of criminal homicide, of course, and also the rape for the simple reason that you have got several head wounds, you have got ligature to the one leg, that is a tying of, a binding. We have got, they have the evidence of pubic hair of Mr. Tedford that would -- Mr. Schwartz forgot about that -- we have the denial; we have a denial of the Defendant himself through the statements given to Officer Peters that he had no contact with her since Tuesday or Wednesday by phone. He has denied that he was ever in the, that no one was in the store that day except one woman. And Mr. Scheller was there and a very young, attractive, dark-haired young woman, well dressed, was in the store at 11:45 A.M. Mr. Tedford's only statement himself indicates that he has given a false statement to the officer. There is sufficient evidence to bind it over for Court.

MR. SCHWARTZ: If I may just briefly respond?

DISTRICT JUSTICE GANT: I can't

stop you.

MR. SCHWARTZ: The fact,
two of the facts pointed out by Mr. Cook that there
is a ligature wound of the leg, it's a tying or
binding, has not been introduced in evidence. There
is no testimony to that fact. That's a conclusion
being drawn by the Commonwealth.

MR. COOK: Right.

MR. SCHWARTZ: And it has
no more evidenciary value for the Commonwealth to
conclude that before this Court than it is to say we
conclude that Donald Tedford is the guilty party.
Those are, the same goes for these apparently incon-
sistent statements. There is no proof that any of
these statement that he made are inconsistent.
The Commonwealth just chose to believe that they are
inconsistent and do choose. And, but they have
produced evidence to you, the factfinder, to believe
that they are inconsistent.

DISTRICT JUSTICE GANT: All
right. After listening to the testimony, there
certainly is, if this were a trial there certainly
would be doubt. I didn't hear, certainly didn't
hear evidence that would convict the Defendant. But

it is not a trial.  This ia a preliminary hearing,

and my responsibility only is to determine whether

or not there is a prima fascia case.

I think this gentleman is not feeling

well here.

I don't like your gestures.

UNIDENTIFIED MAN:  Sorry.

(Whereupon the gentleman

was escorted from the Courtroom

by the Sheriff's Deputy.

DISTRICT JUSTICE GANT:  Held

for Court.

MR. COOK:  Thank you, Your

Honor.

(The proceedings were concluded

at 4:02 P.M.)

-   -   -

(End of transcript.)

-   -   -

# C E R T I F I C A T E

I, Susan Lynn West, do hereby certify that I took the foregoing proceedings in stenotype and at the time and place hereinbefore set forth and thereafter reduced the same to typewritten form, and that the foregoing is a true, full and accurate transcript of my said stenotype notes.

Susan Lynn West

SUSAN LYNN WEST
Official Court Reporter